Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

_____

O.L., By and Through Her Mother,

V.L., and V.L.,

          Plaintiffs,

     v.                              Civil Action No.

COBB COUNTY SCHOOL DISTRICT;          1:23-cv-03285-SDG

ALVIN THOMAS; NAKIA COTTON;

and JESSICA COLEMAN,

          Defendants.

_____

     VIDEOTAPED DEPOSITION OF JESSICA NOELLE COLEMAN

          AS 30(b)(6) CORPORATE REPRESENTATIVE

          FOR COBB COUNTY SCHOOL DISTRICT

DATE:          Friday, September 19, 2025

TIME:          9:06 a.m.

LOCATION:      Parker Poe Adams & Bernstein LLP

               1075 Peachtree Street NE, Suite 1500

               Atlanta, GA 30309

REPORTED BY:   Cara Sparks

JOB NO.:       7581675

Page 2

A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS O.L. AND V.L.:

CHRIS VANCE, ESQUIRE

JUSTIN CROZIER, ESQUIRE

Chris E. Vance, P.C.

2415 Oak Grove Valley Road, Suite 100

Atlanta, GA 30345

chris@chrisvancepc.com

justin@chrisvancepc.com

(404) 320-6672

(762) 218-1116


EUGENE CHOI, ESQUIRE

Southern Poverty Law Center

2 Biscayne Boulevard, Suite 3750

Miami, FL 33137

eugene.choi@splcenter.org

(786) 347-2056

Page 3

A P P E A R A N C E S (Cont'd)

ON BEHALF OF DEFENDANTS COBB COUNTY SCHOOL DISTRICT,

ALVIN THOMAS, NAKIA COTTON, AND JESSICA COLEMAN:

        JEFFREY DANIEL, ESQUIRE

        MARYGRACE BELL KITTRELL, ESQUIRE

        Parker Poe Adams & Bernstein

        1075 Peachtree Street Northeast

        Atlanta, GA 30309

        jeffdaniel@parkerpoe.com

        marygracekittrell@parkerpoe.com


    ALSO PRESENT:

        Duke Stephenson, Videographer, TrueVid, LLC

        Craig Vance, Chris Vance P.C. Paralegal

        V.L., Plaintiff

Page 4

                          I N D E X

EXAMINATION:                                              PAGE

     By Ms. Vance                                          10

     By Mr. Daniel                                        196

     By Ms. Vance                                         199


                       E X H I B I T S

NO.                 DESCRIPTION                           PAGE

Plaintiff:

Exhibit 15      Notice of Rule 30(b)(6) Deposition

                of Cobb County School District     18

Exhibit 16      Cobb County School District FY2020

                Board of Education Adopted Budget    41

Exhibit 17      Composite Exhibit of Files           60

Exhibit 18      Calendars for 2019 - 2022 and 2025   61

Exhibit 19      Cobb County School District 504

                Manual                               94

Exhibit 20      Special Education Guidance for

                Hospital Home Bound/Home-based

                Services 2019-2020                  127

Exhibit 21      Special Education Guidance for

                Hospital Home Bound/Home-based

                Services (Part of CCSD Special

                Education Practitioner's Manual)

                2022-2023                           129

Page 5

E X H I B I T S (Cont'd)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 22 | Georgia Department of Education FTE Special Education Environment School-Age Students Report | 132 |
| Exhibit 23 | Attendance Protocol 8/22/19 | 133 |
| Exhibit 24 | Attendance Protocol 7/1/22 | 134 |
| Exhibit 25 | JBC-R School Admissions/ Withdrawals 7/20/17 | 136 |
| Exhibit 26 | JBC-R School Admissions/ Withdrawals 9/19/19 | 136 |
| Exhibit 27 | JBC-R School Admissions/ Withdrawals 10/15/20 | 136 |
| Exhibit 28 | JBC-R School Admissions/ Withdrawals 7/15/21 | 136 |
| Exhibit 29 | JBC-R School Admissions/ Withdrawals 7/1/22 | 136 |
| Exhibit 30 | JBC-R School Admissions/ Withdrawals 12/7/23 | 136 |
| Exhibit 31 | JCDA-R Student Code of Conduct 7/1/20 | 136 |
| Exhibit 32 | Evaluation & Reevaluation (34 C.F.R. 300.301-300.311; GA Rule (160-4-7-.04)) | 146 |
| Exhibit 33 | Response Letter to Complaint | 149 |

Page 6

                        E X H I B I T S (Cont'd)

NO.              DESCRIPTION                          PAGE

Exhibit 34       Cobb County School District

                 Hospital Home Bound (HHB)

                 Application                          155

Exhibit 35       Defendant Cobb County School

                 District's Objections and

                 Responses to Plaintiff's First

                 Interrogatories                     175

Exhibit 36       Verification Page                   176

Exhibit 37       Defendant Cobb County School

                 District's Objections and

                 Supplemental Responses to

                 Plaintiff's First Interrogatories   176

Exhibit 38       Updated Verification by Defendant

                 Cobb County School District         177

Exhibit 39       Independent Educational Evaluation

                 Request Letter                      182

Exhibit 40       Independent Evaluators Chart        190


             D O C U M E N T S   R E Q U E S T E D

NO.              DESCRIPTION                          PAGE

1                Copy of Notebook Provided to

                 Witness                             58

2                2019/2020 District 504 Manual       99

Page 7

D O C U M E N T S   R E Q U E S T E D (Cont'd)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 3 | District 504 Manuals Between 2019/2020 and 2023/2024 | 100 |

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 8

P R O C E E D I N G S

THE VIDEOGRAPHER:  Good morning, everybody.  We are going on the record at 9:06 a.m. Eastern Standard Time on Friday, September 19, 2025.

Please note that the microphones are sensitive and may pick up private conversations. Please mute your phones, at this time.  Audio and video recording will continue to take place, unless all parties agree to go off the record.

THE REPORTER:  Thank you, Duke.

Good morning.  My name is Cara Sparks. I am the reporter assigned by Veritext to take the record of this proceeding.  This is the deposition of Jessica Coleman as the 30(b)(6) witness for Cobb County School District in the matter of O.L., by and through her mother, V.L. and V.L. vs. Cobb County School District, Alvin Thomas, Nakia Cotton, and Jessica Coleman, on Friday, September 19, 2025, at 1075 Peachtree Street Northeast, Suite 1500, Atlanta, Georgia 30309.

I am a notary authorized to take acknowledgements and administer oaths in Georgia.

Additionally, absent an objection on the record before the witness is sworn, all parties and the witness understand and agree that any

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 9

certified transcript produced from the recording of this proceeding:

    - is intended for all uses permitted under applicable procedural and evidentiary rules and laws in the same manner as a deposition recorded by stenographic means; and

    - shall constitute written stipulation of such.

This video will be recorded via video technology by Duke Stephenson.

At this time will everyone in attendance please identify yourself for the record, starting with taking attorney.

MS. VANCE:  Good morning.  Chris Vance here for Plaintiffs, and I will be taking the deposition of Cobb County School District representative.

MR. CHOI:  Eugene Choi for the plaintiffs.

MR. CROZIER:  Justin Crozier for Plaintiff.

MR. VANCE:  Craig Vance for Plaintiff.

MS. KITTRELL:  MaryGrace Bell Kittrell, attorney for Jessica Coleman and the other defendants

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025
O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 10

in this matter.

MR. DANIEL:  Jeff Daniel, attorney for defendants.

MS. COLEMAN:  Jessica Coleman.  I am the executive director of special ed compliance and the -- the representative here today.

THE REPORTER:  Thank you.  Hearing no objection, I will now swear in the witness.

Please raise your right hand, ma'am.

WHEREUPON,

JESSICA NOELLE COLEMAN,

called as a witness and having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

THE REPORTER:  All right.  You may proceed.

MS. VANCE:  Thank you.

EXAMINATION

BY MS. VANCE:

Q    My name is Chris Vance, and as I said, I'm here on behalf of Plaintiffs in this matter, and this deposition is being taken pursuant to notice filed in the case as document 108.  It is the 30(b)(6) deposition of Defendant Cobb County School District, and it is taken upon cross-examination.  Pursuant to

Corp. Rep. 30(b)(6) Jessica N. Coleman                September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 11

the court's standing order ECF29, when an objection is made, it has to be concise.  There are no speaking objections allowed by Judge Greenberg [ph] or other tactics for coaching a witness.

We all understand that, I believe, and that is in keeping, of course, with Rule 30(c)2.  So we also understand that if an objection is made, make the objection concisely, and then you may answer the question, unless you are instructed by an attorney for Cobb County School District or you to not answer the question, and then we will take that up in a different forum.  Now I ask, would you please state your full name?

A    Jessica Noelle Coleman.

Q    And is it correct that you are here to testify about the information known to Cobb County School District or reasonably available to Cobb County School District regarding the matter set forth in the Notice of Deposition?

A    Yes.

Q    And are you prepared to do so, today?

A    I am.

Q    And did you agree to do so?

A    I did.

Q    Now you just took the oath.  Do you

Page 12

understand what it means when you take the oath?

     A    That I swear to tell the truth, the whole truth, and nothing but the truth.

     Q    Thank you.

     A    Mm-hmm.

     Q    And if I ask a question and you don't understand it, will you tell me that you don't understand it, so I can restate it?

     A    Yes.  I will ask that, or if I need clarification, I will do that.

     Q    Okay.  And do you understand that as the 30(b)(6) representative for Cobb County School District and as a witness in a federal court case, that when a question is asked of you, you are to answer the question?

     A    I do.  Yes.

     Q    And do you understand that an evasive or an incomplete answer to a question is treated as a failure to answer?

     A    I don't know the specifics about that.

     Q    Okay.  But you agree you will answer the questions as they're asked?

     A    Yes, to the best of my ability.

     Q    And if you need a break at any time, you'll let us know, please?

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 13

A     Absolutely.

Q     Thank you.  And it's also important, as you know, to answer each question orally, you know, not a head shake or uh-huh or huh-uh, just yes or no, if it's a yes or no question.

A     Yes.

Q     Thank you.  And I'm not being personal, but are you under any medications or other substances that would affect your ability to testify truthfully and accurately today?

A     No.

Q     And do you have any -- and again, not being personal; it's a normal question.  Do you have any condition or disability that would impact your ability to testify accurately and truthfully today?

A     No.

Q     Okay.  And what is your date of birth?

A     It is ███████.

Q     Okay.  And what is your educational background?

A     I have, obviously, a high school diploma through Cobb County School District.  I have a bachelor's in business administration and an add-on bachelor's in special education, a master's in educational leadership, and a specialist in

Page 14

educational leadership.

Q    And where did you receive those degrees?

A    So my bachelor's in business administration was through Kennesaw State University.  My add-on bachelor's was through UGA.  My master's was through Kennesaw State.  And then my specialist was through Berry College.

Q    Okay.  And what is your occupation?

A    I am an educator.

Q    And who is your employer?

A    Cobb County School District.

Q    And please tell us how long you've been at Cobb County School District and what your positions have been?

A    I -- this is my 21st year in the Cobb County School District.  I have been a teacher, special needs preschool teacher, an autism preschool teacher.  I have been an autism trainer, a educational program specialist, or what they called EPS, a cluster supervisor in special education, and assistant director.

Q    Of?

A    Of 504, and then 504 and special ed compliance, a director of special education compliance and 504 compliance, and then an executive director of

Page 15

special education compliance, 504 compliance, and the Aspire Program.

Q    And what's the Aspire Program?

A    It is the GNETS program that Cobb County School District is the fiscal agent of.

Q    And how many years did you teach autism class?

A    I was a teacher for five years.

Q    You said you taught special needs students and then you taught an autism program?

A    The combined was five years.

Q    Okay.  And what was the breakdown of those two?  Three and two?

A    I would have to go back specifically to my resume, to -- to remember that.

Q    Have you ever given a deposition before?

A    I have.

Q    And where was that?

A    In Cobb County School District.

Q    Involving what?

A    Involving another special education due process matter appeal.

Q    Appeal?

A    Mm-hmm.

Q    And how many --

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 16

A    Yes.

Q    -- times have you -- thank you.  And how many times have you given a deposition before?

A    Once.

Q    Okay.  And that was in that Cobb County matter?

A    Correct.

Q    Thank you.  Have you ever been a party in a civil case?

A    I have not.

Q    Have you ever been a party in a criminal case?

A    I have not.

Q    Okay.  Have you ever been a witness in any legal proceedings?

A    Yes, in special education due process hearings.

Q    And how many times?

A    I do not know.

Q    Okay.  Have you been involved in testifying in at least ten due process hearings?

A    I would say, approximately, we may go to one a year, so I would say, approximately, maybe seven to ten.

Q    Well, didn't Cobb County go to five, in

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 17

2019?

MR. DANIEL:  I'm going to object to relevance.

You can answer.

THE WITNESS:  I do not recall the specific number.

BY MS. VANCE:

Q    And you also give affidavits in due process hearings?

A    I do.  Yes.

Q    What did you do to prepare for the deposition and to be here to testify on behalf of Cobb County School District and the knowledge it has?

A    I reviewed records specific to this case.  I reviewed policies, practices, and procedures in the areas that were given notice of it.

Q    Did you speak to anyone, other than your attorneys, in preparing for this deposition, about the deposition?

A    Yes.

Q    Who did you speak to, and about what?

A    I spoke to a -- one of our special education budget supervisors, to make sure I had some correct information.

Q    I ask you to please look at what's been

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 18

marked as Plaintiff's Exhibit 15.  And do you recognize this document?

(Plaintiff Exhibit 15 was marked for identification.)

A    I don't know that I've seen the full document.  I've seen the specific areas.

Q    To be clear, you have seen the specific areas listed on pages for and five of Exhibit 15; is that accurate?

A    That is accurate.  Yes.

Q    And let's just go through these to make sure that, you know, you're here today, for the record, to testify regarding the information that Cobb County has or is reasonably available to Cobb County involving Cobb County's policies, practices, and procedures relating to initial evaluations and reevaluations as used under the IDEA Section 504 and the ADA?

A    Yes.  That's correct.

Q    And I can summarize this, so we don't take too long.

A    Sure.

Q    Please read each of these sections, one through ten, and testify, if you can, if you're here on behalf of Cobb County to testify regarding the information Cobb County School District has or is

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 19

reasonably available to Cobb County School District regarding each of these ten listed topics in Exhibit 15.

A     Okay.  Just give me one second --

Q     Sure.  Absolutely.

A     I had a chance to review.  Do you mind asking the question again?

Q     Right.  So my question is are you here on behalf of Cobb County School District to testify regarding the information that Cobb County School District has or is reasonably available to Cobb County School District in regards to each one of these ten topics listed on Exhibit 15?

A     Yes.  I am.

Q     Thank you.  So let's start with number ten, which asks you to testify on behalf of Cobb County regarding its policies, practices, and procedures for the collection and reporting of data, including student data, to the Georgia Department of Education, relating to students with disabilities, students' attendance, truancy, student enrollment and withdrawal, Hospital Home Bound, and financial budgets; okay?

A     Okay.

Q     So how does Cobb County School District,

Page 20

today, report data on disabled students who also are students in Cobb County to the Georgia Department of Education?

A    Cobb County reports students with disabilities in multiple ways.  We report students during the FTE1 Collection in October 1st, around October.  We report students ongoing, for their courses and their teacher of record.  We report them in March, specific to the FTE count in the spring.  And then we also report them in June, in student record.

Additionally, the DOE has indicators which we are required to provide specific information throughout the year.  One of the -- the report -- one of the reportings is timelines, so any initial timelines for students being evaluated by the Cobb County School District.  We report -- as of this year, we are reporting annual IEPs and reevaluations that occur every three years.  As of this year, we are reporting any students with disabilities who are incarcerated.  We also report students with disabilities when it is our year for cross-functional monitoring, which was the last fiscal school year.

We report LRE data that is collected in the October count, which is an indicator for both

Page 21

preschool and school age.  And -- I'm trying to go through all the indicators, as I'm going through, on my dashboard.  Transition planning for students and post-school outcomes, so after students leave, either graduate or age out, we do a post-school outcome for where they are.

Q    And do you report test scores to the Georgia Department of Education for students with disabilities?

A    When you say test scores, what test scores are you referring to?

Q    Tests that students take, either the GAA or if they take the same test that disabled students take, that all students take, those test scores.

A    So the test scores are not reported specifically by Cobb.  The test scores are -- they are reported back to us.  Once we -- once those tests are taken, the DOE reports that data back to us.

Q    Okay.

A    We do report that, for students who are eligible to take the GAA, to the DOE.

Q    Okay.  And do you report to the Georgia Department of Education the withdrawal of disabled students?

A    As part of the FTE counts, we -- we do

Page 22

report students that are withdrawn, and specifically, we report students who are withdrawn that are private school or homeschool, for child find.

Q    And doesn't Cobb County School District report to the Georgia Department of Education the withdrawal of disabled and non-disabled students?

A    Yes.

Q    From Cobb County School District?

A    Yes.

Q    Okay.  And it also reports to the Georgia Department of Education the enrollment into Cobb County School District of all students, whether they're disabled or not; correct?

A    Correct.  We're reporting those and -- those dates and reasons, as outlined by the Georgia Department of Education.

Q    Okay.  And what is the platform, the system that Cobb County School District provides its withdrawal and enrollment information for students in Cobb County School District to the Georgia Department of Education?

A    So our student information system reports up to the DOE portal, so the data is flowing from our information system to the Georgia Department of Education.

Page 23

Q    And how often does that flow up?  Every day, or is it monthly, or is it weekly?

A    Different data is going up in different times.  My understanding is that there -- the data for student course -- enrollment in courses is going up throughout the timeframe, but specific data reporting for the FTE collections are only happening within the windows.

Q    Right.  But I'm talking about withdrawal of a student, regardless of FTE information.  How often is that provided in the flow up?

MR. DANIEL:  Objection.  Vague.

MS. VANCE:  You can answer.

THE WITNESS:  My understanding of when the -- the data is flowing up is during those collection periods, and then it is cross-referenced with the student record, at the end.  If a student is no longer in that course, then that -- that information probably would go up, as well, but I'm not sure that specific information.

BY MS. VANCE:

Q    Who would know that specific information?

A    I don't know.  It would -- it -- it would probably be one of the state reporting specialists.

Q    And Cobb County School District has state

Page 24

reporting specialists?

A     They have a state reporting team.

Q     They have a team?

A     Yes.

Q     And do you know anybody on that team?

A     I do.

Q     Who is on that team?

A     There are multiple people on the team.  The person that I work most closely with is Maureen Drago.

Q     I'm sorry.  Say that again?

A     Maureen Drago.

Q     M-A-U-R-E-E-N?

A     Correct.

Q     And spell the last name, please?

A     D-R-A-G-O.

Q     Okay.  Do you work with Ms. Drago on withdrawing students from Cobb County School District?

A     I do.  When there are specific reasons outlined by a special education to ensure that -- that students should be withdrawn or should not be withdrawn, on specific occasions.

Q     So do special education students in Cobb County School District have reasons to be withdrawn from Cobb County School District that differ from students who are not disabled?

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 25

MR. DANIEL:  Object to form.

MS. VANCE:  You may answer.

MR. DANIEL:  Argumentative.

MS. VANCE:  You may answer.

MR. DANIEL:  Vague.

THE WITNESS:  They are not different. There are different circumstances that we are withdrawing students and moving them, for example, from one school to another, based on IEP placement. There are other specific examples of a student we might be working with that has school refusal, and so they are accruing absences and we are working on a plan to transition them back, so we want to make sure that they stay enrolled, while we work through that process.

BY MS. VANCE:

Q   Well, you said that there are -- for disabled students, you communicate with Ms. Maureen Drago to withdraw disabled students, based on special education.  So what are the grounds, the practice of Cobb County School District to withdraw disabled students from the school and the school district?

A   So the withdrawal is the same as any other student, but there may be some nuances in a special education realm, that we would work with student

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 26

reporting to make sure either the student continues to be enrolled or that the student needs to be moved -- enrollment to another place.

Q    So what are the nuances that you reference? What is a nuance?

A    Obviously, in special education, there are individual circumstances, so there might be an example where a -- a student is -- I would say it's more in the enrollment process, we -- where we want to keep students enrolled.  But there would be an example of if a student is in incarcerated and we're trying to -- and they're a student with a disability and we're required to serve, so we are determining whether the student needs to be enrolled or then, when they are no longer incarcerated, withdrawn.

Q    Okay.  Well, is it the practice of Cobb County School District to withdraw a disabled student from a Cobb County School District that would not be applicable to a non-disabled student?

MR. DANIEL:  Objection.  Vague.

THE WITNESS:  Can you -- can you clarify?  I'm trying to process what you said.

BY MS. VANCE:

Q    Okay.  So are there reasons for withdrawing a disabled student from a Cobb County School District,

Page 27

other than IEP placement, that would not apply to a non-disabled student?

MR. DANIEL:  Objection.  Vague.

THE WITNESS:  So there are not specific -- there are -- it's the same reasons, but one of the pieces -- and if you don't mind me just flipping to the -- our tab on withdrawals -- on school admissions and withdrawals --

BY MS. VANCE:

Q    Is that JBC-R?

A    Correct.

Q    Okay.

A    Yes.  So in the -- the board policy, there is a -- there's a withdrawal, obviously, with -- from an enrolling adult.

Q    Excuse me.

A    It's on page seven of nine.

Q    Seven of nine?

A    Yes.

Q    Okay.

A    But then there are also reasons why we might withdraw the student, which we call administrative withdrawal.  One of the factors that are considered is special education.  It says notify the special education office if the student is in special

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 28

education, because obviously, we don't want to --

Q    Sorry.  So for the record --

A    Sure.

Q    -- let's give the code section that -- I mean, the section that you are --

A    Referencing?

Q    -- reading.  Yes, please.

A    So it is page seven of nine of the policy, and it is section two, withdrawal.

Q    Okay.

A    And this one's the board administrative rule.

Q    Is it A or B?

A    It is B.

Q    Okay.  And what subsection?

A    It is one and then C.

Q    Okay.  And I'm sorry.  Now, please go ahead and explain what you were saying.

A    Sure.  So when we withdraw a student, when it's not an adult withdrawing, there are some reasons why the student would be withdrawn.  One is obviously, they're not a student who is not receiving instructional services from us or through Hospital Home Bound, and then there are some -- some reasons there.  And so one of the -- one of the factors that

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 29

is considered is special education, so there are times where they notify the special education office to see if there's anything specific to the student's disability, prior to withdrawal.

Q    So the district will withdraw, without parental permission, a student who is not receiving instructional services from the district through Hospital Home Bound instruction; is that correct?

A    Through the district or through Hospital Home Bound.

Q    But that student has to have accumulated ten or more consecutive days of unexcused absences; correct?

MR. DANIEL:  Objection.  Argumentative.

MS. VANCE:  You may answer.

THE WITNESS:  No.  That is one reason. If you turn to the next page, there are a total of four reasons.  So it's -- so the -- the administrative rule is indicating that the student is not receiving instructional services and then and one of these things, it --

BY MS. VANCE:

Q    Okay.  And is not on Hospital Home Bound and one of these four things?

A    Correct.

Page 30

Q    And what are the four reasons for withdrawing a student from Cobb County School District?

A    So the first reason is if they have accumulated ten or more consecutive days of unexcused absences.

Q    Okay.

A    The second reason is when we learn, as a district, that the student has been enrolled in another school system or private or homeschool, that we withdraw.  And then the third reason is they no longer reside in Cobb County attendance zone.

Q    Okay.

A    And then the third reason is --

Q    You mean the fourth?

A    I mean -- excuse me.  Yes.

Q    Sure.

A    The fourth reason is who is not in attendance on the first day of school but was expected, based on prior enrollment, and they're considered a no-show, at that point.

Q    So those are the four reasons for Cobb County's policy, and this is a policy; correct -- that we're reading from?

A    It -- yes.  It's an -- well, it's an

Page 31

administrative rule, based off of the policy of school admissions, which is, I believe, JBC.

Q    Okay.  And --

A    Let me -- let me just double check --

Q    Yes, please.  Thank you.

A    -- so that I am accurate on the policy I give you.  Yes.  Okay.  So the policy is -- I was correct -- JBC school admissions, and then JBC-R is the board administrative rule --

Q    Okay.

A    -- which gives some more specific information.

Q    Right.  And so it is the policy and practice of Cobb County School District to withdraw a student from Cobb County School District for one of these four reasons; correct?

A    Correct.

Q    And it is the policy and practice of Cobb County School District to withdraw a student from a Cobb County School District public school for one of these four reasons; correct.

A    Could you say that question again?

Q    It is the policy and practice of Cobb County School District to withdraw a student from a Cobb County public -- Cobb County School District public

Page 32

school for one of the four reasons you outlined earlier?

A    Yes.  It is the policy to withdraw a student from the district.

Q    For one of those four reasons?

A    If -- without the enrolling adult.

Q    Correct.

A    Correct.

Q    Or without the child aging out?

A    Correct.

Q    Okay.  Okay.  Well, it's the policy and practice of Cobb County School District to withdraw disabled students from a Cobb County public school for reasons other than these four reasons; isn't that correct?

           MR. DANIEL:  Objection.  Argumentative.

           MS. VANCE:  You may answer.

           THE WITNESS:  No.

BY MS. VANCE:

Q    And I noticed you were looking at something and there's red on it.  May I please see that page?

A    Which one?  This one?

Q    The -- right.  That one your hand's on. Thank you.

A    Yes.

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 33

Q    Oh, it's just highlighted.  Thank you.

A    Yeah.  It's just --

Q    Okay.  Thank you.

A    -- it's just highlighted for me to -- to see it easier.

MS. VANCE:  All right.  And I want to just verify -- I'm going to show you what's been marked as Exhibit 12.  Do y'all have y'all's exhibits from the prior deposition?  We stipulated that we would use these at each deposition, and I gave a copy to Reagan.

MR. DANIEL:  No.  I don't have copies from that --

MS. VANCE:  Well, that's what she's looking at --

MR. DANIEL:  Okay.

BY MS. VANCE:

Q    Okay.  This is already an exhibit into the exhibit book for all the depositions for Plaintiffs, and it's marked as Exhibit 12 and it has a date on it of 10 -- can you read that?

A    Yes.  10/15/2020.

Q    Okay.  And was that the administrative rule for withdrawing students from Cobb County School District, as of December 2020?

Page 34

A    Yes.  That would be correct.

Q    Thank you.

A    I just want to look --

Q    Sure, please.

A    -- to make sure it's the full -- that I was also looking at.

Q    Sure.  Thank you.

A    Yes.  That is correct.

Q    Thank you.  So who would we go to, to find out how Cobb County School District inputs to the Georgia Department of Education system and when it does it and how often it does it, the withdrawal of students from Cobb County School District?

A    So the -- the data is -- is going from our student information system up.  I -- I don't -- I'm trying to remember when it goes up.  I think I had said to you, I -- I don't believe it -- I don't know that it goes up every night as an upload, but I do know that there is student courses that are going up every night, and teachers.  So based off of that information, I -- I would -- I would say that -- that -- the -- if a student is withdrawn, they would not go up in that upload.

Q    Who at Cobb County School District would be able to tell us how often the information uploaded

Page 35

into the -- it's called CSIS; right?

A    That is part of our student information system.

Q    Okay.  And --

A    And the other part is Synergy.

Q    Right.  And CSIS stands for CSIS?

A    Correct.  It's the Cobb -- Cobb School -- or Cobb Student Information System.

Q    Right.  And CSIS is where Cobb County inputs the withdrawal of a Cobb County student from Cobb County; correct?

A    That is correct.  Yes.

Q    And who could tell me and tell Plaintiff's attorneys when that information goes -- first of all, when's it inputted into the CSIS system?

A    When is what inputted?

Q    When is a withdrawal --

A    A withdrawal?

Q    Yeah.

A    When the student has been withdrawn and it is the last day the student attended.

Q    Okay.  And who at Cobb County School District could tell us, when that is inputted in CSIS, how often it is uploaded to the Georgia Department of Education Information System?

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025
O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 36

MR. DANIEL:  I'm going to object to this line of questioning as exceeding the scope of the 30(b)(6) notice.

But the witness can answer, to the extent she's able.

THE WITNESS:  I don't know the specific person on the student reporting team, but -- because they all have different roles, but it would be somebody in the student reporting team.

BY MS. VANCE:

Q   Okay.  Do you know how many people are in the student reporting team?

A   I do not know, specifically.

Q   Okay.  And so Cobb County archives the information it has in its CSIS; correct?

A   When you mean archive, what --

Q   Maintains, keeps.

MR. DANIEL:  And I'm going to again object to this question as exceeding the scope of the notice.

MS. VANCE:  Well, I'm going to state that we asked about the policies, practices, and procedures for collecting and reporting data, including student data, and including students with disabilities, including attendance, truancy,

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 37

enrollment, withdrawal, Hospital Home Bound, and financial budgeted, so we're asking the practice of Cobb County School District in this area.

MR. DANIEL:  Same objection.

MS. VANCE:  You may answer.

THE WITNESS:  Can you ask the question again?  I apologize.

MS. VANCE:  Can the court reporter read back the question, please?

THE REPORTER:  Yes.  One moment.

(The reporter repeated the record as requested.)

MR. DANIEL:  Same objection.  Exceeds scope of notice.

MS. VANCE:  Okay.  You may answer. Yes.  Yes.

THE WITNESS:  So the data is -- there is data that is maintained, not -- the data that is going up to the DOE is -- reports back from the DOE. So there's not data sitting there for that information.

BY MS. VANCE:

Q    Explain that, please.

A    So once the FTE collection period is done, we receive final reports from the Georgia Department

Page 38

of Education.

Q    And does Cobb County School District have a practice of maintaining those reports?

A    We do.

Q    Okay.  And does Cobb County School District maintain the information regarding student withdrawal that is provided to the Georgia Department of Education?

A    Cobb County School District maintains enrollment and withdrawal information in the -- in the student information system until a student graduates. And for students with disabilities, it's -- the data is there two years past their age out or graduation, per the retention policy.

Q    And so just for the record, their age out is?

A    Age 22, or 22nd birth date.

Q    Thank you.  And one, I think you said, indicator for special education students would be the special education student's placement?

A    Yes.  It is an indicator where the state is looking at the amount of time that students are in their least restrictive environment.  So it's looking at a percentage of time that they're in gen ed and outside gen ed?

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 39

Q    And how often does Cobb County School District have a practice of reporting that information to the Georgia Department of Education?

A    It is not Cobb County's practice.  It is actually the Georgia Department of Education.  They require us to report that during the October count.  And then the -- the indicator data is lagging a year, so that is part of our annual performance summary.

Q    And in that data reporting by Cobb County School District to the Georgia Department of Education, it includes how many disabled students are on Hospital Home Bound?

A    On -- yes.  That is correct.  And home-based.  It is combined, and it is looking at the FTE count day.  So it's a snapshot.

Q    So Cobb County School District combines Hospital Home Bound with home-based?

A    No.

Q    So I'm sorry.  I didn't understand, then.  Can you explain?

A    Sure.  So the state indicator is looking at least restrictive environment.  The state is -- the DOE combines those two as part of the least restrictive environment because it's looking at percentage of time outside of the gen ed class.  And

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 40

so it is combining those two because they're both in a -- typically in a home setting.

Q    So if it says 34 students Hospital Home Bound, that could include students home-based in their IEP?

A    Yes.  That's correct.  On that -- on that count day.

Q    Well, you go back a year; correct?  On the count day, from a year past?

A    We report it -- yes -- so we report it in October, every year.

Q    For the prior year?

A    No.  We report -- so for this October count that is coming up, we would report the number of students, on count day, that are receiving Hospital Home Bound and home-based services, along with all of their other settings.  And then the Georgia Department of Education uses that data for our annual indicator of the next year, so their data is lagging a year in the --

Q    Okay.

A    -- in the indicator.

Q    Thank you.

A    You're welcome.

Q    Let me show you what has been marked and

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 41

tabbed as Plaintiff's Exhibit 16.  I want to ask you some questions about the practice of Cobb County School District, relating to financial budgets.

(Plaintiff Exhibit 16 was marked for identification.)

A    Okay.

Q    And it is the practice of Cobb County School District to print and make available to the public its budget for a school year; correct?

A    Correct.

Q    You see on document 16; have you ever seen these -- there's two pages.  Have you ever seen this in any report or any booklet or summary of Cobb County School District's financial budget?

A    I have not seen it in a report.  I see it when it is -- when it is shared at the board meeting.

Q    Okay.

A    As we are required to watch all of those, so I -- I see it there.

Q    Okay.  And the board approves the annual budget; correct?

A    Correct.

Q    And when it says at the top of Plaintiff's Exhibit 16 FY 2020 Board of Education Adopted Budget, what period of time does FY 2020 mean?

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 42

A    That is school year 2019/2020.

Q    And if you look on the next page of Plaintiff's Exhibit 16, it says FY 2021, and what school year would that be?

A    That is school year 2020/2021.

Q    So on the first page for the school year 2019 to 2020, Plaintiff's Exhibit 16 says that the budget for Cobb County School District is 1,319,055,154 documents [sic].  Does that comport, basically, with what you were informed that the budget was for that FY period?

MR. DANIEL:  Objection.  Relevance, vague, 403, and exceeds the scope of the notice.

But you can answer, to the extent you're able.

THE WITNESS:  So I -- I do know -- I don't know the specific number for each year, but I do know that we are -- our budget is over --

BY MS. VANCE:

Q    Do you recall it being over 1.3 million for the FY 2020?

MR. DANIEL:  Same objections.  401, 403, vague, exceeds the scope of the 30(b)(6) notice.

MS. VANCE:  I'm sorry.  I meant billion, not million.  Well, you can answer the

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 43

question, he said.

                    MR. DANIEL:  Same objections.

                    MS. VANCE:  You may answer.

                    THE WITNESS:  Yes.  So I don't know the
-- the specific amount, but I do know that we --
again, we are over -- every -- every year, we're over
a $1 billion --

                    MS. VANCE:  Okay.

                    THE WITNESS:  -- budget for the
district.

BY MS. VANCE:

     Q    Are you aware that Cobb County's current
budget for the current year is over 1.6 billion?

                    MR. DANIEL:  Objection.  401, 403, and
exceeds the scope of the 30(b)(6) notice.

                    THE WITNESS:  And I -- I would say the
same information.  Again, I know the -- the general
amount, but not the -- the very specifics.

BY MS. VANCE:

     Q    And it is the practice of Cobb County School
District to bill Medicaid; isn't that correct?

                    MR. DANIEL:  Objection.  401, 403,
exceeds the scope of the 30(b)(6) notice.

                    THE WITNESS:  If -- if the parent has
consented for us to bill, we will bill for speech and

Page 44

language and related services.

BY MS. VANCE:

Q    What other speech and -- I mean, other related services, other than speech and language?

MR. DANIEL:  Same objections.

THE WITNESS:  So I consider -- we consider our related services occupational therapy, physical therapy, special education, nursing.

BY MS. VANCE:

Q    And speech and language?

A    Speech and language is not a related service, but yes.  We also bill for speech and language, if we have consent.

Q    Okay.  So it is Cobb County School District's practice to never provide speech therapy as a related service?

A    It is not our -- our practice to never provided as a related service.  I was indicating it's an eligibility category, under the Georgia Department of Education.

Q    Well, I want to understand the practice of this IDEA area of the law -- I mean, IDEA area of compliance.  Does Cobb County School District provide speech therapy as a primary service under an eligibility; does it provide it as a related service;

Page 45

or does it provide it in both ways?

A    As -- in Cobb County, we provide it as a eligibility service, as a direct service through the eligibility.  There are individual circumstances where it might provide it as a related service.

Q    But to your knowledge, the primary practice is to provide as an eligibility service?

A    Generally, yes.

Q    Okay.  And so I'll be sure, when permission is obtained, Cobb County School district's practice concerning its budget is to bill Medicaid for speech therapy, occupational therapy, physical therapy, and special ed nursing, you said?

MR. DANIEL:  Objection.  401, 403, and exceeds the scope of the 30(b)(6) notice.

MS. VANCE:  You may answer.

THE WITNESS:  Correct.  If we have consent, if the student is eligible.

BY MS. VANCE:

Q    And are you aware, as the director of compliance for IDEA, that Cobb County bills Medicaid more than $2 billion?

MR. DANIEL:  Same objections.

THE WITNESS:  I do not know the -- the specific amount.

Page 46

MS. VANCE:  I'm sorry.  $2 million a year.

MR. DANIEL:  Same objections.

MS. VANCE:  You may answer.

THE WITNESS:  I do not know the specific amount.

BY MS. VANCE:

Q    Do you have any indication of any amount anywhere close to it?

MR. DANIEL:  Same objections.

MS. VANCE:  You may answer.

THE WITNESS:  I do not.

MS. VANCE:  And when you are done with these exhibits that we're handing you, we'd just like to put them upside down --

THE WITNESS:  Sure.

MS. VANCE:  -- and kind of keep them in order -- thank you -- for the court reporter.

THE WITNESS:  That was the first one.

MS. VANCE:  Thank you.

THE WITNESS:  You're welcome.

BY MS. VANCE:

Q    I appreciate that.  And for financial budget, which we listed as under number ten, we'd like to know the practice of Cobb County School District

Page 47

expenditure of COVID funds for special education.

MR. DANIEL:  Objection.  401, 403, and exceeds the scope of the 30(b)(6) notice.

MS. VANCE:  You may answer.

THE WITNESS:  So as part of the funds that we received, we utilized them for supports and -- and supplies that were needed during that timeframe. Additional -- the evaluations, supplemental pay, and part of the percentage of that went to proportionate share, which is when students are -- private and homeschooled, students are able to access equitable services through proportionate share.  And we attempted to expend as many of -- of those resources that we could, to -- to support students.

BY MS. VANCE:

Q    Okay.  So what was the practice of Cobb County School District to distribute the COVID money, I guess, designated for the special education students?

MR. DANIEL:  Objection.  401, 403, exceeds the scope of the 30(b)(6) notice.

THE WITNESS:  There was a specific allocation.

BY MS. VANCE:

Q    And when was that?

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 48

MR. DANIEL:  Same objections.

THE WITNESS:  When it was provided?  Is that what your question is?

BY MS. VANCE:

Q    Yes.  When was the allocation?

A    I do not recall.

Q    Was it 2021, or is it this year?

A    No.  We -- the funds are all expended.

Q    Okay.  And who made the decision?  Was it the board who made the decision and a policy as to how that money would be spent by special education department?

MR. DANIEL: Objection.  Vague, 401, 403, and exceeds the scope of the notice.

THE WITNESS:  No.  The -- the board's not in the -- the specific day to day of what we're expending for students.

BY MS. VANCE:

Q    So it's not the practice of Cobb to require the board to approve of that spending of that COVID money for special ed students?

A    No.  The board only approves any allocations of anything -- there's a certain amount per policy that it goes to, if -- and then that's when they approve, specifically.

Page 49

Q    And who did approve, then, the expenditure of those COVID funds for special education, well, for disabled students?

MR. DANIEL:  Objection.  401 and exceeds the scope of the 30(b)(6) notice.

THE WITNESS:  So it would be a variety of people.  Our -- our budget supervisor is a part of that.  Would be some approval through the special ed director, my colleague, or myself, based off of the specific request.  It goes to approval to our assistant superintendent, and then through approval in the financial services.

BY MS. VANCE:

Q    And you said that some of the money was spent for supports and supplies.  What were those supports and supplies?

MR. DANIEL:  Objection.  401 and exceed the scope of the 30(b)(6) notice.

THE WITNESS:  Some of the specifics that I recall are when we were coming back from COVID and evaluating students, we had some -- some protocols in place, and so we had to get some supplies for our team to -- in order to evaluate students safely, at that time.

//

Page 50

BY MS. VANCE:

Q    Masks?

A    I don't recall what the specifics were.  I do remember a thermometer was one of them, to take the temperature, based off of the CDC recommendations.

Q    And was one of them hand sanitizer?

MR. DANIEL:  Same objection.

THE WITNESS:  I don't recall.

BY MS. VANCE:

Q    Okay.  And then you said evaluation supplemental; what was that, that you said, the second one?  It was for --

A    I believe I said that --

Q    Supplemental pay?

A    -- there might have been some supplemental pay when we were doing evaluations on -- on the weekends or different times, to ensure that we got evaluations completed.

Q    And then I think you said the third one was spent -- it was Cobb County's practice, in dealing with its budget and the expenditure of the COVID funds it received, to spend the money on the proportional share?

A    There's a -- yes.  There's a requirement that a specific percentage goes to proportionate

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 51

share.  So that's not a Cobb practice.  That's a requirement by the Georgia Department of Education.

Q    Well, isn't it Cobb County School District's practice to comply with the Georgia Department of Education rules?

A    Yes.  But there was not a specific Cobb County practice or policy to provide a -- a specific amount.  The amount is already determined.  That percentage is already determined, based off of our child find numbers.

Q    And what is the proportional share that was involved in this expenditure of funds?

MR. DANIEL:  Objection.  401 and exceeds the scope of the 30(b)(6) notice.

THE WITNESS:  I don't recall the specific percentage that -- that was utilized, then.

BY MS. VANCE:

Q    And did those students who are not students in Cobb County School District but disabled; did they receive extra services?  Did they receive makeup services with that budgeting?

A    You're saying -- I just want to clarify your question.  Are you saying students that were not Cobb County students?

Q    That were in the proportional share.

Page 52

A    Proportional share.

Q    Just for the record, why don't you please explain what proportional share is?  Because we understand, but we want to make sure it's clear on the record.

A    Sure.  So proportional --

MR. DANIEL:  Objections.  401 and exceeds the scope of the 30(b)(6) notice.

MS. VANCE:  And, Jeff, I know you keep making that objection, but we have it right here, the practices of Cobb County, you know, involving collecting and reporting data for financial budgets, and this is definitely the reporting of data for financial budgets involving disabled students.

MR. DANIEL:  Yeah.  Your obligation under 30(b)(6) is to draft the notice with reasonable particularity.  And by covering these types of discrete matters in such granular detail, you are definitely not drafting the notice with reasonable particularity.  So we don't have notice of this topic, meaning the line of questioning goes beyond the scope of the 30(b)(6) notice.

BY MS. VANCE:

Q    So I believe that you can answer this question.  Would you please go ahead and explain what

Page 53

a proportional share means, so that it'll be clear?

MR. DANIEL:  Same objections.

MS. VANCE:  Thank you.

THE WITNESS:  Sure.  So proportionate share is a specific amount based off of students. It's based on our number of students who are in private school, non-for-profit, in Cobb, who are not enrolled in Cobb but are students with disabilities or are homeschool through the DOE and our students with disabilities.  We report that number in October, during the October FTE window.

And based off of the number and our numbers of students with disabilities, the DOE gives us a -- a percentage of our grant funding that needs to be spent on students who are -- reside in Cobb but are not enrolled in a Cobb school.

BY MS. VANCE:

Q    Okay.  So you do report that; it is data reporting to the school, the number of students in special ed, and then the number of students who are disabled in that county, but who are not enrolled in special ed; is that correct?

A    Based -- yes.  That's correct.  But the number of students that are not enrolled in Cobb that are private school, non-for-profit, or homeschool is

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 54

based off of the information we get back from parents when we reach out to them.

So we -- we have to make -- make efforts to gain the information to see if they're still out there, and if they respond to us or they come to our consultation meeting that's held annually, we work with them and provide them services through -- through speech and language or some indirect services, based off of their request.

Q    What would be indirect services?

A    Some of the indirect that we're currently offering is our -- our licenses for specific programming for students with learning disabilities or students who have intellectual disabilities that are using a modified curriculum, and they're able to access our licensing.

Q    I'm sorry --

A    A license for a -- a software outside of --

Q    Oh, okay.

A    -- licensing.

Q    Okay.  So currently, it's for speech and language and the licensing programs; correct?

A    Currently, it's speech and language services through a service plan or indirect services.  We have been utilizing licenses or materials, but we ask -- we

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 55

have on our website and when we meet with families, if they have additional requests for other items, we consider that, on an individual basis.

Q   Okay.  And are those requirements or procedures a policy of Cobb County School District for disabled students?

A   No.  They're not a policy.

Q   Are they a practice?

A   They are a practice.

Q   Is there anything in writing in Cobb County School District regarding that practice?

A   There is information on our website.  We send out notice to -- to families that were previous, about that information.

Q   Previous students?

A   Previous students.

Q   Okay.

A   Yes.  That we have prior knowledge of them being in a private non-for-profit school or -- or child find.  And then we have our practitioner's manual that gets some information.

Q   What is the practitioner's manual?

A   It is our guidance in special education, based off of the Georgia DOE Rules and Regulations under IDEA.

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 56

Q    Does it have a title?

A    Our practitioner's manual.

Q    I'm sorry.  Say that again?

A    CCSD practitioner's manual is the -- the title.

Q    Okay.  Do you have a copy of it there?

A    I do.  The sections actually come from the Georgia Department of Education.  They have a rules outline, that each district should have information on.  Okay.  I will just do them separate.  There we go.

Q    And you are looking at what document?  May I see it for a second, please?  Thank you.  So this is the Cobb County School District child find?

A    Chapter.

Q    Chapter.  And that is in -- that chapter is in what, that procedures manual?

A    Yes.

Q    Okay.

A    So there -- this is the 2020 practitioner's manual, and each -- each area has a -- a chapter.

Q    And we received a lot of documents, either last night or the night before.  And do you know -- and you may not know, but if you do know -- is that the child find portion of the procedures manual that

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 57

we received from Cobb County School District, that it produced?  Do you know?

A    I do --

MR. DANIEL:  Objection.  Exceeds the scope of the notice.

BY MS. VANCE:

Q    Have you looked at what the school district has produced?

A    Have I looked at what we produced?

Q    Yes.

A    No.

Q    Okay.  How would we know what Cobb County produced, which is Bates numbered, is what you are looking at that you had in your practices, procedures, and policies book that you brought with you to testify regarding today?

MR. DANIEL:  I'm going to object.  That exceeds the scope of the 30(b)(6) notice -- testify about discovery productions?

MS. VANCE:  You may answer.

THE WITNESS:  I was -- I was provided this information in this -- in this book for --

BY MS. VANCE:

Q    Okay.  All right.  And is that child find part of Cobb County School district's practices

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 58

involving disabled students in the system?

A    Can you ask the question again?  I'm sorry.

Q    So the child find procedures you are looking at; is that part of the practice of Cobb County School District to implement those guidelines or practices involving the IDEA?

A    Yes.

Q    Okay.  And how do we tell that what you're looking at in this book you brought, that was provided to you, is from 2020?

A    How -- how do I tell, or how do you guys tell?

Q    Well, both.

A    Because we tabbed it -- with the date. It's -- it's a PDF, and we saved them with the -- the different dates.

Q    Okay.  We did not receive that four days prior to the deposition; this book.  We would ask a copy of it, as set forth in the notice.  We would ask that we be provided a copy of the notebook that she's referring to and the documents in it.

MR. DANIEL:  You want a copy of her notebook?

MS. VANCE:  Well, the one that was provided to her.  Yes, please.

Page 59

MR. DANIEL:  Okay.  Well, I mean, you're free to make the notebook an exhibit, if you want to.

MS. VANCE:  We will.

MR. DANIEL:  Okay.

MS. VANCE:  We'll have to have it Bates numbered.

MR. DANIEL:  Well, no.  I mean, we're not agreeing to Bates number it, right now.  I mean, it's a deposition exhibit.  Like, we're not going to stop the deposition to the --

MS. VANCE:  Okay.

MR. DANIEL:  -- Bates numbers --

MS. VANCE:  That's fine.

MR. DANIEL:  That's not even feasible.

MS. VANCE:  Okay.  We'll make it an exhibit.  Let's make it, and let me get a tab.  I have some tabs, right here.  That's not ours, but we can use a blue one.  I'd rather -- yeah.  Oh, I think they're in the litigation bag, in the very front, the very first zipper, small one.

MR. DANIEL:  We have a -- I can't say it's an exact copy of everything in her binder, but it should have most of everything in her binder.  We're happy to provide that to you, if that would --

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 60

THE REPORTER:  I also have an extra copy of the specific document that she's looking at.

MS. VANCE:  We'll just make the whole book a binder.  Exhibit 17, Plaintiff's Exhibit 17. And can you let me ask the court reporter, off the record, a question, please?

THE VIDEOGRAPHER:  Do you want to go off the record?

MS. VANCE:  We can stay on the record.

THE VIDEOGRAPHER:  Okay.

MS. VANCE:  It'll just brief.  Do you want to just have this on the first page of the documents, or do you want it on the notebook itself? We're not going to duplicate the notebook, so probably just the first page of the documents?

(Plaintiff Exhibit 17 was marked for identification.)

THE REPORTER:  Yeah, probably.

MS. VANCE:  So if you would, please, put this on the very first page of the documents.  It can go on the tab, if that's the first page, or you have an index?

THE WITNESS:  I do have an index.

MS. VANCE:  Please.  Yeah.  And just don't cover up anything.  Maybe on the top right

Page 61

corner.  And that is Plaintiff's Exhibit 17.  We are --

MR. DANIEL:  The only thing I'll note is that she has some date calendars, just for a quick reference, in the left side, that is not really tabbed in index, but just as a reference.

MS. VANCE:  May I look at that, please?

THE WITNESS:  Sure.

MS. VANCE:  Thank you.  Okay.  We can agree to put it at the very end of this not document book or we can make it a different tab, whichever you prefer.

MR. DANIEL:  Why don't we just make it a different exhibit number, just for ease?

MS. VANCE:  Okay.  And that's 17, and we'll make this 18, and we will have to get a copy of this from our court reporter because we won't have it. Thank you.

(Plaintiff Exhibit 18 was marked for identification.)

BY MS. VANCE:

Q    And where did you obtain these calendars?

A    Did you say when?

Q    Yeah.  Where or when?

A    When I -- that was in the pocket of the

Page 62

notebook.

Q    So are these true and accurate copies of documents involving Cobb County School District's policies, practices, or procedures, that was provided to you by counsel?

A    Yes.

Q    And that includes the calendars at 18 and all the documents in 17?

A    Yes.

Q    Thank you.  And we introduced that into the record, and we also introduced Plaintiff's Exhibit 15 that we showed you and you went through the items one through ten into the record, and it is documented as file stamped document 108.  So let's go back to what we were discussing, please.

A    Sure.

Q    And you were talking about the practices of Cobb County School District, under the IDEA, regarding the proportional number of students.  And is it in that document you were looking at?

A    It's not in the child find, but it is in the -- it is in the chapter of private schools.

Q    Thank you.  And does it have a number or any --

A    No.

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 63

Q    What's the title of it?

A    Private schools and -- and then it gives the Georgia rule.

Q    Okay.  And I want to go back to data reporting.  Does Cobb County School District report to the Georgia Department of Education how many students are on a 504 plan?

A    Yes.

Q    And what information and how often does it report that information to the Georgia Department of Education, involving students on a 504 plan?

A    It reports -- we report it once a year with student record in June.  And it is a indicator of 504.  Yes.  So it just indicates the student has a 504.

Q    That's all?

A    Yes.  And -- and that is 504 eligibility.  It does not differentiate between 504 eligibility only and 504 plan.

Q    And what is a ombudsman 504 student?

A    An ombudsman 504?  So an ombudsman is our -- well, was our previous alternate ed program.  So they're not the same thing.

Q    What's an alternative ed program?

A    So for students who are disciplined long-term, they have access to an alternative education

Corp. Rep. 30(b)(6) Jessica N. Coleman            September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 64

program, all students.  And so previously, it was called ombudsman.  It was a -- a contracted vendor --

Q    Oh, okay.

A    -- outside of the school district.

Q    Okay.

A    And now we are with Cobb Acceleration Academy, which is also a outside contract vendor, but it is a collaboration with -- with Cobb County School District and the Acceleration Academy.

Q    And by alternate school, that means a school for children who have been expelled or suspended?

A    Correct.  There are other students who go there that are direct referrals, that are just better served in a non-traditional setting, and so they're able to direct refer to -- to that program, as well.

Q    Including 504 students?

A    Yes.  Absolutely.

Q    Okay.  So you mentioned at one point earlier about codes that are used by Cobb County School District for data reporting; is that accurate?

A    I don't know what specific codes you were referring to, so if you could give me some additional context to that.

Q    Let me ask a question.  Does Cobb County School District, for reporting data to the Georgia

Page 65

Department of Education, use codes for reporting data?

A    Yes.  The Georgia Department of Education gives us lots of different codes to use, for various reasons.

Q    So they'll give you a code for demographics?

A    They'll give codes, for example, withdrawal reasons is a specific code.

Q    Do they give codes for school within Cobb County School district?

A    There is a state school number.  Yes.

Q    Okay.  For Cobb County schools?  Like, Tapp Middle School will have --

A    For all facilities.  Yes.

Q    Okay.  Okay.  And does it give codes for disability?

A    Yes.  They -- the Georgia Department of Education takes the primary and secondary -- any of the eligibility categories, and gives it a letter.

Q    Okay.  And what are the withdrawal codes that it's the practice of Cobb County School District to use for reporting data to the Georgia Department of Education?

MR. DANIEL:  Objection.  Exceeds the scope of the 30(b)(6) notice.

MS. VANCE:  You may answer.

Page 66

MR. DANIEL:  But you may answer, if you're able.

THE WITNESS:  There's a -- a variety of codes that are -- each year, the Georgia Department of Education gives a document to all school districts for the -- with the information.  So it's not a Cobb County document, but some of the withdrawal codes are other, private school, RYDC, homeschool, unknown.  So those are just some -- some of them.  I -- I don't -- I don't think that's an exhaustive list, but those are the ones I'm most familiar with.

BY MS. VANCE:

Q    And what is the code for withdrawing a student to effectuate a -- status?

MR. DANIEL:  Objection.  Exceeds the scope of the 30(b)(6) notice.

MS. VANCE:  You may answer.

THE WITNESS:  So the specific code would probably be unknown.  I don't know that there is a specific -- specific practice of one option.

BY MS. VANCE:

Q    Well, doesn't the code unknown mean you don't know the reason why the student was withdrawn?

MR. DANIEL:  Object to form.

MS. VANCE:  You may answer.

Page 67

MR. DANIEL:  Exceeds the scope of the 30(b)(6) notice.

THE WITNESS:  There is not a withdrawal reason that would fit within that category.  And so when you see an enrollment of a student in a school or a new enrollment that comes in with the evaluation, you -- you can see why they were withdrawn.

BY MS. VANCE:

Q   Explain that, please.

A   Sure.  So for a student who is enrolled in a school and is moved to the evaluation status or service plan, they -- you would have an enrollment information for the school and an enrollment for the evaluation school.

Q   So it's your testimony that Cobb County School District's practice is to provide to the Georgia Department of Education data for enrollment of a student into an evaluation phase?

A   No.

Q   Okay.  Okay.  So let's ask this.  What's the data code that Cobb County School District uses to provide the Georgia Department of Education withdrawal of a Cobb County disabled student to place that child into a container school?

MR. DANIEL:  Objection.  Exceeds the

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 68

scope of the 30(b)(6).

THE WITNESS:  So Cobb County School District is reporting students who are enrolled within a -- a school, a specific school, so they would only be reported if they're enrolled in a school, based off of the definitions from the Georgia Department of Education.

BY MS. VANCE:

Q    What is the withdrawal code for withdrawing a student from a Cobb County School District and from a Cobb County School District school, in order to place the student in a container school?

MR. DANIEL:  Objection.  Vague, exceeds scope of 30(b)(6) notice.

THE WITNESS:  As I shared before, I -- I believe we -- we would be using unknown, based off of the categories the Georgia Department of Education gives us.

BY MS. VANCE:

Q    And that's what you would use, even though the Cobb County School District would know the reason?

MR. DANIEL:  Same objections.

THE WITNESS:  Unless there's another -- yes.  Unless there's another code that I'm not familiar with.

Page 69

BY MS. VANCE:

Q    And since there was an objection as to vague, what is a container school?

A    It is a -- a school, loosely school.  It is a place for students who are enrolled, that are not actively enrolled in a specific school.  They are still enrolled with Cobb County School District, in order to perform specific operations, such as evaluating a student or providing a service plan for a student.

Q    And a service plan for a student is a plan that is provided to a student who's not enrolled in Cobb County School District; correct?

A    The -- the service plan for students with disabilities; they are enrolled in the Cobb County School District under the service plan container school, because we develop service plans and provide progress monitoring and re-evals on those students.

Q    But they're not enrolled in Cobb County School District?

A    They're not enrolled in a Cobb County school, because they're attending either a private school or homeschool, so they can't be enrolled in both.

Q    Well, students who get service plans; under

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 70

the IDEA, they're required to not be enrolled in the local educational agency; isn't that correct?

MR. DANIEL: Objection. Exceeds the scope of the 30(b)(6) notice.

THE WITNESS: They are not in -- actively enrolled in a school, so I guess that's it. They're not actively enrolled in school.

BY MS. VANCE:

Q    So as the executive director of compliance, you don't know if a student can be enrolled in Cobb County School District and still get a service plan?

A    As I mentioned before, they're not enrolled in a Cobb County school because they're attending a private or homeschool, but they are still -- they are a student with a disability and are receiving equitable services.

Q    And by equitable, you mean the proportionate share?

A    Correct. The proportionate share is the money -- the amount of money.

Q    Okay. So let's just, for the record, since you've been talking about proportionate share, make sure that we're clear on what is the proportionate share. I mean, how is that computed by Cobb County School District?

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 71

A    I -- I believe I had -- have answered this, but I will reshare my information.  Is -- it is not determined by Cobb County School District.  It's determined by the Georgia Department of Education, the amount of money.

Q    Do you know how the Georgia Department of Education computes it?

MR. DANIEL:  Object.  Objection.  401 and exceeds the scope of the 30(b)(6) notice.

THE WITNESS:  I do not.

MS. VANCE:  Okay.

THE WITNESS:  -- the Georgia Department of Education.

BY MS. VANCE:

Q    So are students with an IEP placed in a container school?

A    If they're not enrolled in a Cobb County School and they're being evaluated or they are receiving services through a service plan, they -- they would be enrolled in a container school.

Q    If they are receiving services through an IEP, would they be placed in a container school?

MR. DANIEL:  Objection.  Vague.

THE WITNESS:  Not -- not if -- they would not be -- so I'm trying to answer your question,

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 72

the way you've asked it.  Sorry.  So they would not be -- they would receive their services enrolled -- while they are enrolled in a school.

//

BY MS. VANCE:

Q    And a student who receives Section 504 services is receiving services through being enrolled in a Cobb County School District School; correct?

A    That is correct.

Q    Do you know the code that is used by Cobb County School District, in its data reporting to the Georgia Department of Education, for Cobb County School District withdrawing a student to minimize the family's burden while awaiting special education evaluation?

MR. DANIEL:  I'm going to object.  Exceeds the scope of the 30(b)(6) notice and also vague.

THE WITNESS:  So it -- it would be the same information that I just shared about the evaluation school.  So if a student is not accessing the services, but we're in the process of evaluating, we would then move them to the evaluation school, so that we can finish the evaluation process and then develop the IEP and provide those services, re-enroll

Page 73

them in -- in the school in where they would provide the -- receive those services.

BY MS. VANCE:

Q    I'm sorry.  I asked do you know the code that -- the practice of Cobb County -- what is its practice -- what code does it use to report the withdrawal of a disabled student to minimize the family's burdens while awaiting special education evaluation?  What is that withdrawal code that is the practice of Cobb County School District to use to report to the Georgia Department of Education the reason for the withdrawal?

MR. DANIEL:  Same objections, plus asked and answered.

THE WITNESS:  Am I answering again?  Sorry.

MS. VANCE:  Well, yes, please.

THE WITNESS:  It -- it -- as I said, there's not a practice, but I believe they're using unknown, based off of the reasons.  There could be another withdrawal reason of other, but I'm not sure.

BY MS. VANCE:

Q    Well, why do you, as a representative to talk about data reporting to the Georgia Department of Education, assume it is unknown?

Page 74

MR. DANIEL:  I'm going to, again -- I'm going to object to the question as argumentative and again, exceeds the scope of the 30(b)(6) notice.

MS. VANCE:  You may answer.

THE WITNESS:  I'm -- I -- that's just based off of my -- my knowledge that I have.

BY MS. VANCE:

Q    Well, you have knowledge that, actually, the unknown was used for Olivia; isn't that correct?

MR. DANIEL:  I'm going to object that this question clearly exceeds the scope of the 30(b)(6) notice.

But if you're able to answer, you may.

MS. VANCE:  It goes to practice on reporting.  Go ahead.

MR. DANIEL:  It's not within the scope of the notice.

THE WITNESS:  I do not recall what the specific code was, that was utilized.

BY MS. VANCE:

Q    Have you had any discussions about the code with anyone, in the last two weeks?

A    No.

Q    Okay.  So your knowledge of codes that are used to report to the Georgia Department of Education

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 75

reasons for withdrawal; where does that knowledge come from that you have to be the representative for Cobb County School District, pursuant to this notice?

MR. DANIEL:  Again, I'm going to object to the question as argumentative.  The notice doesn't put the district on notice that it needs to make a witness available to testify in granular detail about the specific coding used in the reporting process.  No interpretation of the notice would put us on notice of that.  So, I mean, I'm going to, again, object to the argumentative nature of the question.

But to the extent the witness may answer, you may do so.

THE WITNESS:  I have loosely reviewed the -- just to make the FTE report that the state provides us each year, I looked at this year's and just got some general information.  It is a document that is very long and very granular in detail.  So I don't have -- I -- I did not memorize all the specific information.

MS. VANCE:  And I just want to put it on the record that we put it in writing that this person or persons provided today to testify would be called to testify regarding data reporting, including withdrawal of students from the school system.  So we

Page 76

did put the school district on notice of that specific information, data reporting regarding withdrawal of students.

MR. DANIEL:  I don't see the word coding anywhere in this notice.  So if you're insisting on a granular level of detail about a discrete subtopic like that, then just put it in the notice.  You didn't do that.  So that's the --

MS. VANCE:  It's not discrete.  Anyone who knows data reporting knows you use codes.

MR. DANIEL:  Okay.  But if you're asking for -- fine.  Then yes; there are codes used, but that doesn't mean that they are -- that this alerts a witness that they need to be prepared to testify about what specific codes are used in which specific circumstances, as you are trying to do.

MS. VANCE:  Well --

MR. DANIEL:  It goes beyond the scope of the notice.  We don't have to belabor the point. I've made the objection.  You can move on.

MS. VANCE:  Well, we're going to make an objection that Cobb County School District failed to comply with the notice of deposition and provide an individual who has the information Cobb County School District has, regarding the reporting of data to the

Page 77

Georgia Department of Education regarding the withdrawal of students.

MR. DANIEL:  Okay.  And if that's the information you're wanting a designee to testify to, then the notice is hopelessly overbroad.  It couldn't possibly put us on notice of the need to have somebody prepared to testify about that, so the fault lies with you.

MS. VANCE:  Now you're beating it to death, so let's just move on.  But we had an obligation --

MR. DANIEL:  Okay.

MS. VANCE:  -- under rule 30 to make our objection, and we have done so.

MR. DANIEL:  Okay.  And you had an obligation of rule 30 to draft the notice with reasonable particularity.  You didn't, so that's --

MS. VANCE:  Well, we disagree.

MR. DANIEL:  That's fine.

MS. VANCE:  We'll address that when we make our objections.

MR. DANIEL:  But yeah.  Don't accuse us of failing to comply with our obligations under 30(b)(6) and expect no response.

MS. VANCE:  Policies, practices, and

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 78

procedures for reporting data regarding student withdrawal is very clear.  If you had any questions, you could have asked.  You should have talked to the data people.  They would tell you we use codes.

MR. DANIEL:  She's already testified that they use codes.

MS. VANCE:  So we were talking about in here --

MR. DANIEL:  Chris, I'll also add -- I don't mean to interrupt you, but we've been going about an hour and a half.

MS. VANCE:  Would you like to take a break?

MR. DANIEL:  Yeah.

THE WITNESS:  I was just about to ask.

MR. DANIEL:  Great.  Thank you.

THE WITNESS:  Thanks.

MS. VANCE:  We'll be glad to take a break.  Let's wait till they go off.

THE VIDEOGRAPHER:  Okay.  Off the record at 10:32 a.m.

THE REPORTER:  We are also off the audio record.

(Off the record.)

THE VIDEOGRAPHER:  This begins media

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 79

unit number 2, and we're back on the record at 10:45 a.m.

BY MS. VANCE:

Q    Number seven asks that the school district provide a witness to -- I'm sorry, number eight -- to discuss the practices of Cobb County School District relating to financial budgets and budgeting for students with disabilities.  What is the practice of Cobb County School District to establish a budget for expenditures for students with disabilities in Cobb County School District?

A    So the -- specific to staff allotments, the staff allotments are coming from the state, from the QBE funding, and it identifies the number of teacher allotments for special education and then the -- the amount, so there is a number that the school district receives.  And then based off of the number, our special education team takes that information.

The assistant superintendent of teaching and learning support specialized services, which is the division that I'm in; they -- she takes the number of teachers that are needed for the small group program classes and identifies those and then looks at the number -- then the special education team looks at the number of students with disabilities in a school to

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 80

determine how many teacher allotments that are at each school.  There is a process by which the SSA, which is the support and services administrator that supports that school; they are projecting where students might be.

For example, if a student is in general education and the current IEP indicates general education for the following year, they will identify that -- that student as a -- a number in the -- the school for the high incidents -- we call it high incidence allotments, which is the interrelated allotments.  And then same with the program classes; we're looking at where students are and any projected students coming in and determine, based off of student numbers and needs, where those classes will be located, to identify where those teacher allotments are going to go.

And so once the principals receive their allotments in the spring, which include both general ed and special ed staff members, they then begin working kind of on a projected schedule for students towards the end of the year, sometimes summer, beginning of the year, that they're doing that. That -- so that is to identify the, essentially, budgeting of teacher allotments for special ed.  There

Page 81

is a practice that if the schedule is completed and there are services that are not covered, they look -- work through their scheduling process first, and then they submit their schedule and their requested need to the assistant director for that area.

That goes through the special education director and the assistant superintendent, to determine if additional allotments are needed. So that is -- the staffing budget, as we're going through; it's based off of just staff allotments. And then any expenditures for supplies or programming or anything specific to that, we budget based off of what we use typically annually as a reoccurring, and then determine if supplies, items, programming supports are needed, based off of IEP or program specific.

Q    And I think you said that that funding is QBE. For the record, could you please state what that is?

A    Yes. So that's the quality based education, and so that's the amount from FTE that's coming.

Q    And that is the amount that comes from the State of Georgia?

A    Correct.

Q    And what do we do -- what is the practice of Cobb County School District to use the flow through

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 82

money from the federal government for budgeting for special needs students?

A    Sure.  So the majority of our budgeting in the school district, 90 something percent, is on staff for -- for the entire district.  So obviously, the -- the state gives a number, but that we -- we have students that need more than that.  And so based off of what our current structures are, we look to see do we need more or less of teachers, staff members, district level support.  And those people are identified, typically, through the flow through budget, is -- is staff and benefits.

Q    And that flow through budget you are referring to is the money from the federal government?

A    Correct.  It's the IDEA flow through 611, and then there is the preschool.

Q    Okay.  And the IDEA flow through exceeds over 20 million?

A    I don't have the exact number, but it -- it does exceed a -- a large number.  I would say approximately around that.

Q    How about for the preschool?

A    I don't have the exact number of that.

Q    Okay.  So the school district gets the QBE and that's for all or any student; correct?

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 83

A    Correct.

Q    Okay.  And then there's additional funding, that's the flow through from the federal government?

A    Correct.

Q    And then there was additional funding for COVID for disadvantaged students; correct?

A    Correct.  There was -- there was additional funding for -- for all students, through that money.

Q    And some of that additional funding was dogeared for disadvantaged students; correct?

A    Correct.

Q    And it is the practice of the state and Cobb County School District to include disabled students as disadvantaged students; correct?

A    There was a specific amount for IDEA funding, like the flow through funding for the -- the COVID.

Q    And that flow through funding; how many millions of dollars for the financial budget of Cobb County School District was it -- how much of that money was for disabled students?

         MR. DANIEL:  Objection.  401, 403, exceeds the scope of the 30(b)(6) notice.

         MS. VANCE:  Thank you.  You may answer.

         THE WITNESS:  Your question is about

Page 84

the IDEA flow through?

MS. VANCE:  Mm-hmm.

THE WITNESS:  So it's all --

MS. VANCE:  Well -- IDEA flow through.

THE WITNESS:  Okay.

MS. VANCE:  Because that's all?

THE WITNESS:  That's all.

MS. VANCE:  That's right.  And so is
the pre-K; right?

THE WITNESS:  Correct.

MS. VANCE:  I'm talking about the
procedures related to budgeting, using the COVID money
-- Cobb County's procedures using the COVID money for
disabled students.  What was --

THE WITNESS:  So there was specific
amount of money earmarked for special education.

BY MS. VANCE:

Q    And how much was that?

A    There wasn't a -- there -- Cobb County did
not separate those two.  It came from the state, that
way.

Q    Oh, it came from the state, that way?

A    Correct.

Q    Okay.  And it was the practice of Cobb
County School District to see to it that the money

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 85

that the Georgia Department of Education allotted for disabled students was expended in the benefit of those students; correct?

A    Absolutely.  Those --

Q    Okay.

A    -- those funds are for students in special education.

Q    And does that include 504 students?

A    That -- that flow through does not include 504 students.  They are -- it is non -- 504 is non-funded, so it is general funded through the district.

Q    And does the district -- school district, you meant; right?

A    Correct.

Q    Right.  And is the school district -- is its practice to use any of the QBE money for 504 students?

A    Yes.  They're included in the -- in general education.  So they are -- there is not a program code for 504 for FTE funding.  It is -- it is based off of the general ed code, unless they're receive gifted services; then -- or EIP services -- they would get that specific funding, as well.

Q    And who funds the EIP services?

A    What do you mean?

Q    Is that QBE or is that federal or is that --

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 86

A    That's -- that's QBE.  That's through FTE.

Q    Okay.

A    The EIP, and then the RIP, for the older students.

Q    Right.  And the practice of Cobb County School District regarding funding for disabled students is to report to the Georgia Department of Education the disabilities of the students and the services they provide?

A    Yes.  So it is -- during the FTE, both October and March, they -- the -- our district -- I can't even talk, right now -- we report the primary exceptionality, and for the segments they receive special education services.  We may report if they have speech and language.  We -- we would report that, on that day, or any general ed with additional support.

Q    And it's the practice of Cobb County School District to report that data about the disabled students in Cobb County School District to the Georgia Department of Education, in order to receive additional funding for those students; correct -- over regular ed students?

MR. DANIEL:  I'm going to object to the question as exceeding the scope of the 30(b)(6)

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 87

notice.

MS. VANCE:  You may answer.

THE WITNESS:  Sure.  Correct.  They are -- the Georgia DOE funds students with disabilities at a higher weight than general education students.

BY MS. VANCE:

Q    Is it the practice of Cobb County School District to apply for additional grants of funding to the Georgia Department of Education for special needs students?

A    It is.

Q    And explain that, please.

A    There are two grants that we apply for each year, going back, I would say at least five years, if not more.  It is the -- one grant is residential grant.  So that is for students with disabilities who are IEP placed in residential settings.  We are able to apply for a grant to get a portion of that funding back.  And then there is a high cost grant.  So it is a grant that we can apply for for students that exceed a specific amount of money for -- to get a portion of those funds back.

So typically, those are students we're looking at who may have a one-on-one nurse, a one-on-one para, a BCBA support, any of those additional

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 88

services, on top of just the -- the general services that might be offered for students.

Q    And so it's Cobb County School District's practice to submit those grants for students, like the high cost grant --

A    Correct.

Q    -- to say student John -- we'll call him John -- he -- he needs a special needs nurse for half the day, and you submit the cost of that to -- it's a practice of Cobb County to submit the cost of that to the Georgia Department of Education and ask for additional funding for that special needs student?

A    Correct.  It's a -- it's a grant.  So it's funding back out of a pool of money that the Georgia Department of Education has.

Q    Okay.

A    So it -- it varies on the amount that is received, based off of if we meet the criteria, the amount of people that have applied, and -- and what their -- their amount is that they have in that grant, each year.

Q    And you were talking about the proportional share, but sometimes, Cobb County School District will receive all of what it expends because it's based on how many applicants there are and, as you said, the

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 89

pool of money the Georgia Department of Education has;
correct?

A    It could be all, but it -- it may not be,
depending on the number.

Q    Okay.  And I think you said that the high
cost grant would cover students who need BCBA
services?

A    Those are students that we look at that are
high cost, depending on the amount of support that
they're getting.  So when you look at the high cost,
it's the amount of services and supports that are
needed for that student --

Q    And I'm just curious.  What is the practice
of Cobb County School District regarding submitting a
grant for high cost, regarding what that amount is?
Like, is it $10,000 or 20?  I mean, is there some
number that, in its practice, it uses?

MR. DANIEL:  Objection.  401, 403,
exceeds the scope of the 30(b)(6) notice.

MS. VANCE:  You can go ahead.

THE WITNESS:  Sure.  So it is -- for
students that have, for example, one-on-one para, it
would be the cost of the one-on-one para would add up
the -- the amount.  If it is a BCBA, it might be their
-- they've served this many students over the year, so

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 90

this student, out of all of those, is this portion.

BY MS. VANCE:

Q    And I guess -- I'm sorry -- my question was vague.  Is there a certain amount, dollar amount that needs to be reached for a student before you will submit that grant application for funding for disabled students in Cobb County School District?

A    Yes.  There's a certain amount, as identified in the -- by the Georgia Department of Education.  It's not a Cobb practice.

Q    Oh, okay.  But it's Cobb's practice to follow that practice?

A    Absolutely.

Q    And what is that amount set by the Georgia Department of Education?

A    I don't have this specific amount, per student.

Q    Okay.  Does it change every year?

A    I believe it does adjust.

Q    Okay.  Do you have any recollection at all about approximately what it is?

MR. DANIEL:  Object.  Exceeds the scope of the 30(b)(6) notice, 401 --

MS. VANCE:  You may answer.

MR. DANIEL:  -- 403.

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 91

THE WITNESS:  I do not.

BY MS. VANCE:

Q    Okay.  So a student who's on Z status in Cobb County School District; that student doesn't receive educational programming; correct?

A    That is correct.  By default of the intent of the evaluation process, container school; it is students who are being evaluated.

Q    Would a child in that container school that you mentioned who is, say, two years, ten months old and referred to Cobb County School District by Babies Can't Wait; so that child's never been enrolled in a Cobb County School District.  Would that child be put in this container school?

A    If they are -- if we are evaluating the student, they would be in the preschool evaluation. There is a preschool evaluation and a K-12 evaluation.

Q    And is there a policy, by the board, on that preschool evaluation and container school evaluation?

A    No.  That is operational, and the board does not get into day-to-day operational --

Q    So it's a practice, not a policy --

A    Correct.

Q    -- of Cobb County School District?

A    Correct.

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 92

Q    Okay.  So if a student resided in Cobb County School District and the parents said, "I would like to have an evaluation and an IEP considered," but the child wasn't enrolled, would that child be put in the container school?

A    Yes.  The family would do online registration.  The option for online registration is your home zone school.  So they are placed in a -- a queue -- registration queue, and then they are moved into the evaluation school.  So they're not actively enrolled, at that time.

Q    And if you're not actively enrolled, that means it's Cobb County School District's practice not to provide students who are not actively enrolled educational programming?

A    Correct, because it's not required to by IDEA.

Q    And that's because they're not enrolled in the school district?

A    Correct.

Q    What is the practice of Cobb County School District, under section 504?

A    We have a lot of practices, under section 504.

Q    Okay.  Okay.

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 93

A    Can you be more specific?

Q    Yes.  What is this practice, regarding the reason for providing a 504 plan?

A    So it would be if a student has a physical and mental impairment that substantially limits a life activity, and the team, whether it's a parent or somebody from the school, would make a referral to section 504, and they would go through a referral process where they would ask the parent to consent to referral, gather some information, and determine eligibility under section 504, based on the information.

Q    And what is Cobb County School District's practice in finding a -- once it finds a student eligible under 504, what's its practice -- from that point forward?

MR. DANIEL:  Objection.  Objection. Vague.

MS. VANCE:  You may answer.

THE WITNESS:  Once the team has found a student eligible, then the team has a discussion about whether or not the student requires a 504 plan.  At that point, they are considering the mitigating measures the student may have and determining if the student needs accommodations or supports to access

Page 94

their education.  And if they need a 504 plan, if the team determines that, they will develop a 504 plan.

BY MS. VANCE:

Q    And is it the practice of Cobb County School District to provide students with a disability a 504 plan, so they can have access to education?

A    Yes.  That's the intent of 504, is access through their educational environment equal to their non-disabled peers.

Q    Let me -- and it may be in your book, so we're going to look -- the book that is Exhibit -- is it 17?

A    Yes.

Q    Yes.  Okay.  And 18.  So let's make this Exhibit 19.  And for the record, it is produced by Cobb County School District, Bates numbers 33750 to 33802.  We received that, this week.  Do you recognize what has been marked as Plaintiff's Exhibit 19?

(Plaintiff Exhibit 19 was marked for identification.)

A    I do.

Q    And what is that?

A    This is our District 504 practitioner's manual.

Q    And is it a true and accurate copy of the

Page 95

district's practitioner's 504 manual produced by Cobb County School District?  Is it a true and accurate copy of that manual?

A    I mean, I haven't gone through the entire document to -- to compare, so I don't know if it's true and accurate, the one you handed me.

Q    How about this?

A    Sure.

Q    How about the one in the notebook you have?

A    I do know that --

Q    Okay.

A    -- 'cause I've reviewed this one.

Q    Okay.  So it is.  And --

A    -- it's probably the same.  I just didn't want to go through the time to -- to confirm that.

MR. DANIEL:  Yeah.  And assuming, assuming the Bates numbers match up with the one in the notebook, then --

THE WITNESS:  Yes.  It does.

MR. DANIEL:  -- we'll stipulate that it's a true and accurate copy.

BY MS. VANCE:

Q    Okay.  Thank you.  And this was produced for the 2023, 2024 school year, not for this school year; correct?

Page 96

A    So this is the current one that is still --

Q    Okay.

A    -- in effect.  We have been in the process of revising it, but have not completed any revisions, so we are operating under this one.

Q    Thank you.  And that is Plaintiff's Exhibit 19?

A    Correct.

Q    Okay.  And I would like to know where is the one for the 2020/2021 school year?

A    So I -- I don't have the 2020/2021 school year.  I have the one we're currently operating under, as we're -- we're going through.

Q    Does Cobb County School District have the one for the 2020/2021 school year?

A    I don't know if it's maintained.  I was looking back at the -- for the 2019/2020 one.  Since that was not under my -- my purview, I wanted to make sure we had that -- that I reviewed that information, since that was the -- the relative time period.

Q    Right.  I wasn't at that conference.  I was sick with COVID.  So for the 2019/2020 school year, did you find a district 504 manual?

A    So I found a district 504 manual with my feedback revisions to -- to Nakia Cotton, who was the

Page 97

supervisor, at the time.

Q    Okay.

A    But I was not able to find it still maintained in our -- in our systems.

Q    And what did you -- is that in your notebook?

A    I don't believe it is.

Q    Is it in there in the notebook?

A    No.

Q    Okay.  And is it the same as the 2023 or the 2024 manual that's currently used?

A    So I did -- I did not go through everything, but I did, when I was going through, notice that there were a couple things in my feedback that I had given that were in there.  I don't know that if there were any additional revisions.  I was just looking back for what was consistent.

Q    Oh, okay.  And that was responsive to the request for documents.  Will Cobb County School District provide that for us?

MR. DANIEL:  We did.

MS. KITTRELL:  My understanding is it was provided to you yesterday, as part of the production.  It should have been.

MR. DANIEL:  Yeah.  I think we provided

Page 98

a -- I think we provided a native of it, as well as,
like, a printout.

MS. KITTRELL:  -- PDF format.  I'm
sorry.

MS. VANCE:  I have one for the Hospital
Home Bound.  I don't have one for the 504 manual, but
I could have missed it at 4 a.m., so --

THE WITNESS:  Oh, I see.  My mistake.
I was looking back at the -- at the Hospital Home
Bound one.  That was my mistake.

BY MS. VANCE:

Q    Can you explain?  I'm sorry.

A    When I was thinking the '19/'20, with my
feedback, I was thinking the Hospital Home Bound.

Q    Okay.  And we have that one?

A    Yes.  Yes.

Q    Okay.  And that's in your book, too?

A    I don't know that we printed that one --

MS. KITTRELL:  -- marked version is not
in your book --

THE WITNESS:  Yeah.

MS. KITTRELL:  -- but it was produced
yesterday.

MS. VANCE:  Okay.  Right.  So -- and
we'll go through that.

Page 99

THE WITNESS:  Sure.

BY MS. VANCE:

Q    So did you look for the district 504 manual in effect in 2019/2020?

A    I don't recall if I went back to specifically look for that year.

Q    Do we have --

A    I do remember we were looking for -- as part of this process, we were looking for all of those, but I don't remember which specific years.

Q    Will the school district agree that it will look for the 2019/2020 district 504 manual and produce that to Plaintiffs?

MR. DANIEL:  Yes.  Yes.  We will double check whether that document exists.

MS. VANCE:  And if you produce it to us, will you stipulate that it was the 504 manual in effect during 2019/2020?

MR. DANIEL:  Yeah.  Yeah.  I mean, we'd be happy to stipulate to that.

MS. VANCE:  Thank you.  And --

MR. DANIEL:  I mean, if we find it.

MS. VANCE:  And one other question.

THE WITNESS:  Sure.

//

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 100

BY MS. VANCE:

Q    So the 2019/2020 504 manual would be the manual in effect in 2020/'21 because it wasn't revised -- correct -- until '23; is that accurate?

A    I don't know if there were any revisions to it that following year, so I would -- I would need to double check that.

Q    It's not generally the practice of Cobb County School District to revise a 504 manual in one year, is it?

A    If there's updates, some --

Q    Okay.

A    -- new information, or if, you know, there are some -- some procedures that we need to revise, based off of some of our data, we would need that. But typically, it would be generally the same information.

Q    And I do know that that particular -- I mean, it was requested and it's not relevant to the notice of deposition 30(b)(6), but it was requested. Will you provide, also, any between, if there are any such, between 2019/2020 and 2023 and 2024?

           MR. DANIEL:  Are you talking about an RPD?

           MS. VANCE:  I'm talking about the

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 101

district 504 manual.

MR. DANIEL:  I mean, we can look at the additions of the 504 manuals.  I mean, I'm fine giving you whatever versions were in effect from 2019/2020 onward.

MS. VANCE:  Thank you.  And you would stipulate, as well, when you produce them, that they were in effect during the times that are listed on the document or after, if there's not another one behind it?

MR. DANIEL:  Yeah.  I mean, whatever the -- I mean, I don't know if that there is a separate version for each particular school year or if it just carries over, unless otherwise amended, but -- yeah.

MS. VANCE:  Well, she just testified that it carries over, unless otherwise amended.

MR. DANIEL:  Yeah.  I mean, if we find those documents, then we'll produce them and yeah. We're not going to challenge the authenticity of our own documents, on that point.

MS. VANCE:  Thank you.

BY MS. VANCE:

Q    And who, in 2019 -- what was the practice of Cobb County School District in preparing this manual?

Page 102

What was its practice as to who would be involved? And by this manual, meaning district 504 manual.

A    So at that time, Nakia Cotton was the 504 supervisor, the director of special education.  And that '19/'20 would have been -- I believe that was the year George Morgan became the director, and then possibly -- and then myself.

Q    Okay.  And would legal counsel review it?

A    No.

Q    Okay.  And so the three of you would take the manual you had in effect, and the practice would be to make any corrections needed or updates needed and then have a new manual prepared?

A    Correct.

Q    Okay.  And then would it be the practice of Cobb County School District to train anyone on the district 504 manual?

A    So we do annual training for our 504 coordinators, so those same practices they're talking about within that -- that training, and 504 school coordinators have access to the manual on their teams.

MS. VANCE:  And I'm sorry, but I just want to make sure we introduce this in the record as the true and accurate copy of Cobb County School District's 504 manual for 2023/2024 school year --

Page 103

correct?

THE REPORTER:  As P19?

MS. VANCE:  Right.  And there's no objection to that.

MR. DANIEL:  Yeah.  No.  I think we already --

MS. VANCE:  I thought so, but I -- yeah -- just want to make sure.  Thank you.

BY MS. VANCE:

Q    Does Cobb County School District have any policies, practice, or procedures regarding Z K through 12 SE?

A    There are no written procedures or practices.

Q    How about policies?

A    No.  Policies are determined by the Board of Education.

Q    To your knowledge, when did Cobb County School District start withdrawing disabled students from Cobb County School District, in order to effectuate their placement on Z status?

MR. DANIEL:  I'm going to object to the vague nature of the question, and mischaracterizes evidence and prior testimony.

MS. VANCE:  You may answer the

Page 104

question.

THE WITNESS:  I don't -- we don't -- our -- we're not withdrawing students with -- in special education to move them to the evaluations school.  I think -- I'm not understanding --

MS. VANCE:  Let me rephrase.  Thank you.  I appreciate you sharing that.

THE WITNESS:  Yeah.

BY MS. VANCE:

Q     When was it the practice of Cobb County School District to withdraw a student on a 504 plan to effectuate a placement of that student on Z status?

A     So there is not a --

MR. DANIEL:  Object.  Vague.  Yeah. I'm going to object to the question as vague.

MS. VANCE:  Go ahead, please.

THE WITNESS:  There's not a practice to move a student there to effectuate a placement.  The students may be moved to the evaluation school if they are not accessing the services, but they're waiting for an evaluation for special ed.  They may move into that so that they're not actively enrolled in accruing absences, and all of the other things that come with being actively enrolled.

//

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 105

BY MS. VANCE:

Q   And just for the record, Olivia, in November and December of 2020, was not accruing absences, to your knowledge, was she?

A   She --

MR. DANIEL:  I'm going to object that the question exceeds the scope of the 30(b)(6) notice.

MS. VANCE:  You may answer.

THE WITNESS:  She does not currently have any absences.  There was a time period where there were a couple absences as a clerical error, and those were corrected.

BY MS. VANCE:

Q   So to clarify, Olivia had no absences from August, when school started, I believe the 17th of 2020, to December 3rd of 2020; she had no absences; correct?

MR. DANIEL:  I'm going to again object that this question about Olivia's attendance far exceeds the scope of the 30(b)(6) notice.

But if the witness has any personal knowledge, she may answer.

THE WITNESS:  So Olivia was not counted absent, due to her -- one of her 504 accommodations -- if her parent -- if her mom logged her in.

Page 106

BY MS. VANCE:

Q    So she had none?

A    So she had --

MR. DANIEL:  Same objection.

MS. VANCE:  Thank you.  I just wanted to get an answer to the question.  Thank you.

THE WITNESS:  Yes.

BY MS. VANCE:

Q    When did it become the practice of Cobb County School District to withdraw a disabled student with a 504 plan from a Cobb County School District, without first informing the disabled student's parent?

MR. DANIEL:  I'm going to object to the question as mischaracterizing the evidence, assuming facts not in evidence, and also vague.

MS. VANCE:  You may answer.

THE WITNESS:  So the withdrawal process is not specific to students with disabilities.  Can you -- can you repeat your question?  Sorry.

MS. VANCE:  Well, I'm going to repeat it in a second.

THE WITNESS:  Sure.

BY MS. VANCE:

Q    But I want to ask you, what do you mean by the withdrawal process is not specific to students

Page 107

with disabilities?

    A    So there is not a board policy that indicates specific -- specific withdrawal reasons for a student with a disability, and there is not a practice in place for those reasons, either.

    Q    Is there a procedure in place?

    A    There is not a specific procedure in place for withdrawing students specifically due to their disability.  It is a general -- it is based off of policy for all students.

    Q    Okay.  So you wouldn't withdraw a student based upon disability?

    A    No.  That would be discriminatory, so we would not be doing that.

    Q    Does Cobb County School District have a practice, and if so, when did it begin, to withdraw a disabled student with a 504 plan to minimize the family stress?  Does it have a practice for that?

    A    No.  There not a practice, for any specific reason, to withdraw a student with -- for a disability.  There are certainly discretionary decisions that are being made by school teams, based off of individual basis, for students to ease families' burden.  That is part of our job as educators, to try to help support families.

Page 108

Q    How long has it been the practice of Cobb County School District to use educator discretion to withdraw a disabled student from Cobb County School District, who has a 504 plan, to ease family burdens?

MR. DANIEL:  I'm going to object to that the question is mischaracterizing testimony and assuming facts not in evidence and is also vague.

MS. VANCE:  You may answer.

THE WITNESS:  There is not a practice.

BY MS. VANCE:

Q    Has there ever been?

A    There --

MR. DANIEL:  Same objection.

THE WITNESS:  There is not a practice.

BY MS. VANCE:

Q    Is it board policy, or has it ever been board policy, to allow educators to use discretion to decide to withdraw a disabled student with a 504 plan from Cobb County School District, to ease the family burden?

A    If you don't mind, I'm going to go back to our admissions and withdrawals.

Q    And just for the record, tell us what you're looking at, when you do.

A    Sure.  It is JBC-R, the school admissions

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 109

and withdrawals, again.

Q    Okay.

A    So the withdrawal reasons in that policy, again, on page seven --

Q    Okay.

A    -- are not specific to students with disabilities.  It is -- it is general to all students.  So there is not a board policy or practice specific to that.

Q    So does the board then authorize educators to withdraw disabled students with a 504 plan, to ease the family burdens?

MR. DANIEL:  I'm going to object that the question is vague in its use of the word authorize and in the remaining portion of the question.

MS. VANCE:  You may answer.

THE WITNESS:  So the board -- the board administrative rule is a formal rule regarding enrollment and withdrawal.  In that, there are reasons for withdrawal, and so it would need to fall in one of those reasons.

BY MS. VANCE:

Q    And if it doesn't, then an educator doesn't have the discretion to withdraw the student; correct?

A    It would need to follow board policy.

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 110

That's correct.  Yes.

Q    And when a decision is made to place a student on Z status or in a Z school or a container school, is disability considered?

MR. DANIEL:  I'm going to object to the question as posing a vague hypothetical.

MS. VANCE:  You may answer.

THE WITNESS:  So the intent of the evaluation container school is for evaluation purposes.  So many of these students aren't -- don't have a disability, at that point.  Some of them are evaluated and determined eligible; some of them are not.

BY MS. VANCE:

Q    When a decision is made to withdraw a disabled student with a 504 plan and place that student on Z status, is the fact the student is disabled considered?

MR. DANIEL:  I'm going to object to the question as posing a vague hypothetical.

THE WITNESS:  It's not considered for a student with a disability.  Again, it is -- the intent of that is for students to be evaluated.  When we are withdrawing students, they are not receiving their instructional services, and it meets one of those

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 111

criteria.  So there is nothing specific in the policy about disabled students.

BY MS. VANCE:

Q    And if they were not accessing those services, they would have to meet one of those four reasons; right?

Q    Correct.

Q    Thank you.  Who makes the decision for Cobb County School District to withdraw a disabled student with a 504 plan to effectuate placement of that student on Z status?  Who is authorized or who makes those decisions, as practice?

MR. DANIEL:  I'm going to object to the question as posing a vague hypothetical.

THE WITNESS:  There is not a specific person identified to make that determination.  It could be through conversation with the school staff. It could be in conversation with what is occurring with that specific student, and to -- that they should be moved over to the evaluation school

BY MS. VANCE:

Q    And withdrawn from the school?

A    Withdrawn from that -- that specific school. Correct.

Q    But my understanding is it would still have

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 112

to meet one of those four reasons in the administrative rule for withdrawing a student; correct?

A    It would.  Yes.  It would meet one of those reasons.  And -- and part of those reasons is you're looking at whether the student is -- is in attendance, whether they're -- whether they are enrolled in another district, whether they're residing in any area -- in another school district.  Excuse me

Q    In 2020, was the 504 coordinator authorized by practice, policy, or procedure to have a student with a 504 plan withdrawn, if one of those four reasons weren't met?

A    So these are from withdrawal from the school -- school district, so that's what this policy is.  So if a student is being withdrawn into the eval school, they're not being withdrawn from the -- from the district.  But the 504; if it's a 504 student that is being evaluated for special education, that guidance might come from a -- a 504 supervisor.  There's not anybody that's authorizing somebody to make a specific decision, 'cause decisions come to us every day, all day.

Q    So you're saying that those policies don't apply to a disabled student who has a 504 plan to be

Page 113

withdrawn from a public school?

MR. DANIEL:  Objection.  Argumentative, misstating testimony.

MS. VANCE:  That's what I'm asking.

MR. DANIEL:  Vague.

MS. VANCE:  You may answer.

THE WITNESS:  So to clarify, these policies apply to everybody.  This section of the policy is about using to withdraw students from the district.

BY MS. VANCE:

Q    I have a question.  One of the areas that we're asking about are the policies and practices and procedures of Cobb County School District regarding the IDEA, and part of the IDEA involves complaints to the State Department of Education; correct?

A    It does.  Yes.

Q    Okay.  And it is the practice of Cobb County School District, when a parent submits a complaint to the Georgia Department of Education, to respond to that parent complaint; correct?

MR. DANIEL:  I'm going to object to this line of inquiry as exceeding the scope of the noticed topics.

MS. VANCE:  You may answer.

Page 114

THE WITNESS:  It is our practice to respond to those.  Yes.

BY MS. VANCE:

Q   Okay.  And the practice, regarding IDEA, would be to respond accurately to the Georgia Department of Education; correct?

MR. DANIEL:  Same objection.  It exceeds the scope of the notice.

MS. VANCE:  Okay.  You may answer.

THE WITNESS:  Yes, based off of the knowledge that -- that we have gathered.

BY MS. VANCE:

Q   And it would be unethical to falsely report to the Georgia Department of Education; correct?

MR. DANIEL:  I want to object that this exceeds the scope of the notice and poses a vague hypothetical.

BY MS. VANCE:

Q   Is it a practice of Cobb County School District to respond to a complaint regarding IEP services, by a parent?

A   If it is opened under IEP development review and revision or implementation of an IEP, yes.

Q   Okay.

A   I should say if the complaint -- I said

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 115

if -- if the complaint is opened under those areas of allegations.

Q   And is it the practice of Cobb County School District to respond to a parent complaint, of a disabled student, regarding Hospital Home Bound?

MR. DANIEL:  Same objection.  Exceeds the scope of the 30(b)(6) notice.

THE WITNESS:  If that is -- if it is opened under LRE or placements and that is one of the allegations in the complaint, it would respond to.

BY MS. VANCE:

Q   Okay.  And that's the practice of the school district?

MR. DANIEL:  Same objection.

THE WITNESS:  To respond to the complaint and the allegations?

MS. VANCE:  Yes.

THE WITNESS:  Yes.

BY MS. VANCE:

Q   Okay.  To your knowledge, how long has Cobb County School District been with withdrawing disabled students and placing them on Z status?

MR. DANIEL:  Object to the question as vague and mischaracterizing the evidence.

MS. VANCE:  You may answer.

Page 116

THE WITNESS:  Your question is about withdrawing disabled students and -- to to the Z evaluation; correct?  We are -- as I previously said, there is no practice and we're not withdrawing students that are disabled and moving over.  We are moving students over who are in the evaluation or enrolling them straight into the evaluation process.

BY MS. VANCE:

Q    So there is no practice, then, for Cobb County School District to withdraw a disabled student with a 504 plan, to place them on Z status?  Is that what you're saying?

MR. DANIEL:  Objection.  Argumentative, vague, asked and answered.

MS. VANCE:  You may answer.

THE WITNESS:  I -- I -- yeah.  I -- I did answer, I thought -- that it is not our -- there is not a practice about withdrawing disabled students, specifically, to evaluation.

MS. VANCE:  Okay.

THE WITNESS:  There is a practice about enrolling a student or moving the student into the evaluation process, who is being evaluated for special education services.

//

Page 117

BY MS. VANCE:

Q    Okay.  So can a student be placed in the evaluation process, a student, without being withdrawn?

MR. DANIEL:  Object to the form as vague.

THE WITNESS:  A student can be moved into the evaluation process who is enrolled in the district and not currently enrolled in a school, and moved directly in to the evaluation process.

MS. VANCE:  Okay.

THE WITNESS:  That happens, typically, with our private school, homeschool students.

MS. VANCE:  Okay.

THE WITNESS:  It also happens when students are moving into the district, where through discussion, we've determined we need to do an IEP or an evaluation, prior to determining where those -- where those services would be located.  And probably a couple -- couple other reasons that might come up, individually.

BY MS. VANCE:

Q    Is it the policy, practice, or procedure, of Cobb County School District to withdraw a disabled student with a 504 plan from Cobb County School

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 118

District and report to Georgia Department of Education that a student has been withdrawn from the system?

A    I'm trying to understand your question.  Can you clarify that, please?

Q    Yes.  I can.  Thank you.

A    Because it was long.

Q    Okay.  Is it Cobb County School District's practice, when it withdraws a student from Cobb County School District, to report that to the Georgia Department of Education?

A    The Georgia Department of Education indicates we only report enrolled -- enrolled students, and when they are withdrawn from a specific school or the -- or the district,

Q    Well, let me rephrase.

A    Sure.

Q    Is it the policy, practice, or procedure of Cobb County School District to report to the Georgia Department of Education when a student is withdrawn from Cobb County School District?

A    Yes.  Within the last -- if the student is enrolled with us, for example, this school year, '25/'26 school year, and we have reported them as enrolled, they are no longer enrolled with us, but they are -- but they are maybe in another -- if

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 119

they're in another school district, that school district -- them up.  But if they are not enrolled in another school district, we would report that they aren't child find.  And that's specific for students with disabilities.

Q    What was the practice of Cobb County School District to withdraw a disabled student with a 504 plan, to relieve the disabled student of attendance requirements, in 2020?

MR. DANIEL:  Object to the question as vague.

MS. VANCE:  You may answer.

THE WITNESS:  There is not a practice.

BY MS. VANCE:

Q    Was there a practice?

A    There was not a practice or procedure.

Q    Was there a policy?

A    There was not a policy.  As I've stated, there aren't policies, practices, or procedures about withdrawing a student with a disability, specifically.

Q    Does Cobb County School District receive FTE funding for kids on Z status?

A    No.  They are not reported to the state. The state only -- we only report data to the state for a student who is enrolled within a school that's a

Page 120

state ID school.

Q    Have you ever discussed with anyone with the Georgia Department of Education Cobb County School District's practice of placing disabled students with a 504 plan on Z status?

A    No.  And as I stated, we're not placing students -- disabled students on Z status.

Q    Who have 504 plans?

A    Who have 504 plans.  There are -- there may be some reasons why students are placed on Z status, but those -- the -- the question you keep asking is about disabled students and moving them.  There is not a practice for that, specifically.

Q    But it's done, isn't it?

MR. DANIEL:  Objection.  Argumentative.

MS. VANCE:  You may answer.

THE WITNESS:  It -- it might be done, based off of a -- a need for a student.

BY MS. VANCE:

Q    Is that permitted by the Cobb County Board of Education?

A    There is not a specific board policy that defines that.

Q    But then, is that delegated for someone to make that decision, by the Board of Education?

Page 121

MR. DANIEL: Objection. Vague and asked and answered and exceeds the scope of the 30(b)(6) notice.

MS. VANCE: You may answer.

THE WITNESS: The board does not delegate specific duties for staff members.

BY MS. VANCE:

Q   Is it the practice of Cobb County School District to withdraw a disabled student with a 504 plan and move that student to the eval status, without first informing the parent?

MR. DANIEL: Again, objection to the vague hypothetical.

MS. VANCE: You may answer.

THE WITNESS: There is not a practice.

BY MS. VANCE:

Q   Is it the practice -- well, does Cobb County School District, in fact, inform a parent, prior to withdrawing that student with a 504 plan who has disabilities, from a Cobb County School and placing that student on the eval status?

A   I -- I can't say 100 percent sure that they do every time, because I'm not involved in every decision that is -- that is made in that, nor is any one specific person within the district.

Page 122

Q    How many students with a 504 plan who are disabled have been withdrawn from a Cobb County School District and placed on Z status, this school year?

MR. DANIEL:  Again, I'm going to object that the question is vague.  It mischaracterizes the evidence, ignores prior testimony, and exceeds the scope of the 30(b)(6) notice.

MS. VANCE:  You may answer.

THE WITNESS:  I don't know.

BY MS. VANCE:

Q    Do you know of any?

MR. DANIEL:  Again, same objections.

MS. VANCE:  You may answer.

THE WITNESS:  I don't know.

BY MS. VANCE:

Q    That information's not shared with you?

A    Specific --

MR. DANIEL:  I'm going to, again, object to the accusatory insinuation and the question, and restate the same objections.

MS. VANCE:  Speaking objections, but go ahead.  This has been difficult.  We could have been through a lot earlier, but let's go ahead and respond, please.

//

Page 123

BY MS. VANCE:

Q    When a student with disabilities is withdrawn, is it the practice of Cobb County School District to have you informed?

A    No.

Q    Okay.  Is it the practice of Cobb County School District for you to be informed when a student is placed on home services in the student's IEP?

MR. DANIEL:  Objection.  Vague.

THE WITNESS:  Home-based services or Hospital Home Bound services?

BY MS. VANCE:

Q    Home-based.

A    Home-based?  Not me, specifically.  It currently lives in my team, but the supervisor handles that.

Q    Okay.  In fact, it is practice, written practice, when a student is placed on home services in an IEP, that the IEP or IEP change form be immediately provided to your office; correct?

A    To the special education supervisor who handles that.

Q    Okay.  And what is done with that?  What is the practice of Cobb County School District?  What is the practice of that?

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 124

A    They're -- the SSAs -- the support and services administrators are filling out a link, so that the supervisor is aware that the IEP has been completed and how many hours the team determined.  And then the supervisor assigns one of our Hospital Home Bound and home-based teachers.  And so the form is completed that allows them to assign that, and that keeps a log of specific students.

Q    And is it the practice of Cobb County School District to maintain that log?

A    Over -- for the course of the year, yes. 'Cause we're -- they're kind of seeing when students are coming off and coming on.

Q    And is it the practice of Cobb County School District to use that information to report to the Georgia Department of Education how many students have an IEP who receive in-home services?

A    No.

Q    How does Cobb County do that?  What's its practice for reporting that information to the Georgia Department of Education?

A    It is -- so it is based off of students who have, in CSIS, the Hospital Home Bound or home-based tag.  And then the -- it gives a number of students, so -- that -- that goes up to the DOE.  But it's

Page 125

coming from the IEP system.

Q    From the CSIS?

A    From CSIS and the IEP system, they're checking.

Q    Okay.  And does the IEP system for those students indicate the number of hours of in-home services they receive?

A     In each individual IEP, yes.

Q    Okay.  So if Cobb County School District reported to the Georgia Department of Education 34 students receiving Hospital Home Bound, which you said also includes IEP and home services; correct?

MR. DANIEL:  Objection. Mischaracterizes testimony.

MS. VANCE:  I'm asking.

THE WITNESS:  That indicates -- for the LRE indicator?  Yes.

MS. VANCE:  Okay.

THE WITNESS:  But not for -- for funding --

MS. VANCE:  Okay.

THE WITNESS:  -- or anything like that.

BY MS. VANCE:

Q    For the LRE indicator?

A    For the LRE indicator.

Page 126

Q    Okay.  All right.  And so if there are 34 students for the LRE indicator, for a year, who are receiving in-home or Hospital Home Bound, that data provision to LRE indicator to the Georgia Department of Education would indicate there's 34 students in Cobb County School District receiving that placement; correct?

A    On that FTE day.

Q    Right.

A    There is not a reporting of every student, every time they go on Hospital Home Bound or home-based.

Q    Right.

A    It's only during that window for the LRE indicator.

Q    Right.  Okay.

THE WITNESS:  Are we at a -- a place where we can take a quick restroom break?

MS. VANCE:  Sure.  Absolutely.

THE VIDEOGRAPHER:  Off the record, 11:48 a.m.

(Off the record.)

THE VIDEOGRAPHER:  This begins media unit number 3, and we're back on the record at 1 p.m.

//

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 127

BY MS. VANCE:

Q    Thank you.  So let me show you, please, Ms. Coleman, what's been marked as Plaintiff's Exhibit 20, and ask you to please identify that for the record.

(Plaintiff Exhibit 20 was marked for identification.)

A    Sure.  It is the guidance for special education, Hospital Home Bound, and home-based services.

Q    And it's the Cobb County School District guidance?

A    Yes.

Q    But with markups on it for suggested changes?

A    Correct.  Yes.

Q    And so what's kind of scratched -- marked out was what was in effect in the 2019/2020 school year?

A    So I gave feedback in July of 2019.

Q    Okay.  But when was it adopted?

A    It would have been adopted for that year. So the information that's here, that track changes, it would've been adopted with a new -- new version for the '19/'20 school year, if that makes sense.

Page 128

Q    Okay.  And so y'all are going to look for that 2020, not marked up version?

MR. DANIEL:  I think we have looked for the not marked up version.  And as far as we can tell, there is no copy of the not marked up version.

MS. VANCE:  Okay.

MR. DANIEL:  This is the closest thing --

MS. VANCE:  Okay.

MR. DANIEL:  -- we have, so that's what we produced.

BY MS. VANCE:

Q    Thank you.  And so we know then that this marked up version was the 2020 Home Bound guidance?

A    2019/2020, yes.

Q    Well, okay.  Okay.  Thank you.  And that was done in July of 2020?

A    July of 2019.

Q    Okay.  Thank you.

A    Yes ma'am.  So we introduced that into the record as the true and accurate marked up copy of Cobb County's Hospital Home Bound services.  All right.  Let's look please at what's been marked as Exhibit 21, and please tell us what this is.

//

Page 129

(Plaintiff Exhibit 21 was marked for identification.)

This is the special education guidance for Hospital Home Bound, home-based services for the '22/'23 school year, and it's part of our practitioner's manual.

Q    And it is a true and accurate copy of the special education guidance for Hospital Home Bound based services in effect for the 2022/2023 school year forward?

A    I think there's additional things in it, if I'm not mistaken.

Q    Well, the Bates numbers are all sequential.

A    Because -- because this -- so the -- the document goes through page 20, which the Bates stamp of last three digits 823.

Q    Okay.

A    But the next one is a Georgia Department of Education, the FTE reports that are in there, which were not -- which are not a part of our --

Q    Okay.  Okay.  So just the document 21, pages 33803 to 33823 is a true and accurate copy of the Hospital Home Bound Services manual in effect for 2022/2023 forward?

A    Correct.

Page 130

Q    Okay.  And then let's just look then at this Exhibit 21.  In the back, there are pages 33824 to 33829.  And what are these?

A    So the ones that are 33824 to 33828 are the Georgia Department of Education reports that we produced as part of the request for the FTE reports. And then the 3829 is just saying it's produced in native format, so that's not a part of --

Q    Okay.  So it says pages before the last one?

A    Yes, ma'am.

Q    Thank you.  And let's just look at 33824. These are these indicators on LRE; correct?

A    Correct.

Q    And that means least restrictive environment?

A    Yes.

Q    And this document indicates that in the year 2021 one, that at the time of the reporting, was that FTE1 reporting?

A    Yes.

Q    There were 13 students either in Hospital Home Bound or in-home placement with an IEP?

A    Correct.  On count -- on that count date. Yes.

Q    On that count day?

Page 131

A    Yes.

Q    Okay.  And then for 2020, this indicates that for the FTE count one, which is in October of the year; right?

A    Correct.

Q    That the number of special needs students on Hospital Home Bound or in home-based services was 32?

A    Yes.

Q    And for the year 2019 FTE count one, it indicates that at the time of the FTE count, there were zero students with an IEP placing them at home and zero disabled students with Hospital Home Bound services?

A    Based on the reporting part, yes.

Q    Okay.  And we introduced those as accurate FTE indicator information regarding disabled students provided to the Georgia Department of Education from the Cobb County School District.

THE REPORTER:  Are you doing it all as P21?

MS. VANCE:  I can make it Exhibit 22, if you want to.  Okay.  So let's just pull these last pages out of here and we will make this exhibit.

THE WITNESS:  And this is the --

MS. VANCE:  Well -- and let's just take

Page 132

the last page out, too.  I don't think we need it, so we will just get rid of that one.  I'm going to give everybody -- we'll pass this around.  If you'll put a tab on it and write on it that it is Plaintiff's Exhibit, and just write the number 22.  You need a pen?

(Plaintiff Exhibit 22 was marked for identification.)

THE WITNESS:  I've got a pen, right here.  Thank you.  You said 22?

MS. VANCE:  Yeah.  Oh, I got it.  Okay. And let me get you a paper for it.  And these are true and accurate copies, Exhibit 22, of information provided by Cobb County School District to the Georgia Department of Education involving disabled students enrolled in Cobb County.

MR. DANIEL:  I'm just going to object as exceeding the scope of the 30(b)(6) notice.

THE WITNESS:  These are true and accurate reports we have received back from the Georgia DOE.  Yes.

BY MS. VANCE:

Q    Yeah.  And this is data that that was actually provided from Cobb County School District to the Georgia Department of Education?

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 133

A    Correct.  And then we received these reports back.

Q    Okay.  Thank you.  Okay.  Please look at Plaintiff's Exhibit 23.  It is a production from Cobb County School District, numbers 33389 to 33391.  And can you tell us what this is, please?

(Plaintiff Exhibit 23 was marked for identification.)

A    This is one of the forms connected to the policy JB, so it's JB -- it's a form JB5, connected to the attendance protocol.

Q    And it is a Cobb County School District practice, would you call it, regarding attendance?

A    I would -- I would call this a procedure of -- of attendance.

Q    Okay.  And it's true and accurate copy?

A    Yes.  If you don't mind, I'm just going to --

Q    Please.  No, absolutely.  Look.

A    Sorry, I was just getting to the numbers here --

Q    No.  Take your time, please.

A    Sorry.  I just wanted to get to my page, to make sure I --

Q    And note the date on that one, please?

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 134

A    This one is August 22, 2019.

Q    Is that a true and accurate --

A    Oh, I'm sorry.  Yes.

Q    Thank you.  We introduced this into the record as the true and accurate copy of the attendance protocol for Cobb County School District that was in effect as of 8/22/19?

A    2019.  Yes.

Q    Okay.  So then let me show you what's been marked as Exhibit 24, and please identify this for us.

        (Plaintiff Exhibit 24 was marked for

        identification.)

A    This is the same document, the attendance protocol that was in place on July 1, 2022.

Q    Is it a true and accurate copy?

A    It is.  Yes.

Q    Thank you.  I'm going to introduce this into the record.  Now I'm going to do a bunch of these; okay?

A    Sure.

Q    Because these were provided, for the record, by the school district, as the JBC-R school admissions withdrawals.  It starts dated 7/20/17, 9/19/19, 10/15/20, 7/15/21, and 7/1/22, and then 12/7/23.  And I'm just asking you -- and we might just stipulate it

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 135

that these are true and that y'all provided them to us.  They are true and accurate copies -- let me just start marking them.

MR. DANIEL:  Yeah.  If you show us what --

MS. VANCE:  I will,

MR. DANIEL:  -- like, Bates numbers and --

MS. VANCE:  Sure.  Sure.

MR. DANIEL:  We might able to short circuit some of it.

MS. VANCE:  Yeah.  Thanks.  Okay.  Is there two in there?

MS. KITTRELL:  Yes.

MS. VANCE:  I think there are.  Okay. I will, in just a second.

MS. KITTRELL:  I just wanted to make sure you didn't forget.

MS. VANCE:  Oh, I'm not.  I'm going -- okay.

MS. KITTRELL:  Chris, were these all the different versions?

MS. VANCE:  Yes.  I would ask that we stipulate that Plaintiff's Exhibits 25 through Plaintiff's Exhibits 30 are true and accurate copies

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 136

of Cobb County School District's JBC-R school

admissions and withdrawals that were provided to

Plaintiffs by counsel, pursuant to discovery.

And we'd like to stipulate that these

are true and accurate copies of those school

admissions withdrawals, JBC-R I think you call those,

administrative rules to implement the school

district's policy?

(Plaintiff Exhibit 25 through

Exhibit 30 were marked for

identification.)

THE WITNESS:  Correct.

MR. DANIEL:  Yeah.  And yeah.  I mean,

we'll, yeah, stipulate to that, with the qualification

that it's as of the date indicated below the policy

title, for each version.

BY MS. VANCE:

Q   Thank you.  Let me introduce those.  Thank

you.  All right.  Are we on 31?  We probably can

stipulate to this, as well.  Let me show you, please,

what's been marked as Plaintiff's Exhibit 31 and ask

you to identify that, please, for the record.

(Plaintiff Exhibit 31 was marked for

identification.)

A   It is the student code of conduct.

Page 137

Q    And when was it in effect?

A    July 1, 2020.

MS. VANCE:  And is it a true -- can we stipulate this is this a true and accurate copy of the student code of conduct?

MR. DANIEL:  Yes.  As of July 1, 2020.

BY MS. VANCE:

Q    And that is an administrative rule JDCAR that implements a Cobb County School District policy?

A    Yes.

Q    Okay.  And it is the policy of Cobb County School District to explain, in its student code of conduct, the consequences of student having unexcused absences?

A    Is that in the -- one of the -- are you speaking of one of the policy violations?

Q    I mean, you may not be aware that it is Cobb County School District's policy and administrative role to provide that information, but you may be aware, and if you need me to show you where it is, I can do that.

A    And there are some -- B; there's attendance violations.  Is that --

Q    Where?  B?

A    B, on page five of seventeen, 3555.

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 138

Q    No.  Let me look.  Wait a second.  Here it is.  E, on page three, and into page four.

A    Yes.  Part of the code of conduct indicates truancy and -- and that schools will notify parents, when they've accumulated specific numbers of absences.

Q    And then they notify the parents of the potential consequences of truancy; correct?

A    Are you speaking specific to the -- to --

Q    To the administrative rule that implements the policy of the school district.

A    There are -- I would need to go back to the forms that are connected to that, but in the student code of conduct itself, it's not -- in this section, it's not giving --

Q    Oh, three?  On page three, the last paragraph; those are not the consequences?

MR. DANIEL:  I'm going to object to the form as ambiguous.

BY MS. VANCE:

Q    So I'm just making sure it is not the consequence of truancy that a parent could be fined or imprisoned or ordered to perform community service?

A    So I would -- I would definitely want to go back to the attendance rule.  I think that is coming specific from the Georgia State Code there, but not a

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 139

specific violation for the student in attendance.

Q    Okay.  Do you know, and you may not, is it a policy, practice, or procedure for -- well, this is the procedure; right?  This administrative rule?

A    This is the student code of conduct, which gives the violations and some of what the student offenses would be.

Q    Okay.  Is it a procedure, to your knowledge, or practice or a policy for Cobb County School District to notify, in the student code of conduct, the consequences that can arise from truancy?

MR. DANIEL:  Objection.  Vague.

MS. VANCE:  You may --

THE WITNESS:  So I would say -- I -- I would just say it's -- it's connected all the way throughout.  So there is some level one of attendance violations which are laid out here.  And then as -- as you continue through the code of conduct, it gives you more information --

MS. VANCE:  Okay.

THE WITNESS:  -- about what those -- what level one means and where --

MS. VANCE:  Okay.

THE WITNESS:  -- where they're --

MS. VANCE:  Can we stipulate that

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 140

Plaintiff's 31 is a true and accurate copy of the student code of conduct JCDAR, effective as of July 1, 2020?

MR. DANIEL:  Yes.  I think we already have.

MS. VANCE:  Okay.  Thanks.

BY MS. VANCE:

Q    Could you please explain what an evaluation meeting is, pursuant to the IDEA?

A    So your -- your question is about an evaluation meeting?

Q    What is that, pursuant to the IDEA?

A    So there is an -- like, in a referral for an evaluation, and then there is a eligibility meeting to review the results of an evaluation and determine eligibility.

Q    So okay.  If you could, do explain that difference --

A    Sure.

Q    -- between an evaluation meeting and a reevaluation meeting and an eligibility meeting.

A    Sure.  So there is a referral for evaluation, where either the school team or the parent is requesting an evaluation under special education services.  And as part of that, there is a team that

Page 141

comes together that discusses the concerns, where the student might be having concerns or the parent's concerns.  They discuss interventions that might be needed for the student and whether or not there is a recommendation for evaluation.

If so, the district will provide a consent for evaluation form and explain to the parents what that means under the parental rights, what they're consenting to.  Part of that evaluation is -- the scope of it is discussed in that meeting, what might be some evaluation assessments that are conducted. And then the evaluator, afterwards, determines the scope and the assessments and assesses the student, as well as some informal assessments.

Q    And is it the practice or policy or procedure of Cobb County School District to inform the parent, when it's seeking the parent to sign the consent for evaluation form, what areas of suspected disability will be evaluated?

MR. DANIEL:  Objection.  Vague.

THE WITNESS:  So the practice -- it's not a practice to say specific areas of eligibility.

MS. VANCE:  I'm sorry.  Areas of suspected disability.

THE WITNESS:  Disability?  It is not --

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 142

it -- the practice is to have a discussion about what the areas might be, based off of the referral concerns.  But that -- that doesn't only drive the decision of eligibility categories, because the information is reviewed at the end of the evaluation, to look at all areas that might meet that criteria. And then your -- your next question, I think, was about the meeting after the evaluation was completed.

BY MS. VANCE:

Q    The eligibility meeting.  What does that mean?

A    So after there is the initial evaluation, the team comes together to review the results of the evaluation, which includes both formal, informal assessments, and reviews the information and looks at areas, looks to determine if there are areas of adverse impact that requires special education services.  And so based off of the areas of impact, the team then has specific areas of eligibility to consider, based on the Georgia DOE recs.

Q    And is it the practice, policy, or procedure of Cobb County School District to consider, during that eligibility meeting, any privately provided diagnoses, evaluations, information from private providers?

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 143

A    Yes.  It is our -- it is our practice to consider any parent input, any parent provided evaluations, or information that the parent would like us to consider.

Q    Okay.  And so then tell us the difference between -- now we're going to talk about a reevaluation meeting.  What goes on there?

A    So once the child is already found eligible, there is a -- if -- if the team or the parent is requesting another evaluation to consider another area of eligibility or to -- information to determine that that student is still eligible in that category, the team meets for a reevaluation meeting, to review existing data and determine if additional testing is needed to consider specific areas of -- of eligibility.

Q    So a reevaluation meeting isn't an eligibility meeting; it's a meeting to determine if more evaluations are needed?

A    It could end up being a -- if -- it could end up being both, together.  So if the team is considering the information and determines that no additional data is needed and the student still meets eligibility criteria in those areas, then the student -- then they complete the eligibility, and that

Page 144

student would remain eligible in those current categories.

Q    Oh, in the current ones?

A    In the current categories.  If the team believes additional data is needed to look at additional categories or that the student is no longer in need of special education, they will indicate that additional data is needed and that -- that process remains open until whatever additional information the team determines is needed is collected and they come back and --

Q    Have an eligibility meeting.

A    -- have the -- have that as a -- as a reevaluation eligibility meeting.  So it -- it culminates whenever the -- the decision is made into the eligibility document.

Q    And if you are going to consider both reevaluation and eligibility, the notice to the parent, the formal written notice from Cobb County School District; it would list reevaluation and eligibility, both?

A    It would list reevaluation.

Q    Okay.  Now --

A    Because we haven't made that determination yet.

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 145

Q    Do you know, regarding the procedures, policies regarding evaluations under the IDEA section 504 of the ADA -- do you know what it means when a psychologist says that a certain diagnosis is a rule out?

A    So there are a couple different languages private psychologists utilize.  They use a rule out when it's already been ruled out, and they sometimes use a rule out when they are recommending to -- to -- additional evaluations to rule that area out.  And it has -- it is used inconsistently, in the field.

Q    Regarding the policies, practices, and procedures of evaluations under the IDEA, is it the practice of Cobb County School District for you to become involved in reviewing any of those evaluations, prior to the time they are given to a parent?

A    For me specifically?

Q    Yes.

A    It -- it depends.  There's not a practice, but it depends if -- if I'm involved in the student situation, and they might have a question for me regarding part of their evaluation process; they might ask for some guidance.

Q    And is it a practice of Cobb County School District for you to make recommendations about changes

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 146

or what goes into an evaluation of a student?

A    The evaluation specifically, itself?

Q    The report.

A    Oh, the report.  I -- I do not make recommendations for the report.  The evaluator creates and develops the report.  Part of my -- the scope of my job is I do provide guidance, if there's questions.

Q    Now let's, if we could -- let me show you -- oh, well, let's go ahead and get this document in. It's document Plaintiff's 32.  If you would please look at it.  It might be in the book that you have, but Plaintiff's Exhibit 32; can you please tell us what it is?  And we might can stipulate for that, as well.

(Plaintiff Exhibit 32 was marked for identification.)

A    This is the evaluation reevaluation section of our practitioner's manual.  This looks like the accurate copy of the 2020 section.

Q    Thank you.  At this time, we'll offer that into evidence.  As part of the practice, policies, and procedures of IEP development and IEPs being provided for disabled students, what is the practice or policy or procedure when a parent comes to a disagreement regarding an IEP that's developed for a student and

Page 147

files a state complaint?  What is the policy or the practice or procedure that happens, after that happens?

A    There is not a practice, policy, or procedure about -- about what we do after a state complaint.

Q    Well, what is the practice?  What does Cobb County do when that happens?

A    When a state complaint is filed?

Q    Yes.

A    Is that your question?

Q    Yes.  I'm sorry.  Yes.

MR. DANIEL:  I'm going to object to the question is exceeding the scope of the 30(b)(6) notice.

MS. VANCE:  Okay.

THE WITNESS:  When a DOE complaint is received, once it is initiated by the DOE and the district receives receipt of their initiation letter and areas of allegation, we look in my -- either myself or my assistant director gain some information from the school team, if we need it, or from ourselves, in order to develop a response.  We do give a -- we do a email, just to make the principal and the SSA aware that one has been filed and that we will be

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 148

following up with the SSA to gather any necessary documentation.  And then as a district, we respond to the DOE; we submit it into their portal or the investigator's email, and then provide a copy to the parents.

BY MS. VANCE:

Q    And just for the record, you may have said it, but just say what a SAA is.

A    Oh, yes.  I did say it earlier.  Yes.

Q    Yeah.  I thought you did.

A    Support services administrator.

Q    And, like, what level, in the scheme of that, is that person?

A    So they are a district level administrator who has a background in special education and leadership.  They are -- they are district -- and they are district assigned, and they have, typically, two schools.  Over the course of the years, we've identified -- I think the last two years -- we've identified for high school, they have one; and then the other, middle and high -- middle and elementary schools, they share.

Q    Okay.  And would that be -- Stacey Ford; was she an SSA?

A    She was an SSA, previously.

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 149

Q     In 2020?

A     Yes.

Q     Okay.  Okay.  Let me show you what's been marked as Plaintiff's Exhibit 32, and --

MR. DANIEL:  Chris, you have a --

MS. VANCE:  Oh, wait a minute.

MR. DANIEL:  I think you mean 33?

MS. VANCE:  Yes.  Thank you.  All right.  Let me remark that one.  Sorry.

BY MS. VANCE:

Q     Do you recognize this document?

(Plaintiff Exhibit 33 was marked for identification.)

A     I do.

Q     What is this, please?

A     This is the district's response to the -- the formal complaint.

Q     Filed on behalf of Dr. Lyon [ph] and Olivia?

A     Yes.  Filed by Jean Estetes.

Q     Okay.  And what was your practice of being involved in the process of this particular document, 33, being prepared and edited and approved for submission?

MR. DANIEL:  I'm going to object to the question as vague and confusing.

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 150

MS. VANCE:  You may answer.

THE WITNESS:  So at that time, Kelli Cox, who is the assistant director on my team, was drafting the DOE complaints.  I reviewed it and gave suggested feedback and comments for her to consider, as she finalized the report or the response.

BY MS. VANCE:

Q    And did you have any involvement in approving it for submission to the Georgia Department of Education?

A    I actually submitted myself, because we were submitting in the Georgia DOE portal and Kelli did not have access to submit, so I submitted it on her behalf.

Q    Okay.  Did you review it before you submitted it, for accuracy?

A    I did.

Q    Okay.  And were there one or two letters dated March 22, 2021, provided to the Georgia Department of Education, through the portal?

MR. DANIEL:  I'm going to object to the question.

MS. VANCE:  Well, I'm just --

MR. DANIEL:  First off, vague, compound.  Second off, this goes beyond the scope of

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 151

the 30(b)(6) notice, as there's nothing about submissions to the DOE anywhere in the notice.

But if the witness has any personal knowledge to be able to answer the question, she may do so.

THE WITNESS:  I don't recall.  I believe we had an amended response, but I -- I don't recall, specifically, how many were submitted that day.

BY MS. VANCE:

Q    Sure.  And this is a true and accurate copy of what you submitted on the Georgia Department of Education -- you approved and then read for accuracy and submitted on the Georgia Department of Education portal, to the Georgia Department of Education?

MR. DANIEL:  I'm going to, again, object.  Same objections.  Far exceeds the scope of the notice.

THE WITNESS:  I -- I mean, I can't say for certain, 'cause I don't have the copy that I submitted, just to make sure.

MS. VANCE:  Okay.  We offer 33 on the record.  Now let's look, if we could, at just a few more questions here.

MR. DANIEL:  And I'll just note, we

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 152

will be objecting to admission of 33 into the record, but we can --

BY MS. VANCE:

Q    Sure.  Well, just for the record, so we can make sure we're clear, whether you can verify, sitting here today, this is a true and accurate copy, whatever the Georgia Department of Education can verify is a different question.  But whatever was submitted by Cobb County School District to the Georgia Department of Education, you're the one who submitted it?

A    Yes.  That is accurate.  I submitted it.

Q    Okay.  Thank you.  And you are the one who read it and approved it for accuracy, before you did so?

A    I read it and gave suggestions and feedback. I don't -- in my matter of course, I don't say it's approved, but I did give feedback, and then it was revised and sent to me to submit.

Q    Okay.  And you would not have submitted it, if it contained incorrect information, would you?

A    Not if I knew that there was incorrect information.  If there was a clerical or something I wasn't aware of, I can't say for 100 percent.

Q    Sure.  Sure.  So do you have any recollection about a second letter being submitted, an

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 153

amended one?

MR. DANIEL:  Same objection as before. Exceeds the scope of the 30(b)(6) notice.

THE WITNESS:  I recall that there is a -- a document that is an amended response, but I -- I did not go back and specifically look at that, recently.

BY MS. VANCE:

Q    Okay.  Do you recall that you are the one who submitted it?

A    I don't recall that, either.

Q    Okay.  Let's please talk about the Hospital Home Bound practices and policies in Cobb County School District.  What is Hospital Home Bound or HHB, please?

A    So Hospital Home Bound -- I'm going to go to -- just so I have it -- reference.

Q    Oh, it's in there.  And we also have already made it in exhibit, too; right?  Yeah.  Yeah.

A    The Georgia DOE one?

Q    Yeah.  Well, I think --

A    I don't recall seeing the --

Q    I mean, I think we made the --

A    Our manual is in there.  Yes.

Q    Yeah.  20 and 21; is that accurate?

Page 154

A    Yes.

Q    Thank you.

A    So Hospital Home Bound is not specific to students with disabilities.  It is a -- there is a Georgia DOE rule that if a -- that if a student is absent for ten or more consecutive days or anticipated, that Hospital Home Bound services could be considered with -- with -- if it meets the eligibility criteria, in order to provide the services, while they are not able to attend school.

Q    Okay.  Okay.  At the time that -- in October of 2020, it was the practice of Cobb County School District to inform parents in writing that the state board rule requires only three hours of instruction per week for students who are on Hospital Home Bound; correct?

A    No.  That is not correct.

MR. DANIEL:  Objection.

THE WITNESS:  That is for attendance purposes.

BY MS. VANCE:

Q    Okay.  Well, let's look, please, at what is marked as Plaintiff's Exhibit 34, and ask you if you've ever seen that document?

//

Page 155

(Plaintiff Exhibit 34 was marked for
identification.)

A    Yes.

Q    And what is that document?

A    This is the Hospital Home Bound application,
during the -- I have to look at it, here.

Q    See the top left.  Does that help?

A    The application was run in 2020.

Q    So this is an application; is that what
you're saying?

A    It is a specific student application.  Yes.

Q    Okay.  And so we would know that that was
printed or ran in October 2020?

A    Yes.

Q    And it means that this is current, for the
form used, as of that time?

A    As of that date, yes.

Q    Yes.  And if you look, please, on the second
paragraph, on the first page of five, on Exhibit 32,
the second sentence in second paragraph says "The
state board rule 160-4-2-.31 requires only" --
underlined and in bold -- "three hours" and then "of
instruction per week for students enrolled in the
Hospital Home Bound program."  Correct?  Isn't that
what it says?

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 156

A    That is what it says.

Q    Yes.  And it doesn't say that's only for attendance purposes, does it?

A    In this sentence, it does not.

Q    Okay.

A    It's referencing a state board rule that I -- I don't have in front of me, so I would have to see if that's accurate.

Q    Well, and head of compliance, in 2020, are you aware that the Georgia Department of Education did not have a rule that only required three hours of instruction to be provided to students on Hospital Home Bound?

A    Again, I -- I would have to look at the rule, because this is -- there are -- this is coming from our general HHB.  It is not running specifically through my team.

Q    And then, I would like to ask you -- well, I thought you were here today to talk about Cobb County school district's practices about Hospital Home Bound?

A    I am.

Q    Okay.

A    But I -- I said I would have to go to the rule.  You asked me if I was specifically aware, so I was just answering your question.

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 157

Q     So if you would then, please, look over at the fifth page of five of Exhibit 34.  And isn't it true that students in Cobb County School District who is under the care of the physician signing this form for mental health reasons; that Cobb County School district's practice was to limit Hospital Home Bound services to a maximum of six weeks?

A     So you're asking if it was our practice? This is coming from the state -- the Georgia DOE.  So let me go back to look, to see.

Q     Do you have that rule with you, the Georgia DOE rule?

A     I don't have the rule.  I have their implementation manual, but I don't have the actual rule.

Q     And just for the record, tell us the implementation manual for the Georgia DOE involving Hospital Home Bound that you're referring to, and the page numbers, if they're Bates.

A     So it's the -- the date on their document is April 2016.

Q     Okay.  April 20, 2016?

A     No.  It's just April 2016.

Q     Okay.  Okay.

A     There's not a specific April date.

Page 158

Q    And what are your numbers?  Because we're going to get that book, so --

A    So, I mean, it starts at the DOE manual on last four digits 1556.

Q    1556?  Thank you.

A    And then it goes to 1587.

Q    And is that a true and accurate copy of the Georgia Department of Education manual on Hospital Home Bound, at that time that you mentioned, the April 2016?

A    That is what we have, as a district.

Q    Okay.

A    I can't -- I can't say from them what -- whether it was true and accurate, but --

Q    It's true and accurate of what Cobb County has?

A    Yeah.  Yes.

Q    Okay.  All right.  Okay.

A    So I believe I'm going to need to skip through, 'cause it does talk about a short period of time.  Yeah.  So I need to look at that.  I think it just says short term.  And so we -- it was our practice that it was six weeks.  I just wanted to confirm, because I've looked at so many things.

Q    Yes.  Thank you.  And just show us where,

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 159

when you find it, what you're looking at.

A    Okay.  So I just trying to go back to where it said short term.  And so that's where the team -- our district team took six weeks as a short term, to be revisited or reconsidered, at that timeframe.

Q    It doesn't say that, does it, that we're going to revisit it?

A    It asks the -- asks the question about this, and then there is -- I don't know if it specifically states it in this application, but we do have the ability to request extensions --

Q    So --

A    -- which are also contemplated in here.

Q    Is it Cobb County School District's -- well, was it Cobb County School District's practice, at that time of that document, to ensure compliance with Georgia Department of Education Rule 160-4-2-.31 Hospital Home Bound Services, a Georgia Department of Education rule?

A    Yes.  And using that rule in the implementation manual, coming up with some of the -- the operational things that we would need to add, as a district.

Q    And isn't it true that the Georgia Department of Education, at the time that this is

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 160

involved, October 2020, states that although the local school team or IEP team shall determine the number of hours necessary to meet the instructional needs of the student, the student must receive a minimum of three hours of Hospital Home Bound instruction per school week to be considered present by the school?

A    That is correct.  So the district utilizes the -- the information in here, using the -- the requirement of three hours, is what the requirement is.

Q    Well --

A    But the -- the team can determine more.

Q    Well, it doesn't say that in your form, the Cobb County School District's form.  It said the rule requires only three hours of instruction.  But what the rule actually says is that it is the local school team or IEP team that shall determine the hours necessary to meet the instructional needs; correct?

MR. DANIEL:  Hold on.  I'm going to object to that question as completely argumentative.

MS. VANCE:  You may answer.

She did answer, on the record.

THE WITNESS:  I -- I don't think I did. I was about to.

MS. VANCE:  I thought you said sure.

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 161

THE WITNESS:  No.

MS. VANCE:  Okay.

THE WITNESS:  I was going to say --

MS. VANCE:  Do answer, please.

THE WITNESS:  Yes.  So this FAQ -- this is a frequently asked question -- so the FAQ says that -- that it must receive a minimum, so that is interpreted as only three hours, and the -- the team can always determine more.

MS. VANCE:  Okay.

THE WITNESS:  Like, the requirement is three.

BY MS. VANCE:

Q    Well, and you can't get less than three; correct?

A    You -- you could, from an IEP standpoint, if -- if the team determines it, but the attendance purposes would require at least three.

Q    Okay.  And according to the rule for the Georgia Department of Education, it's up to the IEP team, or it could be the 504 team, the school team, to determine the actual number of hours of Hospital Home Bound services that the student needs to meet the student's needs; correct?

A    Yes.  It would be either the IEP team or the

Page 162

ESP team developing the ESP.

Q     Wouldn't it be the 504 team?

A     No.  It's not specific in a 504.  The consideration for HHB would be a -- a team.  It could be the same people, but it's not contemplated, specifically, in a 504 meeting.

Q     And just for the record, ESP means, or stands for?

A     The educational service plan.

Q     Okay.  So I'll understand, if a student with a Hospital Home Bound -- I mean a 504 plan was placed in Cobb County on Hospital Home Bound, would the 504 team not be involved in that?

A     It -- it could be.  That's what I said.  It could be a 504 team, but it would be a team at the school, making decisions about HHB.  It's not a 504 plan, specific of accommodations, 'cause Hospital Home Bound is available to all students.

The -- the reason why the IEP team meets is their IEP likely says something different than Hospital Home Bound, which is why they have the application, and the IEP needs to reflect the services that the student is actually going to get, when they cannot attend school.

Q     Wouldn't the 504 plan likely contain

Page 163

different accommodations for a disabled student than what would be the Hospital Home Bound placement?

A    It might, but it might not.

Q    But if it did, then the 504 team would need to meet, to reassess accommodations for that student; correct?

A    If -- if the team needed to, they can always come back and assess.  Yes.

Q    Okay.  And so we introduced into the record Plaintiff's Exhibit 34 as a true and accurate copy of the Hospital Home Bound application packet for Olivia, given to Dr. Lyon [ph].  So it is the practice of Cobb County School District to provide students, whether disabled or not, but students on Hospital Home Bound three hours of Hospital Home Bound a week; isn't that correct?

MR. DANIEL:  Object to form.  Argumentative, asked and answered.

MS. VANCE:  Not true, but go ahead, please.

THE WITNESS:  That is -- that is not correct.

MS. VANCE:  Please answer.

THE WITNESS:  If it's a student in special education, the IEP team is making that

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 164

decision.

BY MS. VANCE:

Q    Okay.  And isn't it true that the vast majority of students, for the last five years, in Cobb County School District, whether an IEP, 504, or ESP -- the vast majority have not been provided more than five hours of Hospital Home Bound hours a week of services; isn't that correct?

MR. DANIEL:  I'm going to object to the question as exceeding the scope --

MS. VANCE:  You may answer.

MR. DANIEL:  -- of 30(b)(6) notice.

But if the witness has any personal knowledge, she may answer.

THE WITNESS:  I -- I don't know the answer to that.

BY MS. VANCE:

Q    Do you not review, at all, Hospital Home Bound hours for students with IEPs?

A    Not -- in my position, not typically.

Q    Do you not review -- aren't you over section 504 compliance?  Do you not review Hospital Home Bound service plan hours for students with Section 504 plans?

A    No.  They're not indicated in the 504.  The

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 165

ESP is indicating what those services are, but no.
Not in my role, would I --

Q    Does anyone look at that, at the Cobb County
School District?

MR. DANIEL:  Object to the question as
vague.

MS. VANCE:  You may answer.

THE WITNESS:  I'm sure the supervisors
might have a general understanding.  They're not going
and looking what every student specifically has and
keeping track of it.  That's not the intent of their
role.

BY MS. VANCE:

Q    Do you know Mr. Randall Hatcher?

MR. DANIEL:  I'm going to object to --

BY MS. VANCE:

Q    Oh, I'm sorry.  Todd Hatcher.  Do you know
Mr. Todd Hatcher?

A    I do.

Q    And Mr. Todd Hatcher, at one time,
represented Cobb County School District?

A    Gregory Doyle represented Cobb County School
District, but he was an attorney for Gregory Doyle.
Yes.

Q    And so he represented Cobb County School

Page 166

District?

    A   He represented them on some matters, I'm sure.

    Q   Yes.  And you heard, yourself, Mr. Hatcher tell Judge May that in Cobb County School District, five hours of Hospital Home Bound services is a lot of hours; isn't that correct?

            MR. DANIEL:  Objection.  Relevance, 403, and this also far exceeds the scope of any 30(b)(6) notice topic.

            MS. VANCE:  You may answer.

            THE WITNESS:  I don't recall what Mr. Hatcher said.  It's been a long time since we've been represented by them.

BY MS. VANCE:

    Q   I was in that courtroom, that day, wasn't I?

            MR. DANIEL:  Same objections.

            MS. VANCE:  You may answer.

            THE WITNESS:  Probably.

BY MS. VANCE:

    Q   And Mr. Vance was in that courtroom, that day?

    A   I -- I don't recall.

    Q   You recall that the child's parents were in that courtroom, that day?

Page 167

A     I don't recall that.

Q     Do you recall that it was taken down by a court reporter?

MR. DANIEL:  Same objections.

THE WITNESS:  I mean, I'm -- I don't know that there was a court reporter.  I would assume so in a court, but I did not pay attention to a court reporter.

BY MS. VANCE:

Q     You do know -- right -- though, that the educational service plans will indicate the number of hours Cobb County School District provided to the student who was on Hospital Home Bound; correct?

MR. DANIEL:  One, objection.  Exceeding the scope of the noticed topic.  Two, assumes facts not in evidence.

MS. VANCE:  You may answer.

THE WITNESS:  Your question is whether or not the IEP?

MS. VANCE:  No.  The ESP, the educational service plan.

THE WITNESS:  I don't look at the educational service plans, so I would not know that.

MS. VANCE:  Okay.

THE WITNESS:  I mean, that is

Page 168

information that they would typically contain.  Yes.

BY MS. VANCE:

Q    So are you familiar with the Cobb County School District policies, practices, and procedures relating to Hospital Home Bound?

A    I am, but you're asking me if I've specifically looked at any information of all the students.  I'm not looking at that.  I'm -- I am prepared about policies, practices, and procedures.

Q    Okay.  I apologize, if I were vague.

A    Okay.

Q    Let's talk about this.  What is the practice by Cobb County School District to denote the hours Cobb County School District provides to a student on Hospital Home Bound?  What is the practice?  Does it use a form?  Does it just tell a parent and not put it in writing?  What is the practice?

A    The practice is to do the ESP, and the practice is for a student with a disability under IDEA to conduct an IEP amendment to discuss the scope of those services.

Q    Okay.  And for a student with a 504 plan, what is that practice?

A    It's the first practice.  There isn't anything specific --

Page 169

Q    Okay.

A    -- for a student with a 504 plan.

Q    It's either an ESP or an amended IEP?

A    Yes.  That is correct.

Q    Okay.  Thank you.

A    You're welcome.

Q    So is it the practice of Cobb County School District, relating to Hospital Home Bound, to have a doctor or special needs nurse that the school has to inform educators whether a primary diagnosis is a mental health diagnosis or a medical diagnosis?

MR. DANIEL:  I'm going to object to the question as vague and compound.

MS. VANCE:  You may answer.

THE WITNESS:  It is not -- it is not the practice for a school nurse to review that information.

BY MS. VANCE:

Q    How about for a medical doctor?

A    The medical doctor --

MR. DANIEL:  So objection.

THE WITNESS:  -- the medical doctor of the student; they've reviewed and provided that information.

//

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 170

BY MS. VANCE:

Q   Right.  The medical doctor or the student has reviewed and provided that information.  But does Cobb County School District have a practice of using a medical provider to determine that the primary diagnosis and reason for the child needing Hospital Home Bound is medical or psychiatric, or mental health, we can say?

MR. DANIEL:  Object to the question as vague.

MS. VANCE:  You may answer.

THE WITNESS:  The -- the practice is the supervisor or coordinator, depending on the area, whether it's special ed or non-special ed for the HHB, is reviewing the application to determine whether it meets the eligibility criteria under the Georgia DOE.

BY MS. VANCE:

Q   Well, who determines --

THE WITNESS:  So it's not a medical doctor, to answer your question.

BY MS. VANCE:

Q   It's not a medical doctor?  So it's a non-medical doctor or nurse who makes a decision if the primary diagnosis is a mental health disability or a medical, physiological disability?

Page 171

MR. DANIEL:  Object to the form as vague and compound.

MS. VANCE:  You may answer.

THE WITNESS:  So it is the supervisor who's looking at that, and their primary role -- it's -- when you're looking at these applications, it's really clear to see whether it is something by a pediatrician or if there is something from a mental health aspect, that it should be -- that it's a psychiatrist reviewing that.

BY MS. VANCE:

Q    Do you know, as the compliance coordinator -- well, compliance officer, executive director -- excuse me -- of Hospital Home Bound, if cognitive changes of unknown cause is a medical diagnosis?

MR. DANIEL:  Objection.  Vague and also exceeds the scope of the 30(b)(6) notice.

MS. VANCE:  You may answer.

THE WITNESS:  Are you asking me individually, in my -- in my role, or in the 30(b)(6)?

MS. VANCE:  30(b)(6).

THE WITNESS:  Okay.

MR. DANIEL:  And I'm objecting that this goes way beyond the scope of the 30(b)(6)

Page 172

notice --

MS. VANCE:  Okay.  You may answer.

MR. DANIEL:  But if you are able to answer, based on the personal knowledge, you may answer.

THE WITNESS:  Can -- sorry.  There's been a lot.  What was that question again?

BY MS. VANCE:

Q    So in your role as a 30(b)(6), is it the practice of Cobb County School District to say that the medical diagnosis of cognitive change of unknown cause is a medical diagnosis or is a mental health diagnosis?

MR. DANIEL:  Same objections.

MS. VANCE:  You may answer.

THE WITNESS:  It would depend.  You typically don't see a student having a cognitive decline without something typically with mental health, unless there is a -- like, a -- accident with a traumatic brain injury.  So it -- it could depend on what the other context, like, what else is happening in that student's situation.

BY MS. VANCE:

Q    Okay.  And what is the practice of Cobb County School District, who makes that decision?

Page 173

MR. DANIEL:  Object.  Asked and answered.

MS. VANCE:  No.  This is to specific question as to cognitive change of unknown cause.

THE WITNESS:  So if there is a question about that, that part of the application does give the district an opportunity to contact a doctor, if needed.  So if there -- if -- if there is a question about are they the treating provider, they could ask the clarifying question, to make that determination.

BY MS. VANCE:

Q    So in regard to the policies, practices and procedures relating to IEPs, what is the practice of Cobb County School District when a parent challenges an IEP by requesting a due process hearing?

A    Are you're asking what the practice is of the IEP?

Q    No.  What's the practices of Cobb County School District, in relation to the procedures and policies and practices when an IEP is challenged by a parent by requesting a due process hearing?

A    So when a due process hearing request is properly served, that information also goes to our attorneys -- an email is sent out to the principal and the SSA, the support services administrator, to make

Page 174

them aware and let them know that we will be gathering, reaching out to gather some information, and talk to them about any potential next steps, including maybe participating in early resolution, depending on the situation.

We begin to gather records, and then depending on what the due process hearing request is initiated under, if it's a placement challenge and we need to ensure that stay put is in place, then I, as the director of special ed compliance, work with the school to make sure that that is set.

Q    And when you say we will, are you talking about you and those who work under you?

A    We -- like, yes.  Typically, it's our compliance team, but there might be other people that are involved from the district office.

Q    Okay.  And is part of the practice and procedure for you to serve as Cobb County School District's representative when a parent challenges an IEP through the due process hearing procedure?

MR. DANIEL:  And I'm going to object to this line of questioning as going beyond the scope of the noticed topics.

MS. VANCE:  You may answer.

THE WITNESS:  It is part of my job --

Page 175

job role to serve as the party representative.

BY MS. VANCE:

Q    And you have done that at least ten times?

MR. DANIEL:  Objection.  401, 403, exceeds the scope of the 30(b)(6) notice.

MS. VANCE:  You may answer.

THE WITNESS:  I don't recall how many times that I have -- been the party representative.

MS. VANCE:  And --

THE WITNESS:  What was that?  I'm sorry.

BY MS. VANCE:

Q    And lastly, our last bit of questions. Well, let's get these in, real quickly.  Let's look at 35, and let me ask you to please identify what 35 is?

(Plaintiff Exhibit 35 was marked for identification.)

A    Okay.

Q    Have you ever seen this document?

A    I have.

Q    And when did you first see it?

A    I do not know that question -- answer to that question.

MR. DANIEL:  I'm going to also object that questions about discovery responses exceed the

Page 176

scope of the noticed topics.

MS. VANCE:  The policies and procedures are involved in this document.  I'm just trying to get through this.

MR. DANIEL:  I mean, but my objection stands.

BY MS. VANCE:

Q    Yeah.  Okay.  Is 35 a true and accurate copy of what you read and the responses of Cobb County School District regarding the questions asked therein?

A    I mean, based on my knowledge, yes.

Q    And then let me ask you to please look very quickly at 36.  We offer that into evidence, 35, and ask you to please look at 36, and then I'm going to show you with 36, 37, and ask you to please tell us what these documents are.

(Plaintiff Exhibit 36 and Exhibit 37 were marked for identification.)

A    What 37 is?

Q    Well, you can tell me 36 and 37, in relation to 35.

A    All right.  So 36 is a verification of the responses that were on April 24, 2025.

Q    And does this verification verify the responses in 35?

Page 177

MR. DANIEL:  I'm going to object. Look --

MS. VANCE:  No.  This is very important.

MR. DANIEL:  No, but you're not even using the updated verification.  This is exceeding the scope of the 30(b)(6) notice.  You're also -- fine, Chris.  Go ahead and ask a question.  Mislead her. I'll come out with the --

MS. VANCE:  I'm not misleading her. That -- talking objection is sanctionable behavior.

MR. DANIEL:  No.  We're so far off the scope of the 30(b)(6) notice, right now.

BY MS. VANCE:

Q    Let me you what's been marked as 38 and ask you if either one of these verifications verify the responses in 35.

A    35?

(Plaintiff Exhibit 38 was marked for identification.)

MR. DANIEL:  Again, object to the scope of the question exceeding the scope of the 30(b)(6) notice.

THE WITNESS:  35, I have is the January -- and that's a different date than I have here --

Page 178

BY MS. VANCE:

Q    Well, let's start with this.  You did sign documents 38 and 36; correct?

A    Yes.  I signed 38, and I don't -- I don't recall if I signed this or if it was signed on my behalf, after giving approval.

Q    Okay.  But it was either one or the other; correct?

A    Yes.

Q    Okay.  So my question this.  Do 38 or 36 verify the responses in document 35?

MR. DANIEL:  Objection.  Vague, beyond the scope of the 30(b)(6) notice, intentionally misleading.

THE WITNESS:  I can't say for -- because this is -- this is January 31st, and this is -- this is talking about April and then May, like, when I signed in June.

MS. VANCE:  So does --

THE WITNESS:  So it just doesn't have the same date, so that's where I -- I can't say, one way specific or another.

BY MS. VANCE:

Q    So when you signed those documents that are 36 and 38, did you intend, by signing one or the

Page 179

other, to verify under penalty of perjury that the responses in 35 were accurate?

MR. DANIEL:  Chris, the responses in 35 are contained --

MS. VANCE:  Whoa.  Whoa.  Talking objection.  Talking objection.

MR. DANIEL:  No.  Then we're shutting --

MS. VANCE:  No.

MR. DANIEL:  -- this down, because this is not part of the 30(b)(6) notice.  I'll just shut it down.

MS. VANCE:  Okay.

MR. DANIEL:  And then you can go explain how there's nothing here to provide.  Like, there's nothing -- like, this is beyond the scope of the 30(b)(6) notice.

MS. VANCE:  Well, we --

MR. DANIEL:  If you listed discovery interrogatory responses on the notice, then you would have a well prepped witness to discuss this.  But you're --

MS. VANCE:  Well, you may answer the question.

THE WITNESS:  I -- I feel like I've

Page 180

already done that.  I --

MS. VANCE:  Well, I'm not sure.
There's been so many interruptions.  If you could just
answer the question, we can write this --

THE WITNESS:  I -- I did.  I said I
cannot say for certain that it's in response to this,
because this date is different than these dates, so I
don't know.

MS. VANCE:  Okay.

THE WITNESS:  There has been a lot that
I have signed off on and reviewed --

MS. VANCE:  Okay.

THE WITNESS:  -- because there has been
a lot of requests, so --

MS. VANCE:  Okay.

THE WITNESS:  -- I don't want to in
inaccurately state something, if I don't have the --

BY MS. VANCE:

Q    Now we'll go to the last topic.  Cobb County
School District was asked to provide -- yeah.  I'm
going to introduce those into the record as the
interrogatory responses provided by Cobb County School
District and the verifications provided by Cobb County
School District, and I believe, you, through Cobb
County School District or your attorneys.

Page 181

Now, the last section that we want to ask about is five on the notice, Cobb County policies, practices, and procedures related to independent educational evaluations.  What is an independent educational evaluation, in Cobb County School District?

A    Parents can request an independent evaluation if they disagree with an evaluation that we have conducted.

Q    Okay.  And when a parent disagrees with a Cobb County School District evaluation, what is the practice -- and then ask for an independent evaluation, what is Cobb County School District's practice, policy, or procedure in responding to that?

A    So it's a practice.  There are no policies.

Q    I'm sorry.  There's no policies for independent?

A    No.

Q    Okay.

A    Because the policies are done by the Board of Education.

Q    Okay.

A    And they don't do special education --

Q    Okay.

A    -- specific.  It's a practice that when a

Page 182

parent requests it through -- it goes through my office and my secretary sends out an initial acknowledgement of the request.  And then we, as a district, look at the evaluation and analyze the request and determine if we're going to approve or deny the independent evaluation.

Q    And let me ask you to please look at Plaintiff's Exhibit 39 and tell us what that is.  What is this a copy of?

(Plaintiff Exhibit 39 was marked for identification.)

A    This is --

MR. DANIEL:  Objection, exceeds the scope of 30(b)(6) notice.

THE WITNESS:  This is a specific response to a request from Ms. Lyon [ph], regarding a request for an independent evaluation --

MS. VANCE:  This --

THE WITNESS:  -- and it's the approval.

BY MS. VANCE:

Q    Is it a true and accurate copy of what you just stated it to be?

MR. DANIEL:  Same objection.  Exceeds the scope of the notice.

THE WITNESS:  Yes.

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 183

BY MS. VANCE:

Q    And is it Cobb County School District's practice, when an IEE is requested, to send the notice that you sent to Dr. Lyon [ph], if the request is approved?

A    To send what?  I'm sorry.

Q    So is it a practice of Cobb County School District to send what you sent, Exhibit 39, to Dr. Lyon [ph], when Cobb County School District approves of the requested IEE?

A    Yes.

Q    And that's not a policy; that's a practice?

A    That is a practice.  Yes.

Q    Okay.  And who devised that practice for Cobb County School District?

A    It was -- well, it originally started with the director of special education, when I was the assistant director of education.

Q    Was that Ms. Turnage?

A    No.

Q    Who was that?

A    It was Susan Christian.

Q    Okay.

A    The independent evaluations were, at that time, going to the special ed director, when I was the

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 184

special ed education assistant director.

Q    Okay.

A    But the practices were developed by her, as the director, myself, and then our psych services director.

Q    And when did the practice of having the executive director of compliance become the person who handles IEE, you know, switch from the special ed director to the executive director of compliance?

A    So when it -- I -- as -- the assistant director was always involved in the independent evaluation process.

Q    Assistant director of what?

A    Compliance.

Q    Okay.

A    When -- at that time, there was one director.

Q    Okay.

A    So the assistant director of special education compliance was a part of it and gave the recommendation to the director.  When the district split the director role into two, and there was a special education director and then the special education compliance director, the independent evaluation process moved to the compliance director.

Page 185

Q    Okay.  And what year was that, or approximately?

A    I don't recall -- maybe.

Q    So, I mean, let me ask this.  You were the assistant director and then you were the director; right?  Of special ed?

A    I was the assistant director of special education compliance.

Q    Okay.

A    And then I moved into the director role.  It was a created role of director of compliance --

Q    So you were involved in both of those roles, as assistant director and then as executive director of compliance?

A    Correct.

Q    Okay.

A    I've been involved in this process for approximately ten years.

Q    Approximately ten years?

A    Yes.

Q    And it is the practice of Cobb County School District to require, when a parent requests an IEE and selects an independent evaluator -- to require that the independent evaluator be on Cobb County school district's list --

Page 186

A    No.

Q    -- of approved -- let me finish, and then you can explain --

A    Okay.

Q    -- approved independent evaluators?

A    So it is not a practice to be on our list. It is our practice to be approved and meet the -- the IDEA and district criteria.

Q    Wasn't it the practice, in 2020, if the independent evaluator selected by the parent wasn't on the list, that that person would have to be added to the list before they could do the independent evaluation?

A    No.  They had to be vetted.  And if they were vetted and did not meet the criteria -- specifically, the maximum fee criteria is one that comes up most often -- the parent -- but it's any criteria -- the parent has an opportunity to provide the district with unique circumstances to consider a evaluator who is not -- does not meet all the criteria.

Q    And if we look back on Plaintiff's Exhibit 39, the letter that you sent to Dr. Lyon [ph] in regard to her request for an independent educational evaluation, on page two, this sets forth the cap, the

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025
O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 187

maximum amount that Cobb County School District would pay, at that time, for a independent educational evaluation; correct?

A    That is correct.  Yes.

Q    Okay.  And who set that cap?

A    So the cap was -- was set as a district when we looked at the market value, and then also collaborated with other metro districts to see what their processes were.  And ultimately, I set the cap.

Q    And it says here for vision, $3,500 is the cap.  Did you set that cap?

A    Yes.

Q    And that is for a vision evaluation?

A    Yes.

Q    Is that for a low vision evaluation?

A    Any -- any vision evaluation.

Q    $3,500?

A    Yes.

Q    And what did you base that cap on?

MR. DANIEL:  I'm going to object to the question as far exceeding the scope of the 30(b)(6) notice, also in relevance.

MS. VANCE:  You may answer.

THE WITNESS:  Just based off of the market value from the evaluators that we reached out

Page 188

to.

BY MS. VANCE:

Q    And you were the one who set the cap at less than $150 an hour for BCBA's; isn't that correct?  I know it's 150 on this letter, but prior to that, you set the cap at 132.50; is that correct?

MR. DANIEL:  Object to the confusing compound nature of the question.

MS. VANCE:  You may answer.

THE WITNESS:  I don't recall any -- the -- the previous caps.

BY MS. VANCE:

Q    And on the list of evaluators that you provided, at the time, Dr. Robert Montgomery was on the list approved to do independent evaluations; isn't that correct?

A    That is correct.  At that time, he was.

Q    Is he now?

A    He is not.

Q    Okay.  And you have, on page two for assistive technology, Tools for Life.  Are you aware, at that time, that they were not providing assistive technology evals?

A    They were, at that time.  They no longer are providing those.

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 189

Q    Are you aware that your one occupational therapist, Neurotech Solutions, owned by Ms. Mindy Cohen, was on the approved list for OTs?

A    At that time, the OT was approved.

Q    Are you aware, at that time, there was no OT working for Neurotech Solutions?

A    Not at that time.  That was the last information we had.

Q    And I think for the vision evaluators, you had Ms. Wendy Sapp, a former public school educator?

A    We did.  These are as we do the evaluators, so we review them every so often, and as we go through and review every couple years, sometimes there are evaluators who no longer want to participate in the IEE process or are no longer conducting that.  But we don't know until we reach out to them, specifically, for that evaluation.

Q    And I noted that Dr. Michael Meller was not listed on that evaluation?

A    That is correct.

Q    Oh, yeah.  I'm offering into evidence Exhibit 40, and that is the independent evaluators, at the time Dr. Lyon [ph] asked for some independent evaluations; correct?

//

Page 190

(Plaintiff Exhibit 40 was marked for identification.)

A    It's dated 9/20/19, so I don't know if there was an updated one, since then.

Q    Okay.  We offer it into evidence as the requested evaluation packet and was provided to us by Cobb County School District.  Now --

MR. DANIEL:  I'm going to object to --

BY MS. VANCE:

Q    And I see on here that we do not have for a speech language pathologist, Ms. Mindy Cohen?

A    That is correct.

Q    And why was she not on the list?

A    Because she did not meet the district's criteria.

Q    What criteria did she not meet?

A    She did not meet --

MR. DANIEL:  I'm going to object to this line of questioning as exceeding the scope of the 30(b)(6) notice.

THE WITNESS:  She did not meet the -- she did not agree to abide by the max cost cap, and she did also not meet -- in the criteria of tests should be most current edition and norm, for the age of the student being evaluated.

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 191

BY MS. VANCE:

Q    And what test did she not meet for that?

A    I don't remember the specific.  That was based on a previous evaluation that she provided us --

Q    And so after 2020, at some point, Cobb County district put Ms. Cohen back on the list?

A    No.  She's --

Q    Never?

A    She's never been on the list.

Q    And Dr. Michael Meller has not been on the list since 2017?

        MR. DANIEL:  And again, I'm going to object to this entire line of questioning as beyond the scope of the notice.

        MS. VANCE:  We got it.  We have your objection.  It can be ongoing.  Is that good for you?

        MR. DANIEL: Yeah.  Sure.  If you want to give me a standing objection, that's fine.

        MS. VANCE:  Okay.  Go ahead, please.

        THE WITNESS:  Michael -- Mike Meller has not been on the list.  I don't know for how long, but it's been a significant amount of time.

BY MS. VANCE:

Q    Okay.  And you removed -- Cobb County School District, as part of its practice in allowing you to

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 192

vet the independent evaluators, removed Dr. Kim Wing from the list?

MR. DANIEL:  Objection.  Relevance, scope.

THE WITNESS:  Kim Wing -- Kim Wing indicated that she no longer is practicing.

BY MS. VANCE:

Q    As of 2020?

A    When I -- the -- the -- I don't know the date, but there was a request for Kim Wing and when we reached out to her, she indicated she no longer was doing OT, no longer in practice.

Q    And it is accurate that Dr. Michael Meller has testified and matters for disabled children in due process hearings; correct?

MR. DANIEL:  Objection.  Far exceeds the scope of any noticed topic.

MS. VANCE:  Has to do with their practice.  Your objection is --

MR. DANIEL:  No.  No.

MS. VANCE:  Your objection is noted.

MR. DANIEL:  But, like, Chris, you're going so far afield here.

MS. VANCE:  Your objection is noted.

MR. DANIEL:  This isn't even a gray

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 193

area.

MS. VANCE:  We're trying to finish, and it --

MR. DANIEL:  Well, finish, but finish within a scope of the noticed topic.

MS. VANCE:  Well, how can someone finish, when there's just constant nonstop talking by you?  This is a deposition.

MR. DANIEL:  It's a 30(b)(6) deposition, Chris.

MS. VANCE:  Please --

MR. DANIEL:  You act like you don't know what a 30(b)(6) is.

MS. VANCE:  Please move forward.  It is about a practice.  You're just --

MR. DANIEL:  That's not a practice.

MS. VANCE:  -- doesn't mean --

MR. DANIEL:  Whether Mike Meller has testified is not a part of any noticed topic, and it has nothing to do with practice.

MS. VANCE:  It is about the practices and policies involving Cobb County and IEEs.  That you don't understand it, I can't explain that right now, because we're in a deposition.  I don't want to have a talking objection.  We're just trying to get through

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 194

this.  Let's please do.  We're almost done.

BY MS. VANCE:

    Q    So you understand Dr. Michael Meller has
testified on behalf of disabled students and parents
in due process hearings?

                MR. DANIEL:  Same objection.

                MS. VANCE:  You may answer.

                MR. DANIEL:  Same objection.

                THE WITNESS:  I mean, I -- I don't know
if he specifically testifies, in general.  That is --
has nothing to do with our practices of who we put on
or off the list.

BY MS. VANCE:

    Q    Do you know that Ms. Cohen has testified for
disabled children in due process hearings; correct?

                MR. DANIEL:  Same objection.

                THE WITNESS:  I have been in a due
process with her.  Again, that doesn't have anything
to do with her on the list.

BY MS. VANCE:

    Q    And you know that Dr. Wing has testified for
disabled children in a due process hearing?

                MR. DANIEL:  Same objection.

                THE WITNESS:  I don't recall if -- if
she has.

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 195

BY MS. VANCE:

Q    And Dr. Robert Montgomery was on the list, but he, when Jean Estetes is involved, has testified for disabled children; correct?

MR. DANIEL:  Same objection.

THE WITNESS:  I know nothing about any -- any cases with Jean Estetes and him testifying, so, no.  I -- I don't know that.

MS. VANCE:  We'll take a quick break.

THE VIDEOGRAPHER:  Off the record at 2:31 p.m.

(Off the record.)

THE VIDEOGRAPHER:  This begins media unit number 4, and we're back on the record at 2:47 p.m.

BY MS. VANCE:

Q    Ms. Coleman, during the break, did you have the opportunity to discuss any of your testimony or questions?

A    I asked a question.

Q    Did you discuss questions you had been asked or information you had testified regarding?

A    A little bit of information.  I had a question -- I had a question about the questions you were asking me about the information I had about the

Page 196

evaluators.  Like, I -- I asked -- I can tell you.  I specifically asked about -- about -- you had asked me a question about Mike Meller, and I said -- those are people that -- that I know outside of this, but it was interesting you were asking me about that.

MS. VANCE:  I have no further questions for Cobb County School District 30(b)(6) representative at this time, and we do thank you for your time.  It's been a long day.

EXAMINATION

BY MR. DANIEL:

Q   Quick follow-up, just to make sure the record is clear.  Ms. Coleman, can you pull up Exhibits 35, 36, 37 and 38, please?

A   That's in this pile; right?

Q   Should be.  Yes.  Okay.  Let's look at the updated verification marked as Exhibit 38.

A   38.  Let me get back there.  Okay.  38.

Q   Okay.  And do you see the two bullet pointed numbers on this document?

A   Which --

Q   The two bullet pointed numbers on the document?

A   Yes.  The one and the two?

Q   Yes.  What is the item number one on this

Page 197

updated verification?

A     Defendant Cobb County School District's Objections and Supplemental Responses to Plaintiff's First Interrogatories, previously served on April 24, 2025.

Q     Can you pull up Exhibit 37, please?

A     Yes.

Q     And look at that.

A     Okay.

Q     What is the name of that document?

A     Defendant Cobb County School District's Objections and Supplemental Responses to Plaintiff's First Interrogatories.

Q     Okay.  So the same document listed in number one of Exhibit 38?

A     Yes.  It's the same name.

Q     Okay.  Can you flip to page 11, please?  And do you see interrogatory number five?

A     Yes.

Q     Do you see the bolded section below, that says response?

A     I do.

Q     And then if you flip to the next page, page 12, a little over halfway down the page, do you see the part that says supplemental response?

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 198

A      I do.

Q      Okay.  Can you flip to page 13, please?

A      Okay.

Q      Okay.  And you see interrogatory number six, toward the bottom?

A      I do.

Q      Okay.  And if you flip to page 14, do you see the bolded section, titled response?

A      I do.

Q      And do you see the, toward the bottom of the page, where it says supplemental response?

A      Yes.  I do.

Q      And that carries over from page 14 to 15, 16, 17, and 18; is that right?

A      It is.

Q      Okay.  For the other NRI, let's look at -- flip to the first page of Exhibit 37.  And let's just look at interrogatory number one, and flip to the second page of the document.

A      Okay.

Q      Do you see the section that says response, beneath interrogatory number one?

A      I do.

Q      Okay.  Are you aware of any interrogatory response in this set of discovery responses that

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 199

doesn't contain the original response?

    A    Let me look.  No.  They -- they all have response, and then some of them have supplemental response.

             MR. DANIEL:  Right.  Okay.  No further questions.

             MS. VANCE:  Two more.

             THE WITNESS:  Sure.

                    EXAMINATION

BY MS. VANCE:

    Q    So in document 37, it says that these are supplemental responses.

    A    Okay.

    Q    And as you noted, there were formal responses and then there were -- some had additional supplemental responses; correct?

    A    Yes.

    Q    I'm just trying to make sure, and Plaintiff's attorneys are just trying to make sure, that your verifications that we looked at, 36 and 38, are verifying the interrogatory original responses and not just the supplemental.  The original ones are in 35.  And if you, sitting here today, testify under oath that yes, you verified those original responses, in 35, the same ones that are contained in document

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

Page 200

37, we have cleared up an issue that should have never been an issue.  So my question is when you gave the verification stating that you were verifying the supplemental responses to the first interrogatories, did you also mean the original responses to the interrogatories?

A    I was -- I verified, at the time, the original.  And the original -- when it was supplemental, I was looking, obviously, at the supplemental, but the -- the original responses were in there.  There was no -- like, a --

Q    Well, there was no verification to 35; okay?  There was no verification of 35.  I just want to make sure that 36 -- so simple -- is verifying the original responses that were in 35 and the supplemental responses in 37.  That's all.

A    I'm trying to -- I'm trying to -- so you're saying does 30 -- this one -- no -- 35 --

MR. DANIEL:  I'm going to object to the argumentative nature.

MS. VANCE:  I'm not being argumentative.

MR. DANIEL:  And we'll stipulate that the updated verification verifies all the information contained in exactly what it says it's verifying.

Page 201

MS. VANCE:  Well, there's a --

MR. DANIEL:  You're trying to twist this around.

MS. VANCE:  No.  I'm not.

MR. DANIEL:  I'll stipulate that this shouldn't have ever been an issue.

MS. VANCE:  You know why?  Because the law required -- that your client verify the first interrogatory responses.  It was not done.

MR. DANIEL:  But by the time we verified the responses, we had supplemented --

MS. VANCE:  The order was clear.  You were supposed to verify the first interrogatories, and then you were supposed to supplement and verify those. I asked you multiple --

MR. DANIEL:  Why would we verify responses that we knew we had to supplement?

MS. VANCE:  I've asked you multiple times.  The way it is written, it says it is giving -- as long as you can just testify that you verified, using document 36, the original responses and the supplemental responses and that they're all true and accurate, we're done.

THE WITNESS:  Yes.

MR. DANIEL:  Chris.

Page 202

MS. VANCE:  Thank you.

THE WITNESS:  I verify --

MR. DANIEL:  I'm going to -- this is going to be the end of it.  Okay.  The verified responses are verifying all the information contained in document 37; right?

MS. VANCE:  She just said that.

MR. DANIEL:  In 37; correct?

THE WITNESS:  Correct.

MR. DANIEL:  Okay.  And that contains all the original information, all the original responses, subject to any supplementation contained in there; correct?

THE WITNESS:  Correct.  Yes.

MS. VANCE:  I object.  Leading.

MR. DANIEL:  Okay.  Well, you're objecting to reality, but okay.  We're done.

THE VIDEOGRAPHER:  Before we go off the record, you want to discuss read or waive?

MS. VANCE:  Yes.  I would let her attorneys do that with her.

THE REPORTER:  Would you like to read and sign?

MR. DANIEL:  Yeah.  Yeah.  We'll read and sign.

Page 203

THE REPORTER:  Okay.

THE VIDEOGRAPHER:  Okay.  And then lastly, does anybody need a copy of the transcript or the video?

MR. DANIEL:  Yes.

MS. VANCE:  We do.  Thank you.  And we don't need the closed captions, at this time.  We'll review it --

THE REPORTER:  Okay.

MS. VANCE:  -- and see if that --

THE VIDEOGRAPHER:  Regular delivery okay?

MS. VANCE:  Yes, please.

THE REPORTER:  Okay.  How would you like the transcript?

MS. VANCE:  We'd like it electronic.

THE REPORTER:  Electronic.

MS. VANCE:  And we need a --

THE VIDEOGRAPHER:  -- off the record, then.

MR. DANIEL:  Yeah.  We just need the transcript, just searchable electronic format.

THE REPORTER:  Okay.

THE VIDEOGRAPHER:  Okay.  This concludes the video recorded deposition, and we're off

Page 204

the record at 2:57 p.m.

                         (Signature reserved.)

                         (Whereupon, at 2:57 p.m., the

                         proceeding was concluded.)

Page 205

CERTIFICATE OF DEPOSITION OFFICER

I, CARA SPARKS, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.



CARA SPARKS

Notary Public in and for the

State of Georgia

[X] Review of the transcript was requested.

Page 206

CERTIFICATE OF TRANSCRIBER

I, ELIZABETH AUSTIN, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

*Elizabeth A. Austin*

ELIZABETH AUSTIN

Page 207

Jeffrey R Daniel

jeffdaniel@parkerpoe.com

October 5th, 2025

RE: O.L., By And Through Her Mother, V.L. And V.L. v. Cobb
County School District, Et Al.
9/19/2025, Corp. Rep. 30(b)(6) Jessica N. Coleman (#7581675)
The above-referenced transcript is available for
review.
Within the applicable timeframe, the witness should
read the testimony to verify its accuracy. If there are
any changes, the witness should note those with the
reason, on the attached Errata Sheet.
The witness should sign the Acknowledgment of
Deponent and Errata and return to the deposing attorney.
Copies should be sent to all counsel, and to Veritext at
(cs-southeast@veritext.com).
Return completed errata within 30 days from
receipt of testimony.
If the witness fails to do so within the time
allotted, the transcript may be used as if signed.


Yours,
Veritext Legal Solutions

Page 208

O.L., By And Through Her Mother, V.L. And V.L. v. Cobb County

School District, Et Al.

Corp. Rep. 30(b)(6) Jessica N. Coleman (#7581675)

E R R A T A  S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____


_____  _____

Corp. Rep. 30(b)(6) Jessica N. Coleman     Date

Page 209

O.L., By And Through Her Mother, V.L. And V.L. v. Cobb County School District, Et Al.

Corp. Rep. 30(b)(6) Jessica N. Coleman (#7581675)

ACKNOWLEDGEMENT OF DEPONENT

I, Corp. Rep. 30(b)(6) Jessica N. Coleman, do hereby declare that I

have read the foregoing transcript, I have made any

corrections, additions, or changes I deemed necessary as

noted above to be appended hereto, and that the same is

a true, correct and complete transcript of the testimony

given by me.

_____     _____

Corp. Rep. 30(b)(6) Jessica N. Coleman     Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

_____ DAY OF _____, 20___.

_____

NOTARY PUBLIC

**[& - 2022]**    Page 1

**&**

**&** 1:19 3:6 5:22

**0**

**0** 209:10,20
**03285** 1:9
**04** 5:24

**1**

**1** 6:23 43:7
126:24 134:14
137:2,6 140:2
209:1,11,21
**1,319,055,154**
42:9
**1.3** 42:20
**1.6** 43:13
**10** 4:3 33:21
**10,000** 89:16
**10/15/20** 5:13
134:24
**10/15/2020**
33:22
**100** 2:6 7:4
121:22 152:23
**1075** 1:20 3:7
8:19
**108** 10:23
62:14
**10:32** 78:21
**10:45** 79:2
**11** 197:17
**11:48** 126:21

**12** 33:8,20
91:17 103:12
197:24
█████
13:18
**12/7/23** 5:19
134:24
**127** 4:20
**129** 4:25
**13** 130:21
198:2
**132** 5:5
**132.50** 188:6
**133** 5:6
**134** 5:7
**136** 5:9,11,13
5:15,17,19,21
**14** 198:7,13
**146** 5:24
**149** 5:25
**15** 4:10 18:1,3
18:8 19:3,13
62:11 198:13
**150** 188:4,5
**1500** 1:20 8:19
**155** 6:5
**1556** 158:4,5
**1587** 158:6
**16** 4:12 41:1,4
41:11,24 42:3
42:7 198:14
**160-4-2** 155:21
159:17

**160-4-7** 5:24
**17** 4:14 60:4,4
60:16 61:1,15
62:8 94:12
198:14
**175** 6:9
**176** 6:10,14
**177** 6:16
**17th** 105:15
**18** 4:11,15
61:16,19 62:7
94:14 198:14
**182** 6:18
**19** 1:17 4:16
8:4,18 94:15
94:18,19 96:7
98:13 102:5
127:25
**190** 6:19
**196** 4:4
**199** 4:5
**1:23** 1:9
**1st** 20:6

**2**

**2** 2:15 6:25
11:6 45:22
46:1 79:1
209:2,12,22
**20** 4:18 82:18
89:16 98:13
102:5 127:4,6
127:25 129:15
153:25 157:22

209:15
**2016** 157:21,22
157:23 158:10
**2017** 191:11
**2019** 4:15 17:1
42:7 101:24
127:20 128:18
131:9 134:1,8
**2019-2020** 4:20
**2019/2020** 6:25
7:4 42:1 96:17
96:22 99:4,12
99:18 100:2,22
101:4 127:18
128:15
**2020** 33:25
41:24,25 42:7
42:21 56:20
58:10 100:3
105:3,16,16
112:10 119:9
128:2,14,17
131:2 137:2,6
140:3 146:19
149:1 154:12
155:8,13 156:9
160:1 186:9
191:5 192:8
**2020/2021** 42:5
96:10,11,15
**2021** 42:3 48:7
130:18 150:19
**2022** 4:15
134:14

Corp. Rep. 30(b)(6) Jessica N. Coleman    September 19, 2025

O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

**[2022-2023 - 37]**    Page 2

**2022-2023**  4:25
**2022/2023**
  129:9,24
**2023**  95:24
  97:10 100:22
**2023/2024**  7:4
  102:25
**2024**  95:24
  97:11 100:22
**2025**  1:17 4:15
  8:4,18 176:23
  197:5 207:3
**21**  4:21 100:3
  128:23 129:1
  129:21 130:2
  153:25
**218-1116**  2:11
**21st**  14:15
**22**  5:3 38:17
  129:5 131:21
  132:5,7,10,13
  134:1 150:19
**22nd**  38:17
**23**  5:6 100:4
  129:5 133:4,7
**24**  5:7 134:10
  134:11 176:23
  197:4
**2415**  2:6
**25**  5:8 118:23
  135:24 136:9
**26**  5:10 118:23
**27**  5:12

**28**  5:14
**28708**  206:23
**29**  5:16
**2:31**  195:11
**2:47**  195:15
**2:57**  204:1,3

**3**

**3**  7:3 126:24
  209:3,13,23
**3,500**  187:10,17
**30**  1:15 4:10
  5:18 8:14
  10:23 11:6
  12:12 36:3
  42:23 43:15,23
  45:15 47:3,21
  49:5,18 51:14
  52:8,16,22
  57:18 65:24
  66:16 67:2
  68:1,14 70:4
  71:9 72:17
  74:3,12 77:13
  77:16,24 83:23
  86:25 89:19
  90:23 100:20
  105:7,20 115:7
  121:3 122:7
  132:18 135:25
  136:10 147:14
  151:1 153:3
  164:12 166:10
  171:18,21,22

171:25 172:9
175:5 177:7,13
177:22 178:13
179:11,17
182:14 187:21
190:20 193:9
193:13 196:7
200:18 207:5
207:16 208:2
208:24 209:2,4
209:12
**300.301-300....**
  5:23
**30309**  1:21 3:8
  8:20
**30345**  2:7
**30448**  205:20
**31**  5:20 136:19
  136:21,23
  140:1 155:21
  159:17
**31st**  178:16
**32**  5:22 131:7
  146:10,12,15
  149:4 155:19
**320-6672**  2:10
**33**  5:25 149:7
  149:12,22
  151:22 152:1
**33137**  2:16
**33389**  133:5
**33391**  133:5
**33750**  94:16

**33802**  94:17
**33803**  129:22
**33823**  129:22
**33824**  130:2,4
  130:11
**33828**  130:4
**33829**  130:3
**34**  5:22 6:3
  40:3 125:10
  126:1,5 154:23
  155:1 157:2
  163:10
**347-2056**  2:18
**35**  6:6 175:15
  175:15,16
  176:8,13,21,25
  177:17,18,24
  178:11 179:2,3
  196:14 199:23
  199:25 200:12
  200:13,15,18
**3555**  137:25
**36**  6:10 176:13
  176:14,15,17
  176:20,22
  178:3,10,25
  196:14 199:20
  200:14 201:21
**37**  6:11 176:15
  176:17,19,20
  196:14 197:6
  198:17 199:11
  200:1,16 202:6
  202:8

**[3750 - 9/20/19]**                                                                 Page 3

| | | | |
|---|---|---|---|
| **3750** 2:15 | **5** | 164:23,25 | 207:5 208:2,24 |
| **38** 6:15 177:15 | **5** 209:5,15,25 | 168:22 169:2 | 209:2,4,6,12,16 |
| 177:19 178:3,4 | **504** 4:16 6:25 | **58** 6:24 | **60** 4:14 |
| 178:10,25 | 7:3 14:23,23 | **5th** 207:3 | **61** 4:15 |
| 196:14,17,18 | 14:25 15:1 | **6** | **611** 82:15 |
| 196:18 197:15 | 18:17 63:7,11 | | **7** |
| 199:20 | 63:13,14,16,17 | **6** 1:15 4:10 | |
| **3829** 130:7 | 63:18,19,20 | 8:14 10:23 | **7** 209:7,17 |
| **39** 6:17 182:8 | 64:16 72:6 | 12:12 36:3 | **7/1/20** 5:21 |
| 182:10 183:8 | 85:8,10,10,16 | 42:23 43:15,23 | **7/1/22** 5:7,17 |
| 186:23 | 85:19 92:22,24 | 45:15 47:3,21 | 134:24 |
| **3rd** 105:16 | 93:3,8,11,15,22 | 49:5,18 51:14 | **7/15/21** 5:15 |
| **4** | 94:1,2,5,7,23 | 52:8,16,22 | 134:24 |
| | 95:1 96:23,24 | 57:18 65:24 | **7/20/17** 5:9 |
| **4** 98:7 195:14 | 98:6 99:3,12 | 66:16 67:2 | 134:23 |
| 209:4,14,24 | 99:17 100:2,9 | 68:1,14 70:4 | **7581675** 1:23 |
| **40** 6:19 189:22 | 101:1,3 102:2 | 71:9 72:17 | 207:5 208:2 |
| 190:1 | 102:3,17,18,20 | 74:3,12 77:24 | 209:2 |
| **401** 42:22 | 102:25 104:11 | 83:23 86:25 | **762** 2:11 |
| 43:14,22 45:14 | 105:24 106:11 | 89:19 90:23 | **786** 2:18 |
| 47:2,20 48:13 | 107:17 108:4 | 100:20 105:7 | **8** |
| 49:4,17 51:13 | 108:18 109:11 | 105:20 115:7 | |
| 52:7 71:8 | 110:16 111:10 | 121:3 122:7 | **8** 209:8,18 |
| 83:22 89:18 | 112:10,12,18 | 132:18 147:14 | **8/22/19** 5:6 |
| 90:23 175:4 | 112:18,20,25 | 151:1 153:3 | 134:7 |
| **403** 42:13,23 | 116:11 117:25 | 164:12 166:10 | **823** 129:16 |
| 43:14,22 45:14 | 119:7 120:5,8 | 171:18,21,22 | **9** |
| 47:2,20 48:14 | 120:9 121:9,19 | 171:25 172:9 | |
| 83:22 89:18 | 122:1 145:3 | 175:5 177:7,13 | **9** 209:9,19 |
| 90:25 166:9 | 161:21 162:2,3 | 177:22 178:13 | **9/19/19** 5:11 |
| 175:4 | 162:6,11,12,15 | 179:11,17 | 134:23 |
| **404** 2:10 | 162:16,25 | 182:14 187:21 | **9/19/2025** |
| **41** 4:13 | 163:4 164:5,22 | 190:20 193:9 | 207:5 |
| | | 193:13 196:7 | **9/20/19** 190:3 |

**[90 - administrative]**                                    Page 4

| | | | |
|---|---|---|---|
| **90**  82:4 | **academy**  64:7,9 | 146:19 151:11 | **ada**  18:17 |
| **94**  4:17 | **acceleration** | 152:6,11 | 145:3 |
| **99**  6:25 | 64:6,9 | 153:25 156:8 | **adams**  1:19 3:6 |
| **9:06**  1:18 8:3 | **access**  47:11 | 158:7,14,15 | **add**  13:23 14:4 |
| **a** | 54:16 63:25 | 163:10 176:8 | 78:9 89:23 |
| | 93:25 94:6,7 | 179:2 182:21 | 159:22 |
| **a.m.**  1:18 8:3 | 102:21 150:13 | 192:13 201:23 | **added**  186:11 |
| 78:21 79:2 | **accessing**  72:21 | 205:9 206:5 | **additional**  47:8 |
| 98:7 126:21 | 104:20 111:4 | **accurately** | 55:2 64:22 |
| **abide**  190:22 | **accident** | 13:10,15 114:5 | 81:8 83:2,5,7,9 |
| **ability**  12:23 | 172:19 | **accusatory** | 86:16,22 87:8 |
| 13:9,14 159:11 | **accommodati...** | 122:19 | 87:25 88:12 |
| 205:10 206:7 | 93:25 105:24 | **accuse**  77:22 | 97:16 129:11 |
| **able**  34:25 36:5 | 162:17 163:1,5 | **acknowledge...** | 143:14,23 |
| 42:15 47:11 | **accruing**  25:12 | 182:3 209:3 | 144:5,6,8,9 |
| 54:15 64:15 | 104:22 105:3 | **acknowledge...** | 145:10 199:15 |
| 66:2 74:13 | **accumulated** | 8:22 | **additionally** |
| 87:17 97:3 | 29:11 30:5 | **acknowledg...** | 8:23 20:12 |
| 135:10 151:4 | 138:5 | 207:12 | **additions**  101:3 |
| 154:10 172:3 | **accuracy** | **act**  193:12 | 209:6 |
| **above**  207:6 | 150:16 151:13 | **action**  1:8 | **address**  77:20 |
| 209:7 | 152:13 207:9 | 205:12,16 | **adjust**  90:19 |
| **absences**  25:12 | **accurate**  18:9 | 206:8,12 | **administer** |
| 29:12 30:6 | 18:10 31:6 | **actively**  69:6 | 8:22 |
| 104:23 105:3 | 62:2 64:20 | 70:6,7 92:10 | **administration** |
| 105:10,11,14 | 94:25 95:2,6 | 92:12,14 | 13:23 14:3 |
| 105:16 137:14 | 95:21 100:4 | 104:22,24 | **administrative** |
| 138:5 | 102:24 128:21 | **activity**  93:6 | 27:22 28:11 |
| **absent**  8:23 | 129:7,22 | **actual**  157:14 | 29:18 31:1,9 |
| 105:24 154:6 | 131:15 132:13 | 161:22 | 33:23 109:18 |
| **absolutely**  13:1 | 132:20 133:16 | **actually**  39:5 | 112:2 136:7 |
| 19:5 64:17 | 134:2,5,15 | 56:7 74:8 | 137:8,18 138:9 |
| 85:4 90:13 | 135:2,25 136:5 | 132:24 150:11 | 139:4 |
| 126:19 133:19 | 137:4 140:1 | 160:16 162:23 | |

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025
O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

**[administrator - answered]**                                          Page 5

| | | | |
|---|---|---|---|
| **administrator** 80:3 148:11,14 173:25 | 89:20 104:16 122:22,23 146:9 163:19 177:8 191:19 | **ambiguous** 138:18 | 47:4 52:24 57:20 65:25 66:1,17,25 71:25 74:4,13 |
| **administrators** 124:2 | **al** 207:4 208:1 209:1 | **amended** 101:14,17 151:7 153:1,5 169:3 | 75:13 83:24 87:2 90:24 93:19 103:25 |
| **admission** 152:1 | **alerts** 76:14 | **amendment** 168:20 | 105:8,22 106:6 106:16 108:8 |
| **admissions** 5:8 5:10,12,14,16 5:18 27:7 31:2 31:8 108:22,25 134:22 136:2,6 | **allegation** 147:20 | **amount** 38:22 43:5,18 45:25 46:6,8 48:23 51:8,8 53:5 70:20 71:5 79:16 81:20,21 83:15 84:16 87:21 88:17,19 88:20 89:9,11 89:15,24 90:4 90:4,8,14,16 187:1 191:22 | 109:16 110:7 113:6,25 114:9 115:25 116:15 116:17 119:12 120:16 121:4 121:14 122:8 122:13 150:1 151:4 160:21 160:22 161:4 163:23 164:11 164:14,16 |
| **allegations** 115:2,10,16 | |
| **allocation** 47:23 48:5 | |
| **allocations** 48:22 | |
| **adopted** 4:13 41:24 127:21 127:22,24 | **allotments** 79:12,13,15 80:1,11,12,16 80:19,25 81:8 81:10 | | |
| **adult** 27:15 28:20 32:6 | | | |
| **adverse** 142:17 | **analyze** 182:4 | 165:7 166:11 |
| **affect** 13:9 | **allotted** 85:1 207:19 | **annual** 20:18 39:8 40:18 41:20 102:18 | 166:18 167:17 169:14 170:11 |
| **affidavits** 17:8 | | | |
| **afield** 192:23 | **allow** 108:17 | | 170:20 171:3 |
| **age** 5:5 21:1,5 38:13,15,17 190:24 | **allowed** 11:3 | **annually** 54:6 81:13 | 171:19 172:2,4 172:5,15 |
| | **allowing** 191:25 | | |
| **agency** 70:2 | **allows** 124:7 | **answer** 11:8,10 12:15,18,19,21 13:3 17:4 23:13 25:2,4 29:15 32:17 36:4 37:5,15 42:14,25 43:3 45:16 46:4,11 | 174:24 175:6 |
| **agent** 15:5 | **alternate** 63:21 64:10 | | 175:22 179:23 |
| **aging** 32:9 | | | 180:4 187:23 |
| **agree** 8:9,25 11:23 12:21 61:10 99:11 190:22 | **alternative** 63:23,25 | | 188:9 194:7 |
| | **alvin** 1:10 3:3 8:17 | | **answered** 71:1 73:14 116:14 121:2 163:18 173:2 |
| **agreeing** 59:9 | | | |
| **ahead** 28:17 52:25 74:15 | | | |

Veritext Legal Solutions

Corp. Rep. 30(b)(6) Jessica N. Coleman    September 19, 2025
O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

[answering - attendance]    Page 6

| | | | |
|---|---|---|---|
| **answering** 73:15 156:25 | 182:5 **approved** 149:22 151:13 152:13,17 183:5 186:2,5 186:7 188:15 189:3,4 | **argumentative** 25:3 29:14 32:16 74:2 75:5,11 113:2 116:13 120:15 160:20 163:18 200:20,22 | 142:15 **assign** 124:7 **assigned** 8:12 148:17 |
| **anticipated** 154:7 | | | **assigns** 124:5 |
| **anybody** 24:5 112:21 203:3 | | | **assistant** 14:20 49:11 79:19 81:5,7 147:21 150:3 183:18 184:1,10,13,19 185:5,7,13 |
| **apologize** 37:7 168:10 | **approves** 41:20 48:22 183:10 | **asked** 12:14,22 36:22 72:1 73:4,14 78:3 116:14 121:2 156:24 161:6 163:18 173:1 176:10 180:20 189:23 195:20 195:21 196:1,2 196:2 201:15 201:18 | |
| **appeal** 15:22 15:23 | **approving** 150:9 | | |
| **appended** 209:7 | **approximately** 16:22,23 82:21 90:21 185:2,18 185:19 | | **assistive** 188:21 188:22 |
| **applicable** 9:4 26:19 207:8 | | | **assume** 73:25 167:6 |
| **applicants** 88:25 | | | **assumes** 167:15 |
| **application** 6:5 90:6 155:5,8,9 155:11 159:10 162:22 163:11 170:15 173:6 | **april** 157:21,22 157:23,25 158:9 176:23 178:17 197:4 | | **assuming** 95:16 95:17 106:14 108:7 |
| | | **asking** 19:7 37:2 76:12 113:4,13 120:11 125:15 134:25 157:8 168:6 171:20 173:16 195:25 196:5 | **atlanta** 1:3,21 2:7 3:8 8:19 |
| | **archive** 36:16 | | **attached** 207:11 |
| | **archives** 36:14 | | |
| **applications** 171:6 | **area** 37:3 44:22 44:22 56:21 81:5 112:8 143:10 145:10 170:13 193:1 | | **attempted** 47:13 |
| **applied** 88:19 | | **asks** 19:16 79:4 159:8,8 | **attend** 154:10 162:24 |
| **apply** 27:1 87:8 87:13,18,20 112:25 113:8 | **areas** 17:16 18:6,8 113:12 115:1 141:18 141:22,23 142:2,6,16,16 142:18,19 143:15,24 147:20 | **aspect** 171:9 | **attendance** 5:6 5:7 9:13 19:21 30:12,19 36:25 105:19 112:6 119:8 133:11 133:13,15 134:5,13 |
| **appreciate** 46:23 104:7 | | **aspire** 15:2,3 | |
| **approval** 49:8 49:10,11 178:6 182:19 | | **assess** 163:8 | |
| | | **assesses** 141:13 | |
| **approve** 48:20 48:25 49:1 | | **assessments** 141:11,13,14 | |

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025
O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

**[attendance - bates]**                                                Page 7

137:22 138:24
139:1,16
154:19 156:3
161:17
**attended**  35:21
**attending**
  69:22 70:13
**attention**  167:7
**attorney**  9:14
  9:25 10:2 11:9
  165:23 205:14
  206:10 207:13
**attorneys**  17:18
  35:14 173:24
  180:25 199:19
  202:21
**audio**  8:7 78:23
  205:8 206:3
**august**  105:15
  134:1
**austin**  206:2,24
**authenticity**
  101:20
**authorize**
  109:10,14
**authorized**
  8:21 111:11
  112:10
**authorizing**
  112:21
**autism**  14:17
  14:18 15:6,10
**available**  11:17
  18:14 19:1,11

41:8 75:7
  162:18 207:6
**awaiting**  72:14
  73:8
**aware**  43:12
  45:20 124:3
  137:17,20
  147:25 152:23
  156:10,24
  174:1 188:21
  189:1,5 198:24

**b**

**b**  1:15 4:7,10
  5:1 6:1 8:14
  10:23 12:12
  28:13,14 36:3
  42:23 43:15,23
  45:15 47:3,21
  49:5,18 51:14
  52:8,16,22
  57:18 65:24
  66:16 67:2
  68:1,14 70:4
  71:9 72:17
  74:3,12 77:24
  83:23 86:25
  89:19 90:23
  100:20 105:7
  105:20 115:7
  121:3 122:7
  132:18 137:22
  137:24,25
  147:14 151:1

153:3 164:12
  166:10 171:18
  171:21,22,25
  172:9 175:5
  177:7,13,22
  178:13 179:11
  179:17 182:14
  187:21 190:20
  193:9,13 196:7
  207:5 208:2,24
  209:2,4,12
**babies**  91:11
**bachelor's**
  13:23,24 14:3
  14:5
**back**  15:14
  21:17,18 25:13
  37:9,19 40:8
  49:20 54:1
  62:14 63:4
  79:1 87:14,19
  87:22 88:14
  96:17 97:16
  98:9 99:5
  108:21 126:24
  130:2 132:20
  133:2 138:11
  138:24 144:11
  153:6 157:10
  159:2 163:8
  186:22 191:6
  195:14 196:18
**background**
  13:20 148:15

**bag**  59:20
**base**  187:19
**based**  4:19,22
  25:9,19 30:20
  31:1 34:20
  39:14,17 40:4
  40:16 49:9
  50:5 51:9 53:5
  53:6,12,23
  54:1,8 55:24
  68:5,16 73:20
  74:6 79:17
  80:14 81:10,12
  81:15,19 82:7
  85:19 88:18,24
  93:11 100:15
  107:9,12,22
  114:10 120:18
  123:10,13,14
  124:6,22,23
  126:12 127:9
  129:4,9 131:7
  131:14 142:2
  142:18,20
  172:4 176:11
  187:24 191:4
**basically**  42:10
**basis**  55:3
  107:23
**bates**  57:13
  59:6,9,13
  94:16 95:17
  129:13,15
  135:7 157:19

Veritext Legal Solutions

**[bcba - budgets]**   Page 8

| | | | |
|---|---|---|---|
| **bcba** 87:25 89:6,24 | **better** 64:13 | **bold** 155:22 | 162:12,18,21 163:2,11,14,15 |
| **bcba's** 188:4 | **beyond** 52:21 76:18 150:25 | **bolded** 197:20 198:8 | 164:7,19,22 166:6 167:13 |
| **beating** 77:9 | 171:25 174:22 | **book** 33:19 | 168:5,15 169:8 |
| **beginning** 80:23 | 178:12 179:16 191:13 | 57:15,22 58:9 58:18 60:4 | 170:7 171:14 |
| **begins** 78:25 126:23 195:13 | **bill** 43:21,25,25 44:12 45:11 | 61:11 94:10,11 98:17,20 | **brain** 172:20 **break** 12:24 |
| **behalf** 2:2 3:2 10:21 17:12 | **billion** 42:25 43:7,13 45:22 | 146:11 158:2 | 78:13,19 126:18 195:9 |
| 18:24 19:9,16 149:18 150:14 | **bills** 45:21 | **booklet** 41:13 | 195:17 |
| 178:6 194:4 | **binder** 59:23 59:24 60:4 | **bottom** 198:5 198:10 | **breakdown** 15:12 |
| **behavior** 177:11 | **birth** 13:17 38:17 | **boulevard** 2:15 | **brief** 60:11 |
| **belabor** 76:19 | **biscayne** 2:15 | **bound** 4:19,22 6:4 19:22 | **brought** 57:15 58:9 |
| **believe** 11:5 31:2 34:17 | **bit** 175:13 195:23 | 28:24 29:8,10 29:23 37:1 | **budget** 4:13 17:23 41:9,14 |
| 50:13 52:24 68:16 71:1 | **blue** 59:19 | 39:12,17 40:4 40:16 98:6,10 | 41:21,24 42:8 42:10,18 43:9 |
| 73:19 90:19 97:7 102:5 | **board** 4:13 27:13 28:11 | 98:14 115:5 123:11 124:6 | 43:13 45:11 46:24 49:7 |
| 105:15 151:7 158:19 180:24 | 31:9 41:16,20 41:24 48:10,20 | 124:23 125:11 126:3,11 127:9 | 50:21 79:9 81:9,12 82:12 |
| **believes** 144:5 | 48:22 91:18,20 103:16 107:2 | 128:14,22 129:4,8,23 | 82:13 83:19 |
| **bell** 3:5 9:24 | 108:16,17 109:8,10,17,17 | 130:22 131:7 131:12 153:13 | **budgeted** 37:2 **budgeting** |
| **beneath** 198:22 | 109:25 120:20 120:22,25 | 153:14,16 154:3,7,15 | 51:21 79:7 80:25 82:1,3 |
| **benefit** 85:2 | 121:5 154:14 155:21 156:6 | 155:5,24 156:13,20 | 84:12 |
| **benefits** 82:12 | 181:20 | 157:6,18 158:9 159:18 160:5 | **budgets** 19:23 41:3 52:12,14 |
| **bernstein** 1:19 3:6 | **board's** 48:15 | 161:23 162:11 | 79:7 |
| **berry** 14:7 | | | |
| **best** 12:23 205:9 206:6 | | | |

**[bullet - cleared]**                                                    Page 9

**bullet** 196:19 196:22

**bunch** 134:18

**burden** 72:14 107:24 108:20

**burdens** 73:8 108:4 109:12

**business** 13:23 14:3

**c**

**c** 2:1 3:1 6:21 7:1 8:1 11:6 28:16

**c.f.r.** 5:23

**calendars** 4:15 61:4,22 62:7

**call** 27:22 80:10 88:7 133:13,14 136:6

**called** 10:12 14:19 35:1 64:2 75:24

**cap** 186:25 187:5,6,9,11,11 187:19 188:3,6 190:22

**caps** 188:11

**captions** 203:7

**cara** 1:22 8:11 205:2,21

**care** 157:4

**carries** 101:14 101:17 198:13

**case** 10:23 12:13 16:9,12 17:14

**cases** 195:7

**categories** 65:18 68:17 142:4 144:2,4 144:6

**category** 44:19 67:4 143:12

**cause** 95:12 112:22 124:12 151:20 158:20 162:17 171:15 172:12 173:4

**ccsd** 4:23 56:4

**cdc** 50:5

**center** 2:14

**certain** 48:23 90:4,8 145:4 151:20 180:6

**certainly** 107:21

**certificate** 205:1 206:1

**certified** 9:1

**certify** 205:3 206:2

**challenge** 101:20 174:8

**challenged** 173:20

**challenges** 173:14 174:19

**chance** 19:6

**change** 90:18 123:19 172:11 173:4 208:4,7 208:10,13,16 208:19

**changes** 127:15 127:23 145:25 171:15 207:10 209:6

**chapter** 56:15 56:16,16,21 62:22

**chart** 6:19

**check** 31:4 99:15 100:7

**checking** 125:4

**child** 22:3 32:9 51:10 55:20 56:14,25 57:24 58:3 62:21 67:23 91:9,13 92:4,4 119:4 143:8 170:6

**child's** 91:12 166:24

**children** 64:11 192:14 194:15 194:22 195:4

**choi** 2:13 9:19 9:19

**chris** 2:3,5,8 3:14 9:15 10:20 78:9 135:21 149:5 177:8 179:3 192:22 193:10 201:25

**christian** 183:22

**chrisvancepc....** 2:8,9

**circuit** 135:11

**circumstances** 25:7 26:7 45:4 76:16 186:19

**civil** 1:8 16:9

**clarification** 12:10

**clarify** 26:22 51:22 105:14 113:7 118:4

**clarifying** 173:10

**class** 15:7 39:25

**classes** 79:23 80:12,15

**clear** 18:7 52:4 53:1 70:23 78:2 152:5 171:7 196:13 201:12

**cleared** 200:1

Corp. Rep. 30(b)(6) Jessica N. Coleman      September 19, 2025
O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

**[clearly - codes]**                                          Page 10

| | | | |
|---|---|---|---|
| **clearly** 74:11 | 35:10,22 36:14 | 95:1 96:14 | 163:12 164:4 |
| **clerical** 105:11 | 37:3 38:2,5,9 | 97:19 100:8 | 165:3,21,22,25 |
| 152:22 | 39:1,4,9,16 | 101:25 102:16 | 166:5 167:12 |
| **client** 201:8 | 41:2,7,13 42:8 | 102:24 103:10 | 168:3,13,14 |
| **close** 46:9 | 43:12,20 44:14 | 103:18,20 | 169:7 170:4 |
| **closed** 203:7 | 44:23 45:2,10 | 104:10 106:9 | 172:10,24 |
| **closely** 24:9 | 45:21 46:25 | 106:11 107:15 | 173:14,18 |
| **closest** 128:7 | 47:16 48:19 | 108:1,3,19 | 174:18 176:9 |
| **cluster** 14:19 | 50:20 51:1,3,6 | 111:8 113:14 | 180:19,22,23 |
| **coaching** 11:4 | 51:19,23 52:11 | 113:18 114:19 | 180:24 181:2,5 |
| **cobb** 1:9,16 3:2 | 53:7,8,15,16,24 | 115:3,20 116:9 | 181:11,13 |
| 4:11,12,16 6:3 | 55:5,10 56:14 | 117:24,25 | 183:2,7,9,15 |
| 6:6,11,16 8:14 | 57:1,12,25 | 118:7,8,18,20 | 185:21,24 |
| 8:16 9:17 | 58:4 62:3,18 | 119:6,21 120:3 | 187:1 190:7 |
| 10:24 11:10,16 | 63:5 64:6,8,19 | 120:20 121:8 | 191:5,24 |
| 11:17 12:12 | 64:24 65:8,11 | 121:17,20 | 193:22 196:7 |
| 13:22 14:11,13 | 65:20 66:6 | 122:2 123:3,6 | 197:2,11 207:4 |
| 14:15 15:4,19 | 67:15,21,23 | 123:24 124:9 | 208:1 209:1 |
| 16:5,25 17:12 | 68:2,10,11,21 | 124:14,19 | **cobb's** 90:11 |
| 18:13,14,15,24 | 69:7,13,15,19 | 125:9 126:6 | **code** 5:20 28:4 |
| 18:25 19:1,9 | 69:21 70:10,13 | 127:11 128:21 | 65:5,7 66:13 |
| 19:10,11,16,25 | 70:24 71:3,17 | 131:18 132:14 | 66:18,22 67:21 |
| 20:2,4,16 | 72:8,10,12 | 132:16,24 | 68:9,24 72:10 |
| 21:16 22:4,8 | 73:5,10 75:2 | 133:4,12 134:6 | 73:4,6,9 74:19 |
| 22:11,18,20 | 76:22,24 79:6 | 136:1 137:9,11 | 74:21 85:18,20 |
| 23:25 24:17,22 | 79:9,10 81:25 | 137:17 139:9 | 136:25 137:5 |
| 24:24 25:21 | 83:12,19 84:13 | 141:16 142:22 | 137:12 138:3 |
| 26:16,18,25 | 84:19,24 86:5 | 144:19 145:14 | 138:13,25 |
| 30:2,12,22 | 86:18,20 87:7 | 145:24 147:7 | 139:5,10,18 |
| 31:14,15,18,20 | 88:3,10,23 | 152:9 153:13 | 140:2 |
| 31:23,24,25 | 89:14 90:7,10 | 154:12 156:19 | **codes** 64:19,21 |
| 32:12,13 33:24 | 91:4,11,13,24 | 157:3,5 158:15 | 65:1,3,6,8,14 |
| 34:10,13,24 | 92:1,13,21 | 159:14,15 | 65:19 66:4,7 |
| 35:7,7,8,9,10 | 93:13 94:4,16 | 160:14 162:12 | 74:24 76:10,12 |

**[codes - consented]**                                                      Page 11

76:15 78:4,6
**coding**  75:8
  76:5
**cognitive**
  171:15 172:11
  172:17 173:4
**cohen**  189:3
  190:11 191:6
  194:14
**coleman**  1:11
  1:14 3:3 8:14
  8:18 9:25 10:4
  10:4,11 11:14
  127:3 195:17
  196:13 207:5
  208:2,24 209:2
  209:4,12
**collaborated**
  187:8
**collaboration**
  64:8
**colleague**  49:9
**collected**  20:24
  144:10
**collecting**
  36:23 52:12
**collection**
  19:18 20:6
  23:16 37:24
**collections**  23:7
**college**  14:7
**combined**
  15:11 39:14

**combines**  39:16
  39:23
**combining**  40:1
**come**  54:5 56:7
  75:1 104:23
  112:20,22
  117:20 144:10
  163:8 177:9
**comes**  67:6
  81:21 141:1
  142:13 146:24
  186:17
**coming**  40:14
  49:20 79:13
  80:14 81:20
  124:13,13
  125:1 138:24
  156:15 157:9
  159:21
**comments**
  150:5
**communicate**
  25:18
**community**
  138:22
**compare**  95:5
**complaint**  5:25
  113:19,21
  114:20,25
  115:1,4,10,16
  147:1,6,9,17
  149:17
**complaints**
  113:15 150:4

**complete**
  143:25 209:8
**completed**
  50:18 81:1
  96:4 124:4,7
  142:8 207:16
**completely**
  160:20
**compliance**
  10:5 14:24,24
  14:25 15:1,1
  44:23 45:21
  70:9 156:9
  159:16 164:22
  171:12,13
  174:10,15
  184:7,9,14,20
  184:24,25
  185:8,11,14
**comply**  51:4
  76:23 77:23
**comport**  42:9
**composite**  4:14
**compound**
  150:25 169:13
  171:2 188:8
**computed**
  70:24
**computes**  71:7
**concerning**
  45:11
**concerns**  141:1
  141:2,3 142:3

**concise**  11:2
**concisely**  11:8
**concluded**
  204:4
**concludes**
  203:25
**condition**  13:14
**conduct**  5:20
  136:25 137:5
  137:13 138:3
  138:13 139:5
  139:10,18
  140:2 168:20
**conducted**
  141:11 181:9
**conducting**
  189:15
**conference**
  96:21
**confirm**  95:15
  158:24
**confusing**
  149:25 188:7
**connected**
  133:9,10
  138:12 139:15
**consecutive**
  29:12 30:5
  154:6
**consent**  44:13
  45:18 93:9
  141:6,18
**consented**
  43:25

**[consenting - correct]**                                        Page 12

**consenting**
141:9
**consequence**
138:21
**consequences**
137:13 138:7
138:16 139:11
**consider** 44:6,7
55:3 142:20,22
143:2,4,10,15
144:17 150:5
186:19
**consideration**
162:4
**considered**
27:23 29:1
30:21 92:3
110:4,18,21
154:8 160:6
**considering**
93:23 143:22
**consistent**
97:17
**constant** 193:7
**constitute** 9:8
**consultation**
54:6
**cont'd** 3:1 5:1
6:1 7:1
**contact** 173:7
**contain** 162:25
168:1 199:1
**contained**
152:20 179:4

199:25 200:25
202:5,12
**container**
67:24 68:12
69:3,16 71:16
71:20,22 91:7
91:9,14,19
92:5 110:3,9
**contains**
202:10
**contemplated**
159:13 162:5
**context** 64:23
172:21
**continue** 8:8
139:18
**continues** 26:1
**contract** 64:7
**contracted**
64:2
**conversation**
111:17,18
**conversations**
8:6
**coordinator**
112:10 170:13
171:13
**coordinators**
102:19,21
**copies** 33:12
62:2 132:13
135:2,25 136:5
207:14

**copy** 6:23
33:10 56:6
58:19,20,22
59:23 60:2
61:16 94:25
95:3,21 102:24
128:5,21 129:7
129:22 133:16
134:5,15 137:4
140:1 146:19
148:4 151:11
151:20 152:6
158:7 163:10
176:8 182:9,21
203:3
**corner** 61:1
**corp** 207:5
208:2,24 209:2
209:4,12
**corporate** 1:15
**correct** 11:15
16:7 17:23
18:18 22:13,14
24:13 27:11
29:8,13,25
30:23 31:8,16
31:17,21 32:7
32:8,10,15
34:1,8 35:7,11
35:12 36:15
39:13 40:6,8
41:9,10,21,22
43:21 45:17
53:22,23 54:22

64:12 69:13
70:2,19 72:8,9
74:9 81:23
82:15,25 83:1
83:4,6,7,10,11
83:14 84:10,23
85:3,14 86:22
87:3 88:6,13
89:2 91:5,6,23
91:25 92:16,20
95:25 96:8
100:4 102:14
103:1 105:17
109:24 110:1
111:7,24 112:3
113:16,21
114:6,14 116:3
123:20 125:12
126:7 127:16
129:25 130:12
130:13,23
131:5 133:1
136:12 138:7
154:16,17
155:24 160:7
160:18 161:15
161:24 163:6
163:16,22
164:8 166:7
167:13 169:4
178:3,8 185:15
187:3,4 188:4
188:6,16,17
189:20,24

**[correct - county]**                                                    Page 13

190:12 192:15
194:15 195:4
199:16 202:8,9
202:13,14
209:8

**corrected**
105:12

**corrections**
102:12 209:6

**cost**   87:19 88:5
88:9,10 89:6,9
89:10,15,23
190:22

**cotton**   1:10 3:3
8:17 96:25
102:3

**counsel**   62:5
102:8 136:3
205:10,13
206:7,10
207:14

**count**   20:9,25
39:6,15 40:7,9
40:13,15
130:23,23,25
131:3,9,10

**counted**   105:23

**counts**   21:25

**county**   1:9,16
3:2 4:11,12,16
6:3,6,11,16
8:15,16 9:17
10:24 11:10,16
11:17 12:12

13:22 14:11,13
14:15 15:4,19
16:5,25 17:13
18:13,14,24,25
19:1,9,10,11,16
19:25 20:2,4
20:17 22:4,8
22:12,18,20
23:25 24:17,23
24:24 25:21
26:17,18,25
30:2,12 31:14
31:15,19,20,23
31:25,25 32:12
32:13 33:24
34:10,13,24
35:9,10,11,22
36:14 37:3
38:2,5,9 39:1,9
39:16 41:2,7
41:13 42:8
43:20 44:14,23
45:2,10,21
46:25 47:17
51:3,7,19,24
52:11 53:21
55:5,10 56:14
57:1,12,25
58:4 62:3,18
63:5 64:8,19
64:24 65:9,11
65:20 66:7
67:15,21,23
68:2,10,11,21

69:7,13,15,19
69:21 70:11,13
70:24 71:3,17
72:8,11,12
73:5,10 75:3
76:22,24 79:6
79:9,11 81:25
83:13,20 84:19
84:25 86:5,18
86:20 87:7
88:3,10,23
89:14 90:7
91:4,11,13,24
92:2,13,21
93:13 94:4,16
95:2 96:14
97:19 100:9
101:25 102:16
102:24 103:10
103:18,20
104:10 106:10
106:11 107:15
108:2,3,19
111:9 113:14
113:18 114:19
115:3,21
116:10 117:24
117:25 118:7,8
118:18,20
119:6,21 120:3
120:20 121:8
121:17,20
122:2 123:3,6
123:24 124:9

124:14,19
125:9 126:6
127:11 131:18
132:14,16,24
133:5,12 134:6
136:1 137:9,11
137:18 139:9
141:16 142:22
144:19 145:14
145:24 147:8
152:9 153:13
154:12 156:19
157:3,5 158:15
159:14,15
160:14 162:12
163:13 164:5
165:3,21,22,25
166:5 167:12
168:3,13,14
169:7 170:4
172:10,25
173:14,18
174:18 176:9
180:19,22,23
180:25 181:2,5
181:11,13
183:2,7,9,15
185:21,24
187:1 190:7
191:6,24
193:22 196:7
197:2,11 207:4
208:1 209:1

Corp. Rep. 30(b)(6) Jessica N. Coleman         September 19, 2025
O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

**[county's - daniel]**                                          Page 14

| | | | |
|---|---|---|---|
| **county's** 18:15 | **criteria** 88:18 | **daniel** 3:4 4:4 | 103:5,22 |
| 30:23 39:4 | 111:1 142:6 | 10:2,2 17:2 | 104:14 105:6 |
| 43:12 50:20 | 143:24 154:9 | 23:12 25:1,3,5 | 105:18 106:4 |
| 84:13 128:22 | 170:16 186:8 | 26:20 27:3 | 106:13 108:5 |
| **couple** 97:14 | 186:15,16,18 | 29:14 32:16 | 108:13 109:13 |
| 105:11 117:20 | 186:21 190:15 | 33:12,16 36:1 | 110:5,19 |
| 117:20 145:6 | 190:16,23 | 36:18 37:4,13 | 111:13 113:2,5 |
| 189:13 | **cross** 10:25 | 42:12,22 43:2 | 113:22 114:7 |
| **course** 11:6 | 20:22 23:16 | 43:14,22 44:5 | 114:15 115:6 |
| 23:5,18 124:11 | **crozier** 2:4 9:21 | 45:14,23 46:3 | 115:14,23 |
| 148:18 152:16 | 9:21 | 46:10 47:2,20 | 116:13 117:5 |
| **courses** 20:8 | **cs** 207:15 | 48:1,13 49:4 | 119:10 120:15 |
| 23:5 34:19 | **csis** 35:1,6,6,9 | 49:17 50:7 | 121:1,12 122:4 |
| **court** 1:1 12:13 | 35:15,23 36:15 | 51:13 52:7,15 | 122:12,18 |
| 37:8 46:18 | 124:23 125:2,3 | 53:2 57:4,17 | 123:9 125:13 |
| 60:5 61:17 | **culminates** | 58:22 59:1,5,8 | 128:3,7,10 |
| 167:3,6,7,7 | 144:15 | 59:13,15,22 | 132:17 135:4,7 |
| **court's** 11:1 | **curious** 89:13 | 61:3,13 65:23 | 135:10 136:13 |
| **courtroom** | **current** 43:12 | 66:1,15,24 | 137:6 138:17 |
| 166:16,21,25 | 43:13 80:7 | 67:1,25 68:13 | 139:12 140:4 |
| **cover** 60:25 | 82:8 96:1 | 68:22 70:3 | 141:20 147:13 |
| 89:6 | 144:1,3,4 | 71:8,23 72:16 | 149:5,7,24 |
| **covered** 81:2 | 155:15 190:24 | 73:13 74:1,10 | 150:21,24 |
| **covering** 52:17 | **currently** 54:11 | 74:16 75:4 | 151:16,25 |
| **covid** 47:1,17 | 54:21,23 96:12 | 76:4,11,18 | 153:2 154:18 |
| 48:20 49:2,20 | 97:11 105:9 | 77:3,12,15,19 | 160:19 163:17 |
| 50:21 83:6,17 | 117:9 123:15 | 77:22 78:5,9 | 164:9,12 165:5 |
| 84:12,13 96:22 | **curriculum** | 78:14,16 83:22 | 165:15 166:8 |
| **cox** 150:3 | 54:15 | 86:24 89:18 | 166:17 167:4 |
| **craig** 3:14 9:23 | **cv** 1:9 | 90:22,25 93:17 | 167:14 169:12 |
| **created** 185:11 | **d** | 95:16,20 97:21 | 169:21 170:9 |
| **creates** 146:5 | | 97:25 99:14,19 | 171:1,17,24 |
| **criminal** 16:11 | **d** 4:1 6:21,21 | 99:22 100:23 | 172:3,14 173:1 |
| | 7:1,1 8:1 24:15 | 101:2,11,18 | 174:21 175:4 |

Veritext Legal Solutions

800.808.4958                                          770.343.9696

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025
O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

**[daniel - department]**                                    Page 15

175:24 176:5 177:1,5,12,21 178:12 179:3,7 179:10,14,19 182:13,23 187:20 188:7 190:8,18 191:12,17 192:3,16,20,22 192:25 193:4,9 193:12,16,18 194:6,8,16,23 195:5 196:11 199:5 200:19 200:23 201:2,5 201:10,16,25 202:3,8,10,16 202:24 203:5 203:21 207:1

**dashboard** 21:3

**data** 19:18,19 20:1,24 21:18 22:23 23:3,4,6 23:15 34:14 36:23,24 37:17 37:18,18,20 38:12 39:7,9 40:18,19 52:12 52:13 53:18 63:4 64:20,25 65:1,21 67:17 67:21 72:11 73:24 75:24

76:2,10,25 78:1,4 86:19 100:15 119:24 126:3 132:23 143:14,23 144:5,8

**date** 1:17 13:17 33:20 38:17 58:14 61:4 130:23 133:25 136:15 155:17 157:20,25 177:25 178:21 180:7 192:10 208:24 209:12

**dated** 134:23 150:19 190:3

**dates** 22:15 58:16 180:7

**day** 23:1 30:19 35:21 39:15 40:7,9,15 48:16,16 86:16 88:9 91:21,21 112:22,23 126:8 130:25 151:9 166:16 166:22,25 196:9 209:15

**days** 29:12 30:5 58:17 154:6 207:16

**dealing** 50:20

**death** 77:10

**december** 33:25 105:3,16

**decide** 108:18

**decision** 48:9 48:10 110:2,15 111:8 112:22 120:25 121:24 142:4 144:15 164:1 170:23 172:25

**decisions** 107:22 111:12 112:22 162:16

**declare** 209:4

**decline** 172:18

**deemed** 209:6

**default** 91:6

**defendant** 6:6 6:11,15 10:24 197:2,11

**defendants** 1:12 3:2 9:25 10:3

**defines** 120:23

**definitely** 52:13 52:19 138:23

**definitions** 68:6

**degrees** 14:2

**delegate** 121:6

**delegated** 120:24

**delivery** 203:11

**demographics** 65:5

**denote** 168:13

**deny** 182:6

**department** 5:3 19:19 20:2 21:8,23 22:5 22:11,16,20,24 34:11 35:24 37:25 38:7 39:3,5,10 40:17 44:19 48:12 51:2,4 56:8 63:6,10 65:1,2,16,21 66:4 67:17,22 68:6,17 71:4,6 71:12 72:12 73:11,24 74:25 77:1 85:1 86:7 86:21 87:9 88:11,15 89:1 90:9,15 113:16 113:20 114:6 114:14 118:1 118:10,11,19 120:3 124:16 124:21 125:10 126:4 129:18 130:5 131:17 132:15,25 150:9,20 151:12,14,15 152:7,9 156:10

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025
O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

**[department - disabled]**                                    Page 16

158:8 159:17
159:18,25
161:20
**depend**  172:16
172:20
**depending**  89:4
89:9 170:13
174:5,7
**depends**  145:19
145:20
**deponent**
207:13 209:3
**deposing**
207:13
**deposition**  1:14
4:10 8:13 9:6
9:17 10:22,24
11:19 15:16
16:3 17:12,18
17:19 33:9,10
58:18 59:10,11
76:23 100:20
193:8,10,24
203:25 205:1
**depositions**
33:19
**description**  4:8
5:2 6:2,22 7:2
**designated**
47:18
**designee**  77:4
**detail**  52:18
75:7,18 76:6

**determination**
111:16 144:24
173:10
**determine**  80:1
80:14 81:8,14
93:10 140:15
142:16 143:11
143:14,18
160:2,12,17
161:9,22 170:5
170:15 182:5
**determined**
51:8,9 71:3,4
103:16 110:12
117:17 124:4
**determines**
94:2 141:12
143:22 144:10
161:17 170:18
**determining**
26:13 93:24
117:18
**develop**  69:17
72:25 94:2
147:23
**developed**
146:25 184:3
**developing**
162:1
**development**
114:22 146:22
**develops**  146:6
**devised**  183:14

**diagnoses**
142:24
**diagnosis**  145:4
169:10,11,11
170:6,24
171:16 172:11
172:12,13
**differ**  24:24
**difference**
140:18 143:5
**different**  11:11
23:3,3 25:6,7
36:8 50:17
58:16 61:11,14
65:3 135:22
145:6 152:8
162:20 163:1
177:25 180:7
**differentiate**
63:17
**difficult**  122:22
**digital**  205:8
206:3
**digits**  129:16
158:4
**diploma**  13:21
**direct**  45:3
64:13,15
**directly**  117:10
**director**  10:5
14:21,24,25
45:20 49:9
70:9 81:5,7
102:4,6 147:21

150:3 171:14
174:10 183:17
183:18,25
184:1,4,5,7,9,9
184:11,13,17
184:19,21,22
184:23,24,25
185:5,5,7,10,11
185:13,13
**disabilities**
19:20 20:5,20
20:22 21:9
36:25 38:12
53:8,10,13
54:13,14 69:15
79:8,10,25
86:8 87:4,16
106:18 107:1
109:7 119:5
121:20 123:2
154:4
**disability**  13:14
26:12 29:4
65:15 70:15
94:5 107:4,9
107:12,21
110:4,11,22
119:20 141:19
141:24,25
168:19 170:24
170:25
**disabled**  20:1
21:13,23 22:6
22:6,13 24:25

Veritext Legal Solutions

Corp. Rep. 30(b)(6) Jessica N. Coleman                September 19, 2025
O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

**[disabled - district]**                                                    Page 17

25:18,19,21
26:17,19,25
27:2 32:13
39:11 49:3
51:19 52:14
53:21 55:6
58:1 67:23
73:7 83:13,21
84:14 85:2
86:6,19 90:6
94:9 103:19
106:10,12
107:17 108:3
108:18 109:11
110:16,18
111:2,9 112:25
115:5,21 116:2
116:5,10,18
117:24 119:7,8
120:4,7,12
121:9 122:2
131:12,16
132:15 146:23
163:1,14
192:14 194:4
194:15,22
195:4
**disadvantaged**
83:6,10,14
**disagree**   77:18
181:8
**disagreement**
146:24

**disagrees**
181:10
**disciplined**
63:24
**discovery**
57:19 136:3
175:25 179:19
198:25
**discrete**   52:18
76:7,9
**discretion**
108:2,17
109:24
**discretionary**
107:21
**discriminatory**
107:13
**discuss**   79:6
141:3 168:20
179:21 195:18
195:21 202:19
**discussed**   120:2
141:10
**discusses**   141:1
**discussing**
62:15
**discussion**
93:21 117:17
142:1
**discussions**
74:21
**distribute**
47:17

**district**   1:1,2,9
1:16 3:2 4:11
4:12,16 6:3,16
6:25 7:3 8:15
8:17 9:17
10:24 11:10,17
11:18 12:13
13:22 14:11,13
14:16 15:5,19
17:13 18:25
19:1,9,11,12,25
20:17 22:4,8
22:12,18,20
23:25 24:17,23
24:24 25:21,22
26:17,18,25
29:5,7,9 30:3,9
31:14,15,19,20
31:24,25 32:4
32:12 33:25
34:10,13,24
35:23 37:3
38:2,5,9 39:2
39:10,16 41:3
41:8 42:8
43:10,21 44:23
46:25 47:17
51:19 55:5,11
56:9,14 57:1,7
58:5 62:18
63:5 64:4,9,20
64:25 65:9,20
67:21 68:3,10
68:11,21 69:7

69:13,16,20
70:11,25 71:3
72:8,11,13
73:10 75:3,6
76:1,22,25
79:4,6,9,11,16
81:25 82:4,5
82:10,24 83:13
83:20 84:25
85:11,12,12,15
86:6,11,19,20
87:8 88:23
89:14 90:7
91:4,11,13,24
92:2,19,22
94:5,16,23
95:2 96:14,23
96:24 97:20
99:3,11,12
100:9 101:1,25
102:2,16,17
103:10,19,20
104:11 106:10
106:11 107:15
108:2,4,19
111:9 112:8,9
112:15,18
113:10,14,19
114:20 115:4
115:13,21
116:10 117:9
117:16,24
118:1,9,14,18
118:20 119:1,2

Corp. Rep. 30(b)(6) Jessica N. Coleman             September 19, 2025
O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

**[district - due]**                                                    Page 18

| | | | |
|---|---|---|---|
| 119:3,7,21 | 187:6 190:7 | 95:5 99:15 | 151:2 153:20 |
| 121:9,18,25 | 191:6,25 196:7 | 101:9 129:15 | 154:5 157:9,12 |
| 122:3 123:4,7 | 207:4 208:1 | 129:21 130:17 | 157:17 158:3 |
| 123:24 124:10 | 209:1 | 134:13 144:16 | 170:16 |
| 124:15 125:9 | **district's** 6:7,12 | 146:9,10 | **dogeared** 83:10 |
| 126:6 127:11 | 41:14 44:15 | 149:11,21 | **doing** 50:16 |
| 131:18 132:14 | 45:10 51:3 | 153:5 154:24 | 80:23 107:14 |
| 132:24 133:5 | 57:25 62:3 | 155:4 157:20 | 131:19 192:12 |
| 133:12 134:6 | 67:16 88:3 | 159:16 175:19 | **dollar** 90:4 |
| 134:22 137:9 | 92:13 93:13 | 176:3 178:11 | **dollars** 83:19 |
| 137:12 138:10 | 95:1 102:25 | 196:20,23 | **double** 31:4 |
| 139:10 141:6 | 118:7 120:4 | 197:10,14 | 99:14 100:7 |
| 141:16 142:22 | 136:1,8 137:18 | 198:19 199:11 | **doyle** 165:22 |
| 144:20 145:14 | 149:16 156:20 | 199:25 201:21 | 165:23 |
| 145:25 147:19 | 157:6 159:14 | 202:6 | **dr** 149:18 |
| 148:2,14,16,17 | 159:15 160:14 | **documentation** | 163:12 183:4,9 |
| 152:9 153:14 | 174:19 181:13 | 148:2 | 186:23 188:14 |
| 154:13 157:3 | 183:2 185:25 | **documented** | 189:18,23 |
| 158:11 159:4 | 190:14 197:2 | 62:13 | 191:10 192:1 |
| 159:23 160:7 | 197:11 | **documents** | 192:13 194:3 |
| 163:13 164:5 | **districts** 66:5 | 42:9 56:22 | 194:21 195:2 |
| 165:4,21,23 | 187:8 | 58:21 60:13,15 | **draft** 52:16 |
| 166:1,5 167:12 | **division** 1:3 | 60:20 62:3,8 | 77:16 |
| 168:4,13,14 | 79:21 | 97:19 101:19 | **drafting** 52:19 |
| 169:8 170:4 | **doctor** 169:9,19 | 101:21 176:16 | 150:4 |
| 172:10,25 | 169:20,22 | 178:3,24 | **drago** 24:9,11 |
| 173:7,14,19 | 170:2,20,22,23 | **doe** 20:12 | 24:16 25:19 |
| 174:16 176:10 | 173:7 | 21:18,21 22:23 | **drive** 142:3 |
| 180:20,23,24 | **document** | 37:19,19 39:23 | **due** 15:21 |
| 180:25 181:6 | 10:23 18:2,6 | 53:9,13 55:24 | 16:16,21 17:8 |
| 181:11 182:4 | 41:11 56:12 | 87:4 124:25 | 105:24 107:8 |
| 183:8,9,15 | 60:2 61:10 | 132:21 142:20 | 173:15,21,22 |
| 184:21 185:22 | 62:14,20 66:5 | 147:17,18 | 174:7,20 |
| 186:8,19 187:1 | 66:7 75:17 | 148:3 150:4,12 | 192:14 194:5 |

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025
O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

**[due - electronic]**                                                      Page 19

194:15,17,22
**duke**  3:13 8:10
  9:11
**duly**  10:12
  205:5
**duplicate**  60:14
**duties**  121:6

**e**

**e**  2:1,1,5 3:1,1
  4:1,7 5:1 6:1
  6:21,21,21,21
  7:1,1,1,1 8:1,1
  24:12,12 138:2
  208:3,3,3
**earlier**  32:2
  64:18 122:23
  148:9
**early**  174:4
**earmarked**
  84:16
**ease**  61:14
  107:23 108:4
  108:19 109:11
**easier**  33:5
**eastern**  8:4
**ecf29**  11:1
**ed**  10:5 14:23
  38:24,25 39:25
  45:13 48:21
  49:8 53:20,22
  63:21,23 80:20
  80:20,25 85:20
  86:16,23

104:21 170:14
170:14 174:10
183:25 184:1,8
185:6
**edited**  149:22
**edition**  190:24
**education**  4:13
  4:18,21,24 5:3
  5:4 13:24
  14:20,24 15:1
  15:21 16:16
  17:22 19:19
  20:3 21:8,23
  22:5,11,16,21
  22:25 24:19,22
  25:20,25 26:6
  27:24,25 28:1
  29:1,2 34:11
  35:25 38:1,8
  38:19,20 39:3
  39:5,11 40:18
  41:24 44:8,20
  47:1,18 48:11
  49:2 51:2,5
  55:23 56:8
  63:6,11,25
  65:1,2,17,22
  66:5 67:17,22
  68:7,17 71:4,7
  71:13 72:12,14
  73:8,11,25
  74:25 77:1
  79:15,18,24
  80:7,8 81:6,19

84:16 85:1,7
85:18 86:8,14
86:21 87:5,9
88:11,15 89:1
90:10,15 94:1
94:6 102:4
103:17 104:4
112:19 113:16
113:20 114:6
114:14 116:24
118:1,10,11,19
120:3,21,25
123:21 124:16
124:21 125:10
126:5 127:9
129:3,8,19
130:5 131:17
132:15,25
140:24 142:17
144:7 148:15
150:10,20
151:13,14,15
152:7,10
156:10 158:8
159:17,19,25
161:20 163:25
181:21,23
183:17,18
184:1,20,23,24
185:8
**educational**
  6:17 13:19,25
  14:1,18 70:2
  91:5 92:15

94:8 162:9
167:11,21,23
181:4,5 186:24
187:2
**educator**  14:9
  108:2 109:23
  189:10
**educators**
  107:25 108:17
  109:10 169:10
**effect**  96:3 99:4
  99:18 100:3
  101:4,8 102:11
  127:18 129:9
  129:23 134:7
  137:1
**effective**  140:2
**effectuate**
  66:14 103:21
  104:12,18
  111:10
**efforts**  54:3
**eight**  79:5
**eip**  85:21,23
  86:3
**either**  21:4,12
  26:1 56:22
  69:22 107:5
  130:21 140:23
  147:20 153:11
  161:25 169:3
  177:16 178:7
**electronic**
  203:16,17,22

Corp. Rep. 30(b)(6) Jessica N. Coleman        September 19, 2025
O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

**[elementary - evaluator]**                                            Page 20

| | | | |
|---|---|---|---|
| **elementary** 148:21 | 69:12,15,19,21 69:23 70:1,6,7 | **errata** 207:11 207:13,16 | **evaluation** 5:22 6:17 50:10 |
| **eligibility** 44:19 44:25 45:3,4,7 | 70:10,12 71:17 71:20 72:2,3,7 | **error** 105:11 **es** 205:4 | 67:6,11,14,18 72:15,21,23,24 |
| 63:16,17 65:18 93:11 140:14 | 91:12 92:4,11 92:12,14,18 | **esp** 162:1,1,7 164:5 165:1 | 73:9 91:7,16 91:17,17,19,19 |
| 140:16,21 141:22 142:4 | 104:22,24 112:7 117:8,9 | 167:20 168:18 169:3 | 92:3,10 104:19 104:21 110:9,9 |
| 142:10,19,23 143:11,16,18 | 118:12,12,22 118:24,24 | **esquire** 2:3,4 2:13 3:4,5 | 111:20 116:3,6 116:7,19,23 |
| 143:24,25 144:12,14,16 | 119:2,25 132:16 155:23 | **essentially** 80:24 | 117:3,8,10,18 140:8,11,14,15 |
| 144:18,21 154:9 170:16 | **enrolling** 27:15 32:6 116:7,22 | **establish** 79:9 **estetes** 149:19 | 140:20,23,24 141:5,7,9,11,18 |
| **eligible** 21:21 45:18 93:15,21 | **enrollment** 19:21 22:11,19 | 195:3,7 **et** 207:4 208:1 | 142:5,8,12,14 143:10 145:22 |
| 110:12 143:8 143:12 144:1 | 23:5 26:3,9 30:20 37:1 | 209:1 **eugene** 2:13 | 146:1,2,17 181:5,8,8,11,13 |
| **elizabeth** 206:2 206:24 | 38:10 67:5,6 67:12,13,17 | 9:19 **eugene.choi** | 182:4,6,17 184:12,25 |
| **email** 147:24 148:4 173:24 | 109:19 **ensure** 24:19 | 2:17 **eval** 112:16 | 186:13,25 187:3,13,15,16 |
| **employed** 205:11,14 | 50:17 159:16 174:9 | 121:10,21 **evals** 69:18 | 189:17,19 190:6 191:4 |
| 206:8,11 **employee** | **entire** 82:5 95:4 191:13 | 188:23 **evaluate** 49:23 | **evaluations** 18:16 47:8 |
| 205:13 206:10 **employer** 14:10 | **environment** 5:4 38:23 | **evaluated** 20:16 71:18 | 50:16,18 104:4 142:24 143:3 |
| **enroll** 72:25 **enrolled** 25:14 | 39:22,24 94:8 130:15 | 91:8 110:12,23 112:19 116:23 | 143:19 145:2 145:10,13,15 |
| 26:2,10,14 30:9 53:8,16 | **eps** 14:19 **equal** 94:8 | 141:19 190:25 **evaluating** | 181:4 183:24 188:15 189:24 |
| 53:21,24 67:10 68:3,5 69:5,6,7 | **equitable** 47:11 70:16,17 | 49:21 69:9 72:22 91:15 | **evaluator** 141:12 146:5 |

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025
O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

**[evaluator - extent]**                                                  Page 21

185:23,24
186:10,20
**evaluators** 6:19
186:5 187:25
188:13 189:9
189:11,14,22
192:1 196:1
**evasive** 12:17
**everybody** 8:3
113:8 132:3
**evidence**
103:24 106:14
106:15 108:7
115:24 122:6
146:21 167:16
176:13 189:21
190:5
**evidentiary** 9:5
**exact** 59:23
82:19,23
**exactly** 200:25
**examination**
4:2 10:18,25
196:10 199:9
**examined**
10:14
**example** 25:8
26:7,10 65:6
80:6 89:22
118:22
**examples** 25:10
**exceed** 49:17
82:20 87:20
175:25

**exceeding** 36:2
36:19 86:25
113:23 132:18
147:14 164:10
167:14 177:6
177:22 187:21
190:19
**exceeds** 37:13
42:13,23 43:15
43:23 45:15
47:3,21 48:14
49:5 51:14
52:8 57:4,18
65:23 66:15
67:1,25 68:13
70:3 71:9
72:17 74:3,11
82:17 83:23
89:19 90:22
105:7,20 114:8
114:16 115:6
121:2 122:6
151:17 153:3
166:9 171:18
175:5 182:13
182:23 192:16
**exceptionality**
86:13
**excuse** 27:16
30:16 112:9
171:14
**executive** 10:5
14:25 70:9
171:13 184:7,9

185:13
**exhaustive**
66:10
**exhibit** 4:10,12
4:14,14,15,16
4:18,21 5:3,6,7
5:8,10,12,14,16
5:18,20,22,25
6:3,6,10,11,15
6:17,19 18:1,3
18:8 19:2,13
33:8,18,19,20
41:1,4,24 42:3
42:7 59:2,10
59:17 60:4,4
60:16 61:1,14
61:19 62:11
94:11,15,18,19
96:6 127:3,6
128:23 129:1
130:2 131:21
131:23 132:5,7
132:13 133:4,7
134:10,11
136:9,10,21,23
146:12,15
149:4,12
153:19 154:23
155:1,19 157:2
163:10 175:16
176:17,17
177:19 182:8
182:10 183:8
186:22 189:22

190:1 196:17
197:6,15
198:17
**exhibits** 33:8
46:14 135:24
135:25 196:14
**existing** 143:14
**exists** 99:15
**expect** 77:24
**expected** 30:20
**expelled** 64:11
**expend** 47:13
**expended** 48:8
85:2
**expending**
48:17
**expenditure**
47:1 49:1
50:21 51:12
**expenditures**
79:10 81:11
**expends** 88:24
**explain** 28:18
37:23 39:20
52:3,25 67:9
87:12 98:12
137:12 140:8
140:17 141:7
179:15 186:3
193:23
**extensions**
159:11
**extent** 36:5
42:14 75:12

Veritext Legal Solutions
800.808.4958                                              770.343.9696

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025
O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

**[extra - former]**                                                    Page 22

**extra** 51:20
  60:1

**f**

**facilities** 65:13
**fact** 110:17
  121:18 123:17
**factors** 27:23
  28:25
**facts** 106:15
  108:7 167:15
**failed** 76:22
**failing** 77:23
**fails** 207:18
**failure** 12:19
**fall** 109:20
**falsely** 114:13
**familiar** 66:11
  68:25 168:3
**families** 55:1
  55:13 107:24
  107:25
**family** 92:6
  107:18 108:4
  108:19 109:12
**family's** 72:14
  73:8
**faq** 161:5,6
**far** 105:19
  128:4 151:17
  166:9 177:12
  187:21 192:16
  192:23

**fault** 77:7
**feasible** 59:15
**federal** 12:13
  82:1,14 83:3
  85:25
**fee** 186:16
**feedback** 96:25
  97:14 98:14
  127:20 150:5
  152:15,17
**feel** 179:25
**field** 145:11
**fifth** 157:2
**file** 62:14
**filed** 10:22
  147:9,25
  149:18,19
**files** 4:14 147:1
**filling** 124:2
**final** 37:25
**finalized** 150:6
**financial** 19:22
  37:2 41:3,14
  46:23 49:12
  52:12,14 79:7
  83:19
**financially**
  205:15 206:11
**find** 22:3 34:9
  51:10 55:20
  56:14,25 57:24
  58:3 62:21
  96:23 97:3
  99:22 101:18

119:4 159:1
**finding** 93:14
**finds** 93:14
**fine** 59:14
  76:12 77:19
  101:3 177:7
  191:18
**fined** 138:21
**finish** 72:24
  186:2 193:2,4
  193:4,7
**first** 6:8,14
  10:12 30:4,19
  35:14 42:6
  46:19 59:21
  60:12,15,20,21
  81:3 106:12
  121:11 150:24
  155:19 168:24
  175:21 197:4
  197:13 198:17
  200:4 201:8,13
**fiscal** 15:5
  20:23
**fit** 67:4
**five** 15:8,11
  16:25 18:8
  87:14 137:25
  155:19 157:2
  164:4,7 166:6
  181:2 197:18
**fl** 2:16
**flip** 197:17,23
  198:2,7,17,18

**flipping** 27:6
**flow** 23:1,11
  81:25 82:11,13
  82:15,17 83:3
  83:16,18 84:1
  84:4 85:9
**flowing** 22:23
  23:15
**follow** 90:12
  109:25 196:12
**following** 80:8
  100:6 148:1
**follows** 10:14
**ford** 148:23
**foregoing**
  205:3,4 206:4
  209:5
**forget** 135:18
**form** 25:1
  66:24 117:5
  123:19 124:6
  133:10 138:18
  141:7,18
  155:16 157:4
  160:13,14
  163:17 168:16
  171:1
**formal** 109:18
  142:14 144:19
  149:17 199:14
**format** 98:3
  130:8 203:22
**former** 189:10

Corp. Rep. 30(b)(6) Jessica N. Coleman　　September 19, 2025
O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

**[forms - give]**　　　　　　　　　　　　　　　　　　　　　　Page 23

**forms** 133:9 138:12
**forth** 11:18 58:19 186:25
**forum** 11:12
**forward** 93:16 129:10,24 193:14
**found** 93:20 96:24 143:8
**four** 29:18,24 30:1,22 31:15 31:21 32:1,5 32:14 58:17 111:5 112:1,12 138:2 158:4
**fourth** 30:15,18
**free** 59:2
**frequently** 161:6
**friday** 1:17 8:4 8:18
**front** 59:20 156:7
**fte** 5:4 20:9 21:25 23:7,10 37:24 39:14 53:11 75:15 81:20 85:19 86:1,10 119:21 126:8 129:19 130:6 131:3,9 131:10,16

**fte1** 20:6 130:19
**full** 11:12 18:5 34:5
**functional** 20:22
**funded** 85:11 85:11
**funding** 53:14 79:14 81:16 83:2,5,8,9,16 83:16,18 85:19 85:22 86:6,22 87:8,18 88:12 88:14 90:6 119:22 125:20
**funds** 47:1,5 48:8 49:2 50:21 51:12 85:6,23 87:4 87:22
**further** 196:6 199:5 205:12 206:9
**fy** 41:24,25 42:3,11,21
**fy2020** 4:12

**g**

**g** 8:1 24:15
**ga** 1:21 2:7 3:8 5:23
**gaa** 21:12,21

**gain** 54:4 147:21
**gather** 93:10 148:1 174:2,6
**gathered** 114:11
**gathering** 174:2
**gen** 38:24,25 39:25
**general** 43:17 75:17 80:6,7 80:19 85:11,17 85:20 86:16 87:5 88:1 107:9 109:7 156:16 165:9 194:10
**generally** 45:8 100:8,16
**george** 102:6
**georgia** 1:2 5:3 8:20,22 19:19 20:2 21:7,22 22:5,10,15,20 22:24 34:11 35:24 37:25 38:7 39:3,5,10 40:17 44:19 51:2,4 55:24 56:8 63:3,6,10 64:25 65:2,16 65:21 66:4 67:17,22 68:6

68:17 71:4,6 71:12 72:12 73:11,24 74:25 77:1 81:22 85:1 86:7,20 87:4,9 88:11 88:14 89:1 90:9,14 113:20 114:5,14 118:1 118:9,11,18 120:3 124:16 124:20 125:10 126:4 129:18 130:5 131:17 132:14,21,25 138:25 142:20 150:9,12,19 151:12,14,15 152:7,9 153:20 154:5 156:10 157:9,11,17 158:8 159:17 159:18,24 161:20 170:16 205:23
**getting** 89:10 133:20
**gifted** 85:20
**give** 17:8 19:4 28:4 31:7 64:22 65:5,6,8 65:14 132:2 147:23 152:17 173:6 191:18

Veritext Legal Solutions
800.808.4958　　　　　　　　　　　　　　　　　　　　　770.343.9696

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025
O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

**[given - happening]**                                          Page 24

**given** 15:16 16:3 17:16 97:14 145:16 163:12 209:9

**gives** 31:11 53:13 63:2 65:3,18 66:5 68:18 82:6 124:24 139:6 139:18

**giving** 101:3 138:14 178:6 201:19

**glad** 78:18

**gnets** 15:4

**go** 8:9 15:14 16:22,25 18:11 21:1 23:19 28:17 34:9,22 40:8 52:25 56:11 60:7,21 62:14 63:4 64:12 74:15 78:19 80:17 89:20 93:8 95:15 97:12 98:25 104:16 108:21 122:21 122:23 126:11 138:11,23 146:9 153:6,16 156:23 157:10 159:2 163:19 177:8 179:14 180:19 189:12 191:19 202:18

**goes** 34:16,18 35:14 48:24 49:10 50:25 52:21 74:14 76:18 81:6 124:25 129:15 143:7 146:1 150:25 158:6 171:25 173:23 182:1

**going** 8:3 17:2 21:2 23:3,5 33:7 34:14,19 36:1,18,21 37:19 57:17 59:10 60:14 72:16 74:1,2 74:10 75:4,10 76:21 78:10 80:17 81:9 86:24 87:14 94:11 96:13 97:13 101:20 103:22 104:15 105:6,18 106:13,20 108:5,21 109:13 110:5 110:19 111:13 113:22 122:4 122:18 128:1 132:2,17 133:17 134:17 134:18 135:19 138:17 143:6 144:17 147:13 149:24 150:21 151:16 153:16 158:2,19 159:7 160:19 161:3 162:23 164:9 165:9,15 169:12 174:21 174:22 175:24 176:14 177:1 180:21 182:5 183:25 187:20 190:8,18 191:12 192:23 200:19 202:3,4

**good** 8:2,11 9:15 191:16

**government** 82:1,14 83:3

**graduate** 21:5

**graduates** 38:11

**graduation** 38:13

**grant** 53:14 87:15,16,18,19 87:20 88:5,13 88:20 89:6,15 90:6

**grants** 87:8,13 88:4

**granular** 52:18 75:7,18 76:6

**gray** 192:25

**great** 78:16

**greenberg** 11:3

**gregory** 165:22 165:23

**grounds** 25:20

**group** 79:22

**grove** 2:6

**guess** 47:18 70:6 90:3

**guidance** 4:18 4:21 55:23 112:19 127:8 127:12 128:14 129:3,8 145:23 146:7

**guidelines** 58:5

**guys** 58:11

**h**

**h** 4:7 5:1 6:1 208:3

**half** 78:11 88:8

**halfway** 197:24

**hand** 10:9 50:6

**hand's** 32:23

**handed** 95:6

**handing** 46:14

**handles** 123:15 123:22 184:8

**happening** 23:7 172:21

Corp. Rep. 30(b)(6) Jessica N. Coleman    September 19, 2025
O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

**[happens - idea]**    Page 25

**happens**
117:12,15
147:2,3,8
**happy**  59:25
99:20
**hatcher**  165:14
165:17,18,20
166:4,13
**head**  13:4
156:9
**health**  157:5
169:11 170:8
170:24 171:9
172:12,19
**heard**  166:4
**hearing**  10:7
173:15,21,22
174:7,20
194:22
**hearings**  16:17
16:21 17:9
192:15 194:5
194:15
**held**  54:6
**help**  107:25
155:7
**hereto**  205:14
206:11 209:7
**hhb**  6:4 153:14
156:16 162:4
162:16 170:14
**high**  13:21
80:10,10 87:19
88:5 89:5,9,10

89:15 148:20
148:21
**higher**  87:5
**highlighted**
33:1,4
**hmm**  12:5
15:24 84:2
**hold**  160:19
**home**  4:19,19
4:22,22 6:4
19:22 28:24
29:8,10,23
37:1 39:12,13
39:17,17 40:2
40:3,4,16,16
92:8 98:6,9,14
115:5 123:8,10
123:11,13,14
123:18 124:5,6
124:17,23,23
125:6,11,12
126:3,3,11,11
127:9,9 128:14
128:22 129:4,4
129:8,23
130:22,22
131:7,7,11,12
153:13,14,16
154:3,7,15
155:5,24
156:13,20
157:6,18 158:9
159:18 160:5
161:22 162:11

162:12,17,21
163:2,11,14,15
164:7,18,22
166:6 167:13
168:5,15 169:8
170:7 171:14
**homeschool**
22:3 30:10
53:9,25 66:8
69:23 70:14
117:13
**homeschooled**
47:11
**hopelessly**  77:5
**hospital**  4:19
4:22 6:4 19:22
28:23 29:8,9
29:23 37:1
39:12,17 40:3
40:15 98:5,9
98:14 115:5
123:11 124:5
124:23 125:11
126:3,11 127:9
128:22 129:4,8
129:23 130:21
131:7,12
153:12,14,16
154:3,7,15
155:5,24
156:12,20
157:6,18 158:8
159:18 160:5
161:22 162:11

162:12,17,21
163:2,11,14,15
164:7,18,22
166:6 167:13
168:5,15 169:8
170:6 171:14
**hour**  78:11
188:4
**hours**  124:4
125:6 154:14
155:22 156:11
160:3,5,9,15,17
161:8,22
163:15 164:7,7
164:19,23
166:6,7 167:12
168:13
**huh**  13:4,4
**hypothetical**
110:6,20
111:14 114:17
121:13

**i**

**idea**  18:17
44:22,22 45:21
55:25 58:6
62:18 70:1
82:15,17 83:15
84:1,4 92:17
113:15,15
114:4 140:9,12
145:2,13
168:19 186:8

Veritext Legal Solutions
800.808.4958                                    770.343.9696

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025
O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

**[identification - individually]**                                Page 26

| | | | |
|---|---|---|---|
| **identification** 18:4 41:5 60:17 61:20 94:20 127:7 129:2 132:8 133:8 134:12 136:11,24 146:16 149:13 155:2 175:17 176:18 177:20 182:11 190:2 | 130:22 131:11 146:22,25 160:2,17 161:16,20,25 162:19,20,22 163:25 164:5 167:19 168:20 169:3 173:15 173:17,20 174:20 | **incarcerated** 20:21 26:11,15 **incidence** 80:11 **incidents** 80:10 **include** 40:4 80:19 83:13 85:8,9 **included** 85:17 **includes** 39:11 62:7 125:12 142:14 | **indicate** 125:6 126:5 144:7 167:11 **indicated** 136:15 164:25 192:6,11 **indicates** 63:14 80:7 107:3 118:12 125:16 130:17 131:2 131:10 138:3 |
| **identified** 82:11 90:9 111:16 148:19 148:20 | **ieps** 20:18 146:22 164:19 173:13 **ignores** 122:6 **immediately** 123:19 | **including** 19:18 36:24,24,25 64:16 75:24 174:4 **incomplete** 12:18 | **indicating** 29:19 44:18 165:1 **indication** 46:8 **indicator** 20:25 |
| **identifies** 79:14 79:23 | **impact** 13:14 142:17,18 | **inconsistently** 145:11 | 38:19,21 39:7 39:21 40:18,22 |
| **identify** 9:13 80:8,16,24 127:4 134:10 136:22 175:15 | **impairment** 93:5 **implement** 58:5 136:7 | **incorrect** 152:20,21 **independent** 6:17,19 181:3 | 63:13 125:17 125:24,25 126:2,4,15 131:16 |
| **iee** 183:3,10 184:8 185:22 189:15 | **implementati...** 114:23 157:14 157:17 159:21 | 181:4,7,12,17 182:6,17 183:24 184:11 184:24 185:23 | **indicators** 20:12 21:2 130:12 |
| **iees** 193:22 | **implements** 137:9 138:9 | 185:24 186:5 186:10,12,24 | **indirect** 54:8 54:10,11,24 |
| **iep** 25:9 27:1 40:5 71:15,22 72:25 80:7 81:15 87:17 92:3 114:20,22 114:23 117:17 123:8,19,19,19 124:3,17 125:1 125:3,5,8,12 | **important** 13:2 177:4 **imprisoned** 138:22 **inaccurately** 180:17 | 187:2 188:15 189:22,23 192:1 **index** 60:22,23 61:6 | **individual** 26:7 45:4 55:3 76:24 107:23 125:8 **individually** 117:21 171:21 |

Veritext Legal Solutions

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025
O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

**[inform - it'll]**                                                    Page 27

**inform** 121:18
141:16 154:13
169:10
**informal**
141:14 142:14
**information**
11:16 17:24
18:13,25 19:10
20:13 22:19,22
22:24 23:10,19
23:20,22 31:12
34:15,21,25
35:2,8,14,25
36:15 37:21
38:6,10,11
39:2 43:17
54:1,4 55:12
55:14,21 56:9
57:22 63:9,10
66:6 67:13
71:2 72:20
75:17,20 76:2
76:24 77:4
79:18 93:10,12
96:19 100:13
100:17 124:15
124:20 127:23
131:16 132:13
137:19 139:19
142:5,15,24
143:3,11,22
144:9 147:21
152:20,22
160:8 168:1,7

169:17,24
170:3 173:23
174:2 189:8
195:22,23,25
200:24 202:5
202:11
**information's**
122:16
**informed** 42:10
123:4,7
**informing**
106:12 121:11
**initial** 18:16
20:15 142:12
182:2
**initiated**
147:18 174:8
**initiation**
147:19
**injury** 172:20
**input** 143:2
**inputs** 34:10
35:9
**inputted** 35:15
35:16,23
**inquiry** 113:23
**insinuation**
122:19
**insisting** 76:6
**instructed** 11:9
**instruction**
29:8 154:14
155:23 156:12
160:5,15

**instructional**
28:23 29:7,20
110:25 160:3
160:18
**intellectual**
54:14
**intend** 178:25
**intended** 9:3
**intent** 91:6
94:7 110:8,22
165:11
**intentionally**
178:13
**interested**
205:15 206:12
**interesting**
196:5
**interpretation**
75:9
**interpreted**
161:8
**interrelated**
80:11
**interrogatories**
6:9,14 197:4
197:13 200:4,6
201:13
**interrogatory**
179:20 180:22
197:18 198:4
198:18,22,24
199:21 201:9
**interrupt** 78:10

**interruptions**
180:3
**interventions**
141:3
**introduce**
102:23 134:17
136:18 180:21
**introduced**
62:10,11
128:20 131:15
134:4 163:9
**investigator's**
148:4
**involved** 16:20
51:12 102:1
121:23 145:15
145:20 149:21
160:1 162:13
174:16 176:3
184:11 185:12
185:17 195:3
**involvement**
150:8
**involves** 113:15
**involving** 15:20
15:21 18:14
52:11,14 58:1
58:6 62:3
63:11 132:15
157:17 193:22
**issue** 200:1,2
201:6
**it'll** 53:1 60:11

Corp. Rep. 30(b)(6) Jessica N. Coleman September 19, 2025
O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

**[item - leadership]**                                    Page 28

| | | | |
|---|---|---|---|
| **item**  196:25 | **john**  88:7,8 | **knew**  152:21 | 201:7 |
| **items**  55:2 | **judge**  11:3 | 201:17 | **knowledge** |
| 62:12 81:14 | 166:5 | **know**  12:20,25 | 17:13 45:6 |
| **j** | **july**  127:20 | 13:3,3 16:19 | 55:18 74:6,8 |
| **january**  177:24 | 128:17,18 | 18:5,12 23:22 | 74:24 75:1 |
| 178:16 | 134:14 137:2,6 | 23:23 24:5 | 103:18 105:4 |
| **jb**  133:10,10 | 140:2 | 34:17,19 36:6 | 105:22 114:11 |
| **jb5**  133:10 | **june**  20:10 | 36:11,13 42:16 | 115:20 139:8 |
| **jbc**  5:8,10,12 | 63:13 178:18 | 42:17,18 43:4 | 151:4 164:14 |
| 5:14,16,18 | **justin**  2:4,9 | 43:5,17 45:24 | 172:4 176:11 |
| 27:10 31:2,8,8 | 9:21 | 46:5,25 52:9 | 205:9 206:6 |
| 108:25 134:22 | **k** | 52:11 56:23,24 | **known**  11:16 |
| 136:1,6 | **k**  84:9 91:17 | 56:24 57:2,12 | **knows**  76:10,10 |
| **jcda**  5:20 | 103:11 | 64:21 66:19,23 | **l** |
| **jcdar**  140:2 | **keep**  26:9 46:17 | 68:21 70:10 | **lagging**  39:7 |
| **jdcar**  137:8 | 52:9 120:11 | 71:6 72:10 | 40:19 |
| **jean**  149:19 | **keeping**  11:6 | 73:4 95:5,10 | **laid**  139:17 |
| 195:3,7 | 165:11 | 96:9,16 97:15 | **language**  44:1 |
| **jeff**  10:2 52:9 | **keeps**  36:17 | 98:18 100:5,13 | 44:4,10,11,13 |
| **jeffdaniel**  3:9 | 124:8 | 100:18 101:12 | 54:8,22,23 |
| 207:2 | **kelli**  150:2,12 | 122:9,11,14 | 86:15 190:11 |
| **jeffrey**  3:4 | **kennesaw**  14:4 | 128:13 139:2 | **languages** |
| 207:1 | 14:6 | 145:1,3 155:12 | 145:6 |
| **jessica**  1:11,14 | **kids**  119:22 | 159:9 164:15 | **large**  82:20 |
| 3:3 8:14,18 | **kim**  192:1,5,5 | 165:14,17 | **lastly**  175:13 |
| 9:25 10:4,11 | 192:10 | 167:6,10,23 | 203:3 |
| 11:14 207:5 | **kind**  46:17 | 171:12 174:1 | **law**  2:14 44:22 |
| 208:2,24 209:2 | 80:21 124:12 | 175:22 180:8 | 201:8 |
| 209:4,12 | 127:17 | 184:8 188:5 | **laws**  9:5 |
| **job**  1:23 107:24 | **kittrell**  3:5 9:24 | 189:16 190:3 | **leadership** |
| 146:7 174:25 | 9:24 97:22 | 191:21 192:9 | 13:25 14:1 |
| 175:1 | 98:3,19,22 | 193:13 194:9 | 148:16 |
| | 135:14,17,21 | 194:14,21 | |
| | | 195:6,8 196:4 | |

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025
O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

**[leading - ma'am]**                                                    Page 29

| | | | |
|---|---|---|---|
| **leading** 202:15 | **list** 66:10 | 118:24 144:6 | 60:2 62:20 |
| **learn** 30:8 | 144:20,22 | 188:24 189:14 | 80:13 87:24 |
| **learning** 54:13 | 185:25 186:6 | 189:15 192:6 | 96:17 97:16 |
| 79:20 | 186:11,12 | 192:11,12 | 98:9 99:8,9 |
| **leave** 21:4 | 188:13,15 | **look** 17:25 34:3 | 108:24 112:6 |
| **left** 61:5 155:7 | 189:3 190:13 | 42:2 61:7 81:2 | 159:1 165:10 |
| **legal** 16:15 | 191:6,9,11,21 | 82:8 89:8,10 | 168:8 171:5,6 |
| 102:8 207:23 | 192:2 194:12 | 94:11 99:3,6 | 200:9 |
| **letter** 5:25 6:18 | 194:19 195:2 | 99:12 101:2 | **looks** 79:23,24 |
| 65:18 147:19 | **listed** 18:8 19:2 | 128:1,23 130:1 | 142:15,16 |
| 152:25 186:23 | 19:13 46:24 | 130:11 133:3 | 146:18 |
| 188:5 | 101:8 179:19 | 133:19 138:1 | **loosely** 69:4 |
| **letters** 150:18 | 189:19 197:14 | 142:6 144:5 | 75:14 |
| **level** 76:6 82:10 | **litigation** 59:20 | 146:11 147:20 | **lot** 56:22 92:23 |
| 139:16,22 | **little** 195:23 | 151:23 153:6 | 122:23 166:6 |
| 148:12,14 | 197:24 | 154:22 155:6 | 172:7 180:10 |
| **license** 54:18 | **lives** 123:15 | 155:18 156:14 | 180:14 |
| **licenses** 54:12 | **llc** 3:13 | 157:1,10 | **lots** 65:3 |
| 54:25 | **llp** 1:19 | 158:21 165:3 | **low** 187:15 |
| **licensing** 54:16 | **local** 70:2 | 167:22 175:14 | **lre** 20:24 115:9 |
| 54:20,22 | 160:1,16 | 176:12,14 | 125:17,24,25 |
| **lies** 77:7 | **located** 80:16 | 177:2 182:4,7 | 126:2,4,14 |
| **life** 93:5 188:21 | 117:19 | 186:22 196:16 | 130:12 |
| **likely** 162:20 | **location** 1:19 | 197:8 198:16 | **lyon** 149:18 |
| 162:25 | **log** 124:8,10 | 198:18 199:2 | 163:12 182:16 |
| **limit** 157:6 | **logged** 105:25 | **looked** 57:7,9 | 183:4,9 186:23 |
| **limits** 93:5 | **long** 14:12 | 75:16 128:3 | 189:23 |
| **line** 36:2 52:21 | 18:20 63:24 | 158:24 168:7 | **m** |
| 113:23 174:22 | 75:18 108:1 | 187:7 199:20 | **m** 6:21 7:1 |
| 190:19 191:13 | 115:20 118:6 | **looking** 32:20 | 24:12 |
| 208:4,7,10,13 | 166:13 191:21 | 33:15 34:6 | **ma'am** 10:9 |
| 208:16,19 | 196:9 201:20 | 38:22,23 39:14 | 128:20 130:10 |
| **link** 124:2 | **longer** 23:18 | 39:21,24 56:12 | |
| | 26:15 30:12 | 57:14 58:3,9 | |

Veritext Legal Solutions

**[made - means]**                                                                 Page 30

**made** 11:2,7 48:9,10 76:20 107:22 110:2 110:15 121:24 144:15,24 153:19,23 209:5

**maintain** 38:6 124:10

**maintained** 37:18 96:16 97:4

**maintaining** 38:3

**maintains** 36:17 38:9

**majority** 82:3 164:4,6

**make** 11:7 17:23 18:11 25:13 26:1 34:5 41:8 52:4 54:3,3 59:2,16 59:17 60:3 61:11,13,16 70:22 75:6,15 76:21 77:13,21 93:7 94:14 96:18 102:12 102:23 103:8 111:16 112:21 120:25 131:21 131:23 133:24 135:17 145:25

146:4 147:24 151:21 152:5 173:10,25 174:11 196:12 199:18,19 200:13

**makes** 111:8,11 127:25 170:23 172:25

**makeup** 51:20

**making** 52:10 138:20 162:16 163:25

**manner** 9:6

**manual** 4:17,24 6:25 55:21,22 56:2,4,17,21,25 94:24 95:1,3 96:23,24 97:11 98:6 99:3,12 99:17 100:2,3 100:9 101:1,25 102:2,2,11,13 102:17,21,25 129:6,23 146:18 153:24 157:14,17 158:3,8 159:21

**manuals** 7:3 101:3

**march** 20:9 86:11 150:19

**marked** 18:1,3 33:8,20 40:25

41:4 60:16 61:19 94:18,19 98:19 127:3,6 127:17 128:2,4 128:5,14,21,23 129:1 132:7 133:7 134:10 134:11 136:10 136:21,23 146:15 149:4 149:12 154:23 155:1 175:16 176:18 177:15 177:19 182:10 190:1 196:17

**market** 187:7 187:25

**marking** 135:3

**markups** 127:14

**marygrace** 3:5 9:24

**marygracekit...** 3:10

**masks** 50:2

**master's** 13:24 14:5

**match** 95:17

**materials** 54:25

**matter** 8:15 10:1,21 11:18 15:22 16:6 152:16

**matters** 52:18 166:2 192:14

**maureen** 24:9 24:11 25:18

**max** 190:22

**maximum** 157:7 186:16 187:1

**mean** 28:5 30:15,16 36:16 41:25 44:3,22 59:1,8,9 66:22 70:17,24 75:10 76:13 78:10 85:24 89:16 95:4 99:19,22 100:19 101:2,3 101:11,12,18 106:24 136:13 137:17 142:11 149:7 151:19 153:23 158:3 162:11 167:5 167:25 176:5 176:11 185:4 193:17 194:9 200:5

**meaning** 52:21 102:2

**means** 9:7 12:1 53:1 64:10 92:13 130:14 139:22 141:8 145:3 155:15

Corp. Rep. 30(b)(6) Jessica N. Coleman　　September 19, 2025
O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

**[means - multiple]**　　　　　　　　　　　　　　Page 31

162:7
**meant** 42:24
　85:13
**measures** 93:24
**media** 78:25
　126:23 195:13
**medicaid** 43:21
　45:11,21
**medical** 169:11
　169:19,20,22
　170:2,5,7,19,22
　170:23,25
　171:15 172:11
　172:12
**medications**
　13:8
**meet** 55:1
　88:18 111:5
　112:1,4 142:6
　160:3,18
　161:23 163:5
　186:7,15,20
　190:14,16,17
　190:21,23
　191:2
**meeting** 41:16
　54:6 140:9,11
　140:14,20,21
　140:21 141:10
　142:8,10,23
　143:7,13,17,18
　143:18 144:12
　144:14 162:6

**meets** 110:25
　143:13,23
　154:8 162:19
　170:16
**meller** 189:18
　191:10,20
　192:13 193:18
　194:3 196:3
**members** 80:20
　82:9 121:6
**memorize**
　75:19
**mental** 93:5
　157:5 169:11
　170:7,24 171:8
　172:12,18
**mentioned**
　64:18 70:12
　91:10 158:9
**met** 112:13
**metro** 187:8
**miami** 2:16
**michael** 189:18
　191:10,20
　192:13 194:3
**microphones**
　8:5
**middle** 65:12
　148:21,21
**mike** 191:20
　193:18 196:3
**million** 42:20
　42:25 46:1
　82:18

**millions** 83:19
**mind** 19:6 27:6
　108:21 133:17
**mindy** 189:2
　190:11
**minimize** 72:13
　73:7 107:17
**minimum**
　160:4 161:7
**minute** 149:6
**mischaracteri...**
　103:23 122:5
　125:14
**mischaracteri...**
　106:14 108:6
　115:24
**mislead** 177:8
**misleading**
　177:10 178:14
**missed** 98:7
**misstating**
　113:3
**mistake** 98:8
　98:10
**mistaken**
　129:12
**mitigating**
　93:23
**mm** 12:5 15:24
　84:2
**modified** 54:15
**mom** 105:25
**moment** 37:10

**money** 47:17
　48:11,21 49:14
　50:22 70:20,20
　71:5 82:1,14
　83:8,21 84:12
　84:13,16,25
　85:16 87:21
　88:14 89:1
**monitoring**
　20:23 69:18
**montgomery**
　188:14 195:2
**monthly** 23:2
**months** 91:10
**morgan** 102:6
**morning** 8:2,11
　9:15
**mother** 1:5
　8:16 207:4
　208:1 209:1
**move** 72:23
　76:20 77:10
　104:4,18,21
　121:10 193:14
**moved** 26:2
　67:11 92:9
　104:19 111:20
　117:7,10
　184:25 185:10
**moving** 25:8
　116:5,6,22
　117:16 120:12
**multiple** 20:5
　24:8 201:15,18

**[mute - noticed]**                                                      Page 32

| | | | |
|---|---|---|---|
| **mute**  8:7 | 158:21 159:22 | **noelle**  1:14 | 52:22 55:13 |
| **n** | 163:4 174:9 | 10:11 11:14 | 57:5,18 58:19 |
| **n**  2:1 3:1 4:1 | 203:3,7,18,21 | **non**  22:6 26:19 | 65:24 66:16 |
| 6:21 7:1 8:1 | **needed**  47:7 | 27:2 53:7,25 | 67:2 68:14 |
| 24:12 207:5 | 79:22 81:8,15 | 55:19 64:14 | 70:4 71:9 |
| 208:2,24 209:2 | 89:12 102:12 | 85:10,10 94:9 | 72:17 74:3,12 |
| 209:4,12 | 102:12 141:4 | 170:14,22 | 74:17 75:3,5,6 |
| **nakia**  1:10 3:3 | 143:15,19,23 | **nonstop**  193:7 | 75:9,9 76:1,5,8 |
| 8:17 96:25 | 144:5,8,10 | **norm**  190:24 | 76:19,23 77:5 |
| 102:3 | 163:7 173:8 | **normal**  13:13 | 77:6,16 83:23 |
| **name**  8:11 | **needing**  170:6 | **northeast**  3:7 | 87:1 89:19 |
| 10:20 11:13 | **needs**  14:16 | 8:19 | 90:23 97:13 |
| 24:14 197:10 | 15:9 26:2,14 | **northern**  1:2 | 100:20 105:7 |
| 197:16 | 53:14 75:6 | **notary**  8:21 | 105:20 114:8 |
| **native**  98:1 | 80:15 82:2 | 205:22 209:13 | 114:16 115:7 |
| 130:8 | 87:9 88:8,8,12 | 209:19 | 121:3 122:7 |
| **nature**  75:11 | 90:5 93:25 | **note**  8:5 61:3 | 132:18 144:18 |
| 103:23 188:8 | 131:6 160:3,18 | 133:25 151:25 | 144:19 147:15 |
| 200:20 | 161:23,24 | 207:10 | 151:1,2,18 |
| **ne**  1:20 | 162:22 169:9 | **notebook**  6:23 | 153:3 164:12 |
| **necessary** | **neither**  205:10 | 58:20,23 59:2 | 166:10 171:18 |
| 148:1 160:3,18 | 206:7 | 60:13,14 62:1 | 172:1 175:5 |
| 209:6 | **neurotech** | 95:9,18 97:6,8 | 177:7,13,23 |
| **need**  12:9,24 | 189:2,6 | **noted**  189:18 | 178:13 179:11 |
| 76:14 77:6 | **never**  44:15,17 | 192:21,24 | 179:17,20 |
| 81:4 82:7,9 | 91:12 191:8,9 | 199:14 209:7 | 181:2 182:14 |
| 89:6 94:1 | 200:1 | **notice**  4:10 | 182:24 183:3 |
| 100:6,14,15 | **new**  67:6 | 10:22 11:19 | 187:22 190:20 |
| 109:20,25 | 100:13 102:13 | 17:16 36:3,20 | 191:14 |
| 117:17 120:18 | 127:24,24 | 37:14 42:13,23 | **noticed**  32:20 |
| 132:1,5 137:20 | **night**  34:18,20 | 43:15,23 45:15 | 113:24 167:15 |
| 138:11 144:7 | 56:23,23 | 47:3,21 48:14 | 174:23 176:1 |
| 147:22 158:19 | **nine**  27:17,18 | 49:5,18 51:14 | 192:17 193:5 |
| | 28:8 | 52:8,16,19,20 | 193:19 |

**[notify - obtain]**                                                      Page 33

**notify**  27:24
  29:2 138:4,6
  139:10
**november**
  105:2
**nri**  198:16
**nuance**  26:5
**nuances**  25:24
  26:4
**number**  17:6
  19:15 40:14
  42:17 46:24
  53:6,10,12,19
  53:20,24 59:9
  61:14 62:19,23
  65:10 79:1,4,5
  79:14,16,17,21
  79:24,25 80:9
  82:6,19,20,23
  89:4,17 124:24
  125:6 126:24
  131:6 132:5
  160:2 161:22
  167:11 195:14
  196:25 197:14
  197:18 198:4
  198:18,22
**numbered**
  57:13 59:7
**numbers**  51:10
  53:13 59:13
  80:15 94:16
  95:17 129:13
  133:5,20 135:7

138:5 157:19
158:1 196:20
196:22
**nurse**  87:24
  88:8 169:9,16
  170:23
**nursing**  44:8
  45:13

**o**

**o**  6:21 7:1 8:1
  24:15
**o.l.**  1:5 2:2 8:15
  207:4 208:1
  209:1
**oak**  2:6
**oath**  11:25 12:1
  199:24
**oaths**  8:22
**object**  17:2
  25:1 36:1,19
  57:17 66:24
  71:8 72:16
  74:2,10 75:4
  75:10 86:24
  90:22 103:22
  104:14,15
  105:6,18
  106:13 108:5
  109:13 110:5
  110:19 111:13
  113:22 114:15
  115:23 117:5
  119:10 122:4

122:19 132:17
138:17 147:13
149:24 150:21
151:17 160:20
163:17 164:9
165:5,15
169:12 170:9
171:1 173:1
174:21 175:24
177:1,21
187:20 188:7
190:8,18
191:13 200:19
202:15
**objecting**  152:1
  171:24 202:17
**objection**  8:23
  10:8 11:1,7,8
  23:12 26:20
  27:3 29:14
  32:16 37:4,13
  42:12 43:14,22
  45:14 47:2,20
  48:13 49:4,17
  50:7 51:13
  52:10 57:4
  65:23 66:15
  67:25 68:13
  69:2 70:3 71:8
  71:23 76:20,22
  77:14 83:22
  89:18 93:17,17
  103:4 106:4
  108:13 113:2

114:7 115:6,14
116:13 120:15
121:1,12 123:9
125:13 139:12
141:20 153:2
154:18 166:8
167:14 169:21
171:17 175:4
176:5 177:11
178:12 179:6,6
182:13,23
191:16,18
192:3,16,19,21
192:24 193:25
194:6,8,16,23
195:5
**objections**  6:7
  6:12 11:3
  42:22 43:2
  44:5 45:23
  46:3,10 48:1
  52:7 53:2
  68:22 73:13
  77:21 122:12
  122:20,21
  151:17 166:17
  167:4 172:14
  197:3,12
**obligation**
  52:15 77:11,16
**obligations**
  77:23
**obtain**  61:22

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025
O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

**[obtained - okay]**                                                   Page 34

| | | | |
|---|---|---|---|
| **obtained** 45:10 | **oh** 33:1 54:19 | 60:10 61:9,15 | 133:16 134:9 |
| **obviously** | 59:19 64:3 | 63:4 64:3,5,18 | 134:19 135:12 |
| 13:21 26:6 | 84:22 90:11 | 65:11,14,14,19 | 135:15,20 |
| 27:14 28:1,21 | 97:18 98:8 | 67:20,20 70:21 | 137:11 139:2,8 |
| 82:5 200:9 | 132:11 134:3 | 71:11 74:24 | 139:20,23 |
| **occasions** 24:21 | 135:19 138:15 | 76:11 77:3,12 | 140:6,17 143:5 |
| **occupation** | 144:3 146:4,9 | 77:15 78:20 | 144:23 147:16 |
| 14:8 | 148:9 149:6 | 82:17,24 83:2 | 148:23 149:3,3 |
| **occupational** | 153:18 165:17 | 84:5,24 85:5 | 149:20 150:15 |
| 44:7 45:12 | 189:21 | 86:2 88:16 | 150:18 151:22 |
| 189:1 | **okay** 12:11,21 | 89:5 90:11,18 | 152:12,19 |
| **occur** 20:19 | 13:17,19 14:8 | 90:20 91:3 | 153:9,12 |
| **occurring** | 15:12 16:5,14 | 92:1,25,25 | 154:11,11,22 |
| 111:18 | 16:20 19:4,23 | 94:14 95:11,13 | 155:12 156:5 |
| **october** 20:6,7 | 19:24 21:19,22 | 95:23 96:2,9 | 156:22 157:22 |
| 20:25 39:6 | 22:10,17 24:16 | 97:2,10,18 | 157:24,24 |
| 40:11,13 53:10 | 26:16,24 27:12 | 98:15,17,24 | 158:12,18,18 |
| 53:11 86:11 | 27:20 28:10,15 | 100:12 102:8 | 159:2 161:2,10 |
| 131:3 154:11 | 28:17 29:23 | 102:10,15 | 161:19 162:10 |
| 155:13 160:1 | 30:7,13 31:3,7 | 107:11 109:2,5 | 163:9 164:3 |
| 207:3 | 31:10 32:11,11 | 113:18 114:4,9 | 167:24 168:10 |
| **offenses** 139:7 | 33:3,16,18,23 | 114:24 115:12 | 168:11,22 |
| **offer** 146:20 | 35:4,22 36:11 | 115:20 116:20 | 169:1,5 171:23 |
| 151:22 176:13 | 36:14 37:15 | 117:2,11,14 | 172:2,24 |
| 190:5 | 38:5 40:21 | 118:7 123:6,17 | 174:17 175:18 |
| **offered** 88:2 | 41:6,17,20 | 123:23 125:5,9 | 176:8 178:7,10 |
| **offering** 54:12 | 43:8 44:14 | 125:18,21 | 179:13 180:9 |
| 189:21 | 45:9 47:16 | 126:1,16 | 180:12,15 |
| **office** 27:25 | 48:9 50:10 | 127:21 128:1,6 | 181:10,19,22 |
| 29:2 123:20 | 53:18 54:19,21 | 128:9,16,16,19 | 181:24 183:14 |
| 174:16 182:2 | 55:4,17 56:6 | 129:17,21,21 | 183:23 184:2 |
| **officer** 171:13 | 56:10,19 57:12 | 130:1,9 131:2 | 184:15,18 |
| 205:1,2 | 57:24 58:8,17 | 131:15,22 | 185:1,9,16 |
| | 59:1,5,12,16 | 132:11 133:3,3 | 186:4 187:5 |

Veritext Legal Solutions

800.808.4958                                                    770.343.9696

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025
O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

**[okay - parental]**                                                    Page 35

188:20 190:5
191:19,24
196:16,18,19
197:9,14,17
198:2,3,4,7,16
198:20,24
199:5,13
200:12 202:4
202:10,16,17
203:1,2,9,12,14
203:23,24
**old** 91:10
**older** 86:3
**olivia** 74:9
105:2,14,23
149:18 163:11
**olivia's** 105:19
**ombudsman**
63:19,20,20
64:2
**once** 16:4 21:17
21:17 37:24
63:12 80:18
93:14,20 143:8
147:18
**one's** 28:11
**ones** 66:11
130:4 144:3
199:22,25
**ongoing** 20:7
191:16
**online** 92:6,7
**onward** 101:5

**open** 144:9
**opened** 114:22
115:1,9
**operating** 96:5
96:12
**operational**
91:20,21
159:22
**operations** 69:8
**opportunity**
173:7 186:18
195:18
**option** 66:20
92:7
**orally** 13:3
**order** 11:1
46:18 49:23
68:11 69:8
86:21 103:20
147:23 154:9
201:12
**ordered** 138:22
**original** 199:1
199:21,22,24
200:5,8,8,10,14
201:21 202:11
202:11
**originally**
183:16
**ot** 189:4,5
192:12
**ots** 189:3
**outcome** 21:5
205:15 206:12

**outcomes** 21:4
**outline** 56:9
**outlined** 22:15
24:19 32:1
**outside** 38:25
39:25 54:18
64:4,7 196:4
**overbroad** 77:5
**own** 101:21
**owned** 189:2

**p**

**p** 2:1,1 3:1,1
8:1
**p.c.** 2:5 3:14
**p.m.** 126:24
195:11,15
204:1,3
**p19** 103:2
**p21** 131:20
**packet** 163:11
190:6
**page** 4:2,8 5:2
6:2,10,22 7:2
27:17 28:8
29:17 32:21
42:2,6 60:12
60:15,20,21
109:4 129:15
132:1 133:23
137:25 138:2,2
138:15 155:19
157:2,19
186:25 188:20

197:17,23,23
197:24 198:2,7
198:11,13,17
198:19 208:4,7
208:10,13,16
208:19
**pages** 18:8
41:12 129:21
130:2,9 131:23
**paper** 132:12
**para** 87:25
89:22,23
**paragraph**
138:16 155:19
155:20
**paralegal** 3:14
**parent** 43:24
93:6,9 105:25
106:12 113:19
113:21 114:21
115:4 121:11
121:18 138:21
140:23 141:17
141:17 143:2,2
143:3,9 144:19
145:16 146:24
168:16 173:14
173:21 174:19
181:10 182:1
185:22 186:10
186:17,18
**parent's** 141:2
**parental** 29:6
141:8

[parents - plaintiff] Page 36

**parents** 54:1 92:2 138:4,6 141:7 148:5 154:13 166:24 181:7 194:4

**parker** 1:19 3:6

**parkerpoe.com** 3:9,10 207:2

**part** 4:23 21:25 35:2,5 39:8,23 47:5,9 49:7 57:25 58:4 97:23 99:8 107:24 112:5 113:15 129:5 129:20 130:6,8 131:14 138:3 140:25 141:9 145:22 146:6 146:21 173:6 174:17,25 179:11 184:20 191:25 193:19 197:25

**participate** 189:14

**participating** 174:4

**particular** 100:18 101:13 149:21

**particularity** 52:17,20 77:17

**parties** 8:9,24 205:11,14 206:8,11

**party** 16:8,11 175:1,8

**pass** 132:3

**past** 38:13 40:9

**pathologist** 190:11

**pay** 47:8 50:14 50:16 167:7 187:2

**pdf** 58:15 98:3

**peachtree** 1:20 3:7 8:19

**pediatrician** 171:8

**peers** 94:9

**pen** 132:6,9

**penalty** 179:1

**people** 24:8 36:11 49:7 78:4 82:10 88:19 162:5 174:15 196:4

**percent** 82:4 121:22 152:23

**percentage** 38:24 39:25 47:9 50:25 51:9,16 53:14

**perform** 69:8 138:22

**performance** 39:8

**period** 37:24 41:25 42:11 96:20 105:10 158:20

**periods** 23:16

**perjury** 179:1

**permission** 29:6 45:9

**permitted** 9:3 120:20

**person** 24:9 36:7 75:23 111:16 121:25 148:13 184:7 186:11

**personal** 13:7 13:13 105:21 151:3 164:13 172:4

**persons** 75:23

**ph** 11:3 149:18 163:12 182:16 183:4,9 186:23 189:23

**phase** 67:18

**phones** 8:7

**physical** 44:8 45:12 93:4

**physician** 157:4

**physiological** 170:25

**pick** 8:6

**pieces** 27:6

**pile** 196:15

**place** 8:8 26:3 49:22 67:23 68:12 69:5 107:5,6,7 110:2,16 116:11 126:17 134:14 174:9

**placed** 71:15,22 87:17 92:8 117:2 120:10 122:3 123:8,18 162:11

**placement** 25:9 27:1 38:20 103:21 104:12 104:18 111:10 126:6 130:22 163:2 174:8

**placements** 115:9

**placing** 115:22 120:4,6 121:20 131:11

**plaintiff** 3:15 4:9 9:22,23 18:3 41:4 60:16 61:19 94:19 127:6 129:1 132:7 133:7 134:11 136:9,23

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025
O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

**[plaintiff - positions]**                                         Page 37

146:15 149:12
155:1 175:16
176:17 177:19
182:10 190:1
**plaintiff's**  6:8
6:14 18:1
35:13 41:1,23
42:3,7 60:4
61:1 62:11
94:18 96:6
127:3 132:4
133:4 135:24
135:25 136:21
140:1 146:10
146:12 149:4
154:23 163:10
182:8 186:22
197:3,12
199:19
**plaintiffs**  1:7
2:2 9:16,20
10:21 33:19
99:13 136:3
**plan**  25:13
54:24 63:7,11
63:18 67:12
69:9,11,11,14
69:16 70:11
71:19 93:3,22
94:1,2,6
104:11 106:11
107:17 108:4
108:18 109:11
110:16 111:10

112:12,25
116:11 117:25
119:8 120:5
121:10,19
122:1 162:9,11
162:17,25
164:23 167:21
168:22 169:2
**planning**  21:3
**plans**  69:17,25
120:8,9 164:24
167:11,23
**platform**  22:17
**please**  8:5,7
9:13 10:9
11:12 12:25
14:12 17:25
18:22 24:14
28:7,17 31:5
32:21 34:4
37:9,23 52:2
52:25 56:13
58:25 60:6,19
60:24 61:7
62:15 67:9
73:17 81:17
87:12 104:16
118:4 122:24
127:2,4 128:23
128:24 133:3,6
133:19,22,25
134:10 136:20
136:22 140:8
146:10,12

149:15 153:12
153:15 154:22
155:18 157:1
161:4 163:20
163:23 175:15
176:12,14,15
182:7 191:19
193:11,14
194:1 196:14
197:6,17 198:2
203:13
**plus**  73:13
**pocket**  61:25
**poe**  1:19 3:6
**point**  30:21
64:18 76:19
93:16,23
101:21 110:11
191:5
**pointed**  196:19
196:22
**policies**  17:15
18:15 19:17
36:22 57:15
62:4 77:25
103:11,15,16
112:24 113:8
113:13 119:19
145:2,12
146:21 153:13
168:4,9 173:12
173:20 176:2
181:2,15,16,20
193:22

**policy**  27:13
28:8 30:23,23
31:1,6,7,13,18
31:23 32:3,11
38:14 48:10,23
51:7 55:5,7
91:18,22 107:2
107:10 108:16
108:17 109:3,8
109:25 111:1
112:11,15
113:9 117:23
118:17 119:17
119:18 120:22
133:10 136:8
136:15 137:9
137:11,16,18
138:10 139:3,9
141:15 142:21
146:23 147:1,4
181:14 183:12
**pool**  88:14 89:1
**portal**  22:23
148:3 150:12
150:20 151:15
**portion**  56:25
87:18,21 90:1
109:15
**poses**  114:16
**posing**  110:6
110:20 111:14
**position**  164:20
**positions**  14:13

Veritext Legal Solutions

[possibly - private]                                                    Page 38

**possibly** 77:6
102:7
**post** 21:4,5
**potential** 138:7
174:3
**poverty** 2:14
**practice** 25:20
26:16 31:13,18
31:23 32:12
37:2 38:3 39:2
39:4 41:2,7
43:20 44:15,17
44:21 45:6,10
46:25 47:16
48:19 50:20
51:1,4,7 55:8,9
55:11 58:4
65:20 66:20
67:16 73:5,6
73:10,19 74:14
79:8 81:1,24
83:12 84:24
85:16 86:5,18
87:7 88:4,10
89:13,17 90:10
90:11,12 91:22
92:13,21 93:2
93:14,15 94:4
100:8 101:24
102:1,11,15
103:11 104:10
104:17 106:9
107:5,16,18,19
108:1,9,14

109:8 111:12
112:11 113:18
114:1,4,19
115:3,12 116:4
116:9,18,21
117:23 118:8
118:17 119:6
119:13,15,16
120:4,13 121:8
121:15,17
123:3,6,17,18
123:24,25
124:9,14,20
133:13 139:3,9
141:15,21,22
142:1,21 143:1
145:14,19,24
146:21,23
147:2,4,7
149:20 154:12
157:6,8 158:23
159:15 163:12
168:12,15,17
168:18,19,23
168:24 169:7
169:16 170:4
170:12 172:10
172:24 173:13
173:16 174:17
181:12,14,15
181:25 183:3,7
183:12,13,14
184:6 185:21
186:6,7,9

191:25 192:12
192:19 193:15
193:16,20
**practices** 17:15
18:15 19:17
36:22 52:11
57:14,25 58:5
62:4,17 77:25
79:6 92:23
102:19 103:14
113:13 119:19
145:12 153:13
156:20 168:4,9
173:12,18,20
181:3 184:3
193:21 194:11
**practicing**
192:6
**practitioner's**
4:24 55:20,22
56:2,4,20
94:23 95:1
129:6 146:18
**pre** 84:9
**prefer** 61:12
**prepare** 17:11
**prepared** 11:21
76:14 77:7
102:13 149:22
168:9 206:3
**preparing**
17:18 101:25
**prepped**
179:21

**preschool**
14:17,17 21:1
82:16,22 91:16
91:17,19
**present** 3:12
160:6
**previous** 55:13
55:15,16 63:21
188:11 191:4
**previously** 64:1
116:3 148:25
197:4
**primary** 44:24
45:6 65:17
86:12 169:10
170:5,24 171:5
**principal**
147:24 173:24
**principals**
80:18
**print** 41:8
**printed** 98:18
155:13
**printout** 98:2
**prior** 29:4
30:20 33:9
40:12 55:18
58:18 103:24
117:18 121:18
122:6 145:16
188:5 205:5
**private** 8:6
22:2 30:10
47:10 53:7,25

**[private - provided]**                                          Page 39

55:19 62:22
63:2 66:8
69:22 70:14
117:13 142:24
145:7
**privately**
142:23
**probably** 23:19
23:24 60:14,18
66:19 95:14
117:19 136:19
166:19
**procedural** 9:4
**procedure**
107:6,7 112:11
117:23 118:17
119:16 133:14
139:3,4,8
141:16 142:21
146:24 147:2,5
174:18,20
181:14
**procedures**
17:15 18:15
19:17 36:23
55:5 56:17,25
57:14 58:3
62:4 78:1
84:12,13
100:14 103:11
103:13 113:14
119:19 145:1
145:13 146:22
168:4,9 173:13

173:19 176:2
181:3
**proceed** 10:16
**proceeding**
8:13 9:2 204:4
206:4
**proceedings**
16:15 205:3,4
205:6,8 206:6
**process** 15:22
16:16,21 17:8
25:15 26:9,22
72:22,24 75:8
80:2 81:3 91:7
93:9 96:3 99:9
106:17,25
116:7,23 117:3
117:8,10 144:8
145:22 149:21
173:15,21,22
174:7,20
184:12,25
185:17 189:15
192:15 194:5
194:15,18,22
**processes** 187:9
**produce** 99:12
99:16 101:7,19
**produced** 9:1
57:2,8,9,13
94:15 95:1,23
98:22 128:11
130:6,7

**production**
97:24 133:4
**productions**
57:19
**profit** 53:7,25
55:19
**program** 14:18
15:2,3,4,10
63:21,23 64:1
64:15 79:22
80:12 81:15
85:18 155:24
**programming**
54:13 81:11,14
91:5 92:15
**programs**
54:22
**progress** 69:18
**projected**
80:13,21
**projecting** 80:4
**properly**
173:23
**proportional**
50:22 51:11,25
52:1,3,6 53:1
62:19 88:22
**proportionate**
47:9,12 50:25
53:4 70:17,19
70:22,23
**protocol** 5:6,7
133:11 134:6
134:14

**protocols** 49:21
**provide** 20:13
44:15,23,25
45:1,2,5,7 51:7
54:7 59:25
67:16,22 69:17
72:25 73:1
76:23 79:5
86:9 92:14
94:5 97:20
100:21 137:19
141:6 146:7
148:4 154:9
163:13 179:15
180:20 186:18
**provided** 6:23
23:11 38:7
44:18 48:2
57:21 58:9,20
58:25 62:4
69:12 75:23
97:23,25 98:1
123:20 131:17
132:14,24
134:21 135:1
136:2 142:23
143:2 146:22
150:19 156:12
164:6 167:12
169:23 170:3
180:22,23
188:14 190:6
191:4

**[provider - reading]**    Page 40

**provider**  170:5 173:9
**providers** 142:25
**provides**  22:18 75:16 168:14
**providing**  69:9 93:3 188:22,25
**provision**  126:4
**psych**  184:4
**psychiatric** 170:7
**psychiatrist** 171:10
**psychologist** 145:4
**psychologists** 145:7
**public**  31:20,25 31:25 32:13 41:8 113:1 189:10 205:22 209:19
**pull**  131:22 196:13 197:6
**purposes** 110:10 154:20 156:3 161:18
**pursuant**  10:22 10:25 75:3 136:3 140:9,12
**purview**  96:18
**put**  46:15 60:20 61:10 75:6,9

75:21,22 76:1 76:7 77:6 91:13 92:4 132:3 168:16 174:9 191:6 194:11

**q**

**qbe**  79:14 81:17 82:24 85:16,25 86:1
**qualification** 136:14
**qualified**  205:7
**quality**  81:19
**question**  11:9 11:11 12:6,14 12:15,18 13:3 13:5,13 19:7,8 31:22 36:19 37:6,9 43:1 48:3 51:23 52:25 58:2 60:6 64:24 71:25 74:2,11 75:5,11 83:25 86:25 90:3 99:23 103:23 104:1,15 105:7 105:19 106:6 106:14,19 108:6 109:14 109:15 110:6 110:20 111:14

113:12 115:23 116:1 118:3 119:10 120:11 122:5,19 140:10 142:7 145:21 147:11 147:14 149:25 150:22 151:4 152:8 156:25 159:8 160:20 161:6 164:10 165:5 167:18 169:13 170:9 170:20 172:7 173:4,5,8,10 175:22,23 177:8,22 178:10 179:24 180:4 187:21 188:8 195:20 195:24,24 196:3 200:2
**questioning** 36:2 52:21 174:22 190:19 191:13
**questions**  12:22 41:2 78:2 146:7 151:24 175:13,25 176:10 195:19 195:21,24 196:6 199:6

**queue**  92:9,9
**quick**  61:4 126:18 195:9 196:12
**quickly**  175:14 176:13

**r**

**r**  2:1 3:1 5:8,10 5:12,14,16,18 5:20 6:21 7:1 8:1 24:12,15 27:10 31:8 108:25 134:22 136:1,6 207:1 208:3,3
**raise**  10:9
**ran**  155:13
**randall**  165:14
**rather**  59:19
**reach**  54:2 189:16
**reached**  90:5 187:25 192:11
**reaching**  174:2
**read**  18:22 33:21 37:8 151:13 152:13 152:15 176:9 202:19,22,24 207:9 209:5
**reading**  28:7 30:24

**[reagan - referrals]**                                                Page 41

| | | | |
|---|---|---|---|
| **reagan** 33:11 | **reassess** 163:5 | **recently** 153:7 | 195:12,14 |
| **real** 175:14 | **recall** 17:5 | **recognize** 18:2 | 196:13 202:19 |
| **reality** 202:17 | 42:20 48:6 | 94:17 149:11 | 203:19 204:1 |
| **really** 61:5 | 49:20 50:3,8 | **recollection** | 205:9 206:5 |
| 171:7 | 51:15 74:18 | 90:20 152:25 | **recorded** 9:6 |
| **realm** 25:25 | 99:5 151:6,8 | **recommendat...** | 9:10 203:25 |
| **reason** 29:16 | 153:4,9,11,22 | 141:5 184:21 | 205:6 |
| 30:4,8,11,14,18 | 166:12,23,24 | **recommendat...** | **recording** 8:8 |
| 66:23 67:4 | 167:1,2 175:7 | 50:5 145:25 | 9:1 205:8 |
| 68:21 73:12,21 | 178:5 185:3 | 146:5 | 206:4 |
| 93:3 107:20 | 188:10 194:24 | **recommending** | **records** 17:14 |
| 162:19 170:6 | **receipt** 147:19 | 145:9 | 174:6 |
| 207:11 208:6,9 | 207:17 | **reconsidered** | **recs** 142:20 |
| 208:12,15,18 | **receive** 14:2 | 159:5 | **red** 32:21 |
| 208:21 | 37:25 51:20,20 | **record** 8:3,9,13 | **reduced** 205:6 |
| **reasonable** | 58:17 72:2 | 8:24 9:13 | **reevaluation** |
| 52:16,19 77:17 | 73:2 80:18 | 18:12 20:8,11 | 5:22 140:21 |
| **reasonably** | 85:20 86:13,21 | 23:17 28:2 | 143:7,13,17 |
| 11:17 18:14 | 88:24 91:5 | 37:11 38:15 | 144:14,18,20 |
| 19:1,11 | 119:21 124:17 | 52:2,5 60:6,8,9 | 144:22 146:17 |
| **reasons** 22:15 | 125:7 160:4 | 62:11,13 63:13 | **reevaluations** |
| 24:18,23 26:24 | 161:7 | 70:21 75:22 | 18:16 20:18 |
| 27:5,21 28:20 | **received** 47:6 | 78:21,23,24 | **refer** 64:15 |
| 28:24 29:18 | 50:22 56:22 | 79:1 81:17 | **reference** 26:4 |
| 30:1,22 31:16 | 57:1 88:18 | 94:15 102:23 | 61:5,6 153:17 |
| 31:21 32:1,5 | 94:17 132:20 | 105:2 108:23 | **referenced** |
| 32:14,14 65:4 | 133:1 147:18 | 126:20,22,24 | 23:16 207:6 |
| 65:7 73:20 | **receives** 72:6 | 127:5 128:21 | **referencing** |
| 75:1 107:3,5 | 79:17 147:19 | 134:5,18,21 | 28:6 156:6 |
| 109:3,19,21 | **receiving** 28:22 | 136:22 148:7 | **referral** 93:7,8 |
| 111:6 112:1,5 | 29:6,19 40:15 | 151:23 152:1,4 | 93:10 140:13 |
| 112:5,13 | 70:15 71:19,21 | 157:16 160:22 | 140:22 142:2 |
| 117:20 120:10 | 72:7 110:24 | 162:7 163:9 | **referrals** 64:13 |
| 157:5 | 125:11 126:3,6 | 180:21 195:10 | |

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025
O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

**[referred - request]**                                    Page 42

| | | | |
|---|---|---|---|
| **referred** 91:11 | 45:5 84:12 | **repeated** 37:11 | **reporting** |
| **referring** 21:11 | 181:3 205:11 | **rephrase** 104:6 | 19:18 20:18,20 |
| 58:21 64:22 | 206:7 | 118:15 | 22:14 23:6,24 |
| 82:14 157:18 | **relating** 18:16 | **report** 5:5 20:1 | 24:1,2 26:1 |
| **reflect** 162:22 | 19:20 41:3 | 20:5,7,8,10,14 | 36:7,9,12,23 |
| **refusal** 25:11 | 79:7 168:5 | 20:17,21,24 | 39:2,9 52:12 |
| **regard** 173:12 | 169:8 173:13 | 21:7,20,22 | 52:13 53:19 |
| 186:24 | **relation** 173:19 | 22:1,2,5 39:6 | 63:5 64:20,25 |
| **regarding** | 176:20 | 40:10,10,13,14 | 65:1,21 68:3 |
| 11:18 18:13,24 | **relative** 96:20 | 41:13,15 53:10 | 72:11 73:24 |
| 19:2,10,17 | 205:13 206:10 | 53:18 63:5,10 | 74:15 75:8,24 |
| 38:6 55:11 | **relevance** 17:3 | 63:12 73:6,11 | 76:2,10,25 |
| 57:16 62:18 | 42:12 166:8 | 74:25 75:15 | 78:1 124:20 |
| 75:24 76:2,25 | 187:22 192:3 | 86:7,12,14,15 | 126:10 130:18 |
| 77:1 78:1 86:6 | **relevant** 100:19 | 86:19 114:13 | 130:19 131:14 |
| 89:14,15 93:2 | **relieve** 119:8 | 118:1,9,12,18 | **reportings** |
| 103:11 109:18 | **remain** 144:1 | 119:3,24 | 20:15 |
| 113:14 114:4 | **remaining** | 124:15 146:3,4 | **reports** 20:4 |
| 114:20 115:5 | 109:15 | 146:5,6 150:6 | 21:18 22:10,22 |
| 131:16 133:13 | **remains** 144:9 | **reported** 1:22 | 37:19,25 38:3 |
| 145:1,2,12,22 | **remark** 149:9 | 21:15,17 68:5 | 63:12 129:19 |
| 146:25 176:10 | **remember** | 118:23 119:23 | 130:5,6 132:20 |
| 182:16 195:22 | 15:15 34:16 | 125:10 | 133:1 |
| **regardless** | 50:4 99:8,10 | **reporter** 8:10 | **representative** |
| 23:10 | 191:3 | 8:12 10:7,15 | 1:15 9:18 10:6 |
| **regards** 19:12 | **removed** | 37:8,10,11 | 12:12 73:23 |
| **registration** | 191:24 192:1 | 46:18 60:1,5 | 75:2 174:19 |
| 92:7,7,9 | **reoccurring** | 60:18 61:17 | 175:1,8 196:8 |
| **regular** 86:23 | 81:13 | 78:22 103:2 | **represented** |
| 203:11 | **rep** 207:5 208:2 | 131:19 167:3,6 | 165:21,22,25 |
| **regulations** | 208:24 209:2,4 | 167:8 202:22 | 166:2,14 |
| 55:24 | 209:12 | 203:1,9,14,17 | **request** 6:18 |
| **related** 44:1,4,7 | **repeat** 106:19 | 203:23 | 49:10 54:9 |
| 44:11,16,18,25 | 106:20 | | 97:19 130:6 |

Veritext Legal Solutions
800.808.4958                                        770.343.9696

Case 1:23-cv-03285-SDG   Document 171   Filed 01/09/26   Page 252 of 379

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025
O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

[request - right]                                              Page 43

159:11 173:22 174:7 181:7 182:3,5,16,17 183:4 186:24 192:10

**requested** 37:12 81:4 100:19,20 183:3,10 190:6 205:24

**requesting** 140:24 143:10 173:15,21

**requests** 55:2 180:14 182:1 185:22

**require** 39:6 48:19 161:18 185:22,23

**required** 20:13 26:13 41:18 70:1 92:16 156:11 201:8 209:13

**requirement** 50:24 51:2 160:9,9 161:11

**requirements** 55:4 119:9

**requires** 93:22 142:17 154:14 155:21 160:15

**reserved** 204:2

**reshare** 71:2

**reside** 30:12 53:15

**resided** 92:1

**residential** 87:15,17

**residing** 112:8

**resolution** 174:4

**resources** 47:13

**respond** 54:5 113:20 114:2,5 114:20 115:4 115:10,15 122:23 148:2

**responding** 181:14

**response** 5:25 77:24 147:23 149:16 150:6 151:7 153:5 180:6 182:16 197:21,25 198:8,11,21,25 199:1,3,4

**responses** 6:8 6:13 175:25 176:9,23,25 177:17 178:11 179:2,3,20 180:22 197:3 197:12 198:25 199:12,15,16

199:21,24 200:4,5,10,15 200:16 201:9 201:11,17,21 201:22 202:5 202:12

**responsive** 97:18

**restate** 12:8 122:20

**restrictive** 38:23 39:22,24 130:14

**restroom** 126:18

**results** 140:15 142:13

**resume** 15:15

**retention** 38:14

**return** 207:13 207:16

**review** 19:6 102:8 114:22 140:15 142:13 143:13 150:15 164:18,21,22 169:16 189:12 189:13 203:8 205:24 207:7

**reviewed** 17:14 17:15 75:14 95:12 96:19 142:5 150:4 169:23 170:3

180:11

**reviewing** 145:15 170:15 171:10

**reviews** 142:15

**revise** 100:9,14

**revised** 100:4 152:18

**revising** 96:4

**revision** 114:23

**revisions** 96:4 96:25 97:16 100:5

**revisit** 159:7

**revisited** 159:5

**rid** 132:2

**right** 10:9,15 19:8 23:9 31:13 32:23 33:6 35:1,6,9 52:10 57:24 59:9,18 60:25 84:8,9 85:13 85:15 86:5,12 96:21 98:24 103:3 111:6 126:1,9,13,16 128:22 131:4 132:9 136:19 139:4 149:9 153:19 158:18 167:10 170:2 176:22 177:13 185:6 193:23

Corp. Rep. 30(b)(6) Jessica N. Coleman        September 19, 2025
O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

**[right - school]**                                                    Page 44

196:15 198:14 199:5 202:6
**rights** 141:8
**rip** 86:3
**road** 2:6
**robert** 188:14 195:2
**role** 137:19 165:2,12 171:5 171:21 172:9 175:1 184:22 185:10,11
**roles** 36:8 185:12
**rpd** 100:24
**rule** 4:10 5:23 11:6 28:12 29:19 31:1,9 33:23 63:3 77:13,16 109:18,18 112:2 137:8 138:9,24 139:4 145:4,7,9,10 154:5,14 155:21 156:6 156:11,15,24 157:11,12,13 157:15 159:17 159:19,20 160:14,16 161:19
**ruled** 145:8

**rules** 9:5 51:5 55:24 56:8 136:7
**run** 155:8
**running** 156:16
**rydc** 66:8

**s**

**s** 2:1 3:1 4:7 5:1 6:1,21,21 7:1,1 8:1 208:3
**saa** 148:8
**safely** 49:23
**sanctionable** 177:11
**sanitizer** 50:6
**sapp** 189:10
**saved** 58:15
**saying** 28:18 51:22,23 112:24 116:12 130:7 155:10 200:18
**says** 27:24 40:3 41:23 42:3,7 130:9 145:4 155:20,25 156:1 158:22 160:16 161:6 162:20 187:10 197:21,25 198:11,21 199:11 200:25 201:19

**schedule** 80:21 81:1,4
**scheduling** 81:3
**scheme** 148:12
**school** 1:9,16 3:2 4:11,12,16 5:5,8,10,12,14 5:16,18 6:3,6 6:11,16 8:15 8:17 9:17 10:24 11:10,17 11:18 12:12 13:21,22 14:11 14:13,16 15:5 15:19 17:13 18:25 19:1,9 19:10,12,25 20:17,23 21:1 21:4,5 22:3,4,8 22:12,18,20 23:25 24:17,23 24:24 25:9,11 25:21,22,22 26:17,18,25 27:7 30:2,10 30:19 31:1,8 31:14,15,19,20 31:20,24,25 32:1,12,13 33:24 34:10,13 34:24 35:7,22 37:3 38:2,5,9 39:1,10,16

41:3,7,9,14
42:1,4,5,6,8
43:20 44:14,23
45:10 46:25
47:17 51:3,19
53:7,16,19,25
55:5,11,19
56:14 57:1,7
57:25 58:4
62:3,18 63:5
64:4,8,10,10,19
64:25 65:8,9
65:10,12,20
66:5,8 67:5,11
67:13,14,16,21
67:24 68:2,4,4
68:5,10,11,11
68:12,21 69:3
69:4,4,6,7,13
69:16,17,20,22
69:23 70:6,7
70:11,13,25
71:3,16,18,20
71:22 72:3,8,8
72:11,13,21,23
73:1,10 75:3
75:25 76:1,22
76:24 79:4,6,9
79:11,16,25
80:2,4,10
81:25 82:4,24
83:13,20 84:25
85:12,15 86:6
86:18,20 87:7

Veritext Legal Solutions

**[school - section]**                                                   Page 45

| | | | |
|---|---|---|---|
| 88:3,23 89:14 | 123:7,24 124:9 | 183:2,7,9,15 | 171:18,25 |
| 90:7 91:4,7,9 | 124:14 125:9 | 185:21,24 | 174:22 175:5 |
| 91:11,13,14,19 | 126:6 127:11 | 187:1 189:10 | 176:1 177:7,13 |
| 91:24 92:2,5,8 | 127:18,25 | 190:7 191:24 | 177:21,22 |
| 92:10,13,19,21 | 129:5,9 131:18 | 196:7 197:2,11 | 178:13 179:16 |
| 93:7,13 94:4 | 132:14,24 | 207:4 208:1 | 182:14,24 |
| 94:16 95:2,24 | 133:5,12 134:6 | 209:1 | 187:21 190:19 |
| 95:24 96:10,11 | 134:22,22 | **schools**  62:22 | 191:14 192:4 |
| 96:14,15,22 | 136:1,1,5,7 | 63:2 65:11 | 192:17 193:5 |
| 97:19 99:11 | 137:9,12,18 | 138:4 148:18 | **scores**  21:7,10 |
| 100:9 101:13 | 138:10 139:9 | 148:22 | 21:10,14,15,16 |
| 101:25 102:16 | 140:23 141:16 | **scope**  36:2,19 | **scratched** |
| 102:20,24,25 | 142:22 144:20 | 37:14 42:13,23 | 127:17 |
| 103:10,19,20 | 145:14,24 | 43:15,23 45:15 | **sdg**  1:9 |
| 104:5,11,19 | 147:22 148:20 | 47:3,21 48:14 | **se**  103:12 |
| 105:15 106:10 | 152:9 153:14 | 49:5,18 51:14 | **searchable** |
| 106:11 107:15 | 154:10,12 | 52:8,21 57:5 | 203:22 |
| 107:22 108:2,3 | 156:20 157:3,5 | 57:18 65:24 | **second**  19:4 |
| 108:19,25 | 159:14,15 | 66:16 67:1 | 30:8 50:11 |
| 110:3,4,9 | 160:2,5,6,14,16 | 68:1,14 70:4 | 56:13 106:21 |
| 111:9,17,20,22 | 161:21 162:16 | 71:9 72:17 | 135:16 138:1 |
| 111:23 112:9 | 162:24 163:13 | 74:3,11,16 | 150:25 152:25 |
| 112:14,15,16 | 164:5 165:4,21 | 76:18 83:23 | 155:18,20,20 |
| 113:1,14,19 | 165:22,25 | 86:25 89:19 | 198:19 |
| 114:19 115:3 | 166:5 167:12 | 90:22 105:7,20 | **secondary** |
| 115:12,21 | 168:4,13,14 | 113:23 114:8 | 65:17 |
| 116:10 117:9 | 169:7,9,16 | 114:16 115:7 | **secretary**  182:2 |
| 117:13,24,25 | 170:4 172:10 | 121:2 122:7 | **section**  18:17 |
| 118:7,9,14,18 | 172:25 173:14 | 132:18 141:10 | 28:4,5,9 72:6 |
| 118:20,22,23 | 173:19 174:11 | 141:13 146:6 | 92:22,23 93:8 |
| 119:1,1,3,6,21 | 174:18 176:10 | 147:14 150:25 | 93:11 113:8 |
| 119:25 120:1,3 | 180:20,22,24 | 151:17 153:3 | 138:13 145:2 |
| 121:8,18,20 | 180:25 181:5 | 164:10 166:9 | 146:17,19 |
| 122:2,3 123:3 | 181:11,13 | 167:15 168:20 | 164:21,23 |

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025
O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

**[section - signed]**                                              Page 46

181:1 197:20 198:8,21

**sections** 18:22 56:7

**see** 29:2 32:21 33:4 41:11,15 41:19 54:4 56:13 67:5,7 76:4 82:8 84:25 98:8 155:7 156:8 157:10 171:7 172:17 175:21 187:8 190:10 196:19 197:18 197:20,24 198:4,8,10,21 203:10

**seeing** 124:12 153:22

**seeking** 141:17

**seen** 18:5,6,7 41:11,12,15 154:24 175:19

**segments** 86:13

**selected** 186:10

**selects** 185:23

**send** 55:13 183:3,6,8

**sends** 182:2

**sense** 127:25

**sensitive** 8:6

**sent** 152:18 173:24 183:4,8

186:23 207:14

**sentence** 155:20 156:4

**separate** 56:10 84:20 101:13

**september** 1:17 8:4,18

**sequential** 129:13

**serve** 26:13 174:18 175:1

**served** 64:14 89:25 173:23 197:4

**service** 44:12 44:16,18,24,25 45:3,3,5,7 54:24 67:12 69:9,11,14,16 69:17,25 70:11 71:19 138:22 162:9 164:23 167:11,21,23

**services** 4:20 4:23 28:23 29:7,20 40:16 44:1,4,7 47:12 49:12 51:20,21 54:7,8,10,23,24 70:16 71:19,21 72:2,7,7,22,25 73:2 79:20 80:3 81:2 85:21,21,23

86:9,14 88:1,1 89:7,11 104:20 110:25 111:5 114:21 116:24 117:19 123:8 123:10,11,18 124:2,17 125:7 125:12 127:10 128:22 129:4,9 129:23 131:7 131:13 140:25 142:18 148:11 154:7,10 157:7 159:18 161:23 162:22 164:8 165:1 166:6 168:21 173:25 184:4

**set** 11:18 58:19 90:14 174:11 187:5,6,9,11 188:3,6 198:25

**sets** 186:25

**setting** 40:2 64:14

**settings** 40:17 87:17

**seven** 16:23 27:17,18 28:8 79:4 109:4

**seventeen** 137:25

**shake** 13:4

**share** 47:10,12 50:23 51:1,11 51:25 52:1,3 53:1,5 70:18 70:19,22,24 88:23 148:22

**shared** 41:16 68:15 72:20 122:16

**sharing** 104:7

**sheet** 207:11

**short** 135:10 158:20,22 159:3,4

**show** 30:21 33:7 40:25 127:2 134:9 135:4 136:20 137:20 146:8 149:3 158:25 176:15

**showed** 62:12

**shut** 179:11

**shutting** 179:8

**sic** 42:9

**sick** 96:22

**side** 61:5

**sign** 141:17 178:2 202:23 202:25 207:12

**signature** 204:2 205:20 206:23

**signed** 178:4,5 178:5,18,24

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025
O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

**[signed - specifically]**                                                 Page 47

| | | | |
|---|---|---|---|
| 180:11 207:19 | 133:20,23 | 88:8,12 102:4 | 74:19 75:8,19 |
| **significant** | 134:3 141:23 | 104:4,21 | 76:1,15,16 |
| 191:22 | 147:12 149:9 | 112:19 116:23 | 79:12 81:12,15 |
| **signing**  157:4 | 165:17 172:6 | 123:21 127:8 | 83:15 84:15 |
| 178:25 | 175:11 181:16 | 129:3,8 131:6 | 85:22 87:21 |
| **simple**  200:14 | 183:6 | 140:24 142:17 | 90:16 93:1 |
| **sitting**  37:20 | **southeast** | 144:7 148:15 | 99:10 106:18 |
| 152:5 199:23 | 207:15 | 163:25 169:9 | 106:25 107:3,3 |
| **situation** | **southern**  2:14 | 170:14,14 | 107:7,20 109:6 |
| 145:21 172:22 | **sparks**  1:22 | 174:10 181:23 | 109:8 111:1,15 |
| 174:5 | 8:11 205:2,21 | 183:17,25 | 111:19,23 |
| **six**  157:7 | **speak**  17:17,21 | 184:1,8,19,23 | 112:21 118:13 |
| 158:23 159:4 | **speaking**  11:2 | 184:23 185:6,7 | 119:4 120:22 |
| 198:4 | 122:21 137:16 | **specialist**  13:25 | 121:6,25 |
| **skills**  205:10 | 138:8 | 14:6,19 | 122:17 124:8 |
| 206:6 | **special**  4:18,21 | **specialists** | 138:5,8,25 |
| **skip**  158:19 | 4:23 5:4 10:5 | 23:24 24:1 | 139:1 141:22 |
| **small**  59:21 | 13:24 14:16,20 | **specialized** | 142:19 143:15 |
| 79:22 | 14:23,24 15:1 | 79:20 | 154:3 155:11 |
| **snapshot**  39:15 | 15:9,21 16:16 | **specific**  17:6,14 | 157:25 162:3 |
| **software**  54:18 | 17:22 24:19,22 | 18:6,7 20:9,13 | 162:17 168:25 |
| **solutions**  189:2 | 25:19,24 26:6 | 23:6,20,22 | 173:3 178:22 |
| 189:6 207:23 | 27:24,24,25 | 24:18,21 25:10 | 181:25 182:15 |
| **somebody**  36:9 | 29:1,2 38:19 | 27:4 29:3 | 191:3 |
| 77:6 93:7 | 38:20 44:8 | 31:11 36:6 | **specifically** |
| 112:21 | 45:13 47:1,18 | 42:17 43:5 | 15:14 21:16 |
| **sorry**  24:10 | 48:11,21 49:2 | 45:25 46:6 | 22:1 36:13 |
| 28:2,17 39:19 | 49:8 53:20,22 | 47:22 48:16 | 48:25 99:6 |
| 42:24 46:1 | 55:23 72:14 | 49:10 50:25 | 107:8 116:19 |
| 54:17 56:3 | 73:8 79:15,18 | 51:6,7,16 53:5 | 119:20 120:13 |
| 58:2 72:1 73:4 | 79:24 80:20,25 | 54:12 60:2 | 123:14 145:17 |
| 73:16 79:5 | 81:6 82:2 | 64:21 65:7 | 146:2 151:8 |
| 90:3 98:4,12 | 84:16 85:6 | 66:18,20,20 | 153:6 156:16 |
| 102:22 106:19 | 86:14 87:9 | 68:4 69:6,8 | 156:24 159:9 |

Corp. Rep. 30(b)(6) Jessica N. Coleman     September 19, 2025
O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

**[specifically - student]**                                   Page 48

162:6 165:10 168:7 186:16 189:16 194:10 196:2
**specifics** 12:20 43:18 49:19 50:3
**speech** 43:25 44:3,4,10,11,12 44:15,24 45:11 54:8,21,23 86:15 190:11
**spell** 24:14
**spend** 50:22
**spending** 48:20
**spent** 48:11 49:15 50:20 53:15
**splcenter.org** 2:17
**split** 184:22
**spoke** 17:22
**spring** 20:9 80:19
**ssa** 80:2 147:25 148:1,24,25 173:25
**ssas** 124:1
**stacey** 148:23
**staff** 79:12,13 80:20 81:10 82:4,9,12 111:17 121:6

**staffing** 81:9
**stamp** 129:15
**stamped** 62:14
**standard** 8:4
**standing** 11:1 191:18
**standpoint** 161:16
**stands** 35:6 162:8 176:6
**start** 19:15 103:19 135:3 178:2
**started** 105:15 183:16
**starting** 9:14
**starts** 134:23 158:3
**state** 11:12 14:4,6 23:24 23:25 24:2 36:21 38:21 39:21,22 65:10 75:15 79:13 81:17,22 82:6 83:12 84:20,22 113:16 119:23 119:24,24 120:1 138:25 147:1,5,9 154:13 155:21 156:6 157:9 180:17 205:23

**stated** 119:18 120:6 182:22
**states** 1:1 159:10 160:1
**stating** 200:3
**status** 66:14 67:11 91:3 103:21 104:12 110:3,17 111:11 115:22 116:11 119:22 120:5,7,10 121:10,21 122:3
**stay** 25:14 60:9 174:9
**stenographic** 9:7
**stephenson** 3:13 9:11
**steps** 174:3
**stipulate** 95:20 99:17,20 101:7 134:25 135:24 136:4,14,20 137:4 139:25 146:13 200:23 201:5
**stipulated** 33:9
**stipulation** 9:8
**stop** 59:11
**straight** 116:7
**street** 1:20 3:7 8:19

**stress** 107:18
**structures** 82:8
**student** 5:20 19:19,21 20:10 22:22 23:5,10 23:17,17 25:10 25:24,25 26:1 26:2,8,11,12,14 26:17,19,25 27:2,22,25 28:19,21,22 29:6,11,19 30:2,9 31:14 31:19,24 32:3 34:15,19,22 35:2,8,10,20,21 36:7,9,12,24 38:6,11,11 45:18 63:13,14 63:19 66:14,23 67:5,10,18,23 68:10,12 69:9 69:10,11,12 70:10,15 72:6 72:13,21 73:7 78:1 80:6,9,14 82:25 88:7,12 89:12 90:1,5 90:17 91:3,4 91:16 92:1 93:4,14,21,22 93:24,25 104:11,12,18 106:10 107:4

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025
O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

**[student - summarize]**                                            Page 49

| | | | |
|---|---|---|---|
| 107:11,17,20 | 123:8 161:24 | 83:10,13,14,21 | **subject**  202:12 |
| 108:3,18 | 172:22 | 84:14 85:2,3,6 | **submission** |
| 109:24 110:3 | **students**  5:5 | 85:8,10,16 | 149:23 150:9 |
| 110:16,17,17 | 15:9 19:20,20 | 86:4,7,8,20,22 | **submissions** |
| 110:22 111:9 | 20:1,2,4,5,7,16 | 86:23 87:4,5 | 151:2 |
| 111:11,19 | 20:20,21 21:3 | 87:10,16,20,23 | **submit**  81:4 |
| 112:2,6,11,16 | 21:4,8,12,13,14 | 88:2,4 89:6,8 | 88:4,9,10 90:6 |
| 112:18,25 | 21:20,24 22:1 | 89:22,25 90:7 | 148:3 150:13 |
| 115:5 116:10 | 22:2,6,12,19 | 91:8 92:14 | 152:18 |
| 116:22,22 | 24:17,20,22,25 | 94:5 103:19 | **submits**  113:19 |
| 117:2,3,7,25 | 25:8,18,19,22 | 104:3,19 | **submitted** |
| 118:2,8,19,21 | 26:10 32:13 | 106:18,25 | 150:11,13,16 |
| 119:7,8,20,25 | 33:24 34:13 | 107:8,10,23 | 151:8,12,14,21 |
| 120:18 121:9 | 36:24 38:12,19 | 109:6,7,11 | 152:8,10,11,19 |
| 121:10,19,21 | 38:22 39:11 | 110:10,23,24 | 152:25 153:10 |
| 123:2,7,18 | 40:3,4,15 | 111:2 113:9 | **submitting** |
| 126:10 136:25 | 47:10,11,14,19 | 115:22 116:2,5 | 89:14 150:12 |
| 137:5,12,13 | 48:17,21 49:3 | 116:6,18 | **subscribed** |
| 138:12 139:1,5 | 49:21,23 51:18 | 117:13,16 | 209:14 |
| 139:6,10 140:2 | 51:18,23,24 | 118:13 119:4 | **subsection** |
| 141:2,4,13 | 52:14 53:5,6,8 | 120:4,7,7,10,12 | 28:15 |
| 143:12,23,24 | 53:9,13,15,19 | 122:1 124:8,12 | **substances** |
| 144:1,6 145:20 | 53:20,24 54:13 | 124:16,22,24 | 13:8 |
| 146:1,25 154:5 | 54:14 55:6,15 | 125:6,11 126:2 | **substantially** |
| 155:11 160:4,4 | 55:16 58:1 | 126:5 130:21 | 93:5 |
| 161:23 162:10 | 62:19 63:6,11 | 131:6,11,12,16 | **subtopic**  76:7 |
| 162:23 163:1,5 | 63:24 64:1,12 | 132:15 146:23 | **suggested** |
| 163:24 165:10 | 64:16 68:3 | 154:4,15 | 127:14 150:5 |
| 167:13 168:14 | 69:5,14,18,25 | 155:23 156:12 | **suggestions** |
| 168:19,22 | 71:15 75:25 | 157:3 162:18 | 152:15 |
| 169:2,23 170:2 | 76:3 77:2 79:8 | 163:13,14 | **suite**  1:20 2:6 |
| 172:17 190:25 | 79:10,25 80:4 | 164:4,19,23 | 2:15 8:19 |
| **student's**  29:3 | 80:13,14,21 | 168:8 194:4 | **summarize** |
| 38:20 106:12 | 82:2,7 83:6,8 | | 18:19 |

Veritext Legal Solutions

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025
O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

**[summary - teach]**                                                    Page 50

**summary** 39:8 41:13
**summer** 80:22
**superintendent** 49:11 79:19 81:7
**supervisor** 14:20 49:7 97:1 102:4 112:20 123:15 123:21 124:3,5 170:13 171:4
**supervisors** 17:23 165:8
**supplement** 201:14,17
**supplemental** 6:13 47:8 50:11,14,15 197:3,12,25 198:11 199:3 199:12,16,22 200:4,9,10,15 201:22
**supplementat...** 202:12
**supplemented** 201:11
**supplies** 47:7 49:15,16,22 81:11,14
**support** 47:14 79:20 80:3 82:10 86:17

87:25 89:9 107:25 124:1 148:11 173:25
**supports** 47:6 49:15,16 80:3 81:14 89:11 93:25
**supposed** 201:13,14
**sure** 17:23 18:11,21 19:5 23:20 25:13 26:1 28:3,19 30:17 34:4,5,7 39:21 45:9 46:16 52:4,6 53:4 61:8 62:16 67:10 70:23 73:21 82:3 87:3 89:21 95:8 96:19 99:1,24 102:23 103:8 106:22 108:25 118:16 121:22 126:19 127:8 133:24 134:20 135:9,9,18 138:20 140:19 140:22 151:11 151:21 152:4,5 152:24,24 160:25 165:8 166:3 174:11

180:2 191:17 196:12 199:8 199:18,19 200:14
**susan** 183:22
**suspected** 141:18,24
**suspended** 64:11
**swear** 10:8 12:2
**switch** 184:8
**sworn** 8:24 10:12 205:5 209:14
**synergy** 35:5
**system** 22:17 22:22,24 30:10 34:11,15 35:3 35:8,15,25 38:11 58:1 75:25 118:2 125:1,3,5
**systems** 97:4

**t**

**t** 4:7 5:1 6:1,21 6:21 7:1,1 208:3,3
**tab** 27:7 59:17 60:21 61:11 132:4
**tabbed** 41:1 58:14 61:5

**tabs** 59:18
**tactics** 11:4
**tag** 124:24
**take** 8:8,12,21 11:11 12:1 18:19 21:12,13 21:14,14,21 50:4 78:12,18 102:10 126:18 131:25 133:22 195:9
**taken** 10:22,25 21:18 167:2 205:3,12 206:9
**takes** 65:17 79:18,21
**talk** 73:24 86:12 143:6 153:12 156:19 158:20 168:12 174:3
**talked** 78:3
**talking** 23:9 62:17 70:22 78:7 84:11 88:22 100:23 100:25 102:19 174:12 177:11 178:17 179:5,6 193:7,25
**tapp** 65:11
**taught** 15:9,10
**teach** 15:6

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025
O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

**[teacher - think]**                                                    Page 51

**teacher** 14:16 14:17,17 15:8 20:8 79:14 80:1,16,25
**teachers** 34:20 79:22 82:9 124:6
**teaching** 79:19
**team** 24:2,3,5,7 24:8 36:7,9,12 49:23 79:18,24 93:6,20,21 94:2 123:15 124:4 140:23 140:25 142:13 142:19 143:9 143:13,21 144:4,10 147:22 150:3 156:17 159:3,4 160:2,2,12,17 160:17 161:8 161:17,21,21 161:21,25 162:1,2,4,13,15 162:15,19 163:4,7,25 174:15
**teams** 102:21 107:22
**technology** 9:11 188:21,23
**tell** 10:13 12:2 12:7 14:12

34:25 35:13,13 35:23 58:8,11 58:12 78:4 108:23 128:4 128:24 133:6 143:5 146:12 157:16 166:5 168:16 176:15 176:20 182:8 196:1
**temperature** 50:5
**ten** 16:21,24 18:23 19:2,12 19:15 29:11 30:5 46:24 62:13 91:10 154:6 175:3 185:18,19
**term** 63:25 158:22 159:3,4
**test** 21:7,10,10 21:13,14,15,16 191:2
**testified** 10:14 78:5 101:16 192:14 193:19 194:4,14,21 195:3,22
**testifies** 194:10
**testify** 11:16 13:9,15 17:12 18:13,23,24 19:9,16 57:15

57:18 75:7,23 75:24 76:15 77:4,7 199:23 201:20
**testifying** 16:20 195:7 205:5
**testimony** 67:15 103:24 108:6 113:3 122:6 125:14 195:18 207:9 207:17 209:8
**testing** 143:14
**tests** 21:12,17 190:23
**thank** 8:10 10:7 10:17 12:4 13:2,7 16:2,8 19:15 31:5 32:24 33:1,3 34:2,7,9 38:18 40:23 46:18,20 53:3 56:13 61:9,18 62:10 62:23 78:16 83:24 95:23 96:6 99:21 101:6,22 103:8 104:6 106:5,6 111:8 118:5 127:2 128:13 128:16,19 130:11 132:10 133:3 134:4,17

136:18,18 146:20 149:8 152:12 154:2 158:5,25 169:5 196:8 202:1 203:6
**thanks** 78:17 135:12 140:6
**therapist** 189:2
**therapy** 44:7,8 44:15,24 45:12 45:12,12
**thermometer** 50:4
**thing** 61:3 63:22 128:8
**things** 29:21,24 97:14 104:23 129:11 158:24 159:22
**think** 34:16 38:18 50:19 59:19 66:10 81:16 89:5 97:25 98:1 103:5 104:5 128:3 129:11 132:1 135:15 136:6 138:24 140:4 142:7 148:19 149:7 153:21,23 158:21 160:23 189:9

**[thinking - trying]**   Page 52

| | | | |
|---|---|---|---|
| **thinking** 98:13 98:14 | 183:25 184:16 187:2 188:14 188:17,22,24 189:4,5,7,23 191:22 196:8,9 200:7 201:10 203:7 207:18 | **topic** 52:20 166:10 167:15 180:19 192:17 193:5,19 | **treating** 173:9 |
| **third** 30:11,14 50:19 | | | **truancy** 19:21 36:25 138:4,7 138:21 139:11 |
| **thomas** 1:10 3:3 8:17 | | **topics** 19:2,13 113:24 174:23 176:1 | **true** 62:2 94:25 95:2,6,21 102:24 128:21 129:7,22 132:12,19 133:16 134:2,5 134:15 135:1,2 135:25 136:5 137:3,4 140:1 151:11 152:6 157:3 158:7,14 158:15 159:24 163:10,19 164:3 176:8 182:21 201:22 205:9 206:5 209:8 |
| **thought** 103:7 116:17 148:10 156:19 160:25 | **timeframe** 23:6 47:7 159:5 207:8 | **total** 29:17 | |
| **three** 15:13 20:19 102:10 129:16 138:2 138:15,15 154:14 155:22 156:11 160:4,9 160:15 161:8 161:12,14,18 163:15 | | **toward** 198:5 198:10 | |
| | **timelines** 20:15 20:16 | **towards** 80:22 | |
| | **times** 16:2,3,18 23:4 29:1 50:17 101:8 175:3,8 201:19 | **track** 127:23 165:11 | |
| | | **traditional** 64:14 | |
| | **title** 56:1,5 63:1 136:16 | **train** 102:16 | |
| **till** 78:19 | **titled** 198:8 | **trainer** 14:18 | |
| **time** 1:18 8:4,7 9:12 12:24 38:22,24 39:25 41:25 49:24 92:11 95:15 96:20 97:1 102:3 105:10 121:23 126:11 130:18 131:10 133:22 145:16 146:20 150:2 154:11 155:16 158:9,21 159:16,25 165:20 166:13 | **today** 10:6 11:21 13:10,15 18:12 20:1 57:16 75:23 152:6 156:19 199:23 | **training** 102:18 102:20 | **truevid** 3:13 |
| | | **transcriber** 206:1 | **truth** 10:13,13 10:14 12:2,3,3 |
| | **todd** 165:17,18 165:20 | **transcript** 9:1 203:3,15,22 205:24 206:3,5 207:6,19 209:5 209:8 | **truthfully** 13:9 13:15 |
| | **together** 141:1 142:13 143:21 | **transcriptionist** 205:7 | **try** 107:25 |
| | | | **trying** 21:1 26:11,22 34:16 71:25 76:16 118:3 159:2 176:3 193:2,25 199:18,19 200:17,17 |
| | **took** 11:25 159:4 | **transition** 21:3 25:13 | |
| | | **traumatic** 172:20 | |
| | **tools** 188:21 | | |
| | **top** 41:23 60:25 88:1 155:7 | **treated** 12:18 | |

Corp. Rep. 30(b)(6) Jessica N. Coleman               September 19, 2025
O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

**[trying - vague]**                                                      Page 53

201:2
**turn** 29:17
**turnage** 183:19
**twist** 201:2
**two** 15:13,13
  28:9 38:13
  39:23 40:1
  41:12 74:22
  84:20 87:13
  91:10 135:13
  148:17,19
  150:18 167:15
  184:22 186:25
  188:20 196:19
  196:22,24
  199:7
**types** 52:17
**typewriting**
  205:7
**typically** 40:2
  81:13 82:11
  87:23 100:16
  117:12 148:17
  164:20 168:1
  172:17,18
  174:14

**u**

**u** 6:21,21 7:1,1
  24:12
**uga** 14:5
**uh** 13:4,4
**ultimately**
  187:9

**under** 9:4 13:8
  18:17 44:19,24
  46:24 52:16
  55:25 62:18
  69:16,25 77:13
  77:23 92:22,23
  93:11,15 96:5
  96:12,18
  114:22 115:1,9
  140:24 141:8
  145:2,13 157:4
  168:19 170:16
  174:8,13 179:1
  199:23
**underlined**
  155:22
**understand**
  8:25 11:5,7
  12:1,7,8,11,17
  39:19 44:21
  52:4 118:3
  162:10 193:23
  194:3
**understanding**
  23:4,14 97:22
  104:5 111:25
  165:9
**unethical**
  114:13
**unexcused**
  29:12 30:5
  137:13
**unique** 186:19

**unit** 79:1
  126:24 195:14
**united** 1:1
**university** 14:4
**unknown** 66:8
  66:19,22 68:16
  73:20,25 74:9
  171:15 172:11
  173:4
**updated** 6:15
  177:6 190:4
  196:17 197:1
  200:24
**updates** 100:11
  102:12
**upload** 34:18
  34:23
**uploaded** 34:25
  35:24
**upside** 46:15
**use** 33:10 59:19
  65:1,3,21
  68:20 73:6,10
  76:10 78:4,6
  81:13,25 85:16
  108:2,17
  109:14 124:15
  145:7,9 168:16
**used** 18:17
  64:19 72:10
  74:9,25 75:8
  76:12,15 97:11
  145:11 155:16
  207:19

**uses** 9:3 40:18
  67:21 89:17
**using** 54:15
  68:16 73:19
  84:12,13 113:9
  159:20 160:8
  170:4 177:6
  201:21
**utilize** 145:7
**utilized** 47:6
  51:16 74:19
**utilizes** 160:7
**utilizing** 54:25

**v**

**v** 1:8 207:4
  208:1 209:1
**v.l.** 1:6,6 2:2
  3:15 8:16,16
  207:4,4 208:1
  208:1 209:1,1
**vague** 23:12
  25:5 26:20
  27:3 42:13,23
  48:13 68:13
  69:3 71:23
  72:18 90:4
  93:18 103:23
  104:14,15
  106:15 108:7
  109:14 110:6
  110:20 111:14
  113:5 114:16
  115:24 116:14

**[vague - variety]**                                                    Page 54

| | | | |
|---|---|---|---|
| 117:6 119:11 | 61:7,9,15,21 | 115:11,17,19 | 167:9,17,20,24 |
| 121:1,13 122:5 | 65:25 66:12,17 | 115:25 116:8 | 168:2 169:14 |
| 123:9 139:12 | 66:21,25 67:8 | 116:15,20 | 169:18 170:1 |
| 141:20 149:25 | 68:8,19 69:1 | 117:1,11,14,22 | 170:11,17,21 |
| 150:24 165:6 | 70:8 71:11,14 | 119:12,14 | 171:3,11,19,22 |
| 168:10 169:13 | 72:5 73:3,17 | 120:16,19 | 172:2,8,15,23 |
| 170:10 171:2 | 73:22 74:4,7 | 121:4,7,14,16 | 173:3,11 |
| 171:17 178:12 | 74:14,20 75:21 | 122:8,10,13,15 | 174:24 175:2,6 |
| **valley**  2:6 | 76:9,17,21 | 122:21 123:1 | 175:9,12 176:2 |
| **value**  187:7,25 | 77:9,13,18,20 | 123:12 125:15 | 176:7 177:3,10 |
| **vance**  2:3,5 | 77:25 78:7,12 | 125:18,21,23 | 177:14 178:1 |
| 3:14,14 4:3,5 | 78:18 79:3 | 126:19 127:1 | 178:19,23 |
| 9:15,15,23,23 | 83:24 84:2,4,6 | 128:6,9,12 | 179:5,9,13,18 |
| 10:17,19,20 | 84:8,11,17 | 131:21,25 | 179:23 180:2,9 |
| 17:7 23:13,21 | 87:2,6 89:20 | 132:11,22 | 180:12,15,18 |
| 25:2,4,16 | 90:2,24 91:2 | 135:6,9,12,15 | 182:18,20 |
| 26:23 27:9 | 93:19 94:3 | 135:19,23 | 183:1 187:23 |
| 29:15,22 32:17 | 95:22 98:5,11 | 136:17 137:3,7 | 188:2,9,12 |
| 32:19 33:6,14 | 98:24 99:2,16 | 138:19 139:13 | 190:9 191:1,15 |
| 33:17 36:10,21 | 99:21,23 100:1 | 139:20,23,25 | 191:19,23 |
| 37:5,8,15,22 | 100:25 101:6 | 140:6,7 141:23 | 192:7,18,21,24 |
| 42:19,24 43:3 | 101:16,22,23 | 142:9 147:16 | 193:2,6,11,14 |
| 43:8,11,19 | 102:22 103:3,7 | 148:6 149:6,8 | 193:17,21 |
| 44:2,9 45:16 | 103:9,25 104:6 | 149:10 150:1,7 | 194:2,7,13,20 |
| 45:19 46:1,4,7 | 104:9,16 105:1 | 150:23 151:10 | 195:1,9,16 |
| 46:11,13,17,20 | 105:8,13 106:1 | 151:22 152:3 | 196:6 199:7,10 |
| 46:22 47:4,15 | 106:5,8,16,20 | 153:8 154:21 | 200:21 201:1,4 |
| 47:24 48:4,18 | 106:23 108:8 | 160:21,25 | 201:7,12,18 |
| 49:13 50:1,9 | 108:10,15 | 161:2,4,10,13 | 202:1,7,15,20 |
| 51:17 52:9,23 | 109:16,22 | 163:19,23 | 203:6,10,13,16 |
| 53:3,17 57:6 | 110:7,14 111:3 | 164:2,11,17 | 203:18 |
| 57:20,23 58:24 | 111:21 113:4,6 | 165:7,13,16 | **varies**  88:17 |
| 59:4,6,12,14,16 | 113:11,25 | 166:11,15,18 | **variety**  49:6 |
| 60:3,9,11,19,24 | 114:3,9,12,18 | 166:20,21 | 66:3 |

Corp. Rep. 30(b)(6) Jessica N. Coleman          September 19, 2025
O.L., by and through her mother, V.L. and V.L.v. Cobb County School District, et al.

**[various - withdrawal]**                                      Page 55

various  65:3
vast  164:3,6
vendor  64:2,7
verification
  6:10,15 176:22
  176:24 177:6
  196:17 197:1
  200:3,12,13,24
verifications
  177:16 180:23
  199:20
verified  199:24
  200:7 201:11
  201:20 202:4
verifies  200:24
verify  33:7
  152:5,7 176:24
  177:16 178:11
  179:1 201:8,13
  201:14,16
  202:2 207:9
verifying
  199:21 200:3
  200:14,25
  202:5
veritext  8:12
  207:14,23
veritext.com
  207:15
version  98:19
  101:13 127:24
  128:2,4,5,14
  136:16

versions  101:4
  135:22
vet  192:1
vetted  186:14
  186:15
video  8:8 9:10
  9:10 203:4,25
videographer
  3:13 8:2 60:7
  60:10 78:20,25
  126:20,23
  195:10,13
  202:18 203:2
  203:11,19,24
videotaped
  1:14
violation  139:1
violations
  137:16,23
  139:6,17
vision  187:10
  187:13,15,16
  189:9
vs  8:16

**w**

wait  78:19
  91:12 138:1
  149:6
waiting  104:20
waive  202:19
want  25:13
  26:9 28:1 33:6
  34:3 41:1

44:21 51:22
52:4 58:22
59:3 60:7,12
60:13 63:4
75:21 95:15
102:23 103:8
106:24 114:15
131:22 138:23
180:16 181:1
189:14 191:17
193:24 200:13
202:19
wanted  96:18
  106:5 133:23
  135:17 158:23
wanting  77:4
watch  41:18
way  72:1 84:21
  84:22 139:15
  171:25 178:22
  201:19
ways  20:5 45:1
we've  78:10
  117:17 148:18
  148:19 166:13
website  55:1,12
week  94:17
  154:15 155:23
  160:6 163:15
  164:7
weekends
  50:17
weekly  23:2

weeks  74:22
  157:7 158:23
  159:4
weight  87:5
welcome  40:24
  46:21 169:6
wendy  189:10
went  47:9
  62:12 99:5
when's  35:15
whichever
  61:11
whoa  179:5,5
window  53:11
  126:14
windows  23:8
wing  192:1,5,5
  192:10 194:21
withdraw
  25:19,21 26:17
  27:22 28:19
  29:5 30:11
  31:14,19,24
  32:3,12 104:11
  106:10 107:11
  107:16,20
  108:3,18
  109:11,24
  110:15 111:9
  113:9 116:10
  117:24 119:7
  121:9
withdrawal
  19:22 21:23

**[withdrawal - writing]**  Page 56

| | | | |
|---|---|---|---|
| 22:6,19 23:9 | 35:20 66:23 | 84:10,15 87:3 | 169:15,22 |
| 25:23 27:14,23 | 67:7 111:22,23 | 89:21 91:1 | 170:12,19 |
| 28:9 29:4 | 112:12,16,17 | 93:20 95:19 | 171:4,20,23 |
| 34:12 35:10,17 | 113:1 117:4 | 98:8,21 99:1 | 172:6,16 173:5 |
| 35:18 37:1 | 118:2,13,19 | 99:24 104:2,8 | 174:25 175:7 |
| 38:6,10 65:6 | 122:2 123:3 | 104:17 105:9 | 175:10 177:24 |
| 65:19 66:7 | **withdraws** | 105:21,23 | 178:15,20 |
| 67:3,22 68:9 | 118:8 | 106:7,17,22 | 179:21,25 |
| 73:7,9,12,21 | **witness**  6:24 | 108:9,14 | 180:5,10,13,16 |
| 75:1,25 76:2 | 8:14,24,25 | 109:17 110:8 | 182:15,19,25 |
| 77:2 78:2 | 10:8,12 11:4 | 110:21 111:15 | 187:24 188:10 |
| 106:17,25 | 12:13 16:14 | 113:7 114:1,10 | 190:21 191:20 |
| 107:3 109:3,19 | 17:5 23:14 | 115:8,15,18 | 192:5 194:9,17 |
| 109:20 112:14 | 25:6 26:21 | 116:1,16,21 | 194:24 195:6 |
| **withdrawals** | 27:4 29:16 | 117:7,12,15 | 199:8 201:24 |
| 5:9,11,13,15,17 | 32:18 36:4,6 | 119:13 120:17 | 202:2,9,14 |
| 5:19 27:7,8 | 37:6,17 42:16 | 121:5,15 122:9 | 205:4 207:8,10 |
| 108:22 109:1 | 43:4,9,16,24 | 122:14 123:10 | 207:12,18 |
| 134:23 136:2,6 | 44:6 45:17,24 | 125:16,19,22 | **word**  76:4 |
| **withdrawing** | 46:5,12,16,19 | 126:17 131:24 | 109:14 |
| 24:17 25:8 | 46:21 47:5,22 | 132:9,19 | **work**  24:9,16 |
| 26:24 28:20 | 48:2,15 49:6 | 136:12 139:14 | 25:14,25 54:6 |
| 30:2 33:24 | 49:19 50:8 | 139:21,24 | 81:3 174:10,13 |
| 66:13 68:9 | 51:15 53:4 | 141:21,25 | **working**  25:11 |
| 72:13 103:19 | 57:21 60:23 | 147:17 150:2 | 25:12 80:21 |
| 104:3 107:8 | 61:8 66:3,18 | 151:3,6,19 | 189:6 |
| 110:24 112:2 | 67:3 68:2,15 | 153:4 154:19 | **would've** |
| 115:21 116:2,4 | 68:23 70:5 | 160:23 161:1,3 | 127:24 |
| 116:18 119:20 | 71:10,12,24 | 161:5,11 | **write**  132:4,5 |
| 121:19 | 72:19 73:15,18 | 163:21,24 | 180:4 |
| **withdrawn** | 74:5,18 75:7 | 164:13,15 | **writing**  55:10 |
| 22:1,2 24:20 | 75:12,14 76:14 | 165:8 166:12 | 75:22 154:13 |
| 24:21,23 26:15 | 78:15,17 79:5 | 166:19 167:5 | 168:17 |
| 28:21 34:22 | 83:25 84:3,5,7 | 167:18,22,25 | |

**[written - zone]**                                                    Page 57

| | | |
|---|---|---|
| **written** 9:8 103:13 123:17 144:19 201:19 | 20:19,22,23 39:7 40:8,9,11 40:12,19,19 41:9 42:1,4,5,6 42:17 43:6,13 46:2 48:7 63:12 66:4 75:16 80:8,22 80:23 87:14 88:21 89:25 90:18 95:24,24 96:10,12,15,22 99:6 100:6,10 101:13 102:6 102:25 118:22 118:23 122:3 124:11 126:2 127:19,22,25 129:5,9 130:17 131:4,9 185:1 | 110:3,3,17 111:11 115:22 116:2,11 119:22 120:5,7 120:10 122:3 |
| **x** | | **zero** 131:11,12 |
| **x** 4:1,7 5:1 6:1 205:24 | | **zipper** 59:21 |
| **y** | | **zone** 30:12 92:8 |
| **y'all** 33:8 128:1 135:1 | | |
| **y'all's** 33:8 | | |
| **yeah** 33:2 35:19 52:15 59:19 60:18,24 61:24 77:22 78:14 95:16 97:25 98:21 99:19,19 101:11,15,18 101:19 103:5,8 104:8,14 116:16 132:11 132:23 135:4 135:12 136:13 136:13,14 148:10 153:19 153:19,21,25 158:17,21 176:8 180:20 189:21 191:17 202:24,24 203:21 | | |
| **year** 14:15 16:23 20:14,17 | **year's** 75:16 | |
| | **years** 15:6,8,11 20:19 38:13 87:14 91:10 99:10 148:18 148:19 164:4 185:18,19 189:13 | |
| | **yesterday** 97:23 98:23 | |
| | **z** | |
| | **z** 91:3 103:11 103:21 104:12 | |

Georgia Code

Title 9, Chapter 11

Article 5, Section 9-11-30

(e) Review by witness; changes; signing.

If requested by the deponent or a party before completion of the deposition, the deponent shall have 30 days after being notified by the officer that the transcript or recording is available in which to review the transcript or recording and, if there are changes in form or substance, to sign a statement reciting such changes and the reasons given by the deponent for making them. The officer shall indicate in the certificate prescribed by paragraph (1) of subsection (f) of this Code section whether any review was requested and, if so, shall append any changes made by the deponent during the period allowed. If the deposition is not reviewed and signed by the witness within 30 days of its submission to him or her, the officer shall sign it and state on the record that the deposition was not reviewed and signed by the deponent within 30 days. The deposition may then be used as fully as though signed unless, on a motion to suppress under paragraph (4) of subsection (d) of Code

Section 9-11-32, the court holds that the reasons given for the refusal to sign require rejection of the deposition in whole or in part.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

O.L., by and through her mother, **V.L.,**
and **V.L.,**

      Plaintiffs,

v.

**COBB COUNTY SCHOOL
DISTRICT, ALVIN THOMAS, NAKIA
COTTON,** and **JESSICA COLEMAN,**

      Defendants.

CIVIL ACTION NO.:

1:23-cv-03285-SDG

## NOTICE OF RULE 30(b)(6) DEPOSITION
## OF COBB COUNTY SCHOOL DISTRICT

Pursuant to Federal Rule of Civil Procedure 30(b)(6), Plaintiffs will take the

deposition upon oral examination of the Cobb County School District ("CCSD").

Pursuant to Rule 30(b)(6), CCSD shall designate one or more of its officers,

directors, managing agents, or other persons to testify on its behalf as to matters

known or reasonably available to CCSD concerning the subjects identified below.

The deposition will take place as follows:

DATE:          September 19, 2025

TIME:          9:00 am

LOCATION:     1075 Peachtree Street N.E.
                 Suite 1500
                 Atlanta, GA 30309

1



PLAINTIFF'S
EXHIBIT

15

CS      9/19/25

The deposition of CCSD will be taken before a notary public or other officer authorized by law to administer oaths and will be recorded by videotape, audio, and stenographic means. The deposition shall proceed from day-to-day until complete.

Please designate and identify the witness(es) who will testify at the deposition as to each of the topics described below at least **five business days** before the deposition. Each person designated by CCSD should produce, no later than **four business days** prior to the deposition, all documents received in preparation for, or in connection with, the deposition. In the event a witness intends to refer to specific documents in responding to questions on a topic, such documents shall be identified at the time they are produced.

<u>Terms as used in this Notice:</u>

1. The terms "all" and "any" shall each be construed as encompassing any and all.

2. The terms "and" and "or" shall mean and/or to be construed disjunctively or conjunctively, as necessary, to bring within the scope of these topics all information that might otherwise be construed outside the scope.

3. The terms "relating to," "regarding," or "concerning" mean having any relationship or connection to, being connected to, responding to, addressed to, sent to, containing, evidencing, showing, memorializing, describing,

2

analyzing, reflecting, involving, pertaining to, comprising, constituting, or otherwise establishing any reasonable, logical, or causal connection.

Additional Terms:

a. "FAPE" means a Free and Appropriate Public Education, as used or defined under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.* ("IDEA"), and federal and state implementing regulations.

b. "HHB" means Hospital/Homebound as used or defined by the Georgia Department of Education ("GaDOE").

c. "IEP" means Individualized Education Program as used or defined under the IDEA as well as federal and state implementing regulations.

d. "Policy" means any rule, practice, procedure, custom, directive, or policy, whether formal or informal, as well as any common understanding or course of conduct that is or was recognized as such by present or former CCSD directors, agents, employees, or other person acting or purporting to act on CCSD's behalf, that is or was in effect at any time during the period covered by this Notice. "Policy" also includes any change to any "policy" as defined in the preceding sentence.

3

e. "Practice" means a procedure or activity or way of doing something that is done regularly or repeatedly over time.

f. "Section 504 Plan" means a 504 Plan, Individual Accommodation Plan, or other plan used to accommodate students as required under Section 504 of the Rehabilitation Act ("Section 504) and the Americans with Disabilities Act ("ADA").

g. "Student" means any student who is enrolled or eligible to be enrolled.

h. "Students with Disabilities" means any student identified with a disability under the IDEA, Section 504, or the ADA. This includes students identified as eligible to receive a Section 504 Plan, IEP, accommodations, or any combination thereof.

### Matters for Examination

Pursuant to Federal Rule of Civil Procedure 30(b)(6), CCSD is required to designate individual(s) to appear on its behalf and give testimony on the following topics, from the start of the 2019-2020 school year to the present:

1. CCSD's policies, practices, and procedures relating to initial evaluations and re-evaluations as used or defined under the IDEA, Section 504, or the ADA.

2. CCSD's policies, practices, and procedures relating to IEPs and Section 504 Plans as used or defined under the IDEA, Section 504, or the ADA.

4

3. CCSD's policies, practices, and procedures relating to IEP services and Section 504 Plan accommodations and supports as used or defined under the IDEA, Section 504, or the ADA.

4. CCSD's policies, practices, and procedures relating to HHB as used or defined under the IDEA, Section 504, or the ADA.

5. CCSD's policies, practices, and procedures related to independent educational evaluations (IEEs).

6. CCSD's policies, practices, and procedures related to student attendance, excused and unexcused absences, notices of unexcused absences, and truancy.

7. CCSD's policies, practices, and procedures for enrolling and withdrawing students, for reporting enrollment and withdrawal of student, and for complying with Georgia and GaDOE requirements.

8. CCSD's policies, practices, and procedures relating to financial budgets and budgeting for students with disabilities.

9. CCSD's policies, practices, and procedures for at-home, online, remote, and virtual education of students.

10. CCSD's policies, practices, and procedures for the collection and reporting of data, including student data, to the GaDOE relating to students with disabilities, student attendance and truancy, student enrollment and withdrawal, HHB, and financial budgets.

Dated: August 27, 2025

/s/ Chris E. Vance
Chris E. Vance
Ga. Bar No. 724199
Counsel for Plaintiffs

**CHRIS E. VANCE, P.C.**
Suite 100
2415 Oak Grove Valley Road
Atlanta, GA 30345
Tel: (404) 320-6672
Fax: (404) 320-3412
Cell: (404) 313-3800
chris@chrisvancepc.com

/s/ Justin D. Crozier
Justin D. Crozier
Ga. Bar No. 609570
Counsel for Plaintiffs

**JUSTIN D. CROZIER, P.C.**
2415 Oak Grove Valley Road
Suite 100
Atlanta, GA 30345
Tel: (762) 218-1116
justin@chrisvancepc.com

/s/ Carli Raben
Carli Raben, *admitted pro hac vice*
Fla. Bar No. 1036013
Michael J. Tafelski
Ga. Bar No. 507707
Claire Sherburne
Ga. Bar No. 732244
Eugene Choi
Ga. Bar No. 121626
Counsel for Plaintiffs

**SOUTHERN POVERTY LAW CENTER**
2 S. Biscayne Boulevard
Suite 3750
Miami, FL 33131
(786) 347-2056
(786) 237-2949 (fax)
carli.raben@splcenter.org
eugene.choi@splcenter.org
claire.sherburne@splcenter.org
michael.tafelski@splcenter.org

## CERTIFICATE OF SERVICE

I hereby certify that I have on this day served the forgoing NOTICE OF RULE 30(b)(6) DEPOSITION OF COBB COUNTY SCHOOL DISTRICT by way of electronic service to the following attorneys of record:

Reagan G. Sauls
Jeffrey R. Daniel
MaryGrace B. Kittrell
Sheneka S. Lodenquai
PARKER POE ADAMS & BERNSTEIN LLP
reagansauls@parkerpoe.com
jeffdaniel@parkerpoe.com
marygracekittrell@parkerpoe.com
shenekalodenquai@parkerpoe.com

This the 27th day of August, 2025.

/s/ Chris E. Vance
Chris E. Vance
Ga. Bar No. 724199
Counsel for Plaintiffs

**CHRIS E. VANCE, P.C.**
Suite 100
2415 Oak Grove Valley Road
Atlanta, GA 30345
Tel: (404) 320-6672
Fax: (404) 320-3412
Cell: (404) 313-3800
chris@chrisvancepc.com

# All Funds Summary

## COBB COUNTY SCHOOL DISTRICT
## FY2020 BOARD OF EDUCATION ADOPTED BUDGET

| | GENERAL FUND | SPECIAL REVENUE | DEBT SERVICE | CAPITAL PROJECTS | INTERNAL SERVICES | TOTAL ALL FUNDS |
|---|---|---|---|---|---|---|
| **Revenues:** | | | | | | |
| Local Revenue | $563,661,406 | $34,221,429 | $0 | $202,964 | $7,128,164 | $605,213,963 |
| State Revenue | $589,811,266 | $6,826,656 | $0 | $0 | $0 | $596,637,922 |
| Federal Revenue | $7,333,548 | $84,335,749 | $0 | $0 | $0 | $91,669,297 |
| Transfer Revenue | $122,881 | $1,397,383 | $0 | $700,000 | $1,266,133 | $3,486,397 |
| **Total Revenue** | $1,160,929,101 | $126,781,217 | $0 | $902,964 | $8,394,297 | $1,297,007,579 |
| Utilize Fund Balance | $18,699,944 | $3,298,707 | $0 | $48,924 | $0 | $22,047,575 |
| **Total Resources** | $1,179,629,045 | $130,079,924 | $0 | $951,888 | $8,394,297 | $1,319,055,154 |
| **Appropriations:** | | | | | | |
| Instruction | $859,063,162 | $22,995,660 | $0 | $0 | $0 | $882,058,822 |
| Pupil Support Services | $27,366,458 | $9,452,250 | $0 | $0 | $0 | $36,818,708 |
| Improvement of Instructional Services | $14,221,416 | $7,952,244 | $0 | $0 | $0 | $22,173,660 |
| Educational Media Services | $18,933,292 | $7,748 | $0 | $0 | $0 | $18,941,040 |
| Instructional Staff Training | $0 | $11,767,529 | $0 | $0 | $0 | $11,767,529 |
| Federal Grant Administration | $0 | $970,663 | $0 | $0 | $0 | $970,663 |
| General Administration | $12,638,854 | $2,088,293 | $0 | $0 | $0 | $14,727,147 |
| School Administration | $84,966,204 | $184,394 | $0 | $0 | $0 | $85,150,598 |
| Support Services - Business | $6,937,786 | $29,759 | $0 | $0 | $8,370,297 | $15,337,842 |
| Maintenance and Operation of Plant Service | $74,677,885 | $1,740,940 | $0 | $0 | $0 | $76,418,825 |
| Student Transportation | $55,080,828 | $2,069,418 | $0 | $0 | $0 | $57,150,246 |
| Central Support Services | $21,936,532 | $382,845 | $0 | $0 | $0 | $22,319,377 |
| Other Support Services | $391,323 | $13,717 | $0 | $0 | $0 | $405,040 |
| School Nutrition | $0 | $59,563,394 | $0 | $0 | $0 | $59,563,394 |
| Enterprise Operations | $0 | $0 | $0 | $0 | $24,000 | $24,000 |
| Community Services | $98,789 | $10,861,070 | $0 | $0 | $0 | $10,959,859 |
| Capital Outlay | $0 | $0 | $0 | $951,888 | $0 | $951,888 |
| Other Outlays | $3,316,516 | $0 | $0 | $0 | $0 | $3,316,516 |
| Debt Service | $0 | $0 | $0 | $0 | $0 | $0 |
| **Total Appropriations** | $1,179,629,045 | $130,079,924 | $0 | $951,888 | $8,394,297 | $1,319,055,154 |

Public forums on the Tentative Budget were held on April 24, 2019 at 6:30 PM and May 16, 2019 at 6:30 PM. The FY2020 Budget was adopted by the CCSD Board on May 16, 2019 at 7:00 PM. All meetings were conducted at the Cobb County Board of Education, 514 Glover Street, Marietta, Georgia. A copy of the budget is available on the web at http://www.cobbk12.org/centraloffice/finance/2020Budget/

David Chastain, Board Chair

Chris Ragsdale, Superintendent



PLAINTIFF'S EXHIBIT
16
CS  9/19/25

36

**All Funds Summary**

| | GENERAL FUND | SPECIAL REVENUE | DEBT SERVICE | CAPITAL PROJECTS | INTERNAL SERVICES | TOTAL ALL FUNDS |
|---|---|---|---|---|---|---|
| **Revenues:** | | | | | | |
| Local Revenue | $605,564,955 | $35,786,674 | $0 | $4,800 | $7,191,300 | $648,547,729 |
| State Revenue | $524,459,963 | $6,855,014 | $0 | $225,000 | $0 | $531,539,977 |
| Federal Revenue | $7,132,083 | $101,084,400 | $0 | $0 | $0 | $108,216,483 |
| Transfer Revenue | $122,881 | $1,397,383 | $0 | $700,000 | $1,266,133 | $3,486,397 |
| | | | | | | |
| **Total Revenue** | $1,137,279,882 | $145,123,471 | $0 | $929,800 | $8,457,433 | $1,291,790,586 |
| Utilize Fund Balance | $31,256,123 | $1,020,143 | $0 | $48,924 | $0 | $32,322,190 |
| **Total Resources** | $1,168,536,005 | $146,143,614 | $0 | $978,724 | $8,457,433 | $1,324,112,776 |
| | | | | | | |
| **Appropriations:** | | | | | | |
| Instruction | $844,849,865 | $43,058,934 | $0 | $0 | $0 | $887,908,799 |
| Pupil Support Services | $28,548,677 | $5,774,656 | $0 | $0 | $0 | $34,323,333 |
| Improvement of Instructional Services | $24,570,929 | $7,710,716 | $0 | $0 | $0 | $32,281,645 |
| Educational Media Services | $18,854,700 | $7,748 | $0 | $0 | $0 | $18,862,448 |
| Instructional Staff Training | $0 | $11,008,548 | $0 | $0 | $0 | $11,008,548 |
| Federal Grant Administration | $0 | $970,020 | $0 | $0 | $0 | $970,020 |
| General Administration | $12,716,690 | $2,000,665 | $0 | $0 | $0 | $14,717,355 |
| School Administration | $72,956,562 | $217,045 | $0 | $0 | $0 | $73,173,607 |
| Support Services – Business | $7,275,628 | $29,859 | $0 | $0 | $8,433,433 | $15,738,920 |
| Maintenance and Operation of Plant Services | $75,370,521 | $1,961,301 | $0 | $0 | $0 | $77,331,822 |
| Student Transportation | $56,685,352 | $2,181,275 | $0 | $0 | $0 | $58,866,627 |
| Central Support Services | $22,522,628 | $382,885 | $0 | $0 | $0 | $22,905,513 |
| Other Support Services | $770,023 | $16,190 | $0 | $0 | $0 | $783,213 |
| School Nutrition | $0 | $60,751,016 | $0 | $0 | $0 | $60,751,016 |
| Enterprise Operations | $0 | $0 | $0 | $0 | $24,000 | $24,000 |
| Community Services | $97,914 | $9,949,875 | $0 | $0 | $0 | $10,047,789 |
| Capital Outlay | $0 | $0 | $0 | $4,800,000 | $0 | $4,800,000 |
| Other Outlays | $3,316,516 | $122,881 | $0 | $0 | $0 | $3,439,397 |
| Debt Service | $0 | $0 | $0 | $0 | $0 | $0 |
| **Total Appropriations** | $1,168,536,005 | $146,143,614 | $0 | $4,800,000 | $8,457,433 | $1,327,934,052 |



**ONE TEAM ONE GOAL**
COBB COUNTY SCHOOL DISTRICT **STUDENT SUCCESS**

**COBB SCHOOLS FINANCE**
**CSF**

36

Case 1:23-cv-03285-SDG     Document 171     Filed 01/09/26     Page 280 of 379

PLAINTIFF'S EXHIBIT

tabbies

17

CS    9/19/25

## Table of Contents

## 30(b)(6) Deposition

By 30(b)(6) Topic:

**Topic 1:** CCSD's policies, practices, and procedures relating to initial evaluations and re-evaluations as used or defined under the IDEA, Section 504, and the ADA.

| | |
|---|---|
| CCSD Internal Evaluation and Reevaluation Procedures | CCSD_PROD_006220-006261 |

**Topic 2:** CCSD's policies, practices, and procedures relating to IEPs and Section 504 Plans as used or defined under the IDEA, Section 504, and the ADA.

| | |
|---|---|
| Special Ed Manual 2020 | CCSD_PROD_033624- CCSD_PROD_033749 |
| CCSD 504 Section Manual 2023-24 | CCSD_PROD_033750- CCSD_PROD_033802 |

**Topic 3:** CCSD's policies, practices, and procedures relating to IEP services and Section 504 Plan accommodations as used or defined under the IDEA, Section 504, and the ADA.

| | |
|---|---|
| Special Ed Manual 2020 | CCSD_PROD_033624- CCSD_PROD_033749 |
| CCSD 504 Section Manual 2023-24 | CCSD_PROD_033750- CCSD_PROD_033802 |

**Topic 4:** CCSD's policies, practices, and procedures relating to HHB as used or defined under the IDEA, Section 504, and the ADA.

| | |
|---|---|
| GaDOE HHB Services Guidance | CCSD_PROD_031556-031587 |
| GADOE HHB Services Guidance | CCSD_PROD_031524-031555 |
| CCSD SPED HHB.Homebased Manual 2023-24 | CCSD_PROD_033803- CCSD_PROD_033823 |

**Topic 5:** CCSD's policies, practices, and procedures related to independent educational evaluations (IEE) as used or defined under the IDEA.

| | |
|---|---|
| IEE Policy-Guideline | CCSD_PROD_000218-220 |

**Topic 6:** CCSD's policies, practices, and procedures related to student attendance and truancy.

| | |
|---|---|
| Form JB-1 ("Georgia's Compulsory Attendance Law") 10.10.12 | CCSD_PROD_033354 |
| Policy JB ("Student Attendance") 01.07.13 | CCSD_PROD_033362 |
| JB-R Student Attendance 01.07.13 | CCSD_PROD_033368-CCSD_PRDO_033370 |
| JB-R Student Attendance 08.22.19 | CCSD_PROD_033371-CCSD_PRDO_033373 |
| JB-R Student Attendance 08.01.22 | CCSD_PROD_033374-CCSD_PRDO_033377 |
| JB-R Student Attendance 10.24.19 | CCSD_PROD_033378-CCSD_PRDO_033381 |
| JB-R Student Attendance 12.07.23 | CCSD_PROD_033382-CCSD_PRDO_033385 |
| Form JB-5 Attendance Protocol 04.28.16 | CCSD_PROD_033386-CCSD_PRDO_033388 |
| Form JB-5 Attendance Protocol 08.22.19 | CCSD_PROD_033389-CCSD_PRDO_033391 |
| Form JB-5 Attendance Protocol 07.01.22 | CCSD_PROD_033392-CCSD_PRDO_033395 |

**Topic 7:** CCSD's policies, practices, and procedures for enrolling and withdrawing students.

| | |
|---|---|
| Form JBC-1 ("K-1 Out-of-State / Out-of-Country Verification") 07.01.15 | CCSD_PROD_033355 |
| Form JBC-2 ("Statement of Legal Residence") 03.11.19 | CCSD_PROD_033356-CCSD_PRDO_033357 |
| Form JBC-9 ("Disclosures Required for Conditional Admission") 07.01.15 | CCSD_PROD_033358-CCSD_PRDO_033359 |

| | |
|---|---|
| Form JBC-10 ("Parent-Guardian Permission For Voluntary Withdrawal") 07.01.15 | CCSD_PROD_033360 |
| Form JBC-12b ("Student Enrollment/Withdrawal Verification") 08.20.14 | CCSD_PROD_033361 |
| JBC School Admissions 12.05.24 | CCSD_PROD_033396-CCSD_PRDO_033397 |
| JBC-R School Admissions-Withdrawals 07.20.17 | CCSD_PROD_033398-CCSD_PRDO_033406 |
| JBC-R School Admissions-Withdrawals 09.19.19 | CCSD_PROD_033407-CCSD_PRDO_033415 |
| JBC-R School Admissions-Withdrawals 10.15.20 | CCSD_PROD_033416-CCSD_PRDO_033424 |
| JBC-R School Admissions-Withdrawals 07.15.21 | CCSD_PROD_033425-CCSD_PRDO_033434 |
| JBC-R School Admissions-Withdrawals 07.01.22 | CCSD_PROD_033435-CCSD_PRDO_033444 |
| JBC-R School Admissions-Withdrawals 12.07.23 | CCSD_PROD_033445-CCSD_PRDO_033453 |
| Form JBC-3 30-Day Enrollment Waiver 10.31.16 | CCSD_PROD_033454 |
| Form JBC-3a 30-Day Enrollment Waiver For Proof of Birth Date 04.27.20 | CCSD_PROD_033455 |
| Form JBC-3b 30-Day Enrollment Waiver for GA Dept of Public Health Form 3231 (Cert of Immunization) 04.27.20 | CCSD_PROD_033456 |
| Form JBC-3c 30-Day Enrollment Waiver for GA Dept of Public Health Form 330 (Cert of Vision, Hearing, Dental and Nutrition Screening) 04.27.20 | CCSD_PROD_033457 |
| Form JBC-4 Statement of Objection to the Use of SSN for Student ID 07.01.15 | CCSD_PROD_033458 |
| Form JBC-4 Statement of Objection to the Use of SSN for Student ID 04.27.20 | CCSD_PROD_033459 |
| Form JBC-5 Student Enrollment Form 12.11.18 | CCSD_PROD_033460-CCSD_PRDO_033462 |
| Form JBC-5 Student Enrollment Form 09.30.19 | CCSD_PROD_033463-CCSD_PRDO_033465 |
| Form JBC-5 Student Enrollment Form 02.12.21 | CCSD_PROD_033466-CCSD_PRDO_033468 |
| Form JBC-5 Student Enrollment Form 06.01.21 | CCSD_PROD_033469-CCSD_PRDO_033471 |
| Form JBC-5 Student Enrollment Form 09.12.22 | CCSD_PROD_033472-CCSD_PRDO_033474 |
| Form JBC-5 Student Enrollment Form 07.01.23 | CCSD_PROD_033475-CCSD_PRDO_033477 |
| Form JBC-5b Student Re-Enrollment Form 12.11.18 | CCSD_PROD_033478-CCSD_PRDO_033479 |
| Form JBC-5b Student Re-Enrollment Form 09.30.19 | CCSD_PROD_033480-CCSD_PRDO_033481 |
| Form JBC-5b Student Re-Enrollment Form 02.12.21 | CCSD_PROD_033482-CCSD_PRDO_033484 |
| Form JBC-5b Student Re-Enrollment Form 09.12.22 | CCSD_PROD_033485-CCSD_PRDO_033486 |
| Form JBC-8 Authorization to Release Records 01.12.18 | CCSD_PROD_033487 |
| Form JBC-8 Authorization to Release Records 10.15.20 | CCSD_PROD_033488 |
| Form JBC-8 Authorization to Release Records 08.01.24 | CCSD_PROD_033489 |
| Form JBC-12 Student Withdrawal Form 07.01.15 | CCSD_PROD_033490 |
| Form JBC-12 Student Withdrawal Form 02.26.21 | CCSD_PROD_033491 |
| Form JBC-12 Student Withdrawal Form 08.16.21 | CCSD_PROD_033492 |
| Form JBC-12 Student Withdrawal Form 07.16.24 | CCSD_PROD_033493 |
| Form JBC-14 Kinship Caregiver Affidavit 07.01.17 | CCSD_PROD_033494-CCSD_PRDO_033495 |
| Form JBC-14 Kinship Caregiver Affidavit 03.11.19 | CCSD_PROD_033496-CCSD_PRDO_033498 |
| Form JBC-14 Kinship Caregiver Affidavit 10.15.22 | CCSD_PROD_033498-CCSD_PRDO_033499 |
| Form JBC-14 Kinship Caregiver Affidavit 07.16.24 | CCSD_PROD_033500-CCSD_PRDO_033501 |

**Topic 8: CCSD's policies, practices, and procedures relating to financial budgets and budgeting for students with disabilities.**

**Topic 9: CCSD's policies, practices, and procedures for at-home, online, remote, or virtual education of students.**

2

PPAB 12793378v1

Topic 10: CCSD's policies, practices, and procedures for the collection and reporting of data to the Georgia Department of Education relating to students with disabilities, student attendance and truancy, student enrollment and withdrawal, HHB, and financial budgets.

| | |
|---|---|
| | |

By Bates Range:

| CCSD POLICY | BATE RANGES | Depo Topic |
|---|---|---|
| IEE Policy-Guideline | CCSD_PROD_000218-220 | 5 |
| CCSD Internal Evaluation and Reevaluation Procedures | CCSD_PROD_006220-006261 | 1 |
| GaDOE HHB Services Guidance | CCSD_PROD_031556-031587 | 4 |
| GADOE HHB Services Guidance | CCSD_PROD_031524-031555 | 4 |
| Form JB-1 ("Georgia's Compulsory Attendance Law") 10.10.12 | CCSD_PROD_033354 | 6 |
| Form JBC-1 ("K-1 Out-of-State / Out-of-Country Verification") 07.01.15 | CCSD_PROD_033355 | 7 |
| Form JBC-2 ("Statement of Legal Residence") 03.11.19 | CCSD_PROD_033356-CCSD_PRDO_033357 | 7 |
| Form JBC-9 ("Disclosures Required for Conditional Admission") 07.01.15 | CCSD_PROD_033358-CCSD_PRDO_033359 | 7 |
| Form JBC-10 ("Parent-Guardian Permission For Voluntary Withdrawal") 07.01.15 | CCSD_PROD_033360 | 7 |
| Form JBC-12b ("Student Enrollment/Withdrawal Verification") 08.20.14 | CCSD_PROD_033361 | 7 |
| Policy JB ("Student Attendance") 01.07.13 | CCSD_PROD_033362 | 6 |
| JB-R Student Attendance 01.07.13 | CCSD_PROD_033368-CCSD_PRDO_033370 | 6 |
| JB-R Student Attendance 08.22.19 | CCSD_PROD_033371-CCSD_PRDO_033373 | 6 |
| JB-R Student Attendance 08.01.22 | CCSD_PROD_033374-CCSD_PRDO_033377 | 6 |
| JB-R Student Attendance 10.24.19 | CCSD_PROD_033378-CCSD_PRDO_033381 | 6 |
| JB-R Student Attendance 12.07.23 | CCSD_PROD_033382-CCSD_PRDO_033385 | 6 |
| Form JB-5 Attendance Protocol 04.28.16 | CCSD_PROD_033386-CCSD_PRDO_033388 | 6 |
| Form JB-5 Attendance Protocol 08.22.19 | CCSD_PROD_033389-CCSD_PRDO_033391 | 6 |
| Form JB-5 Attendance Protocol 07.01.22 | CCSD_PROD_033392-CCSD_PRDO_033395 | 6 |
| JBC School Admissions 12.05.24 | CCSD_PROD_033396-CCSD_PRDO_033397 | 7 |
| JBC-R School Admissions-Withdrawals 07.20.17 | CCSD_PROD_033398-CCSD_PRDO_033406 | 7 |
| JBC-R School Admissions-Withdrawals 09.19.19 | CCSD_PROD_033407-CCSD_PRDO_033415 | 7 |
| JBC-R School Admissions-Withdrawals 10.15.20 | CCSD_PROD_033416-CCSD_PRDO_033424 | 7 |
| JBC-R School Admissions-Withdrawals 07.15.21 | CCSD_PROD_033425-CCSD_PRDO_033434 | 7 |
| JBC-R School Admissions-Withdrawals 07.01.22 | CCSD_PROD_033435-CCSD_PRDO_033444 | 7 |
| JBC-R School Admissions-Withdrawals 12.07.23 | CCSD_PROD_033445-CCSD_PRDO_033453 | 7 |
| Form JBC-3 30-Day Enrollment Waiver 10.31.16 | CCSD_PROD_033454 | 7 |

3

PPAB 12793378v1

| CCSD POLICY | BATE RANGES | Depo Topic |
|---|---|---|
| Form JBC-3a 30-Day Enrollment Waiver For Proof of Birth Date 04.27.20 | CCSD_PROD_033455 | 7 |
| Form JBC-3b 30-Day Enrollment Waiver for GA Dept of Public Health Form 3231 (Cert of Immunization) 04.27.20 | CCSD_PROD_033456 | 7 |
| Form JBC-3c 30-Day Enrollment Waiver for GA Dept of Public Health Form 330 (Cert of Vision, Hearing, Dental and Nutrition Screening) 04.27.20 | CCSD_PROD_033457 | 7 |
| Form JBC-4 Statement of Objection to the Use of SSN for Student ID 07.01.15 | CCSD_PROD_033458 | 7 |
| Form JBC-4 Statement of Objection to the Use of SSN for Student ID 04.27.20 | CCSD_PROD_033459 | 7 |
| Form JBC-5 Student Enrollment Form 12.11.18 | CCSD_PROD_033460-CCSD_PRDO_033462 | 7 |
| Form JBC-5 Student Enrollment Form 09.30.19 | CCSD_PROD_033463-CCSD_PRDO_033465 | 7 |
| Form JBC-5 Student Enrollment Form 02.12.21 | CCSD_PROD_033466-CCSD_PRDO_033468 | 7 |
| Form JBC-5 Student Enrollment Form 06.01.21 | CCSD_PROD_033469-CCSD_PRDO_033471 | 7 |
| Form JBC-5 Student Enrollment Form 09.12.22 | CCSD_PROD_033472-CCSD_PRDO_033474 | 7 |
| Form JBC-5 Student Enrollment Form 07.01.23 | CCSD_PROD_033475-CCSD_PRDO_033477 | 7 |
| Form JBC-5b Student Re-Enrollment Form 12.11.18 | CCSD_PROD_033478-CCSD_PRDO_033479 | 7 |
| Form JBC-5b Student Re-Enrollment Form 09.30.19 | CCSD_PROD_033480-CCSD_PRDO_033481 | 7 |
| Form JBC-5b Student Re-Enrollment Form 02.12.21 | CCSD_PROD_033482-CCSD_PRDO_033484 | 7 |
| Form JBC-5b Student Re-Enrollment Form 09.12.22 | CCSD_PROD_033485-CCSD_PRDO_033486 | 7 |
| Form JBC-8 Authorization to Release Records 01.12.18 | CCSD_PROD_033487 | 7 |
| Form JBC-8 Authorization to Release Records 10.15.20 | CCSD_PROD_033488 | 7 |
| Form JBC-8 Authorization to Release Records 08.01.24 | CCSD_PROD_033489 | 7 |
| Form JBC-12 Student Withdrawal Form 07.01.15 | CCSD_PROD_033490 | 7 |
| Form JBC-12 Student Withdrawal Form 02.26.21 | CCSD_PROD_033491 | 7 |
| Form JBC-12 Student Withdrawal Form 08.16.21 | CCSD_PROD_033492 | 7 |
| Form JBC-12 Student Withdrawal Form 07.16.24 | CCSD_PROD_033493 | 7 |
| Form JBC-14 Kinship Caregiver Affidavit 07.01.17 | CCSD_PROD_033494-CCSD_PRDO_033495 | 7 |
| Form JBC-14 Kinship Caregiver Affidavit 03.11.19 | CCSD_PROD_033496-CCSD_PRDO_033498 | 7 |
| Form JBC-14 Kinship Caregiver Affidavit 10.15.22 | CCSD_PROD_033498-CCSD_PRDO_033499 | 7 |
| Form JBC-14 Kinship Caregiver Affidavit 07.16.24 | CCSD_PROD_033500-CCSD_PRDO_033501 | 7 |
| Special Ed Manual 2020 | CCSD_PROD_033624- CCSD_PROD_033749 | 2 |
| CCSD 504 Section Manual 2023-24 | CCSD_PROD_033750- CCSD_PROD_033802 | 2 |
| CCSD SPED HHB.Homebased Manual 2023-24 | CCSD_PROD_033803- CCSD_PROD_033823 | 4 |

4

Topic 1
(CCSD's policies, practices, & procedures re to initial evals & re-evals as used/defined under IDEA, §504 &ADA)

## 2014-2015 Count Calendar Timeline
### 60 Day State Rule: Consent for Evaluation until Eligibility Meeting

| July 28 | July 29 | July 30 | July 31 | Aug 1 | Aug 4 | Aug 5 | Aug 6 | Aug 7 | Aug 8 |
|---|---|---|---|---|---|---|---|---|---|
| Oct 3 | Oct 6 | Oct 7 | Oct 8 | Oct 9 | Oct 10 | Oct 13 | Oct 14 | Oct 15 | Oct 16 |
| **Aug 11** | **Aug 12** | **Aug 13** | **Aug 14** | **Aug 15** | **Aug 18** | **Aug 19** | **Aug 20** | **Aug 21** | **Aug 22** |
| Oct 17 | Oct 20 | Oct 21 | Oct 22 | Oct 23 | Oct 24 | Oct 27 | Oct 28 | Oct 29 | Oct 30 |
| **Aug 25** | **Aug 26** | **Aug 27** | **Aug 28** | **Aug 29** | **Sept 2** | **Sept 3** | **Sept 4** | **Sept 5** | **Sept 8** |
| Oct 31 | Nov 3 | Nov 4 | Nov 5 | Nov 6 | Nov 10 | Nov 11 | Nov 12 | Nov 13 | Nov 14 |
| **Sept 9** | **Sept 10** | **Sept 11** | **Sept 12** | **Sept 22** | **Sept 23** | **Sept 24** | **Sept 25** | **Sept 26** | **Sept 29** |
| Nov 17 | Nov 18 | Nov 19 | Nov 20 | Nov 21 | Dec 1 | Dec 2 | Dec 3 | Dec 4 | Dec 5 |
| **Sept 30** | **Oct 1** | **Oct 2** | **Oct 3** | **Oct 6** | **Oct 7** | **Oct 8** | **Oct 9** | **Oct 10** | **Oct 13** |
| Dec 8 | Dec 9 | Dec 10 | Dec 11 | Dec 12 | Dec 15 | Dec 16 | Dec 17 | Dec 18 | Jan 7 |
| **Oct 14** | **Oct 15** | **Oct 16** | **Oct 17** | **Oct 20** | **Oct 21** | **Oct 22** | **Oct 23** | **Oct 24** | **Oct 27** |
| Jan 8 | Jan 9 | Jan 9 | Jan 9 | Jan 14 | Jan 15 | Jan 16 | Jan 16 | Jan 16 | Jan 21 |
| **Oct 28** | **Oct 29** | **Oct 30** | **Oct 31** | **Nov 3** | **Nov 4** | **Nov 5** | **Nov 6** | **Nov 7** | **Nov 10** |
| Jan 22 | Jan 23 | Jan 23 | Jan 23 | Jan 28 | Jan 29 | Jan 30 | Jan 30 | Jan 30 | Feb 4 |
| **Nov 11** | **Nov 12** | **Nov 13** | **Nov 14** | **Nov 17** | **Nov 18** | **Nov 19** | **Nov 20** | **Nov 21** | **Dec 1** |
| Feb 5 | Feb 6 | Feb 6 | Feb 6 | Feb 11 | Feb 12 | Feb 13 | Feb 13 | Feb 13 | Feb 16 |
| **Dec 2** | **Dec 3** | **Dec 4** | **Dec 5** | **Dec 8** | **Dec 9** | **Dec 10** | **Dec 11** | **Dec 12** | **Dec 15** |
| Feb 17 | Feb 18 | Feb 19 | Feb 20 | Feb 23 | Feb 24 | Feb 25 | Feb 26 | Feb 27 | Mar 2 |
| **Dec 16** | **Dec 17** | **Dec 18** | **Dec 19** | **Jan 5** | **Jan 6** | **Jan 7** | **Jan 8** | **Jan 9** | **Jan 12** |
| Mar 3 | Mar 4 | Mar 5 | Mar 6 | Mar 6 | Mar 6 | Mar 6 | Mar 9 | Mar 10 | Mar 13 |
| **Jan 13** | **Jan 14** | **Jan 15** | **Jan 16** | **Jan 20** | **Jan 21** | **Jan 22** | **Jan 23** | **Jan 26** | **Jan 27** |
| Mar 13 | Mar 13 | Mar 16 | Mar 17 | Mar 20 | Mar 20 | Mar 23 | Mar 24 | Mar 27 | Mar 27 |
| **Jan 28** | **Jan 29** | **Jan 30** | **Feb 2** | **Feb 3** | **Feb 4** | **Feb 5** | **Feb 6** | **Feb 9** | **Feb 10** |
| Mar 27 | Mar 30 | Mar 31 | Apr 3 | Apr 13 | Apr 14 | Apr 15 | Apr 16 | Apr 17 | Apr 20 |
| **Feb 11** | **Feb 12** | **Feb 13** | **Feb 16** | **Feb 17** | **Feb 18** | **Feb 19** | **Feb 20** | **Feb 23** | **Feb 24** |
| Apr 21 | Apr 22 | Apr 23 | Apr 24 | Apr 27 | Apr 28 | Apr 29 | Apr 30 | May 1 | May 4 |
| **Feb 25** | **Feb 26** | **Feb 27** | **Mar 2** | **Mar 3** | **Mar 4** | **Mar 5** | **Mar 6** | **Mar 9** | **Mar 10** |
| May 5 | May 6 | May 7 | May 8 | May 11 | May 12 | May 13 | May 14 | May 15 | May 18 |
| **Mar 11** | **Mar 12** | **Mar 13** | **Mar 16** | **Mar 17** | **Mar 18** | **Mar 19** | **Mar 20** | **Mar 23** | **Mar 24** |
| May 19 | May 20 | May 21 | May 22 | May 22 | May 26 | May 27 | May 28* | May 29* | Jun 1* |
| **Mar 25** | **Mar 26** | **Mar 27** | **Mar 30** | **Mar 31** | **Apr 1** | **Apr 2** | **Apr 3** | **Apr 13** | **Apr 14** |
| Jun 2* | Jun 3* | Jun 4* | Jun 5* | Jun 8* | Jun 9* | Jun 10* | Jun 11* | Jun 12* | Jun 12* |
| **Apr 15** | **Apr 16** | **Apr 17** | **Apr 20** | **Apr 21** | **Apr 22** | **Apr 23** | **Apr 24** | **Apr 27** | **Apr 28** |
| Jun 12* | Jun 15* | Jun 16* | Jun 19* | Jun 19* | Jun 19* | Jun 22* | Jun 23* | Jun 26* | Jun 26* |
| **Apr 29** | **Apr 30** | **May 1** | **May 4** | **May 5** | **May 6** | **May 7** | **May 8** | **May 11** | **May 12** |
| Aug 27 | Aug 28 | Aug 28 | Sept 1 | Sept 2 | Sept 3 | Sept 4 | Sept 4 | Sept 8 | Sept 9 |
| **May 13** | **May 14** | **May 15** | **May 18** | **May 19** | **May 20** | **May 21** | **May 22** | **May 26** | **May 27** |
| Sept 10 | Sept 11 | Sept 11 | Sept 15 | Sept 16 | Sept 17 | Sept 18 | Sept 28 | Oct 2 | Oct 2 |

*indicates that although the due date listed here is the actual date, the eligibility meeting should be held prior to the end of the teachers' school year

Revised 7/24/14 sc

CCSD_PROD_006220

Rev June 2015

# Direct Referral by Parent to Special Education

Occasionally, parents insist that their child by-pass the tiered intervention process (RTI) and be referred directly to Special Education for eligibility. The Tiered Intervention process provides additional support and interventions to students in the general education classroom. This process also helps to identify which students respond favorably to the interventions and which students may need further evaluation or referral to special education. It should not be suggested to parents that they by-pass this valuable process. A **Direct Parent Referral** is only used when parents feel that their child is disabled and requires special education services. This process may or may not require a psychological evaluation. **This process does not circumvent the requirement of documentation of strategies implemented in the classroom and progress monitoring as a component of eligibility for special education, but does require that the evaluation/eligibility process begin and not be delayed for the Tiered intervention process.**

The initial point of contact should consider discussing the following points with the parent. The initial point of contact might be the psychologist, administrator, counselor or special education staff.

**Discussion Points:**
- The tiered intervention process identifies student strengths and weaknesses, develops an intervention plan and provides strategies within the general education classroom to assist the student, and monitors student progress frequently.
- A problem-solving team develops the strategies and meets periodically to review outcomes, and adjust the interventions.
- Research indicates that many students respond to the intervention plan and academic/behavior problems can be resolved with no need for special education services.
- The Direct Parent Referral does not eliminate the requirement for classroom interventions and progress monitoring to determine eligibility for special education.
- The referral process will not necessarily be shortened. Interventions should be initiated at the start of the Direct Parent Referral and should continue until the referral process is complete.
- A meeting may be scheduled to address eligibility criteria. If the intervention and progress monitoring component is absent or incomplete, the student will not be eligible for special education services.

CCSD_PROD_006221

# Procedures below are to be followed for this referral:

1. The initial point of contact should first review the **Discussion Points** with the parent(s).
2. The Tier 3 Facilitator should schedule and attend a meeting including a representative from special education teacher, school psychologist, parent, teacher, administrator, and Tier 2 Facilitator. Direct Parent Referral meeting notes should be taken in the CCSD Referral Portal in the Meetings Tab and saved.
3. The parent will explain the disability (documented or suspected) of the child as well as reasons why special education services are being sought.
4. If during the meeting, the parent decides against a Direct Parent Referral to special education but would prefer to begin the tiered intervention process, the Tier 2 process should begin. If during the meeting, the parent decides to move ahead with the Direct Parent Referral to special education, follow steps 5 – 10.
5. The parent will complete Parent Referral to Special Education Form. The special education representative will give parent a copy of Parent Rights and explain those rights.
6. The committee discusses any additional information that must be gathered prior to scheduling the eligibility meeting. All information required for standard referrals in the CCSD Referral Portal must be completed. In addition, observation of the student, achievement or behavior screening (which can be done either by special education teacher or psychologist), comprehensive psychological evaluation, or medical information may be needed. If the committee requests any evaluation, it must provide the parent with the Parental Consent for Evaluation (ISPE2102) form and secure a "yes" or "no" response. If a comprehensive psychological evaluation is needed, the psychologist may request that the parent complete a social history packet or initial referral packet.
7. As classroom interventions and progress monitoring are required components in determining eligibility for special education services, the committee should include the necessary Tier 3 or problem solving team members so that the committee/team can also develop strategies/interventions in order to begin the Tier 2-Tier 3 Intervention process. The implementation of the Tier 2-Tier 3 process would occur simultaneously with the evaluation process and must continue until the process is complete. Though the initial evaluation would be under a 60 day timeline, the intervention period may need to go beyond that 60 day timeline.
8. At the conclusion of the Direct Referral Intake meeting, copies of the completed and signed forms should be made and given to the parent, Special Student Services administrator, and psychologist. The original form must be scanned and saved into the CCSD Referral Portal under the Supporting Documents Tab.
9. Within 60 calendar days of the receipt of signed parental consent, the District must complete any necessary evaluations and convene an eligibility meeting. To meet this timeline, all professionals working with this student must do so concurrently. Outcomes of the Tier 2 and Tier 3 interventions must be documented and saved in the CCSD Referral Portal. The eligibility committee must determine eligibility or ineligibility at the meeting. If the Tier 2-Tier 3 interventions are not yet completed and no clear conclusion can be reached, then the committee should find the child ineligible based on the available information. A student may continue to receive Tier 3 interventions and, based upon the student's response, the eligibility committee could reconvene to review intervention outcomes and reconsider eligibility determination.

CCSD_PROD_006222

**Cobb County School District**

**Parent Referral to Special Education**

Form must be completed and signed by custodial parent or legal guardian.

| | |
|---|---|
| Student's Name: | Date: |
| School: | Grade: |
| Parent's Name: | |
| Address: | |
| | |
| Phone: (H)                                    (W) | |

Parent is requesting a direct referral for Special Education service for the student named above.

What is the student's disability: (Attach available documentation)

What do you believe the educational impact of that disability to be:

How long (approximately) has the student had this disability?

Why do you wish to by-pass the regular procedures (including the tiered intervention process) that the school has established to refer for Special Education service?

_____            _____
Parent(s) or Legal Guardian's Signature            Tier 3 Representative's Signature/Date Received

_____            _____
Psychologist's Signature            Special Student Services Administrator Signature

Committee Responsibilities (Please describe):

- Parent

- Tier 3 Representative

- Special Student Services Administrator

- Psychologist

- Classroom Teacher

Copies:     Copy to Parent
            Copy for Student File
            Copy for Special Student Services Administrator
            Copy for Psychologist

Attach minutes of meeting and other available documentation to this form.

Revised 6/2015

*DPR0000*

CCSD_PROD_006223

**Eligibility Reference Guide**

<u>**FOR ALL AREAS: TO MEET ELIGIBILITY CRITERIA, THERE MUST BE A LINK BETWEEN THE COMPONENTS OF THE DISORDER AND AN ADVERSE AFFECT ON THE CHILD'S EDUCATIONAL PERFORMANCE.**</u>

## Autism Spectrum Disorder

**Components**

| | |
|---|---|
| 1. Delay, arrests or inconsistencies in developmental rates and sequences in motor, sensory, social cognitive or communication skills. (Required component) | ☐ |
| 2. Difficulties in social interaction and participation. ((Required component)) | ☐ |
| 3. Deficit in the use of verbal/nonverbal language, especially for social communication. ((Required component)) | ☐ |
| 4. Unconventional, unusual or repetitive responses to sensory stimuli. | ☐ |
| 5. Displays stress over changes and/or engagement in repetitive activities. | ☐ |

**Evaluations and Assessments**

| | |
|---|---|
| 1. A developmental history, including delays, differences, and age of onset (typically before age 3) was gathered. | ☐ |
| 2. A comprehensive psychological evaluation was completed including formal assessments in intellectual functioning and adaptive behavior. | ☐ |
| 3. An assessment of educational performance and current functioning levels was completed. | ☐ |
| 4. A communication evaluation including verbal and nonverbal, prosody, and pragmatic language was completed. | ☐ |
| 5. Behavioral evaluations including social interaction and participation, stereotypical behaviors, and other behaviors typically associated with autism spectrum disorder were completed. | ☐ |

## Deafblind

**Components**

| | |
|---|---|
| 1. Hearing impairment and visual impairment that cause severe communication and educational needs that cannot be accommodated in programs solely for children with deafness or blindness. | ☐ |

**Evaluations and Assessments**

| | |
|---|---|
| 1. A current optometric or ophthalmological examination <u>and</u> an audiological evaluation were administered by qualified professionals and comprehensive reports were written. | ☐ |

## Deaf/Hard of Hearing

**Components**

| | |
|---|---|
| 1. Absence of measurable hearing such that primary sensory input for communication is other than auditory or | ☐ |
| 2. Absence of enough measurable hearing that the ability to communicate is adversely affected but child usually relies on auditory channel for sensory input for communication. | ☐ |

**Evaluations and Assessments**

| | |
|---|---|
| 1. A current audiological, otological, and a comprehensive educational evaluation were administered by qualified professional and comprehensive reports were written. | ☐ |
| 2. A psychological evaluation, appropriate for children who are deaf or hard of hearing is recommended. | ☐ |
| 3. Children who exhibit unilateral hearing loss may be considered for eligibility provided documentation exists that indicates acade mic or communicative deficits are the result of the hearing loss. | ☐ |

Rev. 6/14/10

Case 1:23-cv-03285-SDG    Document 171    Filed 01/09/26    Page 291 of 379

CCSD_PROD_006224

**COBB COUNTY SCHOOL DISTRICT**
514 Glover Street
Marietta, Georgia 30060

### Eligibility Reference Guide

## Emotional Behavior Disorder
### Components

| Sufficient duration, frequency and intensity of at least one of the following emotionally based characteristics, documented and analyzed: | ☐ |
|---|---|
| 1. An inability to build or maintain satisfactory interpersonal relationships | ☐ |
| 2. An inability to learn that is not explained by intellectual, sensory, or health factors. | ☐ |
| 3. Consistent or chronic inappropriate behavior or feelings under normal circumstances. | ☐ |
| 4. Displayed pervasive mood of unhappiness or depression. | ☐ |
| 5. Displayed tendency to develop physical symptoms, pains or unreasonable fears associated with personal or school problems | ☐ |

### Evaluations and Assessments

| 1. Documentation of RTI and progress monitoring | ☐ |
|---|---|
| 2. Psychological and educational evaluations | ☐ |
| 3. Behavioral observations over time | ☐ |
| 4. Social history, including history of services provided outside of school. | ☐ |
| 5. Adequate documentation and written analysis of duration, frequency, and intensity of one or more of the characteristics of EBD. | ☐ |

## Intellectual Disability
### Components

| 1. Intellectual functioning based on multiple sources of information documenting IQ scores below 70. | ☐ |
|---|---|
| 2. Significant limitations in child's effectiveness in meeting standards of maturation, learning, personal independence or social responsibility, and especially school performance. | ☐ |
| 3. Adaptive behavior in school and home that is at least two standard deviations below the mean in one of three areas: conceptual, social or practical OR composite score that is two standard deviations below the mean | ☐ |
| 4. Deficits in intellectual functioning and adaptive behavior existed prior to age 18 | ☐ |

### Evaluations and Assessments

| 1. Intellectual evaluation was completed by a qualified psychological examiner using individually administered, nationally normed standardized measures. | ☐ |
|---|---|
| 2. Significant subaverage functioning is verified through a written summary of at least one structured observation that demonstrates the child's inability to progress in a typical manner. | ☐ |
| 3. Documentation of subaverage adaptive functioning includes two sources (one home and one school) using standardized measures normed on the general population, including people with and without disabilities. | ☐ |

## Orthopedic Impairment
### Components

| 1. Impairment caused by congenital anomalies (deformity/absence of limb), disease (muscular dystrophy, etc.), or other causes (cerebral palsy, amputations, etc.) | ☐ |
|---|---|
| 2. Deficits in academic functioning, emotional development adaptive behavior, motor or communication skills. | ☐ |

### Evaluations and Assessments

| 1. Medical report from a licensed doctor of medicine indicating the diagnosis and prognosis. | ☐ |
|---|---|
| 2. The medical evaluation used for initial eligibility MUST be current within one year. | ☐ |
| 3. A comprehensive educational assessment to indicate the adverse affects of the orthopedic impairment on education. | ☐ |

Rev. 6/14/10

CCSD_PROD_006225

Case 1:23-cv-03285-SDG   Document 171   Filed 01/09/26   Page 293 of 379

**COBB COUNTY SCHOOL DISTRICT**
514 Glover Street
Marietta, Georgia 30060

**Eligibility Reference Guide**

## Other Health Impaired

### Components

| | |
|---|---|
| 1. Chronic or acute health problems documented with medical report that indicates limits in strength, vitality, or alertness. | ☐ |
| 2. Deficits in pre-academic or academic functioning, adaptive behavior, social/emotional development, motor or communication skills as a result of the health impairment. | ☐ |

### Evaluations and Assessments

| | |
|---|---|
| 1. Medical report from a licensed doctor of medicine indicating the diagnosis and prognosis. In the case of ADD and ADHD, an evaluation by a licensed clinical psychologist may be accepted. | ☐ |
| 2. The medical evaluation used for initial eligibility MUST be current within one year. | ☐ |
| 3. A comprehensive developmental or educational assessment to indicate the effects of the health impairment on the child's educational performance. | ☐ |
| Note: When assessment information indicates significant deficits in cognitive/ academic functioning, a psychological evaluation shall be given. | |

## Significant Developmental Delay

### Components

| | |
|---|---|
| 1. A child that is 2 standard deviations below the mean in one of the areas: Adaptive development, cognition, communication, motor skills or emotional development. | ☐ |
| 2. A child that is 1.5 standard deviations below the mean in at least two of the areas: Adaptive development, cognition, communication, motor skills or emotional development. | ☐ |
| 3. Initial eligibility was established on or before the child's seventh birthday. | ☐ |

### Evaluations and Assessments

| | |
|---|---|
| 1. All 5 skill areas were assessed using at least one formal assessment. At least one additional formal assessment was administered in each area of suspected significant delay. | ☐ |
| 2. Formal assessments were age appropriate and scores obtained were given in standard deviations. | ☐ |
| Note: SDD eligibility may be used for children through the end of the school year in which the child turns nine. | |

## Visual Impairment

### Components

| | |
|---|---|
| 1. Even with correction, a vision impairment that adversely affects a child's educational performance: a) 20/200 or less in the better eye with best correction (Blind); b) 20/70 or less in the better eye with best correction (Partially Sighted; c) limited in visual field subtending a 20 degree angle; d) progressive with significant visual deterioration expected. | ☐ |

### Evaluations and Assessments

| | |
|---|---|
| 1. An eye examination report (within 1 year) completed and signed by the ophthalmologist or optometrist who examined the child. (Report from neurologist is acceptable for blindness due to cortical vision impairment.) | ☐ |
| 2. A comprehensive educational evaluation completed by a certified teacher in the area of visual impairments was administered to determine present levels of functioning and whether or not there is a need for Braille instruction. | ☐ |
| 3. A clinical low vision evaluation was completed by a low vision optometrist for children who are not totally blind. (Refer to GA Rules for specific guidelines/time lines) | ☐ |

Rev. 6/14/10

CCSD_PROD_006226

**COBB COUNTY SCHOOL DISTRICT**
514 Glover Street
Marietta, Georgia 30060

## Eligibility Reference Guide

### Specific Learning Disability

**Components**

| # | Component | |
|---|---|---|
| 1. | Primary deficit in basic psychological processes identified. | ☐ |
| 2. | Underachievement in one or more of the following areas: oral expression, listening comprehension, written expression, basic reading skills, reading comprehension, reading fluency, mathematical calculation, or mathematical problem solving. | ☐ |
| 3. | Research based intervention implemented as designed for a period of time indicated by research or, if not indicated, a minimum of 12 weeks that indicates the child is not expected to make progress toward the benchmark. | ☐ |
| 4. | Achievement in the classroom indicates a pattern of strengths and weaknesses. | ☐ |
| 5. | Achievement deficiencies are directly related to a pervasive processing deficit and correlate to the child's response to scientific, research based interventions. | ☐ |

**Evaluations and Assessments**

| # | Evaluation/Assessment | |
|---|---|---|
| 1. | Multiple sources of evidence prior to formal evaluation were summarized and a pattern of strengths and weaknesses in performance and/or achievement relative to age, state grade level standards, and intellect was documented. | ☐ |
| 2. | At least 2 current (within 12 months) assessments, e.g., CRCT or other state-required assessment, norm-referenced achievement tests or benchmarks, indicate below expectation performance for state approved grade level standards. | ☐ |
| 3. | RtI documentation of research based intervention administered and reviewed as the research requires was completed and indicates the child is not expected to make progress toward the benchmark. | ☐ |
| 4. | An observation by a required team member and analyzed work samples indicating below level performance compared to the classroom normative sample were completed. | ☐ |
| 5. | A comprehensive assessment of intellectual development designed to assess specific measures of processing skills was completed and is current within 12 months. | ☐ |

### Speech / Language Impairment

**Components**

| # | Component | |
|---|---|---|
| 1. | An impairment in the areas of articulation, fluency, voice or language that adversely affects educational performance. | ☐ |

**Evaluations and Assessments**

| # | Evaluation/Assessment | |
|---|---|---|
| 1. | Evidence-based interventions prior to referral are documented. | ☐ |
| 2. | A comprehensive evaluation using a variety of assessment tools and strategies was performed by a certified or licensed Speech-Language Pathologist. At least two measures (at least one formal) were administered in the area(s) of impairment. | ☐ |

### Traumatic Brain Injury

**Components**

| # | Component | |
|---|---|---|
| 1. | Deficits in cognitive, social, or motor skills due to acquired injury that adversely impact educational performance in cognition, language, memory, attention, reasoning, abstract thinking, judgment, problem solving, sensory, perceptual and motor abilities, physical functions, communication and information processing. | ☐ |

**Evaluations and Assessments**

| # | Evaluation/Assessment | |
|---|---|---|
| 1. | Summary of the child's pre-injury functioning status is included. | ☐ |
| 2. | A medical report or other that documents a traumatic brain injury has occurred. | ☐ |
| 3. | A neuropsychological, psychological, or psycho-educational evaluation that addresses the impact of TBI. | ☐ |

Rev. 6/14/10

CCSD_PROD_006227

COBB COUNTY SCHOOL DISTRICT
SPECIAL STUDENT SERVICES
Guidance on Evaluations and Re-evaluations

## 1.    Who can be evaluated?

Students referred for determination of special education eligibility can be referred for initial evaluation. This includes students referred through the school RTI teams, via direct parent referral (see attached Procedures for Direct Referral by Parent to Special Education), or through the procedures for private or home school students (see attached Procedures for Referrals for Students Who Attend Private School or Home Study). Students for whom special education eligibility has previously been established may be referred for evaluation to determine continued eligibility or consider a new area of eligibility.

## 2.    What is the procedure for evaluating private or home school students?

Students who attend a private school or home study located within the Cobb County School District are eligible for referral to Special Education. (If the referral is for speech/language only, direct the parent to call the speech/language pathologist at the child's home attendance school.) No longer is the student's family required to have legal residence within the Cobb County School District. The only requirement is that the private school or home study be located within the Cobb County School District geographic boundary. Students who attend a private school or home study located within another district will need to initiate the referral process through that district.

There are two types of referrals:
- Initial referrals with no previous special education eligibility
- Students with previous special education eligibility

**Initial Referrals**

Initial referrals for private school or home school students are treated as direct parent referrals (DPR). Parents of these students inquiring about evaluation should be directed to contact Jennifer Novak (678-581-6803) who will send information to the parent regarding the process along with questionnaires and intervention logs to be completed by the parent and/or private school teacher. Upon receipt of the information from the parent the appropriate school team will be notified to arrange a DPR meeting according to the following options:

a)  If the private school lies within the geographical boundaries of the CCSD, but the student resides outside the CCSD, the CCSD School that serves the area where the private school is located will be notified to arrange the DPR meeting. At the meeting the team should explain the need for documentation of interventions and data collection during the 60-day evaluation period. The parent is responsible for obtaining data from the private school. CCSD conducts the necessary evaluation and determines eligibility within the 60-day timeline.

b)  If the private school lies within the boundaries of the CCSD and the student resides within the CCSD, the student's home school will be notified to arrange the DPR meeting and proceed as above.

c)  If the private school lies outside the boundaries of the CCSD and the student resides within CCSD, the parent will be directed to contact the public school

Office of Legal and Policy Issues
This guidance is not intended to state new law or supplant any federal or state laws, regulations or requirements. Nothing in this handout should be seen as having the force of law. This handout should not be cited as law or as imposing any additional requirements or obligations outside the requirement so of existing law. Users who have questions about the IEP process are encouraged to contact their special education supervisor. FOR INTERNAL TRAINING PURPOSES ONLY – NOT FOR DISTRIBUTION OUTSIDE OF CCSD                                           page 1

CCSD_PROD_006228

COBB COUNTY SCHOOL DISTRICT
SPECIAL STUDENT SERVICES
Guidance on Evaluations and Re-evaluations

district where the private school is located for evaluation and eligibility determination.

d) Home school students residing within the CCSD will be directed to the team at their local CCSD school to arrange a DPR meeting and the steps outlined in (a) above should be followed. Parents may need more assistance with interventions that can be implemented during the 60-day evaluation period.

Procedure:

- Parent telephones Jennifer Novak who will complete the intake form and send the information/intervention packet to the parent.
- Parent takes the information/intervention packet to the private school to collect information about the student's current functioning and documentation of interventions and results. If the child is being home-schooled, the parent completes the packet of information.
- Parent returns completed packet to Jennifer Novak, 514 Glover Street, Marietta, GA 30060.
- The packet will be sent to the Tier 3 facilitator at the appropriate Cobb County School who contacts the parent to arrange a meeting for the direct parent referral to take place.
- Special education and psychological services will begin assessments to gather the data necessary to determine eligibility.
- Remember that vision and hearing must be assessed prior to evaluation. The parent may provide those results or may bring the child to the school for vision and hearing screening.
- The school psychologist will arrange with the parent a time for the student to be brought in for evaluation.
- It is the responsibility of the special education lead teacher to organize information needed to establish eligibility/ineligibility and to contact parents to schedule a meeting to discuss eligibility determination.

**Referral for Student with Previous Special Education Eligibility**

If a student has previously been determined eligible for special education either in Cobb County or in another public school system, the student should be referred for eligibility redetermination according to the following options:

a) Students attending a private school within the CCSD boundaries who reside outside the district will be directed to the special education supervisor of the CCSD School that serves the area where the private school is located to arrange an IEP meeting to determine whether additional information is needed to re-determine eligibility.

b) Students attending private school within CCSD who also reside within the CCSD area will be directed to the special education supervisor of the student's CCSD home school to arrange an IEP meeting to determine whether additional information is needed to re-determine eligibility.

Office of Legal and Policy Issues
This guidance is not intended to state new law or supplant any federal or state laws, regulations or requirements. Nothing in this handout should be seen as having the force of law. This handout should not be cited as law or as imposing any additional requirements or obligations outside the requirement so of existing law. Users who have questions about the IEP process are encouraged to contact their special education supervisor. FOR INTERNAL TRAINING PURPOSES ONLY – NOT FOR DISTRIBUTION OUTSIDE OF CCSD                                  page 2

CCSD_PROD_006229

COBB COUNTY SCHOOL DISTRICT
SPECIAL STUDENT SERVICES
Guidance on Evaluations and Re-evaluations

c) Those CCSD residents who attend private school within another school district will be directed to contact the public school district where the private school is located for eligibility redetermination.

d) Home school students with previous eligibility who reside within CCSD will be directed to the special education supervisor of their local CCSD School to arrange an IEP meeting to determine whether additional information is needed to re-determine eligibility.

Procedure:

- Parent is directed to contact the appropriate special education supervisor. (Tier 3 Meeting is not part of this process.) The eligibility redetermination process will be discussed with parent to clarify the student's needs.
- The special education supervisor arranges an eligibility redetermination meeting held at the student's home school. The supervisor may provide the parent with current functioning forms to be completed by the private school teachers.
- Parent, education program specialist, school psychologist and a general education teacher attend the meeting. All previous and current information is reviewed. The student's private school must provide current information. Private reports along with previous public school records are reviewed. The committee discusses what additional information is needed to determine eligibility. The discussion is documented in the minutes. The committee may determine that a new psychological evaluation is <u>not</u> required to establish continued eligibility. If a psychological evaluation is needed, parent should complete the Parental Consent for Evaluation (ISPE 2102).
- Remember that vision and hearing must be assessed prior to evaluation. The parent may provide those results or may bring the child to the school for vision and hearing screening.
- If a psychological evaluation is requested, the school psychologist will arrange with the parent a time for the student to be brought in for evaluation.
- The education program specialist will organize information needed to establish eligibility/ineligibility and should schedule the eligibility meeting with the parents.

**NOTES:**

- In all scenarios, the county where the private school or home school is located completes evaluation and eligibility and the county of residence provides FAPE if the student enrolls in the public school.
- Guidance from the state indicates that while evidence of prior interventions is required for students referred for an evaluation from a private school, the school system can accept less formalized intervention data from the private school setting or they can assist the private school in strategies for collecting valid data based on interventions implemented prior to the referral for evaluation or during the evaluation period.

Office of Legal and Policy Issues
This guidance is not intended to state new law or supplant any federal or state laws, regulations or requirements. Nothing in this handout should be seen as having the force of law. This handout should not be cited as law or as imposing any additional requirements or obligations outside the requirement so of existing law. Users who have questions about the IEP process are encouraged to contact their special education supervisor. FOR INTERNAL TRAINING PURPOSES ONLY – NOT FOR DISTRIBUTION OUTSIDE OF CCSD                                    page 3

CCSD_PROD_006230

COBB COUNTY SCHOOL DISTRICT
SPECIAL STUDENT SERVICES
Guidance on Evaluations and Re-evaluations

- For speech/language referrals only, parents should contact the SLP at their local school

**3.      What is the direct referral process?**

Occasionally, parents request that their child by-pass the tiered intervention process (RTI) and be referred directly to Special Education for eligibility.  The tiered intervention process is a problem-solving model that organizes school intervention services for students who are not meeting academic or behavioral expectations. This process also helps to identify which students respond favorably to the interventions and which students may need referral to special education. It should not be suggested to parents that they by-pass this valuable process. A **Direct Parent Referral** is used only when parents feel that their child is disabled and requires special education services. Determination of eligibility may or may not require a psychoeducational evaluation. **This process does not circumvent the requirement of documentation of interventions implemented in the classroom and progress monitoring as a component of eligibility for special education, but does require that the evaluation/eligibility process begin and be completed within 60 days. Implementation of interventions and progress monitoring should occur during the 60-day evaluation period.**

**4.      What is the process for responding to a written request for an evaluation?***

Below is a sample response for responding to a written request to conduct an evaluation. Please remember that the timeline for the evaluation will begin upon receipt of signed written consent (signed 2102). Make sure that Parental Rights are included when sending a response. If a written request for an evaluation is received by someone other than special education personnel, the written request should be forwarded to the appropriate person so that a timely response can be made.

**SAMPLE RESPONSE:**

DATE

Dear _____:

*I am in receipt of your email dated _____. I understand from your email that you are requesting that the District conduct an evaluation of your child. I would like to schedule a meeting so that we can discuss your request and to provide you with detailed information regarding the evaluation process so that you will be fully informed prior to giving signed written consent for the District to conduct an evaluation to determine if your child is a child with a disability under the Individuals with Disabilities Education Act (IDEA) and may require special education and related services.*

Office of Legal and Policy Issues
This guidance is not intended to state new law or supplant any federal or state laws, regulations or requirements. Nothing in this handout should be seen as having the force of law. This handout should not be cited as law or as imposing any additional requirements or obligations outside the requirement so of existing law. Users who have questions about the IEP process are encouraged to contact their special education supervisor. FOR INTERNAL TRAINING PURPOSES ONLY – NOT FOR DISTRIBUTION OUTSIDE OF CCSD                 page 4

CCSD_PROD_006231

COBB COUNTY SCHOOL DISTRICT
SPECIAL STUDENT SERVICES
Guidance on Evaluations and Re-evaluations

*I would like to schedule a meeting with you to discuss this process. Potential participants will include but not be limited to your child's classroom teacher, a special education representative, the school psychologist, and school counselor. Please provide me with three dates and times that you are available to meet. I can be reached via email or by calling _____. If you do not wish to meet to discuss the evaluation process before giving your signed written consent, then please sign and return the attached Parental Consent to Evaluate. Upon receipt of the signed consent form, the District will begin the evaluation process. I have also attached a copy of Parental Rights under IDEA for your review.*

*Sincerely,*

SIGNATURE BLOCK

**\*NOTE:** This is **NOT** the process for handling an IEE request. If an IEE request is received in writing that request is to be **IMMEDIATELY** forwarded to the Director of Special Education.

5.    **What is the process for conducting a meeting with a parent who is making a direct parent referral?**

The initial point of contact should discuss the following points with the parent. The initial point of contact might be the psychologist, administrator, counselor or special education staff.

Discussion Points:
- Through the tiered intervention process the team develops an intervention plan to be implemented within the general education classroom to assist the student and monitors student progress frequently.
- The problem solving team meets periodically to review outcomes and adjust the interventions.
- Research indicates that many students respond to the intervention plan and academic/behavior problems can be resolved with no need for special education services.
- The Direct Parent Referral does not eliminate the requirement for classroom interventions and progress monitoring. Interventions and progress monitoring should be initiated at the start of the Direct Parent Referral.
- A meeting will be scheduled to address eligibility at the end of the evaluation period.

Process:
1. The initial point of contact should first review the **Discussion Points** with the parent(s).
2. The Tier 3 Facilitator should schedule and attend a meeting that includes the education program specialist, school psychologist, parent, teacher, administrator, and Tier 2 Facilitator.  Direct Parent Referral Meeting MinutesMeeting minutes should be kept.

Office of Legal and Policy Issues
This guidance is not intended to state new law or supplant any federal or state laws, regulations or requirements. Nothing in this handout should be seen as having the force of law. This handout should not be cited as law or as imposing any additional requirements or obligations outside the requirement so of existing law. Users who have questions about the IEP process are encouraged to contact their special education supervisor. FOR INTERNAL TRAINING PURPOSES ONLY – NOT FOR DISTRIBUTION OUTSIDE OF CCSD                                                                page 5

CCSD_PROD_006232

COBB COUNTY SCHOOL DISTRICT
SPECIAL STUDENT SERVICES
Guidance on Evaluations and Re-evaluations

3.  The parent will explain the disability of the child as well as reasons why special education services are being sought.

4.  If during the meeting, the parent decides against a Direct Parent Referral to special education but would prefer to begin the tiered intervention process, the Tier 2 process should begin.

5.  If during the meeting, the parent decides to move ahead with the Direct Parent Referral to special education, follow steps 6 – 10.

6.  The parent will complete Parent Referral to Special Education Form.

7.  The special education teacher will give parent a copy of Parent Rights and explain those rights.

8.  The committee discusses any additional information that will be needed to determine eligibility. The Tier 2 Student Information packet and the Analyzed Work Sample packet must be completed by the teacher. In addition, observation of the student, achievement testing, comprehensive psychoeducational evaluation, or medical information may be needed. If the committee requests any evaluation, it must provide the parent with the Parental Consent for Evaluation (ISPE2102) form and secure a "yes" or "no" response. If a comprehensive psychoeducational evaluation is needed, the psychologist may request that the parent complete a parent questionnaire.

9.  As classroom interventions and progress monitoring are required components in determining eligibility for special education services for learning disabilities, the committee should include the necessary Tier 3 or problem solving team members so that the committee/team can also develop strategies/interventions in order to begin the intervention process. The implementation of the Tier 3 process would occur simultaneously with the evaluation process.

10. At the conclusion of the Direct Parent Referral meeting, copies of the completed and signed forms should be made and given to the parent, Tier 3 representative, special education supervisor and school psychologist and the original form given to the education program specialist.

11. Within 60 calendar days of the receipt of signed parental consent, the District must complete any necessary evaluations and convene an eligibility meeting. As referenced in item #8, to meet this timeline, all professionals working with this student must do so concurrently. Outcomes of the Tier 3 interventions must be documented on the Response To Intervention Documentation form. The eligibility committee must determine eligibility or ineligibility at the meeting. In such cases, the eligibility committee could reconvene. A student may continue to receive Tier 3 interventions and, based upon the student's response, the eligibility committee could reconvene to review intervention outcomes and reconsider eligibility determination.

**6.      When does the timeline for evaluation begin?**

The timeline for the evaluation begins when the signed written consent (2102) has been received by the District.

Office of Legal and Policy Issues
This guidance is not intended to state new law or supplant any federal or state laws, regulations or requirements. Nothing in this handout should be seen as having the force of law. This handout should not be cited as law or as imposing any additional requirements or obligations outside the requirement so of existing law. Users who have questions about the IEP process are encouraged to contact their special education supervisor. FOR INTERNAL TRAINING PURPOSES ONLY – NOT FOR DISTRIBUTION OUTSIDE OF CCSD                                                   page 6

CCSD_PROD_006233

COBB COUNTY SCHOOL DISTRICT
SPECIAL STUDENT SERVICES
Guidance on Evaluations and Re-evaluations

7.    **How is the scope of an evaluation determined?**

The parent and other qualified professionals should review existing data and information and determine what other information is necessary in order to determine the child's eligibility and educational needs.  This review should occur in an IEP meeting so that the team will have minutes recording the discussion so that the scope of the evaluation is clear.  The team should not limit the evaluator's professional discretion to select appropriate instruments and evaluation procedures, but rather should discuss the information that the team needs in order to plan effectively for the student.

8.    **Must an evaluation be delayed if a child has not had a recent or has not passed a hearing and vision screening?**

Professional ethics require that a diagnostic evaluation not proceed until it is documented that the student has acceptable levels of vision and hearing. Failure to do this would render test results invalid and might prevent discovery of vision and/or hearing problems as the primary or contributing source of the student's problem. Vision and hearing acuity should be determined to be adequate before the formal assessment of the student begins and should be no older than one calendar year when being applied to an evaluation.

9.    **What should I do if a student fails a hearing or vision screening?**

　　a.　If a student fails the far-point vision (Snellen Chart), a near point screening may be administered by the educational diagnostician, the psychologist or those trained to use the other screening instruments. The evaluation may proceed if the student passes the near point vision; however, the student should be referred for follow-up of distance vision.

　　b.　If a student fails the hearing screening in one ear, then the evaluation may proceed if information is presented to the "good" ear and in a quiet environment. The individual conducting the evaluation should be notified of the results. Document on the Hearing and Vision Screening Procedures for Special Education Students the follow-up to address the hearing problems and note the failed hearing as well as the modifications made during the testing procedures in the report.

　　c.　If the evaluator's professional judgment is that the student's hearing or vision is not adequate to allow valid results, then testing may not occur until documentation is received from an appropriate specialist. Contact either Cobb Audiology Services or the Special Education Supervisor for Hearing and Vision Services regarding referral.

　　d.　If the student has been taken for the follow-up hearing/vision assessment and the testing results indicate that a prosthetic appliance is needed (hearing aid/glasses) and the parent has indicated an inability to pay for the appliance, refer to the school social worker for assistance.

　　e.　If the student is referred to medical personnel, the date of the letter to parents recommending referral should be noted. After the evaluation, a letter from the

Office of Legal and Policy Issues
This guidance is not intended to state new law or supplant any federal or state laws, regulations or requirements. Nothing in this handout should be seen as having the force of law. This handout should not be cited as law or as imposing any additional requirements or obligations outside the requirement so of existing law. Users who have questions about the IEP process are encouraged to contact their special education supervisor. FOR INTERNAL TRAINING PURPOSES ONLY – NOT FOR DISTRIBUTION OUTSIDE OF CCSD                                             page 7

CCSD_PROD_006234

COBB COUNTY SCHOOL DISTRICT
SPECIAL STUDENT SERVICES
Guidance on Evaluations and Re-evaluations

physician should be placed in the student's file. The IEP coordinator is responsible for monitoring referral to physician and obtaining report.

**10.     How is hearing and vision screening conducted for students in special populations (MOID, AU, SID, PID Students)?**

Students who cannot be conditioned to respond to an audiometer will require an objective hearing screening which can be provided by a Cobb County audiologist. Call the Audiology appointment line at 678-581-7400 and ask to schedule an objective hearing screening for the student.

Several screening formats are available for vision screenings which are less difficult than the Snellen chart or the Titmus vision screening instrument. Special Needs Preschool teachers have the Bernell Ten Foot Symbol Chart. SID/PID teachers and diagnosticians have the LEA Single Presentation Cards. If these simpler formats prove unsuccessful in obtaining reliable screening results, contact your cluster diagnostician or the Special Education Supervisor of Vision Services to inquire about other possible vision assessments.

**11.     How are evaluations addressed for students already receiving one special education service and experiencing additional difficulties?**

Generally, any time a student with a disability is experiencing difficulties, it is appropriate for the School District to convene an IEP meeting and discuss the need for new information. If a psychological is being considered, the school psychologist should be invited.

**12.     What happens if a parent refuses to consent to an evaluation?**

The requesting team should be sure that the parent receives a Parental Consent for Evaluation Form (ISPE 2102) and signs either granting or denying consent. If a parent refuses to sign, a special education representative can note in the minutes and on the form that the parent declined to sign. If the parent asks for time to consider the request and then does not respond, the case manager or Special Education Supervisor should send at least one follow-up letter with an additional copy of the consent and indicate in the letter that the School District will consider the parent's failure to respond a refusal to consent.

In circumstances where the team believes that the student cannot be adequately served without an evaluation, the case manager should contact the education program specialist and/or Special Education Supervisor who can seek direction from the Director of Legal and Policy Issues and/or Director of Special Education. In some cases, the School District may choose to initiate mediation or a due process hearing request in an effort to secure consent.

**13.     Must the School District rely on a private evaluation?**

Office of Legal and Policy Issues
This guidance is not intended to state new law or supplant any federal or state laws, regulations or requirements. Nothing in this handout should be seen as having the force of law. This handout should not be cited as law or as imposing any additional requirements or obligations outside the requirement so of existing law. Users who have questions about the IEP process are encouraged to contact their special education supervisor. FOR INTERNAL TRAINING PURPOSES ONLY – NOT FOR DISTRIBUTION OUTSIDE OF CCSD                                    page 8

CCSD_PROD_006235

COBB COUNTY SCHOOL DISTRICT
SPECIAL STUDENT SERVICES
Guidance on Evaluations and Re-evaluations

No, the School District must consider all information provided by a parent, including any private evaluations, but is not required to rely on the private evaluations. The School District may always request an evaluation by an evaluator of its choosing.

### 14.     Is an FBA an evaluation?

Typically, an FBA is not an evaluation under IDEA for which the School District is required to secure parental consent. However, if the purpose of the FBA is to seek support for changing placement, eligibility, and/or services, then consent should be obtained.

### 15.     When is an evaluation in a related service area appropriate?

Eligibility requirements for a primary category of disability must be met prior to a referral to a Related Services provider. However, referrals on preschool students are processed simultaneously with the initial referral. Related Support Areas include:
- Adapted PE
- Occupational Therapy
- Physical Therapy
- Nursing
- Orientation and Mobility
- Audiology
- Assistive Technology

*See Guidance on Related Services

### 16.     How do related services personnel present information to an IEP team?

Related services evaluators should prepare a free-standing, independent report or summary of information. The evaluator may provide a summary statement for inclusion in a draft IEP, but should not cut and paste the entire report into the student's IEP or sign off on any individual portion of the IEP. Evaluators should not use form 143 which makes a recommendation or non-recommendation for service based only on evaluation results.

### 17.     What should the related services personnel do with the completed evaluations?

The evaluator should send the original evaluation report to the Central Office Records Room and a copy to the Related Support Services Office at Skyview. A copy should also be placed in the student's school file.

### 18.     What should the related services evaluators do with evaluative information in preparing for IEP meetings?

Office of Legal and Policy Issues
This guidance is not intended to state new law or supplant any federal or state laws, regulations or requirements. Nothing in this handout should be seen as having the force of law. This handout should not be cited as law or as imposing any additional requirements or obligations outside the requirement so of existing law. Users who have questions about the IEP process are encouraged to contact their special education supervisor. FOR INTERNAL TRAINING PURPOSES ONLY – NOT FOR DISTRIBUTION OUTSIDE OF CCSD                                    page 9

CCSD_PROD_006236

COBB COUNTY SCHOOL DISTRICT
SPECIAL STUDENT SERVICES
Guidance on Evaluations and Re-evaluations

It is good practice to send copies of all completed evaluation reports home to parents in advance of IEP meetings so that the parents can have an adequate opportunity to review the reports. Also, it is good practice for evaluators to offer parents an opportunity to meet or to ask questions about the report in advance of the IEP meeting.

19.   **What special considerations regarding evaluations may exist for seniors?**

1.  Graduation is considered a change in placement. If reeligibility comes due in a student's senior year, a reevaluation consideration meeting should be held to determine if any further evaluation measures are necessary in order for the student to access his/her educational program and/or meet IEP goals/objectives prior to graduation.
2.  Careful consideration should be given to seniors who are going to post-secondary schools. The student's advisor should be invited to attend the IEP meeting wherein reevaluation will be discussed. Discussion should include whether the student has passed the Georgia High School Graduation Test and the Georgia High School Writing Test, whether the student's academic performance indicates that the student will pass the necessary coursework to complete Carnegie Unit requirements, and whether the child's IEP indicates that graduation is anticipated for that school.

20.   **What is the District's responsibility when parent's request evaluations for the student to meet criteria for another agency, such as vocational rehabilitation program, social security, SAT, and/or other postsecondary settings?**

The district is not required to conduct evaluations when the sole purpose is to establish that the child meets the eligibility criteria of another agency. This includes evaluations for social security eligibility, testing accommodations on college entrance examinations (SAT/ACT) and evaluations for post-secondary schools. While the parents have a right to request an assessment to determine whether a child continues to be a child with a disability, that assessment may not necessarily meet the requirements or timelines for other agencies (Letter to Moffett, 54 IDELR 130).

Office of Legal and Policy Issues
This guidance is not intended to state new law or supplant any federal or state laws, regulations or requirements. Nothing in this handout should be seen as having the force of law. This handout should not be cited as law or as imposing any additional requirements or obligations outside the requirement so of existing law. Users who have questions about the IEP process are encouraged to contact their special education supervisor. FOR INTERNAL TRAINING PURPOSES ONLY – NOT FOR DISTRIBUTION OUTSIDE OF CCSD                         page 10

CCSD_PROD_006237

COBB COUNTY SCHOOL DISTRICT
SPECIAL STUDENT SERVICES
Guidance on Independent Educational Evaluations

1.    **When is a parent entitled to an Independent Educational Evaluation (IEE)?**

When the School District has completed an evaluation by an evaluator of its choosing, the parents may object to the evaluation and request one of their own. See Guidelines that follow as a separate document.

2.    **When is a parent not entitled to an IEE?**
If the School District has not yet done its own evaluation, then the right to an IEE is not triggered, whether this is the first discussion of an evaluation, the parent requests an independent person be used in response to the School District's suggestion of an evaluation, or if the parent just brings the evaluation in and requests reimbursement.

3.    **To what types of evaluations do IEEs apply?**

The right to an IEE is triggered for any evaluation that the School District does for which it seeks parental consent, including but not limited to psychological, speech, occupational therapy, and physical therapy.

4.    **What type of documentation should be created regarding IEEs?**

Any request for an IEE must be directed to the secretary of the Office of Special Education, specifically the Special Education Director. The secretary may be contacted by calling 770-426-3309. Once the request is received, the Office of Special Education will handle the request.

5.    **What are the guidelines for the provision of an Independent Educational Evaluation at Public Expense?**

Parents of a student with a disability have the right to an independent educational evaluation ("IEE") at public expense if the parents disagree with an evaluation obtained by the Cobb County School District ("School District"). An IEE is an evaluation conducted by a qualified examiner who is not employed by the School District.

The following are the Cobb County School District's guidelines and applicable procedures for requesting and obtaining an IEE.

1.  If the parents disagree with an evaluation obtained by the School District, the parents may request an IEE at public expense. The request must identify the evaluation with which the parents disagree and should be made or forwarded for consideration to the Office of Special Education.

2.  Upon receipt of a request, the School District will forward to the parents a copy of the Guidelines and a Parental Request Form. Parents are asked to complete the Form,

Office of Legal and Policy Issues
This guidance is not intended to state new law or supplant any federal or state laws, regulations, or requirements. Nothing in this guidance should be seen as having the force of law. This guidance should not be cited as law or as imposing any additional requirements or obligations outside the requirements of existing law. Users who have questions about the IEP process are encouraged to contact their special education supervisor.
FOR INTERNAL TRAINING PURPOSES ONLY – NOT FOR DISTRIBUTION OUTSIDE OF CCSD                    page 1

CCSD_PROD_006238

COBB COUNTY SCHOOL DISTRICT
SPECIAL STUDENT SERVICES
Guidance on Independent Educational Evaluations

including an explanation of the reasons for which the parents object to the School District's evaluation, but the School District will not delay responding to the parents if the parents decline to explain their reasons.

3.  After receiving a request for an IEE, the Director of Special Education or designee will decide whether the requested IEE will be publicly-funded or, in the alternative, whether the School District will request a due process hearing to demonstrate that the School District's evaluation is appropriate or that the IEE does not meet the criteria of the School District.  Once it is clear to the School District that the parents disagree with an evaluation conducted by the School District and the parents have requested an IEE, the Director of Special Education or designee will make a decision without unnecessary delay as to whether the School District will fund the IEE.  If the School District initiates a due process hearing, and the final decision is that the School District's evaluation is appropriate or that the IEE does not satisfy the School District's reasonable criteria, then the parents still have a right to an IEE but not at public expense.

4.  If the School District has decided to fund the IEE and the parents have selected an independent evaluator, the Parent will be provided an Authorization to Release Confidential Information allowing the School District to release the student's education records to the independent evaluator.  Additionally, the Director of Special Education or designee will contact the evaluator in order to make arrangements for the evaluation to be performed, to provide copies of educational records, and to pay the evaluator.  Additionally, the School District will request to be present when the results of the IEE are shared. Should the Parent deny this request, the School District will not deny payment for the completed evaluation. The parent will be copied on a confirming letter to the evaluator and the letter will specify also that the parent will be responsible for making the appointment, paying any charges resulting from "no-show" appointments, and paying for the evaluation if the parent request that the evaluation be stopped prior to completion. The evaluator will be paid for services once the School District has received the written evaluation report from the evaluator and the evaluator has submitted the necessary paperwork for payment.

5.  It is the School District's practice to require all independent evaluators to provide the School District with current curriculum vitae, including their licensing information, as well as a sample report.  Also, independent evaluators who will provide services at public expense must enter into a contract with the School District for the provision of the requested services and agree to provide the report to the School District.  In addition, independent evaluators must adhere to the following requirements:

    a.    They must use a variety of assessment tools to gather relevant information about the student;

Office of Legal and Policy Issues
This guidance is not intended to state new law or supplant any federal or state laws, regulations, or requirements. Nothing in this guidance should be seen as having the force of law. This guidance should not be cited as law or as imposing any additional requirements or obligations outside the requirements of existing law. Users who have questions about the IEP process are encouraged to contact their special education supervisor.
FOR INTERNAL TRAINING PURPOSES ONLY – NOT FOR DISTRIBUTION OUTSIDE OF CCSD                                        page 2

CCSD_PROD_006239

COBB COUNTY SCHOOL DISTRICT
SPECIAL STUDENT SERVICES
Guidance on Independent Educational Evaluations

b.    They must not use any single measure or assessment as the sole criterion for determining whether the student is a student with a disability;

c.    They must use technologically sound instruments, measures, and assessment tools;

d.    They must select and administer instruments, measures, and assessment tools so as not to be discriminatory on a racial or cultural basis;

e.    They must administer instruments, measures and assessment tools in the student's native language or other mode of communication and in the form most likely to yield accurate information on what the student knows and can do, unless it is clearly not feasible to so provide or administer;

f.    They must ensure that any instruments, measures, and assessment tools are used for the purposes for which they are valid and reliable

g.    They must be qualified and trained to administer the chosen instruments, measures, and assessment tools; and

h.    They must ensure that instruments, measures, and assessment tools are administered in accordance with any instructions provided by the producer of the instruments, measures, and assessment tools.

The School District will not authorize an IEE from any evaluator who has not fulfilled or who has been found to have violated any of the above requirements. Those individuals included on the School District's list of evaluators have satisfied the School District's requirements. If the parents wish to use an evaluator not on the School District's approved list, the evaluator must be willing to comply with the School District's requirements and also must be qualified under federal and Georgia law to conduct the evaluation.

6.    **Must the School District consider private evaluations when making decisions regarding the provision of FAPE?**

The School District will consider any information provided by parents, including IEEs, in making any decision regarding the provision of a free appropriate public education.

Policy Based on: 20 U.S.C. § 1415(b)(1); 34 CFR 300.502; Georgia State Bd. of Education Rule 160-4-7-.05(4).

Office of Legal and Policy Issues
This guidance is not intended to state new law or supplant any federal or state laws, regulations, or requirements. Nothing in this guidance should be seen as having the force of law. This guidance should not be cited as law or as imposing any additional requirements or obligations outside the requirements of existing law. Users who have questions about the IEP process are encouraged to contact their special education supervisor.
FOR INTERNAL TRAINING PURPOSES ONLY – NOT FOR DISTRIBUTION OUTSIDE OF CCSD

CCSD_PROD_006240

## Referral Scenarios

### 1. Speech-only student with academic/behavior concerns

Classroom teacher has concerns regarding academics/behavior about a student who already has an IEP for Speech.

Since this student has Special Education eligibility through speech, referral for additional testing must be through the IEP/Redetermination process.
Progress monitoring on specific interventions is required before the referral and testing begins.

- Classroom teacher notifies parent of concerns and consults with SLP.
- Classroom teacher and SLP should work with the school RTI facilitator to determine and implement appropriate interventions- some schools may prefer to place the student in Tier 2. Either approach is acceptable as long as interventions are implemented.
- Classroom teacher should gather data on the interventions.
- Hearing and vision should be updated if not current.
- The team should review the data after 6 weeks to determine how to proceed. Suggested team members include special education teacher, counselor, psychologist and teacher. In some cases, it would be appropriate for the SLP to attend. If the team suspects a Learning Disability, 12 weeks of data is required. The team should decide case-by-case if 12 weeks is required prior to testing for other areas of suspected eligibility.
- At the point when the team determines an evaluation is indicated, the SLP is notified. The SLP sets up an IEP Amendment to discuss reevaluation.
- IEP Team includes the SLP, parent, classroom teacher, special education teacher, psychologist, system rep, and others as appropriate.
- At the IEP meeting, data is presented and if the team recommends additional testing, Parental Consent for Evaluation (2102) is signed. SLP documents the IEP discussion in the Minutes and the IEP is finalized. Academic/behavioral interventions already in place should be continued and data collected during the testing process.
- SLP will be the "Keeper of the Eligibility Report". Classroom teacher and SLP work together to complete the sections 1-5. SLP will update information in Section 6/Communication.
- SLP emails the Special Ed. Case Manager the draft Eligibility Report. Student's name is placed on the Special Education Redetermination Tracking Log at the school. Because this is a redetermination, the 60 day timeline does not apply. The school should attempt to complete the evaluation in a timely manner.

After testing has been completed, Special Education personnel set up an IEP meeting to discuss new area of eligibility and redetermine speech eligibility. SLP must attend. The eligibility statement must indicate all areas for which the student is now eligible.

Revised 9.19.14

CCSD_PROD_006241

**2. Special Ed Student is referred for speech concerns.**
Teacher suspects a speech/language problem for a student already in special education.

- Teacher notifies parent about the concern and completes the appropriate Speech-Language Checklist(s).
- Hearing and vision are updated at the school.
- Case Manager consults with SLP to discuss concerns and set up IEP Amendment meeting. Participants include the parent, teacher, case manager and SLP.
- At the meeting, the team discusses the concerns and develops appropriate intervention strategies. If an evaluation is recommended, the Parental Consent for Evaluation (2102) is signed.
- If the current eligibility report is from a previous school year, the referring Special Ed. Teacher and SLP work together to complete sections 1-5 of the new Special Education Eligibility Report. If the student's initial eligibility is from the current year, follow the instructions for "Reevaluations" in the body of the current Special Education Eligibility Report to update the information in sections 1 – 5.
- SLP begins evaluation and teacher continues to implement the strategies and collect data. SLP provides direct intervention when appropriate (for fluency and articulation concerns). Interventions and speech/language evaluation occur simultaneously.
- Data from the intervention strategies must be included in the Eligibility Report. Special Education Teacher is the "Keeper of the Form". Email a copy to the SLP so she can add testing information.
- When evaluation is completed, Special Education Case Manager sets up an IEP to discuss evaluation results and determine speech eligibility. Special Education eligibility is also redetermined at this time, therefore the SLP and Case Manager work together to complete the remainder of the eligibility report with current information.

**3. Student is in RTI receiving interventions in academic/behavioral areas and speech.**
After the 12 week tiered intervention process, the data indicates that the student is progressing in some areas, but not others. Should a referral for special education testing be made?

In this case the decision must be considered on an individual basis. It is important to remember that with young children, a severe articulation disorder or a language disorder may put the child at risk for future reading problems. There is a plethora of research that demonstrates the risk that students with language disorders have for additional academic concerns. Based on the RTI data, the team may decide to refer for speech-language testing only, but it is recommended that the evaluation be comprehensive in nature. If the progress on academic interventions does not appear to be closing the gap in achievement, testing in academic areas could proceed along with the speech-language evaluation. The teacher would continue the interventions and progress monitoring, and that information would be used to assist in determining eligibility after testing is completed.
If a decision is made to test only for speech-language, progress monitoring on academic/behavioral concerns would continue.

Revised 9.19.14

CCSD_PROD_006242

**4. Student is in evaluation process for academics/behavior when speech-language concerns arise.**

- When a student has been referred to Tier 2 for any reason, the Language Checklist for that grade level should be completed. The Tier Teams should consider this information and initiate strategies if the teacher has significant concerns. There is a strong research base that supports the fact that students with reading difficulty have receptive/expressive language disorders as well.
- If no speech-language concerns were noted during the Tiers, but an examiner noted communication weaknesses, the team can refer back to the checklist and other information already gathered to determine whether a speech-language evaluation is necessary.
- If the speech-language concerns are more significant than originally determined, the SLP can begin an evaluation. Communication strategies should be given to the teacher. Data will be needed when testing is completed.
- If the team wants to proceed with the IEP before speech testing can be completed, then a recommendation for speech-language evaluation is made at the IEP meeting and parents are asked to sign a new Parental Consent for Evaluation (2102). This will mean that a brand new eligibility report will be generated and at the IEP to review these results, Special Education will need to redetermine eligibility for their area as well. **There can only be one eligibility date.**

**5. Student enters CCSD with an IEP that indicates he has been receiving special education services for academics and speech.**
Eligibility information is reported in the IEP and an evaluation report is received, but there is no speech-language eligibility.

- In Georgia, we need a report that includes the evaluations administered in the areas of speech-language and states the determination of eligibility for Speech-Language. If that is not available, the SLP will need to evaluate.
- At the IEP meeting, the eligibility from the previous district will be accepted, however, the SLP will need to ask for additional testing in speech-language, get a Parental Consent for Evaluation (2102) signed, and proceed as if it were a reevaluation.
- While the evaluation is in progress, the SLP provides comparable speech services. The data from these services can be used to document interventions.
- The SLP and Special Education teacher work together to complete a Comprehensive Georgia Eligibility Report. Information from the out-of-district report can be transferred to our document and new information added. This is considered a reevaluation, and at the IEP meeting, all areas of eligibility are redetermined. **There can only be one eligibility date.**

Revised 9.19.14

CCSD_PROD_006243

**6. Speech only transfer student with academic goals**
Student enters your school with eligibility for Speech-Language only, but IEP reflects academic/behavioral goals and daily service time.

- Comparable services must be offered immediately (we honor the out-of-district IEP)
- Both SLP and a representative from Special Education should review the file to determine what additional information is needed.
- At the 10 day Goalview IEP, the team recommends additional evaluation to look at another area of eligibility. Speech eligibility may be accepted at this meeting. Parental Consent for Evaluation (2102) is signed. It is possible that the student is no longer having difficulties in academic/behavioral areas. If there is adequate documentation, the team may decide to eliminate the goals/objectives and additional services rather than proceeding with an evaluation.
- When evaluation is completed, SLP and Special Education work together to complete the eligibility report and schedule an IEP meeting.
- If student does not qualify for any additional areas of eligibility, IEP must be changed to reflect speech-language services only.

**7. Redetermination is due; Special Education does not need to test, but SLP needs to update evaluations.**

- Several weeks prior to the anticipated Redetermination IEP Meeting, the SLP contacts parents to explain the rationale for updating speech-language testing.
  - Communication skills change over time
  - Best Practice is to reevaluate students prior to transitioning to Middle/High (5th Grade, 8th Grade) and if staffed as a preschool student, during the mid-elementary years.
- An IEP Amendment is required to document the need for testing and the conversation with the parents. Include the information in the IEP Meeting Notes, with a dated notation in the Eligibility Notes to "See Discussion in Folder 16". Create a final and send home the new information as well as a Parental Consent for Evaluation (2102) for their signature.
- When the evaluation is completed, the SLP records the results on the *Speech Language Evaluation Summary.*
- When the Special Education Case Manager sets up the Redetermination IEP, the SLP presents the new information and makes a clear statement in the Eligibility Folder of Goalview that based on updated testing B) student is no longer eligible for Speech Impaired. A new Eligibility Report is not required.

Revised 9.19.14

CCSD_PROD_006244

## Section Four: EVALUATION & REEVALUATION (160-4-7-.04)

http://www.gadoe.org/External-Affairs-and-Policy/State-Board-of-Education/SBOE%20Rules/160-4-7-.04.pdf

Evaluations in the world of education range from a quick "screener" administered to a group of students by one person, to an in-depth, comprehensive evaluation performed on an individual student by a multidisciplinary evaluation team. This chapter addresses the individual multidisciplinary evaluation that is used to determine whether or not a student has a disability and, if so, whether special education services are necessary.

Individual multidisciplinary evaluations have major educational as well as legal significance. As such, trained evaluation specialists and sophisticated materials are required to administer them. Since these evaluations often involve considerable time and expense, care should be taken to ensure that an individual multidisciplinary evaluation is necessary prior to making a request for this type of evaluation.

Embedding routine assessment of students and their progress throughout their educational experience provides an informative and efficient process that enables the students to make frequent data "tracks" of their progress so that educators can see when and where timely changes are needed. This gives the schools and parents more flexibility and up-to-date information to consider and use; and, by the time an on-going problem is referred to the student support team (SST) or for a special education evaluation, this process will have already generated a substantial amount of useful data.

### Initial Evaluation

The Individuals with Disabilities Education Act (IDEA) requires that before a student can receive special education services, the district must determine whether the student meets eligibility requirements for special education and needs special education services. The district must conduct (or arrange for) a comprehensive evaluation that:
1. provides sufficient data to determine whether the student is a student with a disability;
2. documents how the disability affects the student's academic or behavioral performance in school; and
3. provides appropriate information for the development of an IEP, if eligible.

Students referred for determination of special education eligibility can be referred for initial evaluation. This includes students referred through the school RTI teams, via direct parent referral, or through the procedures for private or home school students. Students for whom special education eligibility has previously been established may be referred for evaluation to determine continued eligibility or consider a new area of eligibility.

CCSD_PROD_006245

The timeline for the evaluation begins when the signed written consent (2102) has been received by the District.

| July 27 | July 28 | July 29 | July 30 | July 31 | Aug 3 | Aug 4 | Aug 5 | Aug 6 | Aug 7 |
|---|---|---|---|---|---|---|---|---|---|
| Oct 2 | Oct 5 | Oct 6 | Oct 7 | Oct 8 | Oct 9 | Oct 9 | Oct 13 | Oct 14 | Oct 15 |
| **Aug 10** | **Aug 11** | **Aug 12** | **Aug 13** | **Aug 14** | **Aug 17** | **Aug 18** | **Aug 19** | **Aug 20** | **Aug 21** |
| Oct 16 | Oct 19 | Oct 20 | Oct 21 | Oct 22 | Oct 23 | Oct 26 | Oct 27 | Oct 28 | Oct 29 |
| **Aug 24** | **Aug 25** | **Aug 26** | **Aug 27** | **Aug 28** | **Aug 31** | **Sept 1** | **Sept 2** | **Sept 3** | **Sept 4** |
| Oct 30 | Nov 2 | Nov 3 | Nov 4 | Nov 5 | Nov 6 | Nov 9 | Nov 10 | Nov 11 | Nov 12 |
| **Sept 8** | **Sept 9** | **Sept 10** | **Sept 11** | **Sept 14** | **Sept 15** | **Sept 16** | **Sept 17** | **Sept 18** | **Sept 28** |
| Nov 16 | Nov 17 | Nov 18 | Nov 19 | Nov 20 | Nov 30 | Dec 1 | Dec 2 | Dec 3 | Dec 4 |
| **Sept 29** | **Sept 30** | **Oct 1** | **Oct 2** | **Oct 5** | **Oct 6** | **Oct 7** | **Oct 8** | **Oct 9** | **Oct 12** |
| Dec 7 | Dec 8 | Dec 9 | Dec 10 | Dec 11 | Dec 14 | Dec 15 | Dec 16 | Dec 17 | Dec 18 |
| **Oct 13** | **Oct 14** | **Oct 15** | **Oct 16** | **Oct 19** | **Oct 20** | **Oct 21** | **Oct 22** | **Oct 23** | **Oct 26** |
| Jan 7 | Jan 8 | Jan 8 | Jan 8 | Jan 13 | Jan 14 | Jan 15 | Jan 15 | Jan 15 | Jan 20 |
| **Oct 27** | **Oct 28** | **Oct 29** | **Oct 30** | **Nov 2** | **Nov 3** | **Nov 4** | **Nov 5** | **Nov 6** | **Nov 9** |
| Jan 21 | Jan 22 | Jan 22 | Jan 22 | Jan 27 | Jan 28 | Jan 29 | Jan 29 | Jan 29 | Feb 2 |
| **Nov 10** | **Nov 11** | **Nov 12** | **Nov 13** | **Nov 16** | **Nov 17** | **Nov 18** | **Nov 19** | **Nov 20** | **Nov 30** |
| Feb 3 | Feb 4 | Feb 5 | Feb 5 | Feb 10 | Feb 11 | Feb 12 | Feb 22 | Feb 23 | Feb 24 |
| **Dec 1** | **Dec 2** | **Dec 3** | **Dec 4** | **Dec 7** | **Dec 8** | **Dec 9** | **Dec 10** | **Dec 11** | **Dec 14** |
| Feb 25 | Feb 26 | Feb 26 | Feb 26 | Mar 2 | Mar 3 | Mar 4 | Mar 4 | Mar 4 | Mar 9 |
| **Dec 15** | **Dec 16** | **Dec 17** | **Dec 18** | **Jan 4** | **Jan 5** | **Jan 6** | **Jan 7** | **Jan 8** | **Jan 11** |
| Mar 10 | Mar 11 | Mar 11 | Mar 11 | Mar 11 | Mar 14 | Mar 15 | Mar 16 | Mar 17 | Mar 18 |
| **Jan 12** | **Jan 13** | **Jan 14** | **Jan 15** | **Jan 19** | **Jan 20** | **Jan 21** | **Jan 22** | **Jan 25** | **Jan 26** |
| Mar 21 | Mar 22 | Mar 23 | Mar 24 | Mar 28 | Mar 29 | Mar 30 | Mar 31 | Apr 1 | Apr 13 |
| **Jan 27** | **Jan 28** | **Jan 29** | **Feb 1** | **Feb 2** | **Feb 3** | **Feb 4** | **Feb 5** | **Feb 8** | **Feb 9** |
| Apr 14 | Apr 15 | Apr 15 | Apr 19 | Apr 20 | Apr 21 | Apr 22 | Apr 22 | Apr 26 | Apr 27 |
| **Feb 10** | **Feb 11** | **Feb 12** | **Feb 22** | **Feb 23** | **Feb 24** | **Feb 25** | **Feb 26** | **Feb 29** | **Mar 1** |

CCSD_PROD_006246

| Apr 28 | Apr 29 | Apr 29 | Apr 29 | May 2 | May 3 | May 4 | May 5 | May 6 | May 9 |
|---|---|---|---|---|---|---|---|---|---|
| **Mar 2** | **Mar 3** | **Mar 4** | **Mar 7** | **Mar 8** | **Mar 9** | **Mar 10** | **Mar 11** | **Mar 14** | **Mar 15** |
| May 10 | May 11 | May 12 | May 13 | May 16 | May 17 | May 18 | May 19 | May 20 | May 23 |
| **Mar 16** | **Mar 17** | **Mar 18** | **Mar 21** | **Mar 22** | **Mar 23** | **Mar 24** | **Mar 25** | **Mar 28** | **Mar 29** |
| May 24 | May 25 | May 26 | May 27 | May 27 | May 31 | June 1 | June 2* | June 3* | June 6* |
| **Mar 30** | **Mar 31** | **Apr 1** | **Apr 11** | **Apr 12** | **Apr 13** | **Apr 14** | **Apr 15** | **Apr 18** | **Apr 19** |
| June 7* | June 8* | June 9* | June 10* | June 10* | June 10* | June 13* | June 14* | June 17* | June 17* |
| **Apr 20** | **Apr 21** | **Apr 22** | **Apr 25** | **Apr 26** | **Apr 27** | **Apr 28** | **Apr 29** | **May 2** | **May 3** |
| June 17* | June 20* | June 21* | June 24* | June 24* | June 24* | June 27* | June 28* | July 1* | |
| **May 4** | **May 5** | **May 6** | **May 9** | **May 10** | **May 11** | **May 12** | **May 13** | **May 16** | **May 17** |
| | | | | | | | | | |
| **May 18** | **May 19** | **May 20** | **May 23** | **May 24** | **May 25** | **May 26** | **May 27** | **May 31** | **Jun 1** |
| | | | | | | | | | |

*indicates that although the due date listed here is the actual date, the eligibility meeting should be held prior to the end of the teachers' school year

Dates for May will be determined once the calendar is set for the 2016-2017 school year.

CCSD_PROD_006247

Evaluations

The evaluation may include observation of your child in a group setting, a review of current school records or any reports you release to us. Additionally, the assessment areas listed below are examples of those typically addressed in an assessment of a student's abilities. The list does not include every area that might be assessed nor may all areas listed be assessed. The evaluator(s) will choose specific tests that address the scope of the recommended evaluation. Additionally, the evaluator(s) will determine specific tests that are thought to be best for the student's age, grade, physical abilities, and cognitive functioning. You will be given specific information on tests used at the time the results are reviewed.

> VISION -A vision screening to determine the student's visual acuity. If additional testing is indicated, the student may be referred to a medical eye specialist for further evaluation. If visual problems are indicated, other tests (achievement, intelligence, cognitive ability, etc.) will be selected to be nondiscriminatory in terms of the vision impairment or these test may be postponed until the problem can be corrected.

> HEARING – An audiometric screening to determine the student's hearing acuity. This screening may include puretone or impedance audiometry. If additional testing is indicated, the student may be referred to an audiologist or medical specialist. If a hearing impairment is indicated, other tests (achievement, intelligence, cognitive ability, etc.) will be selected to be nondiscriminatory in terms of the hearing impairment.

> ACHIEVEMENT – These tests may be group or individual tests to determine the student's current level of academic functioning. Areas which may be assessed are: oral expression; listening comprehension; written expression; basic reading skills; reading comprehension; reading fluency, mathematics calculation; and, mathematics reasoning.

> MOTOR – Testing may involve determination of the student's gross and fine motor skill development, including abilities to perform functional, school-related tasks and any deficits experienced in physical activities related to the educational program.

> INTELLIGENCE/COGNITIVE ABILITY – Includes individually administered tests of general intelligence. These tests are used to measure different types of cognitive abilities such as comprehension, visual and auditory perception, visual and auditory memory, vocabulary, etc. Results on tests of this kind are required for many eligibility categories under IDEA.

60

CCSD_PROD_006248

SPEECH/LANGUAGE – Testing includes assessment of the student's articulation, language, fluency, voice, and adequacy of the oral mechanism. For the nonverbal student, the assessment will explore alternative communication systems.

SOCIAL/EMOTIONAL - Testing includes an assessment of the student's ability to interact appropriately in everyday situations within the family, the school and the community. Such tests may include rating scales, parent direct interviews and assessment with the student, and observation of the student in the classroom.

VOCATIONAL – Factors related to expected vocational levels are examined. Areas of assessment may include evaluation of scholastic abilities, manual dexterity, clerical (typically including perceptual speed and accuracy), mechanical reasoning, spatial reasoning, career interests and functional motor skills.

COGNITIVE PROCESSING- These types of tests examine individual processing strengths and weaknesses and may include: phonological processing, memory, executive functioning, attention, discrimination/perception, organization, sequencing, conceptualization/reasoning and processing speed.

ADAPTIVE- Testing includes assessment of the child's ability to independently demonstrate levels of conceptual, social and practical skills across home, school and community settings to effectively function and meet environmental/sociocultural demands appropriate for the student's age.

OTHER – In the process of assessing a student's strengths and weaknesses, the evaluator may need to use additional tests in order to gain a better understanding of the student's learning strengths and needs.

61

CCSD_PROD_006249

**CCSD Practice**: Professional ethics require that a diagnostic evaluation not proceed until it is documented that the student has acceptable levels of vision and hearing. It is recommended that vision and hearing be screened during the RTI process in order to avoid any delay once the referral for an evaluation is made. Failure to do this would render test results invalid and might prevent discovery of vision and/or hearing problems as the primary or contributing source of the student's problem. Vision and hearing acuity should be determined to be adequate before the formal assessment of the student begins and should be no older than one calendar year when being applied to an evaluation.

- If a student fails the far-point vision (Snellen Chart), a near point screening may be administered by the educational diagnostician, the psychologist or those trained to use the other screening instruments. The evaluation may proceed if the student passes the near point vision; however, the student should be referred for follow-up of distance vision.
- If a student fails the hearing screening in one ear, then the evaluation may proceed if information is presented to the "good" ear and in a quiet environment. The individual conducting the evaluation should be notified of the results. Document on the Hearing and Vision Screening Procedures for Special Education Students the follow-up to address the hearing problems and note the failed hearing as well as the modifications made during the testing procedures in the report.
- If the evaluator's professional judgment is that the student's hearing or vision is not adequate to allow valid results, then testing may not occur until documentation is received from an appropriate specialist. Contact either Cobb Audiology Services or the Special Education Supervisor for Hearing and Vision Services regarding referral.
- If the student has been taken for the follow-up hearing/vision assessment and the testing results indicate that a prosthetic appliance is needed (hearing aid/glasses) and the parent has indicated an inability to pay for the appliance, refer to the school social worker for assistance.
- If the student is referred to medical personnel, the date of the letter to parents recommending referral should be noted. After the evaluation, a letter from the physician should be placed in the student's file. The case manager is responsible for monitoring referral to physician and obtaining report.

Students who cannot be conditioned to respond to an audiometer will require an objective hearing screening which can be provided by a Cobb County audiologist. Call the Audiology appointment line at 678-581-7400 and ask to schedule an objective hearing screening for the student.

Several screening formats are available for vision screenings which are less difficult than the Snellen chart or the Titmus vision screening instrument. Special Needs Preschool teachers have the Bernell Ten Foot Symbol Chart. SID/PID teachers and diagnosticians have the LEA Single Presentation Cards. If these simpler formats prove unsuccessful in obtaining reliable screening

CCSD_PROD_006250

results, contact your cluster diagnostician or the Special Education Supervisor of Vision Services (Heidi Evans) to inquire about other possible vision assessments.

## Student Support Team/Response to Intervention

A student is typically referred for an evaluation by the RTI team when it has documented sufficient evidence to suspect that a disability may be the primary cause of the student's learning or behavior problem(s). This usually occurs after appropriate interventions in the general education classroom have failed to find a satisfactory solution. A parent may also request an evaluation.

## Parent Request

If the referral is made by parental request, the district can either agree to or refuse the request. If the district refuses, it must give the parent written notice explaining the reason(s) why it is declining to initiate an evaluation, what data the decision was based upon, and other factors considered. The parents then have the right, if they choose, to request a due process hearing to seek a favorable ruling to conduct an evaluation.

Parents should note that Georgia Rules for the IDEA eligibility require "Response to Intervention" (RtI) data in order to eliminate other explanations for student problems. If the SST process has been bypassed, the data may need to be gathered during the evaluation process.

Parents may request that their child be referred directly to Special Education for eligibility. The tiered intervention process is a problem solving model that organizes school intervention services for students who are not meeting academic or behavioral expectations. This process also helps to identify which students respond favorably to the interventions and which students may need referral to special education. It should not be suggested to parents that they by-pass this valuable process. A Direct Parent Referral is used only when parents feel that their child is disabled and requires special education services. Determination of eligibility may or may not require a psychoeducational evaluation. This process does not circumvent the requirement of documentation of interventions implemented in the classroom and progress monitoring as a component of eligibility for special education, but does require that the evaluation/eligibility process begin and be completed within 60 days. Implementation of interventions and progress monitoring should occur during the 60-day evaluation period.

The initial point of contact should discuss the following points with the parent. The initial point of contact might be the psychologist, administrator, counselor or special education staff.

63

CCSD_PROD_006251

Discussion Points:

- Through the tiered intervention process the team develops an intervention plan to be implemented within the general education classroom to assist the student and monitors student progress frequently.
- The problem solving team meets periodically to review outcomes and adjust the interventions.
- Research indicates that many students respond to the intervention plan and academic/behavior problems can be resolved with no need for special education services.
- The Direct Parent Referral does not eliminate the requirement for classroom interventions and progress monitoring. Interventions and progress monitoring should be initiated at the start of the Direct Parent Referral.
- A meeting will be scheduled to address eligibility at the end of the evaluation period.

Process:

1. The initial point of contact should first review the Discussion Points with the parent(s).
2. The Tier 3 Facilitator should schedule and attend a meeting that includes the support and services administrator, school psychologist, parent, teacher, administrator, and Tier 2 Facilitator. Direct Parent Referral Meeting minutes should be kept.
3. The parent will explain the disability of the child as well as reasons why special education services are being sought.
4. If during the meeting, the parent decides against a Direct Parent Referral to special education but would prefer to begin the tiered intervention process, the Tier 2 process should begin.
5. If during the meeting, the parent decides to move ahead with the Direct Parent Referral to special education, follow steps 6 – 10.
6. The parent will complete Parent Referral to Special Education Form.
7. The special education representative will give parent a copy of Parent Rights and explain those rights.
8. The committee discusses any additional information that will be needed to determine eligibility. The Tier 2 Student Information packet and the Analyzed Work Sample packet must be completed by the teacher. In addition, observation of the student, achievement testing, comprehensive psychoeducational evaluation, or medical information may be needed. If the committee requests any evaluation, it must provide the parent with the Parental Consent for Evaluation (ISPE2102) form and secure a "yes" or "no" response. If a comprehensive psychoeducational evaluation is needed, the psychologist may request that the parent complete a parent questionnaire.

64

CCSD_PROD_006252

9. As classroom interventions and progress monitoring are required components in determining eligibility for special education services for learning disabilities, the committee should include the necessary Tier 3 or problem solving team members so that the committee/team can also develop strategies/interventions in order to begin the intervention process. The implementation of the Tier 3 process would occur simultaneously with the evaluation process. 10. At the conclusion of the Direct Parent Referral meeting, copies of the completed and signed forms should be made and given to the parent, Tier 3 representative, special education supervisor and school psychologist and the original form given to the education program specialist.

11. Within 60 calendar days of the receipt of signed parental consent, the District must complete any necessary evaluations and convene an eligibility meeting. As referenced in item #8, to meet this timeline, all professionals working with this student must do so concurrently. Outcomes of the Tier 3 interventions must be documented on the Response To Intervention Documentation form. The eligibility committee must determine eligibility or ineligibility at the meeting. In such cases, the eligibility committee could reconvene. A student may continue to receive Tier 3 interventions and, based upon the student's response, the eligibility committee could reconvene to review intervention outcomes and reconsider eligibility determination

## Parent Rights

If an evaluation is to be conducted, as well as whenever the parent requests an evaluation, the district must give the parent a copy of "Your Rights as Parents - Special Education," and provide an explanation to ensure that the parent understands these rights. If a parent's primary language is not English, a translated copy in his or her language must be given to the parent whenever feasible. Translations may be accessed online at the Parents' Rights link on the Special Education web page of the GaDOE website.

## Parent Consent

Before an evaluation can begin, the district must obtain a signed, informed parental consent for evaluation. The district has 60 calendar days to complete the evaluation process, completion being defined as when the eligibility meeting is held. Development and implementation of the Individualized Education Program (IEP) can take up to 30 additional days. The 60 calendar day time period begins when a district employee receives the signed consent, but excludes school holidays and other times when the student is not in attendance for five or more consecutive school days. An exception occurs if the parent fails or refuses to produce the child for the evaluation.

If the parent refuses to give consent for the evaluation, the district may, but is not required to, pursue the evaluation through mediation or a due process hearing. In some cases (if the child is home schooled or placed by the parents in a private school at their expense), the district cannot use the mediation or due process hearing procedures to override the parents' refusal for evaluation.

65

CCSD_PROD_006253

Parent consent is not needed for the District to perform these routine duties:
1. Review existing evaluation information.
2. Screen a child to determine appropriate instructional strategies.
3. Administer an evaluation that is given to all students without consent for evaluation.

Refer to the Parent Consent form on page 31 of this manual.

## Multidisciplinary Evaluation Team

When a referral for special education evaluation is made, the comprehensive evaluation will be conducted by a multidisciplinary team. This team may consist of the district's psychologist, educational diagnostician, speech-language pathologist, occupational therapist and/or physical therapist, and others as appropriate to the evaluation. The child's parents are considered members of this team. The team is responsible for assessing the student in all areas related to any suspected disability and in any other areas deemed relevant. It is recommended that the student be given a hearing and vision screening during the SST or other pre-referral process and that such results be no older than one calendar year. The parents will be asked to provide input during the evaluation process. Their information is valuable in developing the total picture of the child.

## Impact on Educational Performance

Prior to special education eligibility, a number of interventions must have been provided to the child who is at risk for school failure. Frequently, but not always, these students are those whose performance on statewide assessments is in the lowest performance level. The interventions provided through general education are in addition to the traditional instruction that all students receive and may vary in duration and intensity of support. In addition to the actual interventions, data must be analyzed to determine the amount of progress the child is making with the evidence-based interventions. This data is collected through progress monitoring such as curriculum-based measurements. The objective is to determine whether the child receiving interventions is making progress toward the established benchmark of performance. Benchmark performance is determined by mastery of the standards and elements identified for a specific grade level. Once sufficient data is collected (for SLD, there must be a **minimum** of 4 data points collected from the progress monitoring over a **minimum** of 12 weeks of interventions), the team will analyze the information to determine what support is required for the child to succeed in the general education curriculum. For some children, core instruction in the curriculum combined with other interventions provided by the general education staff will be ample support for the child to make progress toward meeting the standards. Some children, despite the interventions, will continue to fall behind their peers. For these select children, the progress monitoring data must be reviewed to determine the level of progress being made. A child whose *rate of learning* is comparable to grade level peers cannot be determined to have a disability that impacts educational performance even though the child may be below grade level performance. General education interventions should continue to be made available, possibly increasing in their intensity or duration. On the contrary, a child whose *rate of learning* is not comparable with grade level peers may be considered a child with a disability that impacts educational performance. For these children, special education support may be necessary.

CCSD_PROD_006254

## Comprehensive Evaluation

An initial evaluation needs to look at the needs of the whole child, regardless of the reason for the referral.

The evaluation team must ask and answer the following questions:

- What do I know?
- What do I need to know?
- What else do I need to find out to get a true "real world" picture of the student?
- Who needs to do additional assessments?

In a comprehensive evaluation, the district will:

- assess all components related to the areas of suspected disability, including vision and hearing, and, if appropriate, health, social and emotional status, general intelligence, academic performance, communicative status, and motor abilities;
- use a variety of evaluation tools and strategies to gather relevant academic, functional, and developmental information about the child, including information provided by the parent;
- not use any single procedure as the only criterion for determining whether a child is a child with a disability or for determining an appropriate educational program for the child;
- use assessment techniques that may assess intellectual and behavioral skills in addition to physical or developmental skills;
- use evaluation tools and strategies to provide relevant information that will directly assist the eligibility team in determining the educational needs of the child;
- use assessments and other evaluation materials to assess specific areas of educational need and not only those that are designed to provide a single general intelligence quotient (IQ) score; and
- select assessment methods so that, when administered to a child with impaired sensory, manual, or speaking skills, the results accurately reflect the child's aptitude or achievement level.

## Typical Steps in the Evaluation Process

1. A request for an evaluation is made by either the school or the parent. A parental consent for evaluation is received from the parent. For an initial referral the 60 calendar day timeline is begun upon receipt of the signed consent.

2. If the child has not had a vision and hearing evaluation, those screenings will be conducted by the school. If the child does not pass, the parent will be informed, and the district and the parent will work together to clear up the hearing and vision issue. Some vision and hearing issues require medical evaluations and/or interventions. Once clearance is received, the evaluation process continues.

3. The interventions that occur during the RTI process are analyzed. If no interventions have been provided or documented prior to the referral, interventions are immediately implemented and progress data noted. It is not necessary to wait for vision/hearing screening results to begin interventions.

67

CCSD_PROD_006255

4. The other data available about a student, which include the permanent record, current classroom assessment and progress, previous results of statewide assessments, attendance data, and disciplinary history, are all reviewed.

5. Classroom observations are usually conducted to determine current performance and to look for specific causes or reasons why the student is not learning or behaving at the expected levels. The observations are usually conducted by a diagnostician or other professional with expertise who does not interact with the student on a daily basis.

6. The current and previous teachers of the student are interviewed. The focus of the interview is to determine whether the problems cited as the reason for the evaluation are new issues or recurring issues. In addition, the interviews will provide information on any interventions or strategies that have been previously tried.

7. Parent input is an important part of the evaluation process. If the parents have any independent evaluations or medical information they have not provided to the district, they should provide this information now. Information the parents have about learning at home, such as how long it takes the student to complete his or her homework and how much help the student requires, all assist in the evaluation. Often the behavior of the student at home is also discussed to determine whether the parent sees the same behaviors as the school sees, what kind of interventions work at home, and how frequently certain behaviors occur. In addition, many times the district needs to screen for adaptive behavior, so it may ask questions about household chores or tasks, about
money management, and about other things that do not always *feel educational* to the parent. This information contributes to the whole picture of the child.

8. All previous information and data on the student is reviewed (e.g., previous evaluations, medical reports, psychological evaluations, and independent evaluations). This helps the team determine which evaluations to administer for the current evaluation.

9. Many evaluations include the administration of surveys or questionnaires. These are usually published forms of questionnaires or surveys that gather information about the typical day to day behavior of the student. The questionnaires or surveys are often completed by multiple people who know the student in order to provide a comprehensive view that encompasses school, home, and the community.

10. As all this information is received, the multidisciplinary evaluation team begins to review the information and determine what individual assessments are needed to provide more in-depth information. The needed assessments are then conducted and may include a variety of instruments that look at learning, listening, speaking, behavior,
sensory, motor, or academics.

11. As these assessments are administered, other areas of concern may arise that need to be evaluated and additional assessments will be conducted as necessary. For example, fine motor skills may not have been a concern when the evaluation was requested; but information from the assessments and observations may indicate a concern that warrants an evaluation of the fine motor skills as a component of the comprehensive evaluation.

68

CCSD_PROD_006256

12. All instruments are scored, and the results are analyzed and interpreted by the professionals who administered the instruments.

13. The summary of the information learned from the evaluation is developed.

14. The person coordinating the evaluation discusses the results of the evaluation with the parent and educators, with or without an accompanying written report at this time. Occasionally, this discussion occurs at the same time as the eligibility meeting.

15. An eligibility meeting is conducted. The eligibility meeting determines whether a disability exists and what the impact is on the education of the student. If there is a significant impact, the team may determine that the student is a student who needs special education and related services. An eligibility report is created regardless of whether the student is determined eligible or ineligible. The eligibility report may serve as the evaluation report if it is detailed enough to report the results thoroughly.

CCSD_PROD_006257

Steps in an Evaluation for Special Education Consideration

- ❑ Get Permission from Parent to Evaluate
- ❑ Receive Evaluation Request
- ❑ Screen Hearing & Vision
- ❑ Analyze and/or Implement Interventions
- ❑ Review Permanent Record & Current Class Work
- ❑ Complete Classroom Observations
- ❑ Interview Current and/or Previous Teachers
- ❑ Interview Parent
- ❑ Review Previous Data (other evaluations, medical reports, information from previous schools)
- ❑ Review Questionnaires and/or Forms from Respondents
- ❑ Determine and Conduct One-on-One Assessments
- ❑ Determine Other Areas to Investigate if Needed, Based on Data
- ❑ Score All Instruments
- ❑ Analyze & Interpret Results
- ❑ Write Report of Evaluation (*the eligibility report may serve as the evaluation if detailed enough to report results)
- ❑ Share the results with parent and educators
- ❑ Write Eligibility Report (regardless of whether or not the student is eligible)
- ❑ Hold Eligibility Meeting

70

CCSD_PROD_006258

## Eligibility

Once the evaluation is completed, the eligibility team, including the parent, will decide whether the student is eligible for special education services. This involves meeting eligibility requirements as well as not having exclusionary criteria that would prevent eligibility. The parent is included on the team and is provided a copy of the evaluation report as well as a copy of the eligibility decision. If there is no report from an evaluation specialist, such as the district's psychologist or speech-language pathologist, then the eligibility report can serve as the evaluation report as long as it is comprehensive enough to document the results of the evaluation.

Many times a parent will request a copy of the evaluation report prior to the eligibility meeting in order to read and understand the results of the evaluation. The law does not require that the parent be provided with a copy prior to the eligibility decision. On occasion, it is appropriate to provide it prior to a meeting. Other times, the report is not provided until a time at which the evaluation specialist can meet with the parent to explain the results of the evaluation. Many of the assessments that are administered as part of the evaluation have results that are reported in numbers that have little meaning to a parent or others until an explanation is also provided. If the results are confusing or upsetting to the parent, it may be necessary to conduct a meeting to discuss the results of the evaluation and then convene a later meeting for the eligibility decision.

In order to be eligible to receive special education services, the student must meet the requirements of one or more of the following categories:

- *Autism*
- *Deaf-Blind (D/B)*
- *Deaf/Hard of Hearing (D/HH)*
- *Emotional/Behavioral Disorder (EBD),*
- *Mild, Moderate, Severe, or Profound Intellectual Disability (MIID, MOID, SID, or PID)*
- *Orthopedic Impairment (OI)*
- *Other Health Impairment (OUI)*
- *Significant Developmental Delay (SDD)*
- *Specific Learning Disability (SLD)*
- *Speech-Language Impairment (SI)*
- *Traumatic Brain Injury (TBI)*
- *Visual Impairment, including Blindness (VI)*

For more information on eligibility see section five of this manual.

## Reevaluation/Redetermination

The purpose of a reevaluation is to review current evaluation information and to consider what additional information might be needed to decide whether the child continues to have a disability and to determine the needs of the child.

71

CCSD_PROD_006259

A reevaluation of the child's needs is to be conducted at least once every three years unless the parent and the district agree that a reevaluation is unnecessary. The reevaluation may be conducted at any time if the district feels the needs of the child should be reevaluated or if the

## Reevaluation Procedures

The district must provide written notice to the parent and must receive written informed parental consent before conducting any reevaluation of a child with a disability. If the parent does not respond after several attempts, the district can go forward with the reevaluation but it must document its reasonable, varied efforts to contact the parent. The IEP reevaluation committee then reviews the reasons for the reevaluation, as well as existing evaluation data, including any information provided by the parent.

If the committee determines the need to evaluate for a new area of suspected disability, the data collection needs to occur for that area as it would with a new eligibility. For example, if a student is currently eligible in the category of speech and language and the committee determines the need to evaluate for Emotional Behavioral Disorder, data needs to be collected in that area.

## Review of Existing Evaluation Data

As part of an initial evaluation, and as part of any reevaluation, the parent and other qualified professionals must review evaluation data on the child that is already available. This review may be conducted without a meeting and may include evaluations and information provided by the parent, current classroom-based local or Georgia assessments, classroom-based observations, and observations by the teacher and related service providers. The team will, on the basis of that review, and considering how long it has been since formal assessment of the student last occurred, identify additional data needed, if any, to determine the following:
- the present levels of academic achievement and related developmental needs of the child;
- whether the child continues to have a disability or has an additional disability;
- whether the child continues to need special education and related services;
- whether the child needs any additions or modifications to the special education and related services to meet the measurable annual goals set in the IEP; and
- whether or not the child can participate in the general education curriculum, as appropriate.

If the IEP/reevaluation committee determines that no additional information is needed, then the committee can proceed with eligibility. If additional information is determined to be needed, the committee determines which assessments are needed to provide it. The parent has a right to request assessments for the determination of eligibility for the child's educational needs, even if the committee had concluded that no additional data was needed.

72

CCSD_PROD_006260

### Evaluation before Termination of Eligibility

The district must reevaluate a child with a disability before determining that the child is no longer a child with a disability who requires special education services. However, reevaluation is not needed

1. when the student graduates from high school with a regular education diploma, or
2. when the student has exceeded the age of eligibility (22nd birthday) for free appropriate public
education (FAPE).

The district must, however, provide the student with a summary of academic and functional performance that includes recommendations for meeting postsecondary goals when the student is graduating with a regular diploma or aging out of school. Best practice would also include providing the summary of performance for the student who receives a special education diploma or other exit document. It is up to local district policy as to whether services cease exactly on the student's 22nd birthday or continue until the end of the school year in which the student turns 22 years of age.

### Independent Educational Evaluation

If a parent *disagrees with* the results of a completed evaluation done by the district, the parent may request an outside independent educational evaluation (IEE) paid for by the district. The district must agree to pay for the independent evaluation or begin due process procedures to show that the district's evaluation is adequate. If there is a due process hearing and the district's evaluation is judged to be sufficient, then it will not have to pay for an IEE. A parent is entitled to only one independent educational evaluation at public expense each time the public agency conducts an evaluation with which the parent disagrees. The qualifications of the independent evaluator must be the same as those required of the district evaluators. The district may set a reasonable limit on the cost of the independent evaluation. (See 34 C.F.R.§300.502 of the Federal Rules and Regulations for a complete explanation of IEEs.)

A parent does not have the right to an independent evaluation at public expense until he or she has allowed the district to conduct its own evaluation. Then, if the parent disagrees with the results of the evaluation, he or she may request an IEE. The parent always has the right to obtain an outside IEE at his or her own expense, before or after the district's evaluation. As long as the evaluation was conducted by someone who meets the qualifications for district evaluations, the district must consider the results of the parentally obtained evaluation.

See section one for more information regarding the IEE.

CCSD_PROD_006261

**Topic 2**

(CCSD's policies, practices, and procedures re to IEP's & §504 Plans as used/defined under IDEA, §504 & ADA)

SpEd Manual 2020



# CHILD FIND (34 C.F.R. § 300.111; GA Rule (160-4-7-.03)

Child Find is a process that districts use to identify, locate, and evaluate all children, in the district, birth through 21, who are suspected of having disabilities that may result in a need for special education and related services. Districts must have policies and procedures in place to ensure the identification, location, and evaluation of these children; and public notification must be given before any significant Child Find activities are implemented.

The Cobb County School District has Child Find responsibility for all children within our jurisdiction suspected of having disabilities, regardless of the severity of their disabilities. This includes:

- preschool children, ages 3 through 5, who may not be enrolled in a Georgia-funded pre- kindergarten and kindergarten, including children who are parentally placed in private preschools or daycare centers outside the district;
- children who are enrolled in a public school within the district, including public charter schools;
- children who are parentally placed in private and home schools located in the LEA's jurisdiction;
- highly mobile children, including migrant, homeless, and children who are wards of the state;
- children served in community programs such as rehabilitation centers, daycare centers, etc.;
- children who are incarcerated in facilities operated by the local sheriff's office or other municipalities; and
- any other children suspected of having disabilities.

## Child Find Procedures

The Cobb County School District provides information regarding child find procedures in the parent handbook, which can be found on the District's website as well the special education website as a means for disseminating Child Find information. District representatives in Special Education also meet annually with parents who home school and private schools to inform them of that district's Child Find procedures. Information regarding the annual meeting can be found on the



District's special education website in advance of the meeting. Additionally, letters are mailed to parents of students who are listed on the home school report provided by the GaDOE and to parents who parentally place their students in private school as provided by the private schools.

For children transitioning from the Babies Can't Wait program, identification and evaluation should be completed by the child's 3rd birthday. Early identification and evaluation of students with disabilities facilitates a smooth transition into the public school district for these children

### Guidance on Child Find:

Children may be referred to the Special Needs Preschool program by parents, physicians, schools, daycare providers, Babies Can't Wait and other community agencies.

1. Babies Can't Wait (BCW) is the state agency responsible for providing early intervention services for children birth through age three. It is the responsibility of both BCW and the school system to ensure a smooth transition from the BCW program to the school system. School districts are required to evaluate and have an Individual Education Program (IEP) in place by the child's third birthday.
2. Parents may call the Special Needs Preschool office at (770) 426-3331 to refer their child for an evaluation. A referral packet will be sent to the parent to complete. Once returned, a member of the evaluation team will call to schedule the evaluation.
3. Private preschools, daycares, physicians, and local and state agencies may call (770) 426-3331 to refer a child for evaluation.

School Age Children K through Age 22
- Students may be referred for evaluation under IDEA by response to intervention (RtI), Section 504 teams, District employees, and parents.
- The District conducts yearly meetings with parents of students who are accessing home schooling opportunities or are parentally placed in private schools.
- The District has made efforts for child find by sending a letter to local jails regarding the District's obligation for child find.
- Students who attend Charter Schools within the District may be referred for evaluations. The Charter School staff will conduct the evaluation. At this time, there are no Charter Schools within the District

### Child Find for Students Suspected of a Disability
- Children who do not have an IEP or Section 504 plan may still have protections if the school had knowledge that the child may be a child with a disability.

- School district shall NOT be deemed to have knowledge (and child will not have discipline protections) if:

    – Parent of the child has not allowed an evaluation; OR

    – Parent has refused services; OR

    – Child was evaluated and it was determined that the child was not a child with a disability

- What if the parent makes a request for evaluation or claims the child is disabled <u>after</u> the conduct in question?

    – School must conduct an "expedited evaluation"

        • No specific timeline, but should take less than 60 calendar days

    – While evaluation is being conducted, the child's educational setting will be determined by school personnel

        • Child may remain in disciplinary setting

        • Be careful not to "over-discipline" or be disproportionate in discipline

- **<u>A student is suspected to have a disability when</u>**

(1) The parent of the student expressed concern in writing to supervisory or administrative personnel of the appropriate educational agency, or a teacher of the student, that the student is in need of special education and related services;

(2) The parent of the student requested an evaluation of the student pursuant to §§ 300.300 through 300.3111 ;

(3) The teacher of the student, or other personnel of the LEA (Local Education Agency), expressed specific concerns about a pattern of behavior demonstrated by the student directly to the director of special education of the agency or to other supervisory personnel of the agency.

- The District utilizes reports to assist with child find from students entering the District from another Ga District with special education services.

- District Technology support staff (TTSS) provide Student Support Administrators (SSA's) with a list of reports each month. One report is to assist with child find from students entering the District from another Ga District with special education services.

- SSA's initiate the process within 10 days of receiving "no report" information from their designated TTSS.

**Obtain information from Registrar**
1. Check Student's enrollment in OnTrack
2. Review Student's enrollment form to see if Special Education services were indicated
3. Review previous school records, if received, to see if Special Education services are noted

**Call previous school**
1. Speak with Special Education department or someone related to Special Education records
    a. Ask if special education services were provided

    b.   Ask for records related to Special Education (IEP, BIP, etc)

    c.   After records are received, send to your Records Clerk

**Assign a case manager if Student received Special Education services Contact Parent**

1. Records received indicate special education services in the previous school
2. Schedule an Out of District IEP meeting

**Notify Registrar/Clerk**

Update Student's schedule to reflect services, if necessary

## Screening

- Universal screening may occur in order to assist with developing high-quality instruction and interventions matched to student needs, frequent progress monitoring, and the use of student response data to make educational decisions. Screening are not considered an evaluation and do not require parent consent.

## Interventions Prior to Referral

- Parents should note that Georgia Rules for child find require the implementation of multi-tiered system of supports including "Response to Intervention" (RtI) through Student Support Team (SST) in order to eliminate other explanations for student problems.

- Parents may request that their child be referred directly to Special Education for eligibility. The tiered intervention process is a problem-solving model that organizes school intervention services for students who are not meeting academic or behavioral expectations. This process also helps to identify which students respond favorably to the interventions and which students may need referral to special education. It should not be suggested to parents that they by-pass this valuable process. A Direct Parent Referral is used only when parents feel that their child is disabled and requires special education services. Determination of eligibility may or may not require a psychoeducational evaluation. This process does not circumvent the requirement of documentation of interventions implemented in the classroom and progress monitoring as a component of eligibility for special education but does require that the evaluation process begin and be completed within 60 days. Implementation of interventions and progress monitoring should occur during the 60-day evaluation period. Screening for educational strategies are not considered evaluations.  * Requirement for interventions specifically for consideration of Specific Learning Disability

## Guidance on Determining More Significant Impairments

In most cases, student performance will be reviewed by the SST prior to determining that a referral to special education is warranted. However, for students exhibiting the most significant disabilities, ongoing interventions through *the Pyramid of Interventions* may not be appropriate due to the unique learning needs of this population; therefore, the SST may request an expedited special education evaluation process for students exhibiting these characteristics. When determining eligibility for a child with significant disabilities, the team must carefully consider the impact of any sensory, motor, or communication impairments

that impacted the evaluation.

For more CCSD information on Eligibility please go to: CTLS District Wide



# Confidentiality of Personally Identifiable Information
## (GA Rule (160-4-7-.08)

Confidentiality is one of the rights afforded to parents in the Parent Rights document (procedural safeguards). Confidentiality of educational records is a basic right shared by all children in public schools and their parents. These fundamental rights are described in the Family Educational Rights and Privacy Act (FERPA) of 1974, which applies to all students, not just those with disabilities.

- All district personnel (including contracted employees) are governed by confidentiality requirements and should receive training and information regarding the law. Written and dated parental consent must be obtained before personally identifiable information can be disclosed to unauthorized individuals, organizations, or agencies (unless otherwise authorized to do so under FERPA).

- Personally identifiable information includes the following:

    o the name of the student, the student's parent, or other family member;
    o the student's address;
    o any personal identifier such as the student's social security number or student number; and
    o any personal characteristics or other information that would make it possible to identify the student.

- FERPA allows parents to inspect and review all educational records of their child maintained by an educational agency that receives federal funds. This includes all public schools and most private schools. The school must comply with a request to inspect records within a reasonable amount of time, and in no case more than 45 days after the request has been made.
- The District documents any request for access to student record.
- Parents (under the definition of IDEA) have the ability to access their student's records.

## Confidentiality and Educational Records

Education records means the type of records covered under the definition of "educational records" in the Family Education Right to Privacy Act (34 C.F.R. § 99), those regulations define "educational records" as follows:

Directly related to the student and
1.    Maintained by an educational agency or institution or by a party acting for the agency or institution.
       **What does the term "Education Record" include?**
       Educational records mean those records that are:
- Directly related to the student and

- Maintained by an educational agency or institution or by a party acting for the agency or institution.

2. **What does the term "Educational Record" not include?**
   The term may not include:

   - Records that are kept in the sole possession of the maker, are used only as a personal memory aid, and are not accessible or revealed to any other person except a temporary substitute for the maker of the record. Records of the law enforcement unit of an educational agency subject to the provisions of §99.8
   - Records relating to an individual who is employed by an educational agency or institution that are made and maintained in the normal course of business; related exclusively to the individual in that individual's capacity as an employee; and are not available for use for any other purpose.
   - Records on a student who is 18 years of age or older or is attending an institution of postsecondary education that are made or maintained by a physician, psychiatrist, psychologist or other recognized professional or paraprofessional acting in his or her professional capacity; made, maintained or used only in connection with treatment of the student and disclosed only to individuals providing the treatment, and treatment does not include remedial educational activities or activities that are program of instruction.
   - Records created or received by an educational agency or institution after an individual is no longer a student in attendance and that are not directly related to the individual's attendance as a student.
   - Grades on peer-graded papers before they are collected and recorded by a teacher.
   - Records, such as emails, that are not printed and purposefully maintained in the student record.

3. **What Rights do Parents have related to educational records?**
   Parents have the

   - Right to examine all records relating to their child without unnecessary delay after parent's request and before any meeting regarding an IEP or hearing and, in no case, more than 45 days after request. To inspect testing protocols, parents should contact the Assistant Director or Director, Special Education Compliance who will assist the parent with arranging a time for review and inspect testing protocols.
   - Right to have their representative review the records.
   - Right to request that the agency provide electronic copies of the records if failure to provide those copies would effectively prevent the parent from exercising the right to inspect and review the records with the exception of testing protocols due to copy right.
   - Right to have the agency presume that a parent has authority to inspect and review records of his or her child unless agency has been notified that parent does not have authority under state law
   - Right to inspect and review only the information relating to their child if any educational record includes information on more than one child.
   - Right to have the public agency keep a record of parties obtaining access to

identifiable student information included in educational records collected, maintained, or used under this part (except access by parents and authorized employees of the participating agency), including the name of the party, the date access was given, and the purpose for which the party was authorized to use the records.

- Right to have the public agency search for or retrieve educational records without charge.
- A parent may be charged a fee for copies of records which are made for parents if the fee does not effectively prevent the parents from exercising their right to inspect and review those records.
- Right to be informed of all types and locations of records being collected, maintained or used by the agency.
- Right to ask for an explanation of any item in the records.
- Right to ask for an amendment of any record if the record is inaccurate, misleading or violates the privacy or other rights of the child.
- Right to have the agency decide whether to amend the information within a reasonable time after being asked to do so.
- Right to be informed of refusal to amend and right to a hearing if the agency refuses to make the requested amendment.
- Right to be informed if the agency decides in a hearing that the information is inaccurate, misleading or violate of the child's rights and the right to have the record amended.
- Right to be informed of the parents' right to place a statement in the record commenting on information or setting forth the parents' reasons for disagreeing with the agency decision if it is decided in a hearing that information need not be amended.
- Right to have the parents' explanation maintained in the record as long as the contested record is maintained.
- Right to have the parents' explanation disclosed if the contested record is disclosed.

4.  **What is the process for responding to a parent/guardian's request for educational records?**

   A. Upon written receipt of a parent/guardian's request for educational records by completing the records request form JR-3 contact Teaching and Learning Records Room and provide the following information:
   - Student's Name
   - Student's Date of Birth
   - Student's Current School
   - Parent/Guardian's Name
   - Parent/Guardian's Contact Information

   B. Once has been notified of the parent/guardian's request for educational records, an email will be sent to the Special Education Administrator (SSA), Program Supervisor(s) if appropriate, and Records Room Clerk. Attached to the email will be a cover letter. The cover letter provides details as to the action steps required for responding to a parent/guardian's request for educational records.

   C. Upon receipt of the email from the Records Room, the SSA, and Special Education Supervisor(s) if appropriate, are expected to review the attached checklist and to

respond within 3 days.

D. The Special Education Administrator is expected to check with all teachers,

administrators, and record keepers to ensure that **all special education records purposefully maintained for the student** have been provided. After gathering the educational records, the SSA is expected to review the records to ensure that all records related to the request have been provided and to ensure that no other student's records have been mistakenly included in the production of educational records.

E.  Any Programs Supervisor(s) is expected to check with all service providers and Program Specialists to ensure that **all special education records purposefully maintained for the student have** been provided. After gathering the educational records, the Supervisor(s) is expected to review the records to ensure that all records related to the request have been provided and to ensure that no other student's records have been mistakenly included in the production of educational records.

F.  Records Room Clerk is expected to secure the student's special education electronic file. The Records Room Clerk is expected to carefully review the student file to ensure that no other student's records have been mistakenly included in the production of educational records.

G.  After the records have been inspected, the SSA and Program Supervisor(s) if appropriate are to sign off on the cover letter and send the Special Education/504 Records Room.

H.  Upon receipt the designated records room clerk will scan records and make a CD of copies of the records provided.

I.  A cover letter from Special Education will be prepared and attached to the copied records.

The parent/guardian will be notified by the designated records room clerk to inquire as to whether the parent/guardian would like to pick up the records at the Central Office or if the parent/guardian prefers to have the records mailed to the parent's home address.

**The following individuals can access a student's education records:**
Parents and School District representatives with a "legitimate educational interest" are entitled to access a student's records. Any teacher who is teaching a student has the right to read all information on the student including evaluations and IEPs. By law, educators working with a student must be informed about the child's educational needs and the educator's obligations to serve the student. It is NOT necessary for parents and authorized School District representatives to sign a Record of Access, but other parties must do so.

Requests for records or information received under a court order or subpoena should be directed to the Policy and Planning Office and/or Teaching and Learning Support and Specialized Services.

**The School District may disclose records to consultants hired by the School District:**
FERPA specifically recognizes that "school officials" who are entitled to information about students include consultants that a district may hire. The School District is able to contract with educational consultants and then use those consultants as resources to support a child or learning environment, including disclosing information about particular students to that consultant.

**Parents are able to review/receive records:**
If parents request to review their child's education records, the parents are entitled to access the student's cumulative file, discipline file, and school file in addition to the special education file. Since the School District places different people in charge of different types of records, fully complying with a parent's request may require the involvement of several people.
The Office of Special Education, through the Records Room, facilitates parents' access to records by providing parents with one free copy of a student's special education records. If other students' or employee's confidential information is included in those records, then that information should be blacked out or redacted. This process requires making a copy of the original, blacking out such information, and then recopying it. It is recommended to keep a copy of whatever is provided to the parents. General Education records will be provided through the local school.

**Emails** that are not printed out and included in a student's file are not education records

Testing **protocols** are usually protected by copyright. Accordingly, parents may not have copies of any pages containing the test content. Usually, the front page contains only the scoring information and is appropriate for copying. Parents or their representatives are authorized to inspect protocols. Such requests should be directed to the Assistant Director or Director of Special Education Compliance who will schedule an appointment to facilitate such review.

If the parents and/or their representatives would like to review the original education records, they need to make an appointment to do so. Generally, it is appropriate to ask parents/ representatives to review the records in a room with a School District representative. It is also appropriate to ask that the people reviewing the records not have any bags or other papers on the table with the documents or any writing instruments.

**Timeline for records being made available:**
Under FERPA, parents are entitled to inspect and review requested records without unnecessary delay and in no case later than 45 days after their request. The records need to be provided before any due process hearing, resolution meeting, or IEP meeting. For IEPmeetings the meeting may need to be delayed if the records cannot be gathered intime.

**Parents may object to the contents of records:**
In accordance with District Administrative Rule JR-R(B)(5), the first step of a FERPA challenge requires the principal to "investigate the complaint and endeavor to settle the matter." Once a principal reviews the challenged document and otherwise investigates, the principal notifies the parents in writing of the decision. In cases involving special education records, it isprudent for an appropriate special education representative (e.g. supervisor, psychologist, assistant director) to communicate with the principal about any such request so that the principal understands the significance and use of any challenged document.

**Special education records are kept:**

The School District retains records in accordance with the State of Georgia's retention schedules. As of July 2007, the schedule requires that student special education records be kept "until no longer needed to provide services to student." The Teaching and Learning Support and Specialized Services Department publishes an annual notice in the local newspaper indicating records that are scheduled for destruction.

**Inadvertent disclosure of confidentiality:**
It is important to remember to use discretion in identifying a particular student as being a member of a class for students with disabilities without first contacting the student's parent or the student (if over 18 years of age). For example, activities such as PTA projects, displays of art or written work, newspaper articles/photos featuring disabled youngsters may require that the parent or adult student sign a release form for the specific activity.Remember that others can overhear our conversations with peers or parents. Take precautionary care to avoid using a complete name or clearly identifiable information that could be overheard by others who may know the student.

**NOTE: Video recording of IEP team meetings is not permitted.**

The Parent Rights in Special Education (Parent Rights) notice provides the foundation for ensuring that a child with a disability has access to FAPE. The Parent Rights notice provides parents with the opportunity to understand their rights, the rights of their child, and the procedures for resolving differences. This document should also help facilitate communication between parents and district personnel. The Parent Rights notice outlines all of the rights and safeguards available to parents of children with disabilities and children who are decision makers.

## Guidance regarding Parent Request to Amend the IEP Record

If the parent requests changes or information in the IEP that the team deems appropriate, conduct an IEP amendment and note the changes to the IEP record. If the parent requests changes or information included in the IEP that is not what the IEP team deems appropriate the parent may use the following form to request a document be attached to the IEP. You would add the following information and the parent's requested information under minutes and attach the parent's document.

District Response to Parent Request to amend the IEP record

Student Name:                                        Date:

Date of Birth:

Student ID:

Dear Parent/Guardian:

The Cobb County School District has received your request to attach, to your child's most recent IEP, the document that you have prepared. Though the District neither agrees nor disagrees as to the appropriateness or accuracy of the statements contained in your document, as is its usual practice, it will be attached to your child's IEP. If you believe that another IEP meeting is necessary in order to address the concerns outlined in your document, please, contact SSA.

## Parent Consent

The District is required to obtain informed written consent for any action requested. Parental consent is voluntary and may be revoked at any time. Consent is required for the following actions:
- to conduct an initial evaluation;
- to conduct a reevaluation; except that such informed parental consent need not be obtained if the LEA can demonstrate that it has taken reasonable measures to obtain such consent and the child's parents failed to respond.
- for the initial provision of special education and related services on the IEP; and
- before disclosure of personally identifiable information that is subject to confidentiality.

If a parent questions any proposed actions or changes to the IEP, it is recommended that he or she discuss the concern with the teacher or administrator. Consent for the initial evaluation does not provide consent for initial placement.

A parent may revoke consent for the receipt of special education and related services once the child is initially provided special education and related services. This revocation of consent must be made in writing and is for all special education and related services, not for individual services.



# DISCIPLINE (GEORGIA RULE 160-4-7-.10)

Local educational agency (LEA)[1] personnel must follow specific procedures when they discipline children with disabilities. Removals of children by LEA officials refer to out-of-school suspensions (OSS), expulsions, or other disciplinary actions resulting in children not receiving a free appropriate public education (FAPE) under the Individuals with Disabilities Education Act (IDEA).

The Cobb County School District has a code of student conduct which is provided through the Family Information Guide and located on the District's website.

## Positive Behavior Supports

The District utilizes positive behavior supports for all students through the multi-tiered system including PBIS. Along with supports and interventions available to all students, students with disabilities may require more intensive behavior supports. The District utilizes phases of phases of behavior support to address student's individual needs.

Intensive Support

Specialist supports local school with PSP revision and/or FBA/BIP

Local school supports development and implementation of PSP

Specialist Support team may include:
-Program Support Specialist
-Program Supervisor

Intensive Support Team (IST) may include:
- 2 Board Certified Behavior Analyst (BCBA)
- 2 Registered Behavior Technicians (RBT)
- 1 Intensive Interventionist (II)

Phase 1:
- Observe Student to identify any potential problem-based behaviors.
- Identify appropriate strategies for behaviors exhibited- you may refer to the behavior tool kit
  - Implement and take 10 days of frequency data to determine if strategies are appropriate to consider creating a positive support plan (PSP)
- Evaluate frequency data to develop a PSP for the IEP team to consider
- If frequency of behavior is decreasing, continue with PSP. If frequency of behavior are not decreasing, complete a referral for a program specialist to support in moving to phase 2.

Phase 2:
- If behaviors continue, convene an IEP team meeting to consider the need for an functional behavior assessment (FBA) to determine if a behavior intervention plan (BIP) is required.
- At the IEP meeting, the IEP team will review present levels along with the PSP and PSP data, the team will determine if additional information is required and a FBA is warranted. If so, the team will provide the parental consent for evaluation to the parent/guardian to initiate the FBA.

  *Please note- it is preferred that the program specialist is in attendance at this meeting.
- Once the FBA is completed, the IEP team will re-convene to consider the results of the evaluation and determine if a BIP is required to address the behaviors that impedes the students' learning or the learning of others.

## Disciplinary Actions of 10 School Days or Less

All students are expected to follow the code of conduct. A student with a disability, who has an Individualized Education Program (IEP) in effect, can be removed due to a disciplinary incident that violates the student code of conduct to In-School suspension (ISS), Out of School Suspension (OSS), another setting, or an appropriate interim alternative educational setting (IAES), just as any other student without a disability can, for up to a total 10 school days. The IEP team is not required to meet when this occurs. Likewise, it is not required for a manifestation determination review (MDR) to be completed, a functional behavior assessment (FBA)to be conducted, a behavior intervention plan (BIP) to be developed, or for any special education services to be provided if the removal is for 10 or fewer school days in the school year. Students with disabilities who receive (ISS) due to a disciplinary incident must continue to have access to the general curriculum and to progress toward the goals in the IEP in order for ISS not to be considered a removal and not to be counted

toward the 10 days of suspension.

### House Bill 740 regarding Pre-School- Third Grade Students

- House Bill 740 went into effect on July 1, 2018 and is intended to improve the student learning environment and to appropriately implement a multi-tiered system of support. Below is the specific wording from the bill:

  Prior to assigning any student in preschool through third grade to out-of-school suspension for more than five consecutive or cumulative days during a school year, if such student has an Individualized Education Program (IEP) pursuant to the federal Individuals with Disabilities Education Act or a plan under Section 504 of the federal Rehabilitation Act of 1973, the school or program shall also convene an IEP or Section 504 meeting to review appropriate supports being provided as part of such Individualized Education Program or Section 504 plan.

  Guidance regarding HB 740 and administrative rule JDD- R for Students with Disabilities

- **Prior to any Pre-K- 3rd grade student who is identified as a student with a disability or has a Section 504 Plan being suspended out of school for 6 or more days, (after 5 consecutive or cumulative), the following is required:**

  - Pre- K through 3rd an IEP meeting or 504 meeting will be required prior to out of school suspension for the sixth day (after 5 consecutive or cumulative).

  - Focus of the IEP/504 meeting should be to discuss the behaviors that have resulted in the previous 5 days of suspension. Discuss any previous strategies used and determine what strategies or supports must be implemented going forward as a result of the behaviors.

  - Strategies and/or supports may include but are not limited to, addition of accommodations, revision or additional of goals and/or objectives, development of a positive support plan, or behavior intervention plan (BIP) resulting from a Functional Behavior Analysis (FBA).

  - After the IEP, the SSA should complete the log on the S drive.

- **If support with PSP, FBA, or BIP is needed - please contact the program specialist assigned to your school.**

### Disciplinary Actions beyond 10 Days

When a student with a disability receives disciplinary action(s) which add up to more than 10 school days in a school year, or when frequent disciplinary actions clearly indicate a pattern that is a change in placement, the IEP team must convene a manifestation determination review (MDR). If the MDR team determines the incident is not related to the student's disability then the IEP team must determine appropriate services that allow the student to continue to participate in the general education curriculum **and** progress toward meeting the goals outlined in the student's IEP, although in another setting.

### Manifestation Determination Review (MDR)

Within 10 school days from the beginning of a disciplinary action that either exceeds 10 school days in a row or that constitutes a pattern of removals (a change in placement), the student's IEP team must meet to determine whether the conduct in question was caused by, or had a direct and substantial relationship to, the student's disability or whether the conduct was a
result of the district's failure to implement the student's IEP.  In making this determination, the district, the parent, and relevant members of the IEP team (as determined by the parent and the district), will review the following:

- Student's current IEP
- Student's eligibility report
- Psychological report and any other relevant evaluations
- Behavior Intervention Plan (if applicable)
- Functional Behavior Assessment (if developed)
- Other materials or documentation which pertain to the student's educational program
- Any relevant teacher observations, and
- Any other information provided by the parents

*Note: The purpose of an MDR is not to determine if the incident occurred, if the behavior was a code of conduct violation, or if the length of the suspension being recommended is appropriate.

If the IEP team finds that the student's behavior was caused by or had a direct and substantial relationship to the student's disability, or that the behavior was a direct result of the District's failure to implement the IEP, then the behavior is a manifestation of the student's disability. In this case, if the team has not conducted an FBA then one must be conducted. If the student already has a BIP that addresses the conduct in question,

the IEP team must review and revise as necessary to address the behavior.

If the IEP team finds that the student's behavior was not a manifestation of the student's disability, the same disciplinary actions can be imposed on the student with a disability as those imposed on any student. If these actions include long term suspension or expulsion, the IEP team must determine how the student will continue to receive educational services that allow him or her to continue to participate in the general education curriculum and progress toward meeting the goals in the IEP. In addition, the IEP team, if appropriate, will conduct a functional behavior assessment and develop a behavior intervention plan.

## MDR Guidance

School administration to notify the SSA when a student with disabilities will be recommended for out-of-school short-term or long-term suspension or expulsion that will cause the student to exceed a total of ten (10) days suspensions in any given school year. Disciplinary due process occurs prior to scheduling the MDR. It is best practice for SSAs to be given suspension letters for all students with disabilities. If applicable, an MDR should be referenced in the suspension letter. Guidance for administrators regarding suspension letters is located on the Student Support Page. The description/code of conduct violation in the suspension letter should match what is in the Discipline Tracker.

MDR Scheduling

Coordinate with administration/case manager to determine meeting date(s) that will work with IEP team members to offer the family within the 10-school day timeline. Ensure meeting time(s) are offered to the family and coordinate with case manager to secure other participants and ensure notice of meeting is sent.

## MDR Documentation

MDR Logs
- What documentation is needed following the MDR?
    - Update MDR Log
    - If not related
        - Communicate with staff members responsible for providing services
        - Complete Service Log or Upload Written Parental Decline of Services

- How do I document when the Parent declines services?

- If the parent indicates at the MDR they are declining services, request the parent to complete the Parent Decline of Continuation Services Form.
    - Upload to the S drive your SSA MDR Logs folder
- How do I document when the Student is a "no show" for the offer of continuation of services?
    - Case Manager should send an email to the parent cc'ing the SSA indicating the Student was a "no show" for the offered services.
    - The SSA should upload the email documentation as part of the MDR service log to show offered continuation of services.

### MDR Service Log

- MDR Service Log will be completed to document the DIRECT services accessed by the student following an MDR (not related).
- Document Students services on the log including the date, time the student was served, and the service provider should sign indicating those services were provided.
- The MDR service log is documenting 1 students services for the time period the student is suspended per the MDR.
- For students who have multiple MDR's, a service log will be completed each time.
- MDR Service Log should be uploaded on the S drive with your MDR logs.



**Protections for Students with a Suspected Disability (Not Yet Identified)**

**When is a student determined to have a suspected disability?**
- the parent expressed concern in writing to the school; or
- the parent requested an evaluation for special education; or
- the child's teacher or other school district staff expressed concerns about a pattern of behavior.

**How should the LEA conduct the MDR, given the fact that the LEA may have little to no information about the student's disability?**
- If the LEA cannot conduct the evaluation* before the MDR, the LEA can convene a group of knowledgeable persons who would be able to conduct the MDR.
- Based upon its review and consideration of the available information, the group would

determine whether the conduct in question was caused by, or had a direct and substantial relationship to the child's suspected disability.

*Any evaluations that have been requested for a student being disciplined should be completed in an expedited timeframe.

- **The team will consider and determine-** Was the conduct in question caused by or does it have a direct and substantial relationship to the child's suspected disability?

  **If the behavior is found to be a manifestation of the student's suspected disability, what happens?**
    - The student must return to the original setting unless it is a case of illegal drugs, weapons, or serious bodily injury* (SSA should contact the Special Education Compliance Team)

- **If the behavior is not found to be a manifestation of the student's suspected disability, what happens?**
    - If the behavior is not a manifestation, the student serves the suspension (including long term suspension). Once the evaluation is completed, the team conducts the eligibility meeting. If the student is determined eligible, then the student would receive continuation of services and in the case of long-term suspension, an alternative education setting with services.

Frequently Asked Questions

1. **When does discipline for a student with a disability under IDEA differ from general education?**
   The law allows local school systems to suspend a student with a disability for 10 cumulative days due to a discipline infraction before significant and specific procedural safeguards take effect for the student. Out of school suspensions accrued at other schools or school systems during the current school year must be counted toward these 10 days of out of school suspension. After the initial 10 days of out of school suspension, the School District must continue to provide the student with services in an interim alternative setting. IDEA mandates that FAPE be available to all students with disabilities, including students who may be suspended and/or expelled from school.

2. **Are there any special considerations given to offenses related to drugs, weapons, or serious bodily**

**injury?**

School personnel may remove a student to an interim alternative educational setting for not more than 45 school days without regard to whether the behavior is determined to be a manifestation of the child's disability if the child (1) carries a weapon to or possesses a weapon on school premises, or to or at a school function under the jurisdiction of an state education agency (SEA) or local education agency ( LEA); (2) Knowingly possesses or uses illegal drugs, or sells or solicits the sale of a controlled substance while at school, on school premises, or at a school function under the jurisdiction of an SEA or an LEA; or (3) has inflicted serious bodily injury upon another person while at school, on school premises, or at a school function under the jurisdiction of an SEA or an LEA. 34 C.F.R. §300.530 (g)(1)-(3). For additional guidance on this aspect, please contact your SSA and/or the Special Education Compliance team.

3. **What role does the special education teacher play in a Manifestation Determination Review meeting?**
In most cases, the Support and Services Administrator will lead the manifestation determination review (MDR) meetings. The student's case manager is required to prepare for the MDR by having the student's special education records which must include the following materials available for the team to review:

- Student's current IEP
- Student's eligibility report
- Psychological report and any other relevant evaluations
- Behavior Intervention Plan (if applicable)
- Functional Behavior Assessment (if developed)
- Other materials or documentation which pertain to the student's educational program
- Any relevant teacher observations, and
- Any other information provided by the parents

After the meeting, the student's case manager should follow up with recommendations that were made by the MDR Team. Recommendations must include a request for a Functional Behavior Assessment or an update to the existing Functional Behavioral Assessment to be conducted for the student if the offense is related to the student's disability.

4. **What role does local administration play in MDRs?**
Local administrators are expected to:

- Provide the student with due process in accordance with District admin rules and practices
- Prepare a discipline letter consistent with School District policy and send the letter to the parent with a copy to the student's case manager.
- Consult the student discipline activity tracker to determine the number of days the student has been suspended out of school.
- If the recommended suspension will take the student over 10 days, contact the student's case manager immediately to arrange the IEP/Manifestation Determination Review meeting, including notifying the parents.
- Notify the SSA for the school.
    Participate in the MDR meeting, if appropriate.

5. **What happens if the student's conduct is determined to be a result of the student's disability or the failure of the School District to implement the student's IEP?**

   If the IEP/Manifestation Determination Review Team determines that the behavior exhibited by the student **is** related to the student's disability, then the student's placement may not be changed, including by suspension or expulsion from school. The MDR team will be required to conduct an FBA (if not already done) and implement a BIP for the student. In addition, the IEP team should review the student's IEP to determine whether revisions can be made so that the student may be successful in his/her educational setting.

6. **What happens if the student's conduct is determined <u>NOT</u> to be a result of the student's disability or the failure of the School District to implement the student's IEP?**

   If the MDR team determines that the behavior exhibited by the student **is not related** to his/her disability, then the student may be assigned the same discipline that a nondisabled student would receive; however, the school district must continue to provide special education services which are documented on the MDR service log. It is not required to provide expelled/suspended students with disabilities for more than 10 days exactly the same services in exactly the same setting as was provided prior to the disciplinary action. However, the student must be afforded the opportunity to "continue to participate in the general education curriculum, although in another setting, and to progress toward meeting the goals set out in the child's IEP" in accordance with 34C.F.R. §300.530 (d)(i).

7. **How do MDR teams determine if the conduct in question was caused by or had been a direct and substantial relationship to the student's disability?**

   The MDR team must fully examine the conduct in question and as well as all aspects of the student's documented disability. This is appropriately done by reviewing all relevant information, including evaluation data, information regarding the conduct in question, relevant observations, the current IEP, current supports, placement, and related services, as well as behavior across settings and time. Additionally, the MDR team should consider any other relevant information, including input provided by staff and/or parents.

8. **How do MDR teams determine if the conduct in question is a direct result of the system's failure to implement the student's IEP?**

   The MDR team must fully examine the conduct in question as well as the contents of the student's individualized education plan (IEP). The team must then determine if the conduct in question was directly caused by the system's failure to implement all or part of the student's IEP. For example, if the student is being recommended for suspension for skipping class and the MDR team discovers that the student had not received occupational therapy (OT) for two weeks as outlined in the student's IEP, the team would need to determine if the behavior of skipping class was a direct result of the system's failure to provide OT for two weeks.

9. **What occurs if there is no agreement on whether a child's behavior was or was not a manifestation of his or her disability?**

   The LEA representative must make the determination on behalf of the District and provide the parent with Prior Written Notice, which is the finalized MDR document. The parent of the child with a disability has the right to exercise his or her procedural safeguards by requesting mediation and/or a due process hearing to resolve a disagreement about the manifestation determination. A parent also has the right to

file a State complaint alleging a violation of Part B related to the manifestation determination. If the parent of the child files a due process hearing request the student's placement will be the alternative education placement.

10. **Who determines where a student will attend school or receive services during a period of suspension or expulsion?**

A properly constituted IEP team must determine the appropriate services needed in order to provide the child with FAPE so as to enable the child to continue to participate in the general education curriculum, although in another setting, and to progress toward meeting the goals set out in the child's IEP.

11. **How do students with disabilities access the Ombudsman/Alternative Education Program (AEP)?**

Students with disabilities can access Ombudsman/Alternative Education Program (AEP) in one of two ways:

- The student's placement has been changed as a result of a disciplinary removal through an MDR and subsequent IEP. If the student goes through a disciplinary hearing, the tribunal may make a recommendation or determination that the student it's not able to attend AEP. In such cases, the student's IEP team may need to reconvene to review and revise the student's IEP in place during the suspension or expulsion period.
- Administrative referral: Referrals to the AEP which are not the result of an MDR require this prior approval BEFORE an IEP team meeting convenes to discuss a possible change in placement. If approved, the IEP team must convene to determine if the Ombudsman Alternative Education Program is the LRE (for no more than one semester) in which the student can receive FAPE.

12. **What are the steps the Local Case Manager needs to take following an MDR meeting where an alternative education program has been recommended?**
- Following the MDR meeting, conduct an IEP amendment meeting to address the recommendations of the MDR team
- The existing annual IEP can be amended to reflect continued services during the period of suspension or expulsion
- Verify with home school counselor that the Ombudsman Student Profile has been sent to the director of AEP
- If the student receives speech and language services, notify the SLP, as these services will also need to addressed as a part of the IEP amendment
- Send copy of the BIP or FBA to the SSA for your school
- Notify the SSA if the student will be requiring transportation to the alternate education program. Follow through on any evaluations in process (Vocational, Eligibilities, etc.)

13. **What are the steps for referral to the Ombudsman program without the recommendation being tied to a long term suspension or expulsion?**
- The Support and Services Administrator must request a referral packet.
- The referral packet is reviewed to determine if Ombudsman is an appropriate option for consideration.

- If appropriate, the IEP must convene to determine if the Ombudsman program is the least restrictive environment in which the student can receive FAPE
- If the student has a BIP, send a copy to the SSA to forward to the Center

14. **Can a student with a disability be removed from the AEP site?**
    Prior to a student with a disability being removed from the AEP site, the SSA must be notified. Upon notification, the SSA will work with Ombudsman staff to implement appropriate strategies to support the student. Should removal need to be considered **after** the implementation of strategies, the Center will contact the SSA to coordinate scheduling an IEP meeting to discuss placement of the alternative education program. An IEP meeting must be held to address current functioning including behavioral concerns and to determine how services will be provided for the remainder of the student's suspension/expulsion.

15. **What happens when a student is removed from the AEP site based on the IEP team decision?**
    If Home-based instruction is recommended, the Support and services Administrator will send a referral for Home-based instruction to the Coordinator of Home- based Instruction.

16. **What duties are the responsibilities of the local school case manager while the student is attending Ombudsman Alternative Education Program?**
    - The student remains on caseload at the local home school. Therefore, caseload responsibilities still remain the responsibility of the home school case manager.
    - Support the SSA in regards to Ombudsman procedures for students with disabilities.
    - Follow the Case Manager's checklist for Responsibilities.
    - Monitor the student's progress while at the center.
    - Obtain data from SSA and update IEP and BIP goals based on data collected.
    - Collect data in preparation to upcoming IEP meetings.
    - Set up, draft and facilitate the IEP process.
    - Enter progress information from the AEP site into the IEP progress report
    - Finalize and send home progress reports on the same reporting schedule as general education students.
    - Maintain relationships and support parents and students while at the center.
    - When preparing for re-evaluation discussion, work with the SSA and Alternative Programs Supervisor in the Special Education office if needed to discuss the information that needs to be gathered. Information from the AEP will need to be supplemented by the home school.

17. **What is the role of the SSA?**
    - Support student's participation in the AEP and serve as a contact between the local home school special education staff and the AEP staff.
    - Complete transportation information on students attending the AEP.
    - For student's annual IEP meeting, gather updated current functioning and progress on goals and objectives from the AEP staff and send to the home school case manager.
    - Assist with gathering information for home school for redetermination discussions/evaluations in process.
    - Communicate with Ombudsman Center and Staff regarding student data and progress.

- Send a copy of the IEP, BIP and data probe sheets (if applicable) to the Center.
- Collect data for data probes and distribute to case managers.
- Collect information for upcoming IEP meetings and provide to the case managers.
- Serve as the LEA for IEP meetings for students attending the center.
- Contact Alternative Ed Supervisor for Administrative Referrals. Contact the Alternative Program Supervisor in the Special Education office for support.
- Ensure AEP staff has testing accommodations for EOGs, EOCTs and other system- wide assessments.
- Secure additional staff from home school/cluster as needed to implement testing accommodations for system wide assessments

18. **Can law enforcement officials be informed of suspected criminal activity or charges be filed of a child with a disability or judicial authorities?**

Yes. Nothing in the Discipline Rule prohibits the LEA from filing reports or charges. The CCSD police department handles reporting to outside law enforcement officials. The District participates in Local Interagency Planning Team (LIPT) in conjunction with Department of Behavioral Health and Developmental Disabilities whose membership shall include a local representative(s) from various agencies. For more information, contact your SSA to work with the LIPT chairperson identified in Cobb.

## Ombudsman Alternative Education Program

1. **What is the Ombudsman Alternative Education Program?**

   Ombudsman is an alternative education program for at risk middle and high school students who have had chronic behavioral difficulties in the traditional classroom setting or who have been suspended or expelled from their home high school or middle school. Ombudsman has contracted with the Cobb County School District to provide students with an alternative route to receive FAPE while suspended or expelled.
   Placement at an Ombudsman alternative education center is through the IEP process.

2. **How is the Ombudsman Alternative Education Program different from a traditional middle or high school?**

   The Ombudsman program is a blended learning environment consisting of an individualized computer- assisted instruction supported with weekly small group teacher led learning activities to assist students with skill mastery. Certified general and special educators facilitate both the computer-based instruction as well as provide direct instruction in the small group work sessions. In addition, students participate in social skills development groups to help them learn appropriate behaviors.

   The Ombudsman schedule includes either a four-hour morning (high school) or five- hour afternoon (middle school) session which meets five days per week. Students with disabilities are offered transportation to and from the Ombudsman site.

   Ombudsman uses several research-based curriculum platforms and resources in addition to their own programs and materials to support student learning. The Ombudsman program is

aligned to state standards and is accredited by AdvanED, as well as SACS and the North Central Association Commission on Accreditation and School Improvement.

3.  **What is the role of the Ombudsman Center Staff?**
    - Communicate with the Local School SSA's regarding intake.
    - Obtain a copy of the student's current IEP and BIP and implement services.
    - Create and collect data collection probes and send data to local school SSAs.
    - Complete and provide information for upcoming IEP meetings.
    - Communicate any changes in residency to the local school SSA.
    - Communicate with the SSA in regards to meeting requests.

*All documents are located on CTLS.



Discipline Flow Chart

**Restraint of a Student-** *Refer the board policy for seclusion and restraint of students: http://www.cobbk12.org/centraloffice/adminrules/J/JGF(2)-R.pdf*

- o The District uses Crisis Prevention Intervention (CPI) to verbally de-escalate students. If required, District staff who are trained will use CPI holds in an event a student is a danger to themselves or others.

- Staff must document each incident with the submission of form JGF (2) -1: Student Restraint Incident Form. This form should be sent to Special Education Records room to be maintained in the student's education record.



## Dispute Resolution *(GEORGIA RULE 160-4-7-.12)*

A resolution in a dispute with a local educational agency (LEA)over the rights and services afforded to children with disabilities and their families can be accomplished several different ways. The quickest and most efficient method is to contact the special education administration in the LEA. The special education director/director of compliance can often assist a family in working out the differences with minimal time and conflict. Parents or LEA personnel may also initiate a Facilitated IEP (FIEP) Team meeting with the Georgia Department of Education (GaDOE). When a resolution cannot be worked out locally, other processes are guaranteed to children with disabilities under the Individuals with Disabilities Education Act (IDEA). These include (1) mediation, (2) formal complaints, and (3) a due process hearing. Parents are encouraged to contact their child's teacher and, if necessary, building level administrators when a concern arises. If concerns cannot be satisfactorily addressed at the school level, parents should contact the Director of Special Education Compliance.

- If a parent wishes to request dispute resolution such as mediation, DOE complaint, or Due Process Hearing Request, he/she should contact the Director, Special Education Compliance at 770-426-3417.

- Mediation: Mediation is a way to discuss and resolve disagreements between the parent and the district with the help of a trained, impartial third person. Mediation should be offered to either party to resolve disputes. Although this process is voluntary for each party, both parties must agree to mediation. Discussions during the mediation process are confidential and may not be used as evidence in any due process hearings or civil proceedings. The GaDOE contracts with a number of qualified mediators and will assign a mediator when mediation is requested. If an agreement is reached during mediation, the agreement is legally binding in a State or District Court. The failure to carry out an agreement may also be the subject of a State complaint.

- Formal Complaints: Parents may file a formal complaint with the Georgia Department of Education (GaDOE) when they believe a violation of the IDEA has occurred. A formal complaint investigation is a procedure to determine whether the district is complying with federal or Georgia laws and/or regulations regarding the provision of special education and related services to children with disabilities.
    - This investigation is conducted by the GaDOE.
    - In addition to filing a complaint with the GaDOE, the party filing the complaint must forward a copy of the complaint to the district serving the child. The party filing the complaint will address the complaint with the district in writing and will request a response from the district within 10 business days. The parent who filed the complaint will have an opportunity to engage voluntarily in mediation with the district to resolve the dispute.

- Due Process Hearing:
    - Parents or the District may request a due process hearing regarding any matter related to the identification, evaluation, placement, or the provision of special education and related services to the child.
    - A resolution can be reached through several ways in a dispute with a district over the rights and services afforded to students with disabilities and their families. The quickest and most efficient method is to contact the special education administration in the district. The special education director can often assist a family in working out the differences with minimal time and conflict. When a resolution cannot be worked out locally, specific processes are guaranteed to families of students with disabilities under the Individuals with Disabilities Education Act (IDEA). These include: (1) formal complaints, (2) mediation, and/or (3) a due process hearing. Please refer to the dispute resolution chapter in this manual for a full description of the dispute resolution process.

- Parents may request the form to complete through the Special Education Compliance office or through the GaDOEin the general curriculum and to progress toward meeting the goals and objectives in his/her IEP.

**Agreement Procedures-**
- If the District and Family resolve through mediation or resolution agreement, the following procedures should be completed for oversight and compliance with agreements.
    - If Agreement is reached,

- Compliance team meets with team to share follow-up checklist with SSA, teachers, Principal. Include additional staff as necessary
- Only includes information for staff to implement or to enforce
- If additional items exist which are not need to know, information is not shared due to confidentiality
- Compliance team works with the school team to enforce agreement

**Mediation or Resolution Agreement**

| Complaint Action | Person Responsible | Time Frame |
|---|---|---|
| Signed agreement should be scanned into aXs | Secretary for AD-Special Education | Day 1 |
| Create a log of the agreement items on individual spreadsheet | Compliance Team | Day 1 |
| Contact the Student Support Administrator (SSA) to schedule a meeting with the school team members required to implement the agreement | Compliance Team | Within 5 days of signed agreement |
| Meet with the school team to review items to be implemented by the school team | Compliance Team | Within 10 days of signed areement |
| Send a copy of the itemized list of portions of the agreement checklist to the SSA | Compliance Team | Within 10 days of signed areement |
| Add date due for items on the agreement to the Outlook calendar | Compliance Team | Within 10 days of signed areement |
| Add documentation of completion of agreement items on the checklist upon completion | Compliance Team | Date completed |

## GaDOE Complaint Procedures

Once the District receives a formal complaint from the Parent as well as the GaDOE initiation letter, the following procedures should be completed:

### Tasks to be completed by Secretary for AD-Special Education

☐ Stamp received date and indicate who received request

☐ Log on Formal Complaint chart in excel spreadsheet

☐ Email on the date received, a copy of the DOE complaint to the Director of Special Education Compliance, Assistant Director of Compliance and Special Education Supervisor.

☐ Add due dates on the Microsoft Outlook Calendar for District Response and

Mediation due date

☐ Log the date that the District's response was sent to the ParentAdd documentation of completion of resolution requirements to the Outlook calendar

☐ Once the close letter has been received by the GaDOE, file the complaint and all documents

### Tasks to be completed by Assistant Director of Special Education Compliance or Supervisor, Support and Services

☐ Contact the Student Support Administrator (SSA) to gather information required to respond to the complaint

☐ Send District response to the Ga DOE

☐ Send a copy of the District's response to the Parent

☐ Work with the Complaint investigator to answer additional questions or provide additional information requested

☐ If the District is found in noncompliance in any area, add the resolution required and date due of evidence to the GaDOE to the Outlook calendar

☐ If the District needs more time to complete the resolution required by the GaDOE, contact Jamila Pollard to request an extension prior to the timeline referenced in the resolution letter

☐ After completing resolution requirement, send resolution letter and supporting documents to the GaDOE



## ELIGIBILITY Determination and Categories of Eligibility
## (34 C.F.R. § 300.306; GA Rule (160-4-7-.05)

### Special Education Eligibility Decision Making

Districts must recognize the direct and relevant relationship between a multi-tiered system of supports, Student Support Team (SST), and the individual evaluation requirement of the IDEA. Once problem-solving teams determine that a child is suspected of having a disability, a comprehensive evaluation shall be provided to the student being considered for special education categorical eligibility.

However, an eligibility determination cannot occur until the existing data is reviewed to determine whether exclusionary factors related to specific eligibility categories are present.

Moreover, eligibility determination for special education services occurs only when a student's response to both general education instruction and supplemental interventions does not result in **movement toward achieving** benchmarks resulting in grade level performance. Likewise, a student may be considered for special education if the individual response to intensive interventions **produces meaningful growth**, but that growth **requires significant and ongoing** resources to maintain.

Eligibility determination must be made using the convergence of data from multiple sources to document each of the following:

- **grade level difference**, such as large performance difference compared to peers and benchmark expectations in specific areas (data from statewide testing, district level benchmarks, etc.);
- **rate of learning difference**, such as a large difference in rate of learning compared to the trajectory toward the benchmarks when provided with high-quality interventions implemented over a significant period (CBM, progress monitoring, tiered support);
- **adverse educational impact**, such as a review of the individual student qualitative and quantitative data that indicates the need for specially designed instruction;
- **exclusionary factors**, such as those that rule out more significant impairments and absence of meaningful instructional opportunities. These are defined in more detail in the criteria outlined for each eligibility category.

## Categories of Eligibility

- <u>Autism spectrum disorder</u>: developmental disability generally evident before age three that adversely affects a child's educational performance and significantly affects developmental rates and sequences, verbal and non-verbal communication and social interaction and participation. Other characteristics often associated with autism spectrum disorder are unusual responses to sensory experiences, engagement in repetitive activities and stereotypical movements and resistance to environmental change or change in daily routines. Autism does not apply if a child's educational performance is adversely affected primarily because the child has an emotional disturbance as defined in (d). Children with autism spectrum disorder vary widely in their abilities and behavior.
    - See the GaDOE Regulations for eligibility under Autism
- <u>Deaf Blind</u>: concomitant hearing and visual impairments, the combination of which causes such severe communication and other developmental and educational needs that they cannot be accommodated in special education programs solely for children with deafness or children with blindness.
    - See the GaDOE Regulations for eligibility under Deaf Blind
- <u>Deaf Hard of Hearing:</u> One who exhibits a hearing loss that, whether permanent or fluctuating, interferes with the acquisition or maintenance of auditory skills necessary for the normal development of speech, language, and academic achievement and, therefore, adversely affects a child's educational performance.
    - See the GaDOE Regulations for eligibility under Deaf Hard of Hearing
- <u>Emotional Behavioral Disorder</u> emotional disability characterized by the following:
    - An inability to build or maintain satisfactory interpersonal relationships with peers and/or teachers. For preschool-age children, this would include other care providers.
    - An inability to learn which cannot be adequately explained by intellectual, sensory or health factors.
    - Consistent or chronic inappropriate type of behavior or feelings under normal conditions.
    - Displayed pervasive mood of unhappiness or depression.
    - Displayed tendency to develop physical symptoms, pains or unreasonable fears associated with personal or school problems.
    - See the GaDOE Regulations for eligibility under EBD
- <u>Intellectual Disability (Mild, Moderate, Severe, Profound):</u> refer to significantly subaverage general intellectual functioning which exists concurrently with deficits in adaptive behavior that adversely affects educational performance and originates before age 18. [34 C.F.R § 300.8(c)(6)] Intellectual disability does not include conditions primarily due to a sensory or physical impairment, traumatic brain injury, autism spectrum disorders, severe multiple impairments, cultural influences or a history of inconsistent and/or inadequate educational programming
    - See the GaDOE Regulations for eligibility under ID
- <u>Orthopedic Impairment:</u> Orthopedic impairment refers to a child whose severe orthopedic impairments adversely affects their educational performance to the degree that the child requires special education. This term may include:
    - (1) Impairment caused by congenital anomalies, e.g., deformity or absence of some limb.
    - (2) Impairment caused by disease (poliomyelitis, osteogenesis imperfecta, muscular dystrophy, bone tuberculosis, etc.)
    - (3) Impairment from other causes, e.g., cerebral palsy, amputations, and fractures or burns that cause contractures. [34 C.F.R.§ 300.8(c)(8)]

- o Secondary disabilities may be present, including, but not limited to, visual impairment, hearing impairment, communication impairment and/or intellectual disability.
- o See the GaDOE Regulations for eligibility under OI

- Other Health Impairment: Limited strength, vitality or alertness including a heightened alertness to environmental stimuli, that results in limited alertness with respect to the educational environment, that:

  - o is due to chronic or acute health problems such as asthma, attention deficit disorder or attention deficient hyperactivity disorder, diabetes, epilepsy, or heart condition, hemophilia, lead poisoning, leukemia, nephritis, rheumatic fever, and sickle cell anemia; and Tourette Syndrome, and

  - o adversely affects a student's educational performance.

  - o See GaDOE Regulations for eligibility under OHI

- Significant Developmental Delay: A delay in a child's development in adaptive behavior, cognition, communication, motor development or emotional development to the extent that, if not provided with special intervention, the delay may adversely affect a child's educational performance in age-appropriate activities. The term does not apply to children who are experiencing a slight or temporary lag in one or more areas of development, or a delay which is primarily due to environmental, cultural, or economic disadvantage or lack of experience in age appropriate activities. The SDD eligibility may be used for children from ages **three** through **nine** (the end of the school year in which the child turns nine).

  - o See GaDOE Regulations for eligibility under SDD

- Specific Learning Disability:  A disorder in one or more of the basic psychological processes involved in understanding or in using language, spoken or written, that may manifest itself in an imperfect ability to listen, think, speak, read, write, spell or do mathematical calculations. The term includes such conditions as perceptual disabilities, brain injury, minimal brain dysfunction, dyslexia and developmental aphasia. The term does not apply to students who have learning problems that are primarily the result of visual, hearing or motor disabilities, intellectual disabilities, emotional or behavioral disorders or environmental, cultural or economic disadvantage.

  - o See GaDOE Regulations for eligibility under SLD

- Speech Language Impairment: a communication disorder, such as stuttering, impaired articulation, language or voice impairment that adversely affects a child's educational performance. A speech or language impairment may be congenital or acquired. It refers to impairments in the areas of articulation, fluency, voice or language. Individuals may demonstrate one or any combination of

speech or language impairments. A speech or language impairment may be a primary disability or it may be secondary to other disabilities.

- See GaDOE Regulations for eligibility under SLI

- Traumatic Brain Injury: An acquired injury to the brain caused by an external physical force, resulting in total or partial functional disability or psychosocial impairment, or both, that adversely affects the student's educational performance. The term applies to open or closed head injuries resulting in impairments which are immediate or delayed in one or more areas, e.g., cognition, language, memory, attention, reasoning, abstract thinking, judgment, problem solving, sensory, perceptual and motor abilities, psychosocial behavior, physical functions, speech and information processing. These injuries may intensify pre-existing problems in these areas as well. Resulting impairments may be temporary or permanent in nature. The term does not apply to brain injuries that are congenital or degenerative in nature, brain injuries induced by birth trauma or those resulting from internal occurrences such as stroke, tumor or aneurysm.

  - See GaDOE Regulations for eligibility under TBI

- Visual Impairment: Impairment of vision interferes in access to a regular school program regardless of the acuity measurements.  Students with a visual impairment are those whose vision interferes with functioning in or, for preschool-age children, in learning tasks. Visual impairments may result from congenital defects, eye diseases, or injuries to the eye. Visual impairment is determined based on a current examination by an ophthalmologist or optometrist.

  - See GaDOE Regulations for eligibility under VI

## Eligibility Determinations

1. **How are students referred for eligibility determination?**
   Students can be referred in two ways: SST/RtI Referrals - A referral for a psycho-educational evaluation and special education eligibility is made when the SST/RtI team has reviewed Tier 3 documentation and suspects that the student has a disability. The review of the Tier 3 information would occur after the strategies, interventions, and accommodations have been implemented for a period of time in the SST/RtI process.
   These interventions and strategies must directly relate to the reason for referral. The outcome of the interventions must be documented through the Tier 3 data. As part of the RTI process, hearing and vision should be screened to ensure that hearing and vision
   problems are not the cause of the student's classroom difficulties. Documentation of interventions and strategies are required by IDEA and must be in place before eligibility can be established. Direct Referrals – A direct parent referral may occur when the parent has reason to believe their child has a disability and wants to

expedite the referral process. For this type of referral, the parent would suspect their child has a disability and request to speed up the referral process by making a direct referral to special education. Although the referral process may move along more quickly, it should be noted that SST/RtI data/documentation is still required to determine special education eligibility.

2. **Who determines if a student is eligible for special education?**
   A group of qualified and knowledgeable professionals and the student's parents must make the eligibility decision. The eligibility team does not need to have all of the same participants as the IEP team, but it may. At the meeting, the designee would present the evaluation report and eligibility information to the Eligibility/IEP team who then determines eligibility based on all the information presented.

3. **What is the process when a student with an IEP appears to be having difficulty in another area?**
   Generally, it is appropriate to convene an IEP team meeting to address any difficulties that a student with an IEP may be experiencing. If an IEP team determines that an evaluation is appropriate, Parental Consent for Evaluation would need to be signed by the parent. After the evaluation is completed, an IEP team meeting would have to be held to address reevaluation of the current eligibility and any additional eligibility considerations.

4. **What is the process when a student with a speech and language eligibility appears to be having difficulty in another area?**
   For those students who have a speech and language eligibility and who have not previously been identified as having academic or behavioral difficulties, the classroom teacher should initiate the RtI process. After RtI intervention has been documented and data has been collected, the RtI team should consult with the SLP to convene an IEP team meeting to discuss the need for an additional evaluation. The SLP should invite the psychologist and special education representative to the IEP team meeting. If additional testing is required and eligibility in another area is determined, the previous eligibility category (speech and language) should be reevaluated when considering any new areas of eligibility.Given that the Significant Developmental Delayed (SDD) eligibility may be used for children from ages three through nine, when does an IEP team address the expiration of the SDD eligibility for a student who turns 9 during the summer months?
   a. A student may retain the SDD eligibility through the end of the school year in which the student turns nine [See 34 C.F.R. § 300.8(b)]. For students who turn 9 after the last day of post planning, in any school year, the IEP team must address the SDD eligibility during the upcoming school year.

5. **Can a student be eligible for services under IDEA and not have an IEP?** If the student is enrolled in the Cobb County School District and is eligible for services

under IDEA, the student must have an IEP which offers FAPE. There are two exceptions:

    I.    The student has been found eligible for services under IDEA and at the initial eligibility/IEP team meeting, the parent does not consent to services.

    II.   The student is eligible for services under IDEA and the parent revokes consent for services under IDEA. In both cases, the student would be returned to general education and would not receive special education services under IDEA.

6. **What happens if a student evidences a need for special education services after being found ineligible for services under IDEA?**
   The student would be treated as an initial referral. Therefore, prior to a referral for special education, the student should be supported through the SST/RtI process. The information gathered from Tier 3 of the SST/RtI process would be used to make a determination as to whether or not to refer to special education.

7. **What happens if a student evidences a need for special education services after a parent has revoked consent for services under IDEA?**
   The student would be treated as an initial referral. Therefore, prior to a referral for special education, the student should be supported through the SST/RtI process. The information gathered from Tier 3 of the SST/RtI process would be used to make a determination as to whether or not to refer to special education.

8. **What services may be available to students who are found ineligible for Special Education?**
   Students who are ineligible under IDEA may be referred back to the SST/RtI team or to the Section 504 process.

9. **What happens to the student's records and file upon determination of ineligibility?**
   After the eligibility meeting where a student has been determined ineligible:
   a. The special education designee finalizes the eligibility document in Synergy SE.
   b. The special education case manager should give the student's school file to the SST/RTI contact at the local school for possible support via SST/RTI.



# EVALUATION & REEVALUATION
## (34 C.F.R. § 300.301-300.311; GA Rule (160-4-7-.04)

### Initial Evaluation

IDEA requires that before a child can receive special education services, the LEA must determine whether the child requires specialized instruction and meets eligibility requirements for special education. The LEA must conduct (or arrange for) a comprehensive evaluation that:

- provides sufficient data to determine whether the child is a child with a disability;
- documents how the disability affects the child's academic, developmental, social/emotional, and/or behavioral performance in school; and
- provides appropriate information for the development of an Individualized Education Program (IEP), if eligible.

Students for whom special education eligibility has previously been established may be referred for an evaluation to determine continued eligibility or consider a new area of eligibility.

Students referred for determination of special education eligibility can be referred for initial evaluation. This includes students referred through the school RTI teams, via direct parent referral, or through the procedures for private or home school students.

- Parent Rights- Whenever the parent requests an evaluation or when a child has been referred for an initial comprehensive evaluation, the LEA must give the parent a copy of "Your Rights as Parents - Special Education" document and provide an explanation to ensure that the parent understands these rights. If a parent's primary language is not

English, a translated copy in his or her language must be given to the parent whenever feasible. Translations may be accessed online at the Parents' Rights link on the Special Education web page of the GaDOE website or through CTLS Special Education District Wide Community

The following guidance of practices and procedures are intended to assist in completion of an initial evaluation in the 60-day timeline:

\* Note- The District calculates the 60-day count calendar which is available through SSA's on the S drive.

- Exceptions- There are exceptions to the 60-day timeline, those are documented on the tracking logs.

- CCSD's practice is to schedule a meeting for referral to special education. Student can be referred for evaluation to consider special education services through the school RTI teams, via direct parent referral, or through the procedures for private or home school students. During the meeting, the team discusses concerns in which they believe the student has deficits or may have a disability. This meeting will inform evaluators and will assist with the evaluators determining the scope of the evaluation. After the parent(s) sign consent for the District to evaluate, the special education representative in the meeting will provide the Consent for Evaluation form and relevant information to the SSA who support the school. The SSA will document the request for evaluation on the Special Education Referrals log. Next, the SSA will inform any evaluators performing assessments for the request of an initial comprehensive evaluation. The SSA should provide a copy of the Consent for Evaluation and any other relevant information to the evaluators performing the assessment.

- Evaluators should complete their assessment of the student for the initial comprehensive evaluation within 45 days from the date the District received Consent for Evaluation. Each evaluator will complete an evaluation report, which includes scores (if applicable), a summary of the assessment, dates of assessment, signature of the evaluator with the date of the completed evaluation report. A copy of the completed report will be provided to the SSA at the school. The SSA will document the date(s) of the completed evaluation

report(s) on the Special Education Referrals log and the Special Education Initial Timeline Summary Report once all evaluations are completed. The information provided on the Special Education Initial Timeline Summary Report will serve as documentation of completion of the initial evaluation within the 60-day timeline. For multiple evaluations, the SSA will document each completed evaluation report, review the dates documented on the Special Education Initial Timeline Summary Report and report the latest date as the completion of the 60-day timeline. For initial evaluations completed after the 60-day timeline, the SSA will document information as requested on the Indicator 11 log.

- It is a best practice to draft an eligibility report/IEP to review the evaluation process and to convene an IEP/eligibility meeting to determine if student is eligible for special education services within 10 days from the 60-day timeline due date.

## Evaluations

The evaluation may include observation of the child in a group setting, a review of current school records or any reports the parent releases to us. Additionally, the assessment areas listed below are examples of those typically addressed in an assessment of a student's abilities. The list does not include every area that might be assessed nor may all areas listed be assessed.

The evaluator(s) will choose specific tests that address the scope of the recommended evaluation. Additionally, the evaluator(s) will determine specific tests that are thought to be best for the student's age, grade, physical abilities, and cognitive functioning. The Parent will be given specific information on tests used at the time the results are reviewed.

VISION -A vision screening to determine the student's visual acuity. If additional testing is indicated, the student may be referred to a medical eye specialist for further evaluation. If visual problems are indicated, other tests (achievement, intelligence, cognitive ability, etc.) will be selected to be nondiscriminatory in terms of the vision impairment or these tests may be postponed until the problem can be corrected.

HEARING – An audiometric screening to determine the student's hearing acuity. This screening may include pure tone or impedance audiometry. If additional testing is indicated, the student may be referred to an audiologist or medical specialist. If a hearing impairment is indicated, other tests (achievement,

intelligence, cognitive ability, etc.) will be selected to be nondiscriminatory in terms of the hearing impairment.

ACHIEVEMENT – These tests may be group or individual tests to determine the student's current level of academic functioning. Areas which may be assessed are: oral expression; listening comprehension; written expression; basic reading skills; reading comprehension; reading fluency, mathematics calculation; and, mathematics reasoning.

MOTOR – Testing may involve determination of the student's gross and fine motor skill development, including abilities to perform functional, school-related tasks and any deficits experienced in physical activities related to the educational program.

INTELLIGENCE/COGNITIVE ABILITY – Includes individually administered tests of general intelligence. These tests are used to measure different types of cognitive abilities such as comprehension, visual and auditory perception, visual and auditory memory, vocabulary, etc. Results on tests of this kind are required for many eligibility categories under IDEA.SPEECH/LANGUAGE – Testing includes assessment of the student's articulation, language, fluency, voice, and adequacy of the oral mechanism. For the nonverbal student, the assessment will explore alternative communication systems.

SOCIAL/EMOTIONAL - Testing includes an assessment of the student's ability to interact appropriately in everyday situations within the family, the school and the community.

Such tests may include rating scales, parent direct interviews and assessment with the student, and observation of the student in the classroom.

VOCATIONAL – Factors related to expected vocational levels are examined. Areas of assessment may include evaluation of scholastic abilities, manual dexterity, clerical (typically including perceptual speed and accuracy), mechanical reasoning, spatial reasoning, career interests and functional motor skills.

COGNITIVE PROCESSING- These types of tests examine individual processing strengths and weaknesses and may

include: phonological processing, memory, executive functioning, attention, discrimination/perception, organization, sequencing, conceptualization/reasoning and processing speed.

ADAPTIVE- Testing includes assessment of the child's ability to independently demonstrate levels of conceptual, social and practical skills across home, school and community settings to effectively function and meet environmental/sociocultural demands appropriate for the student's age.

OTHER – In the process of assessing a student's strengths and weaknesses, the evaluator may need to use additional tests in order to gain a better understanding of the student's learning strengths and needs.

Professional ethics require that a diagnostic evaluation not proceed until it is documented that the student has acceptable levels of vision and hearing. It is recommended that vision and hearing be screened during the RtI process in order to avoid any delay once the referral for an evaluation is made. Failure to do this would render test results invalid and might prevent discovery of vision and/or hearing problems as the primary or contributing source of the student's problem. Vision and hearing acuity should be determined to be adequate before the formal assessment of the student begins and should be no older than one calendar year when being applied to an evaluation.

- If a student fails the far-point vision (Snellen Chart), a near point screening may be administered by the educational diagnostician, the psychologist or those trained to use the other screening instruments. The evaluation may proceed if the student passes the near point vision; however, the student should be referred for follow-up of distance vision.
- If a student fails the hearing screening in one ear, then the evaluation may proceed if information is presented to the "good" ear and in a quiet environment. The individual conducting the evaluation should be notified of the results. Document on the Hearing and Vision Screening Procedures for Special Education Students the follow-up to address the hearing problems and note the failed hearing as well as the modifications made during the testing procedures in the report.
- If the evaluator's professional judgment is that the student's hearing or vision is not adequate to allow valid results, then

testing may not occur until documentation is received from an appropriate specialist. Contact either Cobb Audiology Services or the Special Education Program Supervisor for Hearing and Vision Services regarding referral.

- If the student has been taken for the follow-up hearing/vision assessment and the testing results indicate that a prosthetic appliance is needed (hearing aid/glasses) and the parent has indicated an inability to pay for the appliance, refer to the school social worker for assistance.
- If the student is referred to medical personnel, the date of the letter to parents recommending referral should be noted. After the evaluation, a letter from the physician should be placed in the student's file. The case manager is responsible for monitoring referral to physician and obtaining report.

Students who cannot be conditioned to respond to an audiometer will require an objective hearing screening which can be provided by a Cobb County audiologist. Call the Audiology appointment line at 678-581-7400 and ask to schedule an objective hearing screening for the student.

### Student Support Team/Response to Intervention

- A student is typically referred for an evaluation by the RtI team when the team has provided interventions and has documented sufficient evidence to suspect that a disability may be the primary cause of the student's learning or behavior problem(s). This usually occurs after appropriate interventions in the general education classroom have failed to find a satisfactory solution. A parent may also request an evaluation.

### Parent Request

- If the referral is made by parental request, the district can either agree to or refuse the request.If the district refuses, it must give the parent written notice explaining the reason(s) why it is declining to initiate an evaluation, what data the decision was based upon, and other factors considered. The parents then have the right, if they choose to exercise their parent rights.
- Parents should note that Georgia Rules for the IDEA eligibility require "Response to Intervention" (RtI) data in order to eliminate other explanations for student problems. If the SST/RtI process has been bypassed, the data may need to be gathered during the evaluation process.
- Parents may request that their child be referred directly to Special Education for eligibility. The tiered intervention process is a problem-solving model that organizes school intervention services for students who are not meeting academic or behavioral expectations. This process also

helps to identify which students respond favorably to the interventions and which students may need referral to special education. It should not be suggested to parents that they by-pass this valuable process. A Direct Parent Referral is used only when parents feel that their child is disabled and requires special education services. Determination of eligibility may or may not require a psychoeducational evaluation. This process does not circumvent the requirement of documentation of interventions implemented in the classroom and progress monitoring as a component of eligibility for special education but does require that the evaluation/eligibility process begin and be completed within 60 days. Implementation of interventions and progress monitoring should occur during the 60-day evaluation period.

- The District staff member whom initially receives a request for a direct parent referral to special education should discuss the following points with the parent. Staff members who may receive the parent request might be the psychologist, administrator, counselor or special education staff.

  Discussion Points:

  - Through the tiered intervention process the team develops an intervention plan to be implemented within the general education classroom to assist the student and monitors student progress frequently.
  - The problem solving team meets periodically to review outcomes and adjust the interventions.
  - Research indicates that many students respond to the intervention plan and academic/behavior problems can be resolved with no need for special education services.
  - The Direct Parent Referral does not eliminate the requirement for classroom interventions and progress monitoring. Interventions and progress monitoring should be initiated at the start of the Direct Parent Referral.
  - A meeting will be scheduled to address eligibility at the end of the evaluation period.

  Process:
  The initial point of contact should first review the Discussion Points with the parent(s).
  1. The Tier 3 Facilitator should schedule and attend a meeting that includes the Support and Services Administrator, school psychologist, parent, teacher, administrator, and Tier 2 Facilitator.